# EXHIBIT 7

1

1            UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3    _____

4    K STREET DEVELOPERS,    :

5    LLC, et al.,            :

6              Plaintiffs, :

7       vs.                 : Civil Action No.

8    Teachers INSURANCE     : 1:12-cv-00666-RLW

9    AND ANNUITY ASSOCIATION:

10   OF AMERICA, et al.,    :

11             Defendants. :

12   _____ :

13

14                        Wednesday, May 1, 2013

15                        Washington, D.C.

16   The Deposition of ALAN D. COHEN was taken on Wednesday,

17   May 1, 2013, commencing at 11:07 a.m., at the Law

18   Offices of Cooter, Mangold, Deckelbaum & Karas, LLP,

19   5301 Wisconsin Avenue, NW, Suite 500, Washington, D.C.,

20   before Dianne M. Reidy  Notary Public, Registered

21   Professional Reporter.

22

8

1

2

3

4

5

6

7      Q.  Okay.  Who all has ownership interest in Union

8  North?

9      A.  My father and his three children.

10     Q.  So, again, family owned.

11

12

13

14

15

16

17

18

19

20

21

22

1

2

3

4      Q.  Okay.  So I want to be crystal clear.  I just

5   want your personal recollection of your actual

6   communications with the Teachers folks.  Did that

7   commence in that 2007 time frame that you're thinking

8   of, once the deal was consummated with your father?

9      A.  No.  The deal was consummated, I think,

10   January 2007.  But prior to that, I would say probably

11   -- the summer of 2007 is when I met Gerry Casimir.  And

12   I met him and I met Harry St. Clair regarding as we

13   knew it as Union Place, the entire city block.

14      Q.  All right.  So the LLC then was executed in

15   January of 2007.

16      A.  Right.

17      Q.  And that is the LLC for the Phase I property.

18   And you're familiar with that LLC agreement, correct?

19

20

21      Q.  So when was the first time you were involved

22   with any discussions with Teachers -- either with your

1    father or by yourself -- where Phase I had not yet been

2    agreed to?

3        A.   That would be the summer of 2006, late summer

4    2006, when I first met Harry and Gerry.

5        Q.   Why were you meeting with Harry and Gerry

6    along with -- was it with your father?

7        A.   Yes.

8        Q.   Why were you meeting along with them?

9        A.   Because we're a team.

10       Q.   So in the midsummer of 2006, is that the

11   beginning, to your knowledge, of the negotiations

12   between the Cohen folks and Teachers regarding Phases 1

13   and 2?

14       A.   To my recollection, yes.

15

16

17

18

19

20

21

22

1

2

3

4

5      Q.  So in the summer of 2006, when you first start

6   talking with Teachers about the development of the

7   property, tell me as specific as you can remember the

8   actual nature of the conversations about Phase I versus

9   Phase II.

10      A.  Well, obviously we were discussing the deal at

11   hand, which was Phase I.  But at the same time, within

12   the same meetings we had with Gerry and Harry and the

13   TIAA-CREF team, we always discussed Phase II.  Because

14   at that time we were finalizing our P.U.D. for Phase II

15   and keeping them in the loop to exactly what it would

16   look like and how we would go about developing it.  We

17   had certain time restraints within the P.U.D. to start

18   developing Phase II.

19          And also, it was discussed regarding the tax

20   abatement that my father and I spearheaded with NOMA

21   where we had a certain amount of time.  We had to be

22   the first one to get the tax abatements and then we

16

1    would go right to Phase II.  So that was always

2    discussed in the same breath.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

17

16          Q.   In terms of the deal that was inked, what's

17     your understanding, what deals were inked between

18     Teachers and -- and I'm just going to use the Cohens,

19     plural?

