1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLUMBIA
2


3        _____
     K STREET DEVELOPERS,    :
4    LLC, et al.,            :
                             :
5             Plaintiffs, :
                             :
6     vs.                    : Civil Action No.
                             : 1:12-cv-00666-RLW
7    TEACHERS INSURANCE      :
     AND ANNUITY ASSOCIATION :
8    OF AMERICA, et al.,     :
                             :
9             Defendants.   :
         _____:
10

11

12           The Deposition of RONALD COHEN

13   was taken on Tuesday, May 14, 2013,

14   commencing at 10:02 a.m., at the Law

15   Offices of Seyfarth Shaw, LLP, 975 F

16   Street, NW, Washington, D.C., before Ryan

17   K. Black, Notary Public, Registered

18   Professional Reporter.

19

20

21

22

23

24    VERITEXT NATIONAL COURT REPORTING COMPANY

25           WASHINGTON, D.C.  20036

1      Q.   Okay.  And how was it that you

2  came to even talk with Teachers to begin

3  with?

4      A.   We were introduced to Teachers

5  by Peter Witham of Greenwich Capital

6  Group.

7      Q.   And was the introduction

8  specifically to the property that the

9  Loree Grand is on?

10      A.   Specifically.

11      Q.   It was?  Yes?

12      A.   Yes.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19     Q.   So when you just in your answer

20   talked about the back and forth discussion

21   and you said all terms were hashed out,

22   were you referring to the LLC agreement

23   that was ultimately executed, or are you

24   talking about some prior conversation, or

25   is it not clear?

1          A.    No.   I'm talking about the

2    ultimate governing documents were hashed

3    out --

4          Q.    Mm-hmm.   Okay.

5          A.    -- that allowed both parties to

6    feel they were protected by executed

7    documentation to move forward.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10      Q.   All right.  Well, we'll talk

11  about those documents shortly.  But

12  separate from the written documents, are

13  you -- was there any -- in your view, any

14  oral agreement that committed Teachers to

15  develop Phase 2?

16      A.   Absolutely.

17      Q.   Okay.  Tell me about when that

18  oral agreement was made.

19      A.   The oral agreement was during

20  the entire negotiations of Phase 1 where

21  Gerry made -- Gerry Casimir made it very

22  clear that he's looking at this project as

23  a total Phase 1 and Phase 2 undertaking.

24          And one of the documents were

25  the LLC development -- I don't know which

1    one it ends up in -- became an issue of

2    discussion and negotiating about what

3    price he would pay for Phase 2.

4            And we had a conversation, he

5    and I.  And he said, because we're buying

6    it, you're saving sales commissions, so

7    there should be a discount on the purchase

8    price.  I said that made rational sense.

9    And, again, one of the documents is

10   reflected 94, 95, 96 percent of fair

11   market value.  It was very, very, very

12   clear to me, without question.

13        Q.   Okay.  Well, it's not clear to

14   me.

15        A.   Okay.  That's your prerogative.

16        Q.   So we're going to get into great

17   detail.

18            So was there one single meeting

19   or conversation in you which think there,

20   that's the deal, by Teachers?  Or was

21   it, as you said, over the course of

22   negotiations of Phase 1 that you got the

23   impression that Teachers was committed to

24   Phase 2?

25        A.   No.  Teachers was committed to

23

1     Phase 2 the minute they signed Phase 1.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16     Q.    Okay.  So you have an in-house

17  counsel who then employs outside counsel

18  on an as-needed basis, right?

19     A.    I have inside counsel, and we

20  employ outside counsel on an as-needed

21  basis.

22     Q.    Got it.  And for the

23  negotiations with respect to the LLC

24  agreement, you had legal counsel, correct?

25     A.    Yes.

1        Q.   And for the negotiations with

2   respect to the letter of intent that was

3   executed, you had legal counsel, right?

4        A.   Yes.

5        Q.   And your legal counsel helped

6   you with those agreements, right?

7        A.   I don't understand what you mean

8   by helped me.

9        Q.   Well --

10       A.   He memorialized the agreement

11   that I told him we reached.

12       Q.   So your legal counsel was

13   involved in helping to draft or edit the

14   LLC agreement?  Yes?

15       A.   Based upon the information that

16   I told him we had agreed to between the

17   parties.

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25      Q.   All right.  Why was -- to your

1    understanding, why was the LLC agreement

2    drafted to begin with?

3         A.   Well, because it was a function

4    of the document that we wanted to express

5    what the understanding of the venture was.

6         Q.   Okay.  So this document reflects

7    your understanding of the Phase 1 venture,

8    right?