20          A.   January 2007, the joint venture agreement was

21     executed there about that time.  And obviously the JV

22     agreement, the main focus was Phase I because that's

1    what we had our approvals to build, but also

2    contemplated, per our many negotiation discussions,

3    Phase II as well.  It was always understood -- and for

4    me agreed to -- that Teachers was looking at this

5    project not as a standalone, but as an ultimate

6    two-phase, 700-plus-unit apartment building.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1

2

3

4

5

6

7

8        Q.  What is marked as D-1 is the Limited Liability

9   Agreement of Union Place Phase I, LLC, dated January

10  31, 2007.  If you want to take a couple of moments to

11  flip through it.

12        A.  A couple of moments?  Ask away.

13        Q.  Are you familiar with this document?

14        A.  It's been a while.

15        Q.  Is this the document that you were referring

16  to just before when you thought that Teachers had

17  committed to develop Phase II?

18        A.  Well, there is this agreement and the

19  development agreement; so either one or the other, or

20  both.  Is that here as well, the development agreement?

21        (Thereupon, Exhibit No. D-2 was marked.)

22  BY MS. WOODS:

1      Q.   Can you tell me what Exhibit D-2 is?

2      A.   Me?

3      Q.   Yes.

4      A.   The construction contract between Union Place

5    1, LLC, and ADC Builders for the Loree Grand at Union

6    Place.

7      Q.   If you look at the last page of this, it looks

8    like you executed; is that right?

9      A.   Yes, ma'am.

10     Q.   And this is the construction agreement, right?

11     A.   This is part of it.  There is a general

12   conditions part as well.  And there's plans, obviously,

13   that are part of the contract, and all that good stuff.

14     Q.   All right.  The development agreement is

15   referenced in the LLC as Exhibit E, right?  If you look

16   at it, I guess E1 of this document?

17     A.   It's here.

18     Q.   It's not part of it, it's attached as Exhibit

19   E?

20     A.   I'll take your word for it.

21     Q.   Okay.  Who was it at Teachers who, in your

22   view, committed Teachers to develop the Phase II

1    property?

2         A.   Whoever signed this agreement; whoever signed

3    the agreement with my father.  It was Gerry Casimir, I

4    think, if I remember correctly.

5         Q.   And you're referring to D-1, the LLC

6    agreement?

7         A.   Yes, ma'am.  Yeah, Gerry Casimir, Assistant

8    and Secretary, I think.

9         Q.   The LLC agreement refers, at section 414, to a

10   Right of First Offer in Phase II.

11        A.   What page?

12        Q.   It's on page 26.

13        A.   Okay.

14        Q.   Are you familiar with this provision in the

15   LLC agreement?

16        A.   Yes, ma'am.

17

18

19

20

21

22

24

1

2

3

4

5

6

7

8

9          Q.  I think you're thinking of Exhibit G?

10         A.  Yeah.  Exhibit G, yeah, Project Costs.  It had

11   a value for Phase II at $53 million, which was the same

12   -- yeah.  There was a value of Phase I at $17, which

13   doubles the amount agreed upon, and a value at Phase II

14   at $53.  So that was the value at that time we were

15   discussing for Phase II.

16         Q.  So was that value then up for negotiation, or

17   did Teachers simply have to then proceed, in your mind,

18   with the development of Phase II at, what is it, 93.5

19   percent --

20         A.  Of $53 million.

21         Q.  Of $53 million?

22         A.  Yes.

1       Q.  Now, when the negotiations occurred

2   substantially in 2011 about Phase II -- of which you

3   were a part of -- the land value was negotiated; is

4   that correct?

5       A.  That's correct.  The market changed, that's

6   correct.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

41

1       Q.  And the flip side of that is, is it your

2  understanding that as of, I guess, mid-2006, no matter

3  what Teachers had to proceed with developing, investing

4  in Phase II?