9         A.   Yes.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3      Q.   Ron, Union North is a Ronald

4  Cohen Company, right?

5      A.   It's a family -- it's a Ronald

6  Cohen Family Company.

7      Q.   Okay.  You have some sort of

8  ownership interest, even though you may

9  not specifically know what it is, in Union

10  North?

11      A.   I have some in role in it.  I

12  don't know if I have ownership.  I have

13  some role in it.

14      Q.   Okay.  All right.  Does Alan

15  have a role in Union North?

16      A.   Yes.

17      Q.   Who else has a role in Union

18  North?

19      A.   My other two kids.

20      Q.   Who are?

21      A.   Sue Ann Siegel and Craig Cohen.

22

23

24

25

1    Q.   Okay.  This provision says in

2  the beginning that, if at any time within

3  five years after the date the company

4  breaks ground on Phase 1, K Street

5  Developers, LLC, an affiliate of operating

6  member, elects to sell, directly or

7  indirectly, or undertake the development

8  of Phase 2, operating member shall first

9  give investor member notice of such sale

10  or development, et cetera.

11         Did you understand that as

12  of January of 2007, K Street had an

13  election -- had an opportunity to elect to

14  sell or undertake the development of Phase

15  2?

16    A.   I don't know the date, but I

17  know we had that election.

18    Q.   Okay.  So you could elect to

19  sell, to develop, or not to do anything,

20  as of January of 2007, correct?

21    A.   If that's the date -- again, I'm

22  not referring to a date.  But, yes, I know

23  that the terminology is correct.

24

25

```
 1
 2
 3
 4
 5
 6
 7
 8        Q.   Okay.  Let me go ahead and show
 9   you what has previously been marked as
10   Exhibit 9.
11            This is a November 3rd, 2010,
12   letter on Cohen Company's letterhead.
13   It's signed by you.
14            And in it you note that, by
15   this letter, delivered pursuant to the
16   provisions of the LLC agreement, Union
17   North Phase 1 does hereby give notice of
18   its intention to undertake the development
19   of Phase 2 at this time.  And then it goes
20   on.
21            Is this what you're talking
22   about?
23        A.   I believe so.
24        Q.   Okay.  So at some point prior to
25   November 23rd, 2010, you got a call from a
```

1    broker noting that some other investor had

2    an interest in Phase 2.

3         A.   Yes.

4         Q.   And that triggered you to send

5    this letter to Teachers, right?

6         A.   Yes.

7         Q.   And you sent this letter to

8    Teachers because why?  Did you think you

9    had to pursuant to the LLC agreement?

10        A.   It wasn't about had to.  We had

11   a good relationship with Teachers, and

12   they were our partner.  And they invested

13   money with us.  And as a business

14   courtesy, there was no reason not to serve

15   them with the proper procedures and

16   manners, if you will.

17

18

19

20

21

22

23

24

25

50

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20     Q.   Okay.  Got it.

21        So up until at least sometime in

22 November 2010, you have the option to

23 develop or not develop.  We've established

24 that, right?

25     A.   Yes.

1

2

3

4

5

6

7

8      Q.    Look back at Section 414,

9    because I want to understand your

10   understanding of this provision.

11       A.    I will accept the premise

12   that at this letter they could have said,

13   thanks, but we don't want to do it.

14       Q.    Okay.  So you'll accept the

15   premise that, as of November of 2010,

16   Teachers could have said no to the ROFO

17   and walked away from Phase 2?

18       A.    Right.  And I would have then

19   been clear and free to negotiate with

20   another joint venture partner.

21

22

23

24

25

       Q.   Okay.  And in 2010, I think we

already talked about Phase 2, you weren't

trying to develop it or sell it, right?

       A.   No.  Correct.

       Q.   And in 2011, what was happening

with Phase 2?

       A.   Well, you have to show me where

1    the letter of intent was on Phase 2

2    because I need to get my chronology

3    straight.

4         Q.   Okay.  So let's go back to

5    -- you had a series of phone calls after

6    November 3rd of 2010 with Teachers, and

7    there were statements made to you by, I

8    think you said, Marc Debree --

9         A.   And Evangeline.

10        Q.   -- and Evangeline that it was

11   their intent to do Phase 2?

12        A.   The deal is done, guys.  We just

13   have to finish our, whatever words they

14   used, a lot of times it was vacations.

15   But it was done, done, done, --

16        Q.   Okay.

17        A.   -- no question.

18        Q.   And, again, that intellectual

19   exercise, the deal was done in terms of

20   you had great expectations that you could

21   eventually strike a deal with Teachers and

22   everybody could agree to all --

23        A.   We --

24        Q.   Let me finish.

25             Everybody could agree to all the

1   material terms, or somehow by Evangeline

2   and Marc saying the deal is done, you

3   think you have, from a non-lawyer's point

4   of view, a right to pursue Teachers and

5   say, hey, you had a deal here?