5       A.  Yes, that was my understanding.

53

1

2

3

4

5

6

7

8       Q.  What was Peter Witham's role with regard to

9    Phase II?

10       A.  Peter was the broker who introduced us to

11   Teachers on Phase I.  As relates to Phase II, when we

12   were establishing values and doing cash flow analysis

13   for Phase II, Peter put those models together for us

14   because he did the same models for Phase I and knew

15   what type of return Teachers was looking for at that

16   point in time in the market.  So he was our middle man

17   between us and Teachers as relates to funneling numbers

18   and due diligence to Teachers for Phase II -- with the

19   input of obviously myself and my father.

20

21

22

60

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          Q.   What's been marked as Exhibit D-7 is another

19     set of e-mails.   Fifteen days after D-6, the letter

20     from your father granting the 30-day extension, you

21     e-mail Evangeline and you say:

22               "Good morning Evangeline, I would appreciate

1    an update on your thoughts on Union Place phases 2A and

2    2B.  I have ceased further discussions with two groups

3    that want to JV the remaining units at Union Place.  I

4    told the two groups that I have given you all an

5    extension until the first of the year to decide if you

6    wish to exercise your option.  They were a bit

7    disappointed.  My father and I are ready to sit down

8    with you and your group to discuss moving forward on 2A

9    and 2B.  If you feel that TIAA is not in the

10   development mood, please let me know."

11           Did you write those words, sir?

12       A.  Yes.

13       Q.  What was going on with these two other groups?

14       A.  Like I told you, we were being -- I'm not

15   going to say hounded, but we were being approached by

16   several groups that were interested in Phase II.

17       Q.  Okay.

18       A.  And it's not my style to double-dip, so I was

19   transparent with Evangeline about what was going on.

20   That's it.

21       Q.  So there were two other entities that

22   expressed interest in developing Phase II, right?

62

1        A.   At that time, yes.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

75

1

2

3

4

5

6

7

8

9

10

11      Q.  D-11 is another set of e-mails.  These are

12  between you and Peter.

13          Just to orient you, on the second page there

14  seems to be back and forth between Gerry Casimir and

15  Peter seeking a time to talk.  And then at the bottom

16  of the first page you e-mail on April 1, 2011 to Peter:

17  "As of this e-mail we haven't received anything from

18  TIAA.  Looks like they have zero interest in phases 2a

19  and 2b.  Time to move on!  What a joke!"

20          Did you write that?

21      A.  Yeah.

22      Q.  What is the "what a joke;" what is that about?

1       A.  It was a joke because we were in negotiations

2  and all the information was trading hands.  And all of

3  a sudden they just sort of went silent for a period of

4  time.  We don't know why.  And that's sort of that.

5       Q.  All right.  What I'm marking as D-12 is

6  another set of e-mails.

7       (Thereupon, Exhibit No. D-12 was marked.)

8  BY MS. WOODS:

9       Q.  The bottom e-mail is correspondence between

10  Peter Witham and Scott Anderson where Peter says that

11  he revised the development proforma to reflect a land

12  value of $30 million.  And then it looks like

13  Evangeline forwarded this to you on May 9, 2011.

14       So it looks like as of May of 2011 the Cohens

15  have agreed to a land value of $30 million; is that

16  right?

17       A.  I think we agreed on a land value once the LOI

18  was signed, whatever date this is.

19       Q.  I'm talking about as of May of 2011.

20  According to this, according to your broker, Peter is

21  revising the development proforma to reflect a land

22  value of $30 million.  Is it your understanding, as you

1    can recall sitting here today, that as of April 11 the

2    Cohens were willing to sell the land for $30 million?

3        A.  April 11?

4        Q.  April 2011.  That's when Peter wrote this

5    e-mail.

6        A.  Yeah.  I guess we were running numbers at a

7    $30 million value.

8        (Thereupon, Exhibit No. D-13 was marked.)

9    BY MS. WOODS:

10       Q.  D-13 is yet another e-mail.  It's from you to

11   Evangeline.  It is dated May 10, 2011.

12           In this, it appears that you provide a listing

13   of the information that you were providing, right?