6       A.   Yes.

7       Q.   The latter?

8       A.   Yes.

9       Q.   Okay.  Okay.

10          And when were those

11  conversations had that made you think

12  -- and I'm sorry.  I'm going to get really

13  anal retentive with you on this.  I have

14  to.  It's my job.

15      A.   No, you're not.  No.  No.  No.

16  I'm just trying to go chronology-wise,

17  which I'm not going to be able to do.  But

18  you can ask whatever question you want.

19  I'm pretty clear on the intent, not

20  necessarily the chronology.

21      Q.   Okay.  And I would like to

22  get the chronology.  I have a lot of

23  documents.  I will trundle you through

24  them.  But right now I want your

25  unadulterated memory on when you think it

60

1   was a meeting of the minds that a deal was

2   done for Phase 2?

3        A.    Probably within a week of

4   receiving this letter of putting them on

5   notice that we are going to develop the

6   property.

1      A.   There was -- you know, I don't

2   know how to answer that.  We knew what the

3   -- what the -- the value of the property

4   was based on the proformas that were given

5   to Gerry Casimir that mirrored the

6   original proformas and internal rate of

7   returns that they looked for in Phase 1,

8   and that number was $42 million.

9           That was a number we presented

10  to Gerry.  There was a discussion,

11  face-to-face, with Gerry about how we

12  -- what we do about the 42 million.  And I

13  had come up with the suggestion, that I

14  think Alan earlier testified to, that we

15  would create a special capital account so

16  that they would get all of their

17  investment returns, yields.  But before

18  there was excess profit we would get the

19  12 million that we left behind.

20          Gerry indicated, that sounds

21  reasonable.  He then, I think three or

22  four days later, called back and said, we

23  will not -- Trevor Michael will not agree

24  to that procedure.

25          That took 42, less the 12

1    capital account, removed the 12 million

2    capital account, left 30.  And we said,

3    okay, there's the meeting of the minds.

4              So price was determined.

5         Q.   Okay.  All right.  I want to get

6    down to some nuts and bolts here.  We just

7    looked at Section 414.  And I thank you

8    for your answer.  We'll go back to some of

9    that.  But it sounds to me like 414

10   contemplates, and you just testified, that

11   the parties are to negotiate about the

12   price, right?

13        A.   They had to negotiate how to

14   get to what was agreed to as fair market

15   value.

16             There's a big difference.

17        Q.   Okay.  I don't get that at all.

18        A.   Well, let me try to explain it

19   to you in a simpler form.

20        Q.   Okay.  All right.

21        A.   There was no question in our

22   mind that the underwriting criteria

23   Teachers used in Phase 1, which was a

24   mathematical formula to get to a portion

25   -- a -- a point in time where you're

72

1          A.   I was present.   Remember, there

2     was a Chinese wall between ADC Builders

3     and Ronald Cohen as developers protecting

4     the interest of TIAA CREF in development.

5     So anything ADC did, it was going to be a

6     charge against us, and I had to make sure

7     that I protected the venture.

8               So my protection was when I got

9     a payment requisition, I would look at

10    every item on it, number one, on the hard

11    cost side of construction, to make sure

12    the contractor is not getting ahead of his

13    progress in payment, and, number two, all

14    the various things that were part of the

15    soft costs, and everything else that we

16    were asking the lender to fund.

17              One of them happened to have

18    been real estate taxes, which I know, as

19    developer, we made a deal with the

20    contractor that we were basically going to

21    let -- we want them to store the earth on

22    Phase 2.  And the venture, being Cohen

23    Casimir at that time, were going to

24    compensate them -- us by paying the real

25    estate taxes on somebody else's property

1   him -- who was aware of it.

2       Q.   No, I don't want to know who was

3   aware of the agreement.  I want to know

4   with whom was the deal struck?

5       A.   Well, it would have been Gerry,

6   because he was the authority to strike the

7   deal with.

8       Q.   Okay.  And if the deal was

9   struck before the construction draw

10  schedule was drawn up, was it simply, hey,

11  let's pay Phase 2 taxes, of whatever

12  amount they might be, in compensation for

13  storing dirt?

14      A.   No.  No.  No.  No.  No.  It

15  wasn't an open-ended guesstimate.  It was

16  a guesstimate moving forward beyond the

17  initial tax bills.  We knew the tax bill

18  for Phase 1 before we broke ground.  We

19  knew the tax bill for the land in Phase 2.

20          The only thing that could have

21  happened with the real estate taxes is an

22  increase.  So I said to Alex, let's put in

23  some additional funds.  In the event we

24  need them, let's have them in our draw

25  schedule.  As it ended up, I don't know

1  him what the tax bill was at the time.