14       A.  It's a long e-mail for me to type.

15       Q.  It looks like you are providing follow-up

16   questions as to what they are looking for in terms of

17   information, correct?

18       A.  Well, this is part of her checklist for her

19   due diligence.

20       Q.  And you endeavored to provide all that she

21   asked, right?

22       A.  Always, yes.

1          (Thereupon, Exhibit No. D-14 was marked.)

2      BY MS. WOODS:

3          Q.  D-14 is a similar --

4          A.  We're done with that already?

5          Q.  Yes.  In this one, it's May 18 from Evangeline

6      to you and Ron.  She's noting that she's still missing

7      or needs clarification on some items.

8          A.  Again, this is her checklist.  Exactly.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

85

1

2

3

4

5

6

7

8

9      Q.  D-15 is your e-mail.  This is May 26, 2011.

10   You e-mailed:  "Evangeline, I have requested from you

11   now three times to please provide me with an update on

12   Phase II at Union Place.  I don't quite understand?"

13      She responds she's sorry for the delay.  "I left a

14   message for you to anticipate hearing from William

15   Harrison from our Acquisition Team who will be working

16   on Phase II going forward."

17      A.  I learned through the process of dealing with

18   Evangeline and everybody at Teachers -- but Jae -- that

19   I had to push, push and push.  Just like when we were

20   getting the budgets approved for Loree Grand, it would

21   take her two months past the deadline to approve

22   budgets.  I understand that she's busy; big company.

1    This is just how I had to write e-mails.  I had to keep

2    on reminding her.  And once I got annoyed enough, she

3    would respond; or once I needed it approved, she would

4    approve.  You learn how people operate.  That's how she

5    operated.

6        Q.  Here is where she refers to William Harrison

7    from the Acquisitions Team.

8            Did you have an understanding at the time as

9    to what the Acquisitions Team was versus, say, asset

10   management, as she refers in this e-mail?

11       A.  No.

12       Q.  It's just the result of bureaucracy at

13   Teachers?

14       A.  Well, I knew that we had -- Gerry Casimir was

15   our guy.  So whatever these people did, it was just a

16   formality of checking the boxes.  They have a lot of

17   box checkers over there.

18

19

20

21       Q.  D-16 is technically two documents, the cover

22   e-mail and the attached letter.

1          Now, to orient us -- my apologizes for this

2     being out of chronological order -- D-10 was the term

3     sheet that William Harrison sent on June 6, 2011.  So

4     now here we are in July of 2011 and Marc deBree sends

5     you an attached revised term sheet with two versions

6     with changes.  And he directs it to you.

7          It seems like at this point in time in the

8     negotiations you are taking the lead at least on the

9     Letter of Intent; is that right?

10     A.  What's happened is there were just too many

11    chefs in the kitchen, everything going through Peter.

12    I said just send it to me and I will copy Peter, just

13    to save a step.

14     Q.  Okay.  And as between you and your father,

15    were you taking the lead on the negotiations?

16     A.  Together.  Our offices are right next door --

17    10 steps away.

18     Q.  So this is a revised term sheet still showing

19    the land value of a total of $30 million.  I presume

20    you reviewed this?

21     A.  If it came to me, absolutely.

22     Q.  Just to be clear, Exhibit D-16 is a cover

1    e-mail with two attached term sheets, one showing a red

2    line and one not.

3         A.  Yes.

4         (Thereupon, Exhibit No. D-17 was marked.)

5    BY MS. WOODS:

6         Q.  D-17 is a series of e-mails.  So this is a

7    follow-on e-mail from D-16, where Marc deBree had sent

8    you the edits to the LOI at the time.  You respond to

9    Peter on July 6, 2011 saying:  "What a joke!"  And then

10   Peter responds to you:  "I just sent you a message.

11   I'll have this squared away."

12            What was the source of your reaction "what a

13   joke? "

14        A.  Either the price or some of the terms; I'm not

15   exactly sure.  I would venture to guess the price at

16   that time.