2  But I told him, here's what we're going to

3  put into the category.  This is the tax

4  bill today.  Gerry, I think we should

5  increase it by 5, 6 percent -- I forget

6  what number I might have used -- because

7  taxes go up.  But no matter what happens,

8  Gerry, it's still saving the venture a lot

9  of money and logistics.

10         He said fine.

11     Q.   And for how many years would the

12  Phase 2 property taxes be paid?  What was

13  the agreement?

14     A.    Until we had no more

15  construction loan.  And with two

16  extensions that we had built in, I thought

17  we would be under construction with Phase

18  2, so it all dovetailed perfectly.

19     Q.   So this agreement was struck

20  sometime in what, '07 or '08?  Do you know

21  when?

22     A.    I think we closed the

23  construction loan in '07.

24     Q.   So the expectation was that

25  Phase 2 property taxes would be paid in

1    '08 and '09 and '10?

2         A.   As long as it took for us to

3    break ground on Phase 2, because it was

4    dirt that we needed on Phase 2, and,

5    therefore, it was going to be more to the

6    benefit of the Phase 2 construction.

7         Q.   How was it that you needed on

8    Phase 2?

9         A.   We were going to be using that

10   on -- I think one of the sides of the

11   property needed some fill.

12        Q.   Mm-hmm.

13        A.   We didn't know what dirt was

14   coming out of the hole, whether it had to

15   go offsite or not or it was rocks, so we

16   had the dirt sitting there.

17        Q.   All right.  So it was basically

18   an open-ended agreement that the taxes for

19   Phase 2 would be paid for as long as the

20   construction was underway; is that right?

21        A.   Underway for which project?

22        Q.   For Phase 1, it sounds like.

23        A.   It was until the construction

24   line category ran out of money.  Because

25   we had projected a certain amount of time.

1    And, obviously, if we couldn't -- if Phase

2    2 wasn't started by then, we would have

3    run out of money to fund it under that.

4    But there was no indication that Phase 2,

5    in view of the fact that it was just a

6    question of finishing Phase 1 and them

7    being happy with the results, we had our

8    agreement for Phase 2, we would be under

9    construction.

10       Q.   So you thought that the Phase 2

11   property tax -- well, I guess I'm stuck

12   here.

13           What was the end point, the

14   stopping point for paying Phase 2 property

15   taxes?  What was the agreement?

16       A.   We projected -- we speculated,

17   Gerry and I, that by the time we funded

18   the amount set forth in the construction

19   loan and we had no more left, we would be

20   under construction with Phase 2.  That was

21   the speculation.

22           So to answer your question, the

23   time period was speculative.  The defined

24   period was when the money ran out in the

25   construction loan, if it exceeded the

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20      Q.    Peter Witham negotiated the

21   Phase 1, or what was Peter Witham's role?

22      A.    Introduction.

23      Q.    Okay.

24      A.    Marriage broker.

25      Q.    And he actually exchanged

1  documents with Teachers for Phase 1,

2  right?

3       A.   Exchanged documents?

4       Q.   On behalf of the Cohens, he

5  exchanged documents with Teachers in order

6  to try and strike a deal on Phase 1?

7            Yes?

8       A.   I'm sure that they might have

9  gone through him, or we might have sent

10 them directly to Gerry.  We might have

11 copied Peter.  I don't know what documents

12 you're referring to.

13           It wasn't a general practice,

14 necessarily.

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10          MS. WOODS:  Okay.  I'm going to

11   mark Exhibit 110, which is the loan

12   agreement.

13          (Deposition Exhibit No. 110, a

14   loan agreement, was marked.)

15   BY MS. WOODS:

16     Q.   If you could take a look at

17   this and let me know if this is the loan

18   agreement that you negotiated with West

19   Immo.

20          I mean, I know it's a big

21   document.  Just breeze through it.

22          And I will -- it looks like your

23   signature on behalf of Union Place Phase 1

24   is on Bates Number 49720.

25     A.   That is my signature.

1    Q.   Okay.  Were the terms actually

2    negotiated with West Immo?  Or did West

3    Immo say, here's our loan agreement, sign

4    it?

5    A.   No.  Each deal has a certain

6    amount of negotiations for the specificity

7    of what's being built.

8             So, I mean, I can't tell you,

9    without going through each of these and

10   comparing them to others, what they might

11   have been.  But they weren't just, you

12   know, tell me what you're going to do to

13   me and tell me where to sign.  It didn't

14   work that way.

15

16

17

18

19

20

21

22

23

24

25

1      A.   Yes.

2      Q.   And there are a variety of

3  reasons identified -- I have the letters

4  here somewhere -- that, from TIAA Union

5  Place's point of view, constituted

6  commingling and taking of Union Place's

7  monies.

8           Do you remember those

9  communications?  I know you don't agree

10  with them, but do you remember the

11  communications?