17        Q.  Sitting here today, you don't have a specific

18   recollection?

19        A.  No.

20        (Thereupon, Exhibit No. D-18 was marked.)

21   BY MS. WOODS:

22        Q.  D-18 is yet another revision to the term

1   sheet.  This is July 8 from Marc deBree to you.  He

2   attaches two versions.  I printed off one.  I think I

3   have the non-red line version for some reason.

4          He directs it to you.  I presume you reviewed

5   this term sheet and engaged in negotiations?

6          A.  I don't know what I did.  I don't see what I

7   did with this.  Obviously I received it and I reviewed

8   it, but I don't know what came next.

9          Q.  Okay.  Obviously after lunch I'm going to have

10  to reorganize these.

11         (Thereupon, Exhibit No. D-19 was marked.)

12  BY MS. WOODS:

13         Q.  D-19 is a July 27, 2011 cover e-mail from

14  Peter Witham to you.  He is attaching the revised

15  Letter of Intent to reflect a 5 percent variance on

16  hard costs.

17         What is he referring to there?  Is that the

18  development fee?

19         A.  No.  That's hard costs, construction costs.

20         Q.  Oh, I see.

21         A.  I just wanted some room.

22         Q.  Okay.  Again, it looks like as of July 27,

90

1    2011, Peter is forwarding this revised LOI to you guys,

2    with a land price of $30 million.

3         A.  Correct.

4         Q.  Okay.  We finally get to the executed version,

5    D-20.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1

2

3

4          Q.   2011 -- a draft Loree Grand agreement for the

5     Phase II project.  I'll mark this as D-29.

6          (Thereupon, Exhibit No. D-29 was marked.)

7     BY MS. WOODS:

8          Q.   So on October 6, Marc deBree sends off to

9     Michael Hollander, you and Peter a Phase II JV

10    agreement for your reviewing draft.  And then it

11    appears that the Cohen folks go silent for a period of

12    a couple of weeks; got some e-mails back and forth

13    indicating that Teachers is waiting to hear from you

14    guys.

15          What was going on upon receipt or around the

16    time of receiving this?

17          A.   I'm not sure.  I know one thing is that when

18    they send this JV agreement, I was very perplexed and

19    concerned about all the changes that had to do with

20    Phase I here as well.  I'm not sure why we sat dark or

21    why we went dark, per your words, for a little while.

22          Q.   When you said you were concerned about the

114

1      A.  No.  The only change should have been how much

2    land was going into the JV; nothing to do with the

3    merger.  The merger was already agreed upon when it was

4    first signed.

5           This JV agreement was set up for both phases.

6    It should have one red line.  $17 million should have

7    been $30 million.  That's the only change.  So when he

8    sent us this bill, what are you doing?  Why are there

9    so many changes?  Well, you know, we've got to go back

10    and make some changes in Phase I.  We didn't agree to

11    that bill.  And that was where we left it.  I was

12    surprised.

13      (Thereupon, Exhibit No. D-30 was marked.)

14    BY MS. WOODS:

15      Q.  This is the e-mail where it looks like they

16    are reaching out to you 13 days later; we haven't

17    talked.  Do you have time for a call?

18           Do you remember what your response was, either

19    to this e-mail or to this draft of the JV agreement?

20      A.  What my response was to this e-mail?

21      Q.  If you remember.

22      A.  No, I didn't respond.  I don't recall.

 1          (Thereupon, Exhibit No. D-31 was marked.)

 2     BY MS. WOODS:

 3          Q.  D-31 is kind of a follow on to that, where on

 4     October 20 Marc says to you, Michael Hollander and

 5     Peter:  "Since sending over the draft JV agreement for

 6     your review on the 6th of October, I've not heard

 7     anything from you guys."

 8              So that is a 17-day stretch.  And it seems

 9     like you guys were eager to get Phase II underway.