12      A.   Yes.

13      Q.   And those takings include, for

14  example, there's $190,000 tax rebate that

15  RCMC received and deposited and has, to

16  date, never paid Union Place.  You're

17  familiar with that $190,000?

18      A.   Do you mean the check that came

19  in which was made payable to the Cohen

20  Companies and deposited by my CEO into a

21  Cohen Company account?  Yes.

22      Q.   And that check or those amounts

23  should be paid to Union Place, right?

24      A.   Yes.

25      Q.   Okay.  What is your

107

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24      Q.    Okay.   Well, with regard to the

25    bogus claim, you just told me that the 190

108

1    should be paid to Union Place.  And it

2    still hasn't, right?

3        A.   That is correct.

4        Q.   So that's not a bogus claim, is

5    it?

6        A.   Yes, it was.

7        Q.   What's bogus about it?

8        A.   Bogus is that they said, tender

9    it, Ron, so that we can get on with it,

10   and we understand what happened.  Here's

11   the evidence of the check that was made

12   payable to Cohen Companies.  We know how

13   it happened.  Pay it back.  We would have

14   said, okay.

15            Instead, we ended up in

16   litigation.

17       Q.   Is it your testimony that you

18   only learned about the $190,000 that was

19   due until after litigation was filed?

20       A.   No.  I learned about it when

21   we had a meeting with Ron Gart and he

22   brought it up with the accountants.  That

23   was the first that I had heard about it.

24   And I went back, and we answered that, I

25   think in written response, which is what

1    the agenda of that meeting was to explain.

2    We explained what it was.  I think -- I'm

3    not -- if I'm not mistaken, I think in our

4    explanation we even sent a copy of the

5    check that showed it was made to Cohen

6    companies, and that was it.

7              Next thing we know, we became

8    adversarial.  They didn't want to hear my

9    answers.

10

11

12             (Deposition Exhibit No. 111, a

13   letter dated February 22nd, 2012, was

14   marked.)

15   BY MS. WOODS:

16        Q.   This is a letter from Ron Gart

17   to you dated February 22nd, 2012.  And in

18   this letter it identifies Union -- TIAA

19   Union Place's intent to initiate removal

20   of the operating member, and it identifies

21   some bases for the removal.

22             Did you receive this letter on

23   or about February 22nd, 2012?

24        A.   I'm sure I did.

25

1

2

3

4

5

6

7

8

9        Q.    Okay.  And you, in fact, had a

10   meeting with Teachers at some point after

11   February 22nd, 2012, correct?

12        A.    Yes.

13        Q.    All right.  And at that meeting,

14   it became clear to you that, at a minimum,

15   the $190,000 should have been paid to

16   Union Place, right?

17        A.    Yes.

18        Q.    And you didn't pay that to Union

19   Place, did you?

20        A.    No.

21

22

23

24

25

151

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16          MS. WOODS:  Okay.  This is

17  Exhibit 120.

18          (Deposition Exhibit No. 120, a

19  series of e-mails, was marked.)

20  BY MS. WOODS:

21     Q.   This is a series of e-mails

22  around January 3rd, 2011.  And if you'll

23  look at the bottom of the first page, it

24  looks like that on January 3rd, 2011,

25  Evangeline Taylor writes to you and Alan

1   and says, once again, I'm requesting the

2   additional three weeks in order to analyze

3   the Union Place Phase 2 development.

4            As stated below, we require the

5   additional time due to key personnel being

6   out of the office, as well as the need to

7   have an appraisal completed.  And then you

8   respond about a half hour later and you

9   start with, after hanging up with you this

10  afternoon, I was very frustrated.  So it

11  sounds like you had a call with Evangeline

12  before she sent the e-mail I just read.

13           Does that sound right?

14       A.   Obviously after hanging up, I

15  must have had a call.  But I don't recall.

16       Q.   Okay.  Then you say, as a

17  result, I placed a call to Scott Anderson.

18  I explained to Scott exactly what Alan and

19  I explained to you about the uncomfortable

20  situation the continued extensions are

21  putting us in, vis a vis the other buyer.

22  So it sounds like another buyer is at play

23  here as of January 2011.

24       A.   It does.

25       Q.   So sitting here today, you can't

1    remember that?

2        A.   Obviously, if I wrote there's

3    another buyer, there was.  So the better

4    answer to your question is, I don't

5    remember who the other buyer was.

6        Q.   Okay.  Got it.

7             Then you note that Scott

8    indicated that with an extension through

9    January 28 he feels comfortable he can

10   have all the requisite underwriting to

11   allow either an approval or disapproval of

12   Phase 2.

13            Sounds to me here that you're

14   noting that you're waiting for Teachers to

15   decide whether or not they're going to

16   move forward with Phase 2, right?