10          A.  We were eager to get Phase II underway, then

11     they re-traded the price.

12          Q.  So is that your recollection then?

13          A.  As I'm thinking how I operate, obviously there

14     was an issue.  We agreed, and they re-traded.  We were

15     quite upset about it.  We never agreed to the new

16     structure of the new deal.  We agreed to what my dad

17     signed back in August of -- whenever it was -- 2011,

18     the $30 million.  That's what we agreed to.  The JV did

19     not reflect the $30 million.

20          Q.  And D-29 reflects that on page 27, for

21     purposes of the payment of the land, it provided for

22     $20 million, with an additional distribution of $7

1      Q.  Do you remember reading it?

2      A.  I'll venture a guess, yes.

3      (Thereupon, Exhibit No. D-32 was marked.)

4    BY MS. WOODS:

5      Q.  Here is what is marked as Exhibit D-32.

6          At what point in time did you get a copy of

7    this letter from Peter Witham -- or a draft, if you saw

8    one in advance?

9      A.  I knew Peter asked my permission to write a

10   letter explaining because at that time, Teachers was

11   looking again at Velocity.  And we put it in writing to

12   where exactly Velocity was and to let them know again

13   how it was cross-collateralized with Phase II.  That

14   was it.  I mean, I didn't put much thought to this

15   letter.

16     Q.  Did you see a draft of this letter or this

17   letter before Peter sent it?

18     A.  He would have sent it to me before he sent it.

19   Did I read it?  I'm not even sure.  But I know what he

20   was saying in his letter.  I didn't go through it.

21     Q.  Okay.  So if you saw it before it went on to

22   Teachers, you would have told Peter if he was

1    misstating things to fix them, right?

2         A.  If I would have read it thoroughly and I saw a

3    mistake?  Absolutely.  I didn't go through -- I knew

4    the gist of what he was -- we trusted Peter.  And he

5    suggested we write a letter, since Teachers was now

6    re-interested in Velocity because that market started

7    getting really hot again on the residential side.  And

8    he said he's going to mention about the

9    cross-collateralization.  And I said, whatever, they

10   know about it.  It's no hidden secret.  It's like there

11   is a mortgage on Phase I.  We could have that released.

12   It was never an issue releasing Phase II in order to

13   close with Teachers.

14        Q.  You knew that Michael Frisk was fairly high up

15   in Teachers, right?

16        A.  No.

17        Q.  Did you understand Michael Frisk to be

18   superior to Gerry Casimir and Trevor Michael?

19        A.  I had no idea until you told me that now.  Is

20   he?  I think he was new at the time.

21        Q.  Okay.  Is it your testimony, Alan, that Peter

22   sent you this letter before it went out to Teachers,

165

1      Q.  You're aware that there was a tax rebate that

2   was issued by the city for Phase I that was deposited

3   in a Cohen company account on the order of $190,000?

4      A.  Was I made aware when?  Do I know about it?

5   Of course I know about it now, yes.  Was I aware of it

6   then when it happened?  Absolutely not.

7      Q.  Is it the Cohens' position in this litigation

8   that they don't have to pay that to the Loree Grand?

9      A.  I have no idea.  I don't know anything about

10  that, except that a check from the outcome of the

11  Taxation Department of D.C. came payable to the Cohen

12  Companies, and it was deposited into the Cohen

13  Companies' account.

14     Q.  Well, in the course of discovery we've issued

15  various interrogatories, and it appeared to me that the

16  justification for the payment of the Phase II property

17  taxes and the retention of the $190,000 rebate was as

18  an offset for this dirt and dog park and parking

19  issue.

20         So what I'm asking you, as official corporate

21  designee of multitudes of Cohen entities is, that

22  $190,000 that is clearly owned to the Loree Grand, are

1    you going to pay it back or not?