17       A.   I'm waiting for Teachers to

18   finalize the letter of intent that we are

19   expecting.

20       Q.   That's not what you wrote.

21            You wrote you're waiting for the

22   underwriting to allow either an approval

23   or disapproval of Phase 2.  Doesn't that

24   mean that Teachers is deciding whether or

25   not to approve or disapprove Phase 2?

1        A.    Not in my opinion.

2        Q.    So your words don't mean what

3    they say?

4        A.    Not necessarily.  Interpreted

5    out of context.

6        Q.    All right.  So it looks like you

7    grant Teachers an extension until January

8    28th, correct?

9        A.    Mm-hmm.

10       Q.    And the extension is for what,

11   the exercise of the ROFO?

12       A.    It's the exercise to do whatever

13   they were doing, knowing that we were

14   trying to protect the tax credit that they

15   also were aware was an issue as part of

16   the deal.  And it backed into the

17   proformas that they had, and it's the

18   agreement that we were going to undertake

19   to develop Phase 2.

20       Q.    At the end of this you say, at

21   the conclusion of the January 28 date,

22   please respectfully understand that, in

23   fear of losing the other buyer, I cannot,

24   in good conscience, grant any further

25   extensions.

1        So as of January 3rd, 2011, it

2   was not your intent to grant any more

3   extensions past January 28th for fear of

4   losing the other buyer for Phase 2,

5   correct?

6        A.   That's what that says.

7

8

9

10

11        Q.   All right.  This is Exhibit 121.

12   This is a letter from Teachers dated

13   January 27, 2011.  It's addressed to Union

14   North, Phase 1, care of the Cohen

15   Companies.  Attention:  Ronald Cohen.

16   It's signed by Scott Anderson.

17        In the middle of the second

18   paragraph, it says, unfortunately, based

19   on the information we've received today,

20   we are unable to accept the offer to have

21   you contribute Phase 2 to the company.

22        As such, and for the avoidance

23   of doubt, we hereby elect not to cause you

24   to have Phase 2 contributed to the company

25   under Section 414 of the Operating

156

1   Agreement.

2           The next paragraph says, in

3   furtherance of potential discussions, we

4   desire to inform you of several concerns

5   that have resulted in our response.  As an

6   institutional investor, it is not possible

7   for us to exercise the ROFO given the

8   uncertainties around Phase 2, including

9   the timing, cost and financing for the

10  development of Phase 2.

11          Do you remember receiving this

12  letter on or about the end of January

13  2011?

14      A.   I'm sure I received it, yes.

15

16

17

18

19

20

21

22

23

24

25

158

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20          MS. WOODS:  Okay.  All right.

21   Exhibit 122.

22          (Deposition Exhibit No. 122, a

23   letter from Ron Cohen to Scott Anderson,

24   was marked.)

25   BY MS. WOODS:

1      Q.   This is a letter from you to

2   Scott Anderson at Teachers.   It's dated

3   February 1, 2011.

4          In it you say, per our

5   conversation yesterday, please find

6   attached the revised concept terms upon

7   which we would be prepared to proceed on

8   Union Place, Phase 2.

9          You note further that we

10   are extremely happy with our current

11   relationship with TIAA CREF and want to

12   explore every possibility in order to

13   continue our success at the project.

14          All right.   Why did you write

15   this letter?

16      A.   Well, I must have written the

17   letter based upon the content of the

18   letter, which I'll stand behind.

19          I don't remember my mind set at

20   the time I wrote the letter, but obviously

21   it was expressed in the letter, what I was

22   saying.

23

24

25

1

2

3

4       Q.   And so by early June of 2011,

5    had you agreed to a land price of 30

6    million?

7       A.   Yes.

8       Q.   Had you had direct conversations

9    with William Harrison?

10      A.   I might have on occasion.  I

11   don't specifically remember when.  There

12   would be no reason that I would not have

13   in the process of our relationship.

14      Q.   I'm going to hand you what I've

15   previously marked as D20.

16           This is the letter of intent

17   that was executed by you, it looks like on

18   August 2nd, 2011; is that right?

19      A.   That's right.

20      Q.   And what did you understand this

21   document to be?

22      A.   This is the outline of the

23   agreement that we reached.

24      Q.   All right.  And if you look

25   at the second page, the provision for

1    nonbinding nature of letter of intent, --

2         A.   Yes.

3         Q.   -- it says, it is expressly

4    agreed by Cohen and TIAA that this letter

5    of intent is nonbinding on Cohen and TIAA.

6    And Cohen and TIAA will have no obligation

7    to purchase, sell or form a venture with

8    respect to the property prior to the

9    execution and delivery by Cohen and TIAA

10   of a written operating agreement?