2         MR. COOTER:  He says he doesn't know.

3         MS. WOODS:  He's the corporate designee.

4         THE WITNESS:  As I said, once this financial

5    situation with the dirt, the dog park, the parking is

6    all figured out, then we will sit down and figure out

7    who gets what.  But I will guarantee that at the end of

8    the day Phase I makes out because they are getting much

9    more compensation than we are for the taxes than

10   whatever rebate check that came to our company.

11   BY MS. WOODS:

12        Q.  Okay.  There is an amount of money that is the

13   subject of a dispute in this legislation, being that

14   $190,000 rebate.  I think I am entitled to an answer

15   from the corporate designee as to what your view is as

16   to whether or not -- your lawyer may have his own

17   lawyer view.

18        MR. COOTER:  You know, I have been sitting here

19   quietly while we have been portrayed as the functional

20   equivalent of the Salvation Army.

21        MS. WOODS:  What?

22        MR. COOTER:  You've asked your question.  He has

190

1    I certify that I have read or had read to me the

2    foregoing transcript.

3    _____

4    DISTRICT OF COLUMBIA to wit:

5    Subscribed to and sworn before me this _____ day of

6    _____, 2013.

7    _____

8    Notary Public

9    My Commission Expires: _____

10   DATE:

11

12

13

14

15

16

17

18

19

20

21

22

1   RE:  K STREET DEVELOPERS et al. VS. TIAA, et al.

2   DEPONENT:  ALAN M. COHEN

3   DEPOSITION DATE:  MAY 1, 2013

4

5   Under the Rules of Court, you have the right to read

6   and review the transcript of your deposition.

7   If you are represented by counsel and he/she has

8   obtained a copy of the transcript, you may review

9   his/her copy and (1) sign the original signature page,

10  and (2) complete the errata sheet if you feel there has

11  been an error in the transcription.  Both forms should

12  be forwarded to our office at the above-referenced

13  address so that we may incorporate them into the

14  original transcript.  If you do not have a copy of the

15  transcript available for your review, please contact

16  this office at (202) 803-8830 and make an appointment

17  to come in and read the original.  The Rules allow 21

18  days for this review.  However, if a court date is

19  pending, it should be done right away.  If you choose

20  not to read your transcript, the original may be filed

21  at the request of counsel without your signature at the

22  time of the trial or hearing in this matter.

192

```
 1   RE:  K STREET DEVELOPERS et al. VS. TIAA, et al.

 2   DEPONENT:  ALAN M. COHEN

 3   DEPOSITION DATE:  MAY 1, 2013

 4        I hereby certify by my dated signature that I have

 5   read the entire transcript of my deposition, or same

 6   has been read to me.  I request that the following

 7   changes be entered upon the record for the reasons

 8   indicated.  I have signed my name to the signature line

 9   below, and authorize you to attach the same to the

10   original transcript.

11   Page     Line Correction or change and reason

12   ------------------------------------------------------

13   ------------------------------------------------------

14   ------------------------------------------------------

15   ------------------------------------------------------

16   ------------------------------------------------------

17   ------------------------------------------------------

18   ------------------------------------------------------

19   ------------------------------------------------------

20   ------------------------------------------------------

21   SIGNATURE:_____

22   DATE: _____
```

193

1              C E R T I F I C A T I O N

2

3       I, Dianne Reidy, the officer before whom the

4    foregoing deposition was taken, do hereby certify that

5    the witness whose testimony appears in the foregoing

6    deposition, was duly sworn by me; that the testimony of

7    said witness was taken by me in Stenographic notes and

8    thereby reduced to typewriting under my supervision;

9    that I am neither counsel for, related to, nor employed

10   by any of the parties to the action in which this

11   deposition was taken, and further that I am not a

12   relative or employee of any attorney or counsel

13   employed by the parties thereto, nor financially or

14   otherwise interested in the outcome of the action.

15

16

17   _____

18   Dianne M. Reidy,

19   Notary Public

20   District of Columbia

21   My Commission Expires:

22   March 14, 2017