11        A.   Yep.

12        Q.   It further says, Cohen

13   acknowledges and agrees that the terms and

14   conditions of this letter of intent remain

15   subject to review and approval by TIAA's

16   required authorization procedures and

17   further inspection of the property by

18   representatives of TIAA.

19             You saw that provision in this

20   document before you signed it, right?

21        A.   Yes.

22             I don't agree with what it says

23   on its face.

24

25

1    the paperwork.

2         A.   I don't know what you're

3    referring to about no response from the

4    Cohens.

5              What's the definition of a

6    timeline before one draws a conclusion

7    there was no response?

8         Q.   Well, yeah.  So let's do it this

9    way:  In earlier October, Teachers sends

10   draft LLC agreements to the Cohens.  I

11   don't see anywhere in the paperwork any

12   response from the Cohens as to the LLC

13   agreements.

14             What happened on the Cohen's

15   side?

16        A.   There could have been a lot of

17   things that happened.

18        Q.   Well, I'm not asking you what

19   could have.  I'm asking you what happened

20   on the Cohen's side.

21        A.   I can't tell you what happened.

22   I could only tell you what was happening.

23   We were in a meltdown economy.  I had over

24   $200 million worth of mortgages I was

25   dealing with.  And maybe this didn't take

1   a precedent because we were talking with

2   them on a regular basis, we were moving

3   forward to talk about wiring $750,000.

4   This wasn't like we went underground to

5   hide from them.  It didn't become a

6   necessity to focus on it immediately

7   because there's ongoing dialog.  We've got

8   a building we're running.  Alan is talking

9   to Evangeline about rents for next year on

10  the Loree Grand and budgets for next year.

11  This wasn't something that went silent.

12          Did we respond within the

13  timetable that one -- that you might

14  decide is a reasonable timetable to

15  respond?  Very possible.  And we might not

16  have met your definition of that, because

17  there might have been another fire we were

18  putting out.  But we didn't hide.  I don't

19  think anybody has any evidence that we

20  didn't return calls or we pretended like

21  we weren't there.

22      Q.   Let me go ahead and give you

23  what's been marked as D29.  And it's a

24  October 6th, 2011, e-mail from Marc

25  Debree.  And it attaches a redline markup

1    of the first draft of the proposed LLC

2    agreement for Phase 2, sent to you,

3    Michael Hollander and Peter Witham.

4              In this redline markup, it

5    includes the payment for the land of $20

6    million with a phase-in of $7 million upon

7    the achievement of the tax abatements.

8              Did you agree to that?

9        A.    No.  They reneged on the deal

10   that we had in place.

11       Q.    Okay.  So they -- when you're

12   thinking about the deal, you're thinking

13   about that letter of intent for 30

14   million, correct?

15       A.    That is correct.

16       Q.    And when they reneged on that

17   deal and they proposed 27 million with a 7

18   million payout, the Cohens basically said,

19   no, we're not doing that, right?

20       A.    They reneged on the deal.  They

21   went back on an agreement we had.  And,

22   no, we weren't going take -- an agreement

23   that Trevor Michaels decided on, I think

24   it was September 10th, to put down our

25   throat, because we already had a deal.  We

1    were all working towards a deal.   750 in

2    architecturals were being funded against

3    that deal.  We're moving forward with that

4    deal.  We're talking about tax credits

5    with that deal.  Not the 20 million.

6         Q.   Well, I want to be clear.  Under

7    the letter of intent the payout to the

8    Cohens would have been 27 million?

9         A.   Yeah.  Thirty less three.

10        Q.   What?

11        A.   The payoff to the ownership

12   entity was 30.  Cohen would contribute

13   three and, --

14        Q.   Right.  Right.

15        A.   -- remember, there's two

16   different entities here.

17        Q.   Got it.  So you would get a

18   credit for, what, 3 million, 10 percent.

19   It would be your 10 percent equity

20   contribution, right?

21        A.   It wouldn't be a credit.

22             The venture -- Loree Grand was

23   formed.  It entered into a contract with

24   people who owned the property of Loree

25   Grand.  It happened to be my three kids,

1   step.  If this forbids me from doing

2   anything with this timeline, push it to a

3   brand new project now, and that timeline

4   now goes into the year 2012, 2013, 2014 or

5   2015.  So if I would have broken ground on

6   Velocity Phase 2, and we broke ground on

7   Phase 2 on Union Place, I would be in

8   violation because I knew this was, by

9   virtue of explanation, the mimicking

10   document that was going to govern Phase 2.

11   That's why we had all of our documents in

12   place, so I knew what was coming.

13        Q.   Okay.  You never executed an LLC

14   for Phase 2, did you?

15        A.   No.

16        Q.   Okay.  And would you agree to be

17   restricted in your ability to earn a

18   living and develop properties until you

19   had a deal signed with Teachers?

20        A.   I had no reason to believe that

21   Teachers wasn't going to fulfill their

22   committed obligation to do Phase 2.  What

23   am I going to say?  Whoops, I thought you

24   all were really going to screw me, so I

25   started a project.  What do I do now?  No.

1

2

3

4

5

6              (Deposition Exhibit No. 127,

7    Teachers response to Ron Cohen's November

8    15 letter, was marked.)

9    BY MS. WOODS:

10       Q.   So Exhibit 127 is Teacher's

11   response to your --

12       A.   Yeah.

13       Q.   -- November 15 letter?

14       A.   Mm-hmm.

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24          (Deposition Exhibit No. 132, a

25    auditor engagement letter, was marked.)

1    BY MS. WOODS:

2         Q.   Exhibit 132 is one of them.

3    Would you have reviewed this letter and

4    authorized the auditor to go ahead and do

5    their thing?

6         A.   The latter.  I would have

7    authorized the auditor to do whatever he

8    wanted to do.  Whether I physically

9    reviewed the letter or not, no.  I would

10   have turned to Alex, my CFO, and said, is

11   this within the scope that we should be --

12   that is reasonable?  And he would say,

13   yes.  And I would say, go do it.  And

14   here.  Turned all the pages over, give me

15   the signature pages to sign, and I had to

16   sign it.

17             Yep.  I signed it.

18

19

20

21

22

23

24

25

1          A.    No.

2          Q.    Okay.  All right.  Removal of

3    Operating Members, Section 4.4, Page 20.

4                MR. COOTER:  What was it?

5                MS. WOODS:  4.4, Page 20.

6    BY MS. WOODS:

7          Q.    All right.  Look at Number 12,

8    the failure of operating member to make

9    any additional capital contribution.

10         A.    Yes.

11         Q.    You will agree with me that

12   Union North has never made capital

13   contribution for the build-out of Kitchen

14   on K?

15         A.    No, not the form of cash.  But

16   in the form of monies that were owed to

17   us, had people sat down intelligently and

18   not looked to go on a witch hunt, to sit

19   down and to understand where the offsets

20   were, they would have been a very, very

21   simple thing for people to resolve that.

22   It wasn't what Teachers was looking for.

23         Q.    Do you know when the capital

24   call was made for the -- or when the

25   additional contributions should have been

1    made for Kitchen on K?

2         A.   No, I don't.  Sitting here today

3    I have no idea.

4         Q.   And then am I to understand your

5    answer to mean that somehow Union North is

6    owed money and so the capital contribution

7    that should have been made should have

8    been made as an offset?

9         A.   It would have been offset.

10         Q.   And why was Union North owed

11    money at the time of the capital call

12    contributions?

13         A.   There was architectural outlays

14    that we did.  There was some of the

15    construction costs that were funded.  And

16    I don't have the details in front of me,

17    but there was an offset.  There was a

18    typical, normal situation that two parties

19    sit across the table, we agree, we run

20    thing -- we show things, and we reserve

21    it.  We don't go after a witch hunt to try

22    to find something that's not correctible.

23         Q.   Okay.  The witch hunt you're

24    talking about is the removal of Union

25    North?

1        A.   Absolutely.

2        Q.   Okay.  The capital contribution

3   that Union North should have made was

4   something less than, what, $80,000?

5        A.   Whatever it was.

6        Q.   It was a small amount, right?

7        A.   It was minimal.

8        Q.   Okay.  Union North could have

9   been made that capital contribution,

10  right?

11       A.   It was an offset.  Sure we could

12  have made it, but it was an offset.  There

13  was no reason to make it.  There was a

14  reason for two intelligent parties to sit

15  across the table and talk about everything

16  and anything rather than look for

17  non-correctable deficiencies to throw us

18  out in the witch hunt.

19       Q.   With regard to the offset, is

20  there anything sitting here today, other

21  than dog park, parking for Phase 1 and

22  dirt, that constitutes the basis for an

23  offset claim?

24       A.   You mean things that I like to

25  allege?

1              C E R T I F I C A T E

2

3         I do hereby certify that I am a

4    Notary Public in good standing, that the

5    aforesaid testimony was taken before me,

6    pursuant to notice, at the time and place

7    indicated; that said deponent was by me

8    duly sworn to tell the truth, the whole

9    truth, and nothing but the truth; that the

10   testimony of said deponent was correctly

11   recorded in machine shorthand by me and

12   thereafter transcribed under my

13   supervision with computer-aided

14   transcription; that the deposition is a

15   true and correct record of the testimony

16   given by the witness; and that I am

17   neither of counsel nor kin to any party in

18   said action, nor interested in the outcome

19   thereof.

20

21        WITNESS my hand and official seal

22   this _____ day of _____, 2013.

23

24   _____

25   Notary Public