# EXHIBIT 9

# Limited Liability Company Agreement

## Of

## UNION PLACE PHASE I, LLC

January 31, 2007



DEPOSITION
EXHIBIT

DF D-1
4. Cohen
5-1-13

1367102.06153670

CONFIDENTIAL

TIAA049415

# TABLE OF CONTENTS
(continued)

Page

## ARTICLE 1
## DEFINITIONS

| | | |
|---|---|---|
| Section 1.1 | Definitions | 1 |
| Section 1.2 | Captions, References | 9 |

## ARTICLE 2
## ORGANIZATIONAL MATTERS; PURPOSE; TERM

| | | |
|---|---|---|
| Section 2.1 | Formation of Company | 9 |
| Section 2.2 | Name | 9 |
| Section 2.3 | Registered Office; Registered Agent; Principal Office | 10 |
| Section 2.4 | Foreign Qualification | 10 |
| Section 2.5 | Purpose and Scope | 10 |
| Section 2.6 | Term | 10 |
| Section 2.7 | No State Law Partnership | 10 |
| Section 2.8 | Representations, Warranties and Covenants of Operating Member | 10 |
| Section 2.9 | Representations, Warranties and Covenants of Each Member | 12 |

## ARTICLE 3
## MEMBERSHIP; DISPOSITION OF INTERESTS

| | | |
|---|---|---|
| Section 3.1 | Members | 14 |
| Section 3.2 | Dispositions of Membership Interests | 14 |
| Section 3.3 | Creation of Additional Membership Interests | 14 |
| Section 3.4 | Resignation | 15 |
| Section 3.5 | Information | 15 |
| Section 3.6 | Liability to Third Parties | 15 |

## ARTICLE 4
## MANAGEMENT OF THE COMPANY

| | | |
|---|---|---|
| Section 4.1 | Management | 15 |
| Section 4.2 | Business Plan and Budget | 19 |
| Section 4.3 | Meetings of Members | 20 |
| Section 4.4 | Removal of Operating Member | 20 |
| Section 4.5 | Reimbursement of Expenses | 23 |
| Section 4.6 | Compensation of Members | 23 |
| Section 4.7 | Transactions with Affiliates | 23 |

1367102 06153670

CONFIDENTIAL                                    TIAA049416

TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| Section 4.8 | Member and Affiliate Agreements and Compensation | 23 |
| Section 4.9 | Indemnification; Reimbursement of Expenses; Insurance | 24 |
| Section 4.10 | Conflicts of Interest | 24 |
| Section 4.11 | Appraisals | 24 |
| Section 4.12 | Brokerage Fee Indemnification | 25 |
| Section 4.13 | Property Contribution | 25 |
| Section 4.14 | Right of First Offer on Phase II | 25 |

ARTICLE 5
ACCOUNTING AND REPORTING

| Section 5.1 | Fiscal Year, Accounts, Reports | 26 |
| Section 5.2 | Bank Accounts | 27 |

ARTICLE 6
CAPITAL CONTRIBUTIONS

| Section 6.1 | Initial Capital Contributions | 27 |
| Section 6.2 | Additional Capital Contributions | 28 |
| Section 6.3 | Failure to Make Contributions | 28 |
| Section 6.4 | Return of Contributions | 29 |
| Section 6.5 | Balances | 30 |
| Section 6.6 | Limitation of Liability for Capital Contributions | 30 |
| Section 6.7 | Project Cost Overrun Payments | 30 |

ARTICLE 7
FINANCING

| Section 7.1 | Loan | 30 |

ARTICLE 8
DISTRIBUTIONS

| Section 8.1 | Distributions in General | 31 |
| Section 8.2 | Distribution of Net Cash Flow | 31 |
| Section 8.2 | Special Distribution to Operating Member | 31 |

ARTICLE 9
CAPITAL ACCOUNTS, ALLOCATIONS, AND TAX MATTERS

| Section 9.1 | Capital Accounts | 32 |
| Section 9.2 | Adjustment of Gross Asset Value | 32 |

1367102 06153670

CONFIDENTIAL

TIAA049417

TABLE OF CONTENTS
(continued)

Page

Section 9.3    Profits, Losses and Distributive Shares of Tax Items ................................. 33

Section 9.4    Tax Returns .................................................................................................. 36

Section 9.5    Tax Elections ............................................................................................... 36

Section 9.6    Tax Matters Member .................................................................................... 36

Section 9.7    Allocations on Transfer of Interests ............................................................ 37

ARTICLE 10
WITHDRAWAL, DISSOLUTION, LIQUIDATION, AND TERMINATION

Section 10.1    Dissolution, Liquidation, and Termination Generally ................................. 37

Section 10.2    Liquidation and Termination ...................................................................... 37

Section 10.3    Deficit Capital Accounts ............................................................................ 38

Section 10.4    Cancellation of Certificate ......................................................................... 38

ARTICLE 11
BUY-SELL OPTION

Section 11.1    Buy-Sell ...................................................................................................... 38

Section 11.2    Right of First Offer on Sale of Membership Interest ................................. 39

Section 11.3    General Transfer Provisions ....................................................................... 40

ARTICLE 12
MISCELLANEOUS PROVISIONS

Section 12.1    Notices ......................................................................................................... 43

Section 12.2    Governing Law; WAIVER OF JURY TRIAL ............................................ 43

Section 12.3    Entire Agreement; Amendments .................................................................. 43

Section 12.4    Waiver .......................................................................................................... 43

Section 12.5    Severability .................................................................................................. 43

Section 12.6    Ownership of Property and Right of Partition ............................................ 44

Section 12.7    Involvement of Members in Certain Proceedings ....................................... 44

Section 12.8    Interest .......................................................................................................... 44

Section 12.9    Duplicate Originals ...................................................................................... 44

Section 12.10   Section Titles ................................................................................................ 44

Section 12.11   Attorneys' Fees ............................................................................................ 44

Section 12.12   Arbitration .................................................................................................... 44

1367102 06153670

CONFIDENTIAL

TIAA049418

INDEX TO EXHIBITS

| EXHIBIT | DESCRIPTION | Section in which Exhibit is referenced |
|---|---|---|
| Exhibit A | Schedule of Acquisition Costs | Section 1.1 (Acquisition Costs) |
| Exhibit B | Operating Member Guaranty | Section 1.1 (Operating Member Guaranty) |
| Exhibit C-1 | Legal Description of the Property | Section 1.1 (Property) |
| Exhibit C-2 | Legal Description of the Phase II | Section 1.1 (Phase II) |
| Exhibit C-3 | Legal Description of Reconveyance Property | Section 1.1 (Reconveyance Property) |
| Exhibit D | Schedule of Pro Forma Net Cash Flow | Section 4.4 (n) |
| Exhibit E | Schedule of Agreements with Operating Member and its Affiliates with Forms of Agreements Attached | Section 4.8 |
| Exhibit F | Reporting Requirements | Section 5.1 |
| Exhibit G | Project Costs | Section 6.7 |
| Exhibit H | Special Warranty Deed | Section 4.13 |
| Exhibit I | Title Policy | Section 4.13 |
| Exhibit J | Property Agreements | Section 1.1 (Property Agreements) |

1367102 06153670

CONFIDENTIAL

TIAA049419

LIMITED LIABILITY COMPANY AGREEMENT
OF
UNION PLACE PHASE I, LLC

This Limited Liability Company Agreement (this "**Agreement**") is entered into as of January 31, 2007 between UNION NORTH PHASE I, a District of Columbia limited liability company, ("**Operating Member**"), and TIAA UNION PLACE PHASE I, LLC, a Delaware limited liability company, as a Member ("**Investor Member**").

ARTICLE 1
DEFINITIONS

Section 1.1 **Definitions.**  As used in this Agreement, the following terms shall have the following meanings:

"**Acquisition Costs**" means any and all third-party costs, expenses and fees, as itemized and set forth on Exhibit A attached hereto, reasonably incurred by any Member, its Affiliate or the Company in connection with (i) the due diligence for the Property and the Members' investment in the Company, (ii) the formation of the Company and the preparation, review, negotiation, and entering into of this Agreement and the other organizational and authorization documents for the Company, and (iii) the payment of the purchase price set forth in Section 8.3 hereof, together with all other closing costs required to acquire the Property.  In addition, Acquisition Costs shall include the cost of the title insurance policy and survey update ordered in connection with the contribution of the Property and fifty percent (50%) of transfer and recordation taxes and escrow fees incurred in connection therewith, which shall all be expenses of the Company.

"**Acquisition Date**" means the date upon which the Company acquires title to the Property.

"**Act**" means the Delaware Limited Liability Company Act, as it may be amended from time to time.

"**Additional Capital Contribution**" has the meaning set forth in Section 6.2.

"**Adjusted Capital Account**" means, with respect to a Member, such Member's Capital Account as of the end of each fiscal year, as the same is specially computed to reflect the adjustments required or permitted to be taken into account in applying Regulations Section 1.704-1(b)(2)(ii)(*d*) (including adjustments for Partnership Minimum Gain and Partner Nonrecourse Debt Minimum Gain).

"**Adjusted Capital Account Deficit**" means, for each Member, the deficit balance, if any, in that Member's Adjusted Capital Account.

"**Affiliate**" means, with respect to a Person, another Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Person in question.  The term "**control**" as used in the preceding sentence (and elsewhere in this Agreement) means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Person.

1367102 06153670

CONFIDENTIAL

TIAA049420

"**Agreement**" has the meaning set forth in the Preamble.

"**Arbitrated Value**" means the proceeds which a Member would receive with respect to its Membership Interest if the Property were sold to a third party at Market Value, any Default Loans to Members together with accrued and unpaid interest thereon were repaid in full, and the remaining proceeds (net of customary closing costs, and transfer taxes payable by a seller of real estate in the state where the Property is located were distributed to the Members in a liquidation of the Company pursuant to the terms of this Agreement.

"**Arbitration Procedure**" means the following procedure for determining the Market Value of the Property: (1) the Members shall seek in good faith to agree upon a third party independent appraiser who shall determine the Market Value, (2) should the Members be unable to agree upon such an independent appraiser, (w) each Member shall choose an independent appraiser, and such independent appraisers shall choose a third independent appraiser (the "**Third Appraiser**"), (x) each Member shall submit to the Third Appraiser its good faith estimate of the Market Value of the Property, (y) the Third Appraiser shall determine which of such estimates (the "**Better Estimate**") is closer to the Third Appraiser's determination of the Market Value, and (z) the Better Estimate shall be deemed the Market Value.

"**Architect**" means GTM Architects, Inc., the architect selected by the Members to prepare the Plans and to act as the project architect for the development of the Project, or such replacement architect as the Members approve.

"**Bankruptcy**" means, with respect to a Person, the occurrence of (1) an assignment by the Person for the benefit of creditors; (2) the filing by the Person of a voluntary petition in bankruptcy; (3) the entry of a judgment by any court that the Person is bankrupt or insolvent, or the entry against the Person of an order for relief in any bankruptcy or insolvency proceeding; (4) the filing of a petition or answer by the Person seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; (5) the filing by the Person of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding for reorganization or of a similar nature; (6) the consent or acquiescence of the Person to the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties; or (7) any other event which would cause the Person to cease to be a member of a limited liability company under Section 18-304 of the Act.

"**Bank Secrecy Act**" means the Bank Secrecy Act, 31 U.S.C. §5311 et seq.

"**Business Day**" means any day other than Saturday, Sunday, or other day on which commercial banks in New York are authorized or required to close under the laws of the State of New York and are actually closed.

"**Buy/Sell Deposit**" has the meaning set forth in Section 11.1(a).

"**Buy-Sell Notice**" has the meaning set forth in Section 11.1(a).

"**Capital Account**" has the meaning set forth in Section 9.1.

1367102 06153670

CONFIDENTIAL

TIAA049421

"**Capital Contribution**" means, with respect to each Member, the amount of cash and the initial Gross Asset Value of any property (net of liabilities assumed by the Company resulting from such contribution and liabilities to which the property is subject) contributed to the Company by that Member.

"**Capital Sharing Ratios**" means the percentages, from time to time, of Capital Contributions of the Members relative to the total Capital Contributions of all Members. The initial Capital Sharing Ratios of the Members (based on the net Capital Contributions made by each of the Members as of the date hereof) are as follows:

| Member | Capital Sharing Ratio |
|---|---|
| Operating Member | 10% |
| Investor Member | 90% |

"**Cash Purchase Price**" has the meaning set forth in Section 11.1(a).

"**Cash Selling Price**" has the meaning set forth in Section 11.1(a).

"**Certificate**" has the meaning set forth in Section 2.1.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time, and any corresponding provisions of succeeding law.

"**Company**" means Union Place Phase I, LLC, a Delaware limited liability company.

"**Company Default Loan**" has the meaning set forth in Section 6.3.

"**Company IRR**" means the Internal Rate of Return realized by the Company (as opposed to any Member) upon the total Capital Contributions of all Members, calculated at the times set forth in Section 6.3.

"**Construction Contract**" means a customary and usual guaranteed maximum price contract between the Company and Contractor containing a provision that provides that the Company shall receive 80% of all cost savings from the development of the Project and the Contractors 20% of such cost savings.

"**Contractor**" means ADC Builders, Inc., an Affiliate of the Operating Member who has been engaged by the Company to construct the Project pursuant to the Construction Contract.

"**Contributing Member**" has the meaning set forth in Section 6.3.

"**Control**" has the meaning set forth in the definition of "Affiliate."

"**Default Amount**" has the meaning set forth in Section 6.3(a).

"**Default Loan**" has the meaning set forth in Section 6.3.

- 3 -

CONFIDENTIAL

TIAA049422

"**Default Rate**" means the greater of (a) fifteen percent (15%) per annum and (b) eight percent (8%) above the Prime Rate, as hereinafter defined; provided that such greater rate shall in no event exceed the maximum lawful interest rate.

"**Depreciation**" means, for each taxable year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for the year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of the year or other period, Depreciation will be an amount which bears the same ratio to the beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for the year or other period bears to the beginning adjusted tax basis, provided that if the federal income tax depreciation, amortization, or other cost recovery deduction for the year or other period is zero, Depreciation will be determined with reference to the beginning Gross Asset Value using any reasonable method selected by the Operating Member and Investor Member.

"**Elective Changes**" means any modifications or changes that the Company elects to make to the Plans (and any applicable corresponding changes to the Business Plan and Budget) that are not required to complete the construction of the Project as originally contemplated by the Plans and are approved by Investor Member (which approval or disapproval shall be given by Investor Member within fifteen (15) business days of request therefor).

"**Encumbrance**" has the meaning set forth in <u>Section 3.2(a)</u>.

"**Executive Order**" means the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism.

"**Gross Asset Value**" has the meaning set forth in <u>Section 9.2</u>.

"**Guaranty Payment**" has the meaning set forth in <u>Section 7.2</u>.

"**Hard Cost Savings**" means actual realized savings to the Company in any hard cost line item in the Business Plan and Budget, after taking into account any savings shared with the Contractor under the Construction Contracts. For avoidance of doubt, professional fees and interest expense, among other items, are not hard cost line items.

"**Initial Capital Contribution**" has the meaning set forth in <u>Section 6.1</u>.

"**Initiating Member**" has the meaning set forth in <u>Section 11.1(a)</u>.

"**Intangible Property**" means all of Operating Member's or its applicable Affiliate's rights and interests in and to all nonproprietary and nonconfidential, assignable intangible property related to the Property, including, without limitation: (a) any governmental licenses, permits and approvals held by Operating Member relating to the occupancy or use of the Property, (b) any existing warranties held by Operating Member or any Affiliate of Operating Member and given by third parties with respect to the Property, (c) trade names and trade marks associated with the Property; (d) the plans and specifications and other architectural and engineering drawings for any improvements at the Property; (e) non-governmentally issued licenses, telephone exchanges and other identifying material relating to the Property, including

1367102.06153670

CONFIDENTIAL

TIAA049423

street addresses, telephone numbers and goodwill associated with the Property; and (f) all other records relating to the Property.

"**Internal Rate of Return**" means the discount rate, using cumulative annual compounding, at which the net present value of the Members' Capital Contributions to and distributions from the Company equals zero, calculated for each such Capital Contribution from the date such Capital Contribution was made.  For example, Investor Member shall have received a fourteen and one-half percent (14.5%) annual Internal Rate of Return upon its receipt of a cumulative amount of distributions that cause (a) the present value of the aggregate of all distributions to Investor Member, discounted at an annual rate of fourteen and one-half percent (14.5%) from the date of each such distribution using cumulative annual compounding back to the date of the Capital Contribution for which such distribution is made, reduced by (b) the present value of such Capital Contribution discounted at an annual rate of fourteen and one-half percent (14.5%) using cumulative annual compounding from the date of such Capital Contribution, to equal zero.  The Members' Internal Rate of Return shall be calculated on the basis of the actual number of days elapsed over a 365 or 366-day year, as the case may be, using cumulative annual compounding. For purposes of each Internal Rate of Return calculation, all distributions and Capital Contributions shall be deemed made on the last day of the calendar quarter in which they are actually made; the Internal Rate of Return calculation shall be determined from and including the last day of the calendar quarter in which the Capital Contribution was made by the Members to and including the last day of the calendar quarter in which any distribution is made on account thereof.

"**Investor Member Affiliate**" means any Affiliate of Investor Member.

"**Investor Member**" means TIAA Union Place Phase I, LLC, a Delaware limited liability company, and any permitted assignee or successor to any of the Membership Interests currently held by Investor Member, for so long as such Person is a Member.

"**Lender**" means the Lender under any Loan taken by the Company secured by the Property.

"**Loan**" means the construction loan or other financing made to the Company by a Lender as evidenced by the Loan Documents.

"**Loan Documents**" means the documents executed by, among others, the Company and any Lender.

"**Lockout Period**" has the meaning set forth in Section 11.1.

"**Market Value**" means the value of the Property if sold to a third party in an arms-length transaction.

"**Business Plan**" has the meaning set forth in Section 4.2.

"**Major Decisions**" has the meaning set forth in Section 4.1(b).

"**Member Default Loan**" has the meaning set forth in Section 6.3.

- 5 -

1367102 06153670

CONFIDENTIAL

TIAA049424

"**Members**" means Investor Member and Operating Member, and each Person hereafter admitted as a Member in accordance with this Agreement, until such Person ceases to be a Member of the Company.

"**Membership Interests**" means all of the rights and interests of whatsoever nature of the Members in the Company, including the right to participate in management to the extent herein expressly provided, to receive distributions of funds, and to receive allocations of income, gain, loss, deduction, and credit.

"**Net Cash Flow**" means, for any period, the amount by which Operating Revenues exceed Operating Expenses for such period.

"**Non-Contributing Member**" has the meaning set forth in Section 6.3.

"**Non-Selling Member**" has the meaning set forth in Section 11.2.

"**Nonrecourse Deductions**" has the meaning assigned to it in Regulations Sections 1.704-2(b)(1) and 1.704-2(c).

"**Notice of Proposed Sale of Membership Interest**" has the meaning set forth in Section 11.2.

"**Operating Expenses**" means, for any period, the current obligations of the Company for such period, determined in accordance with sound accounting principles approved by Investor Member, consistently applied, for operating expenses of the Property, for capital expenditures not paid from the Members' Capital Contributions, for interest expenses (other than interest with respect to any Company Default Loan) and for reserves actually funded. Operating Expenses shall not include any non-cash expenses such as depreciation or amortization.

"**Operating Member Guaranty**" means the Guaranty executed by Ronald J. Cohen in favor of the Company in the form attached hereto as Exhibit B.

"**Operating Member**" means Union North Phase I, LLC, a District of Columbia limited liability company, and any permitted assignee or successor to the Membership Interests currently held by Operating Member, for so long as such Person is a Member.

"**Operating Member Permitted Transferee**" means any Affiliate of Operating Member which is at least fifty-one percent (51%) owned (directly or indirectly) by Ronald J. Cohen, Alan D. Cohen, Craig S. Cohen and Sue-Ann Cohen Siegel and controlled by Ronald J. Cohen.

"**Operating Revenues**" means, for any period, the gross revenues of the Company from any source arising from the ownership and operation of the Property during such period, including (w) receipts from the operations of the Company, (x) proceeds of any sale, refinancing or other capital event, (y) proceeds of any business interruption or rental loss insurance maintained by the Company from time to time, and (z) amounts released from Company reserves, but specifically excluding Capital Contributions.

"**Other Member**" has the meaning set forth in Section 11.1(a).

"**Other Member's Deposit**" has the meaning set forth in Section 11.1(b).

- 6 -

CONFIDENTIAL

TIAA049425

"**Partner Nonrecourse Debt**" has the meaning assigned to it in Regulations Sections 1.704-2(b)(4) and 1.752-2.

"**Partner Nonrecourse Debt Minimum Gain**" has the meaning assigned to it in Regulations Section 1.704-2(i)(3).

"**Partner Nonrecourse Deductions**" has the meaning assigned to it in Regulations Section 1.704-2(i)(2).

"**Partnership Minimum Gain**" has the meaning assigned to it in Regulations Section 1.704-2(d).

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended.

"**Person**" means an individual or entity.

"**Phase I Report**" means Phase I Report prepared by _____ with respect to the Property.

"**Phase II**" means the land specifically described on and depicted in <u>Exhibit C-2</u> and all improvements and appurtenances and all fixtures and other personal property related thereto which may now or hereafter be located, erected or developed thereon or used in connection therewith.

"**Plans**" means the plans, specifications and construction drawings of the Project and the development of the Project prepared by the Architect and approved by Operating Member and Investor Member, together with all additions, modifications, supplements, addenda and change orders thereto authorized in accordance with this Agreement.

"**Prime Rate**" means the "prime rate" announced from time to time by Citibank, N.A. in its New York, New York offices as its prime rate.

"**Proceeding**" has the meaning set forth in <u>Section 4.9</u>.

"**Profits**" and "**Losses**" mean, for each taxable year or other period, an amount equal to the Company's taxable income or loss for the year or other period, determined in accordance with Section 703(a) of the Code (including all items of income, gain, loss or deduction required to be stated separately under Section 703(a)(1) of the Code), with the following adjustments:

    (1)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses will be added to taxable income or loss;

    (2)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Section 705(a)(2)(B) expenditures under Regulations Section 1.704-1(b)(2)(iv)(*i*), and not otherwise taken into account in computing Profits or Losses, will be subtracted from taxable income or loss;

- 7 -

CONFIDENTIAL

TIAA049426

(3)    Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Gross Asset Value of the property, notwithstanding that the adjusted tax basis of the property differs from its Gross Asset Value;

(4)    In lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there will be taken into account Depreciation for the taxable year or other period;

(5)    Any items which are specially allocated under Section 9.3(c) or 9.3(d) shall be excluded from the calculations of Profits or Losses; and

(6)    If the Gross Asset Value of any Company asset is adjusted under Section 9.2(b), 9.2(c) or 9.2(d), the adjustment will be taken into account as gain or loss from disposition of the asset for purposes of computing Profits or Losses.

"**Prohibited Person**" means any person or entity: (a) listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order, or (b) that is named as a "specifically designated national (SDN)" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website (http://www.treas.gov.ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such list.

"**Project**" means the work to be done at the Property, including the development of a 10-story, 236,905 square foot apartment complex, all as provided in the Business Plan and Budget from time to time.

"**Project Cost Overrun**" means the amount by which the costs incurred for a Project Cost line item in the Business Plan and Budget exceeds the amount allocated for that line item in the initial Business Plan and Budget (after allocation of any available contingency in the Business Plan and Budget, to the extent permitted under any applicable Loan).

"**Project Cost Overrun Payment**" has the meaning set forth in Section 6.7.

"**Project Costs**" means the hard and soft costs required to cause completion, listed on Exhibit G.

"**Property**" means the land specifically described on and depicted in Exhibit C-1 and all improvements and appurtenances and all fixtures and other personal property related thereto which may now or hereafter be located, erected or developed thereon or used in connection therewith.

"**Property Agreements**" means collectively, the agreements relating to the development, construction and sale of the Project entered into by the Operating Member prior to the date hereof as listed and described on Exhibit J.

"**Property Contribution**" means the contribution by Operating Member of the Property as of the date hereof to the Company.

- 8 -

CONFIDENTIAL

TIAA049427

"Reconveyance Property" means those portions of Square 749 Lots 47, 56, 4 and 27, as specifically described on and depicted in Exhibit C-3.

"Regulations" means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code. All references herein to sections of the Regulations shall include any corresponding provisions of succeeding, similar or substitute temporary or final Regulations.,

"Regulatory Allocations" has the meaning set forth in Section 9.3(d).

"Removal Event" has the meaning set forth in Section 4.4.

"Selling Member" has the meaning set forth in Section 11.2.

"Specified Value" has the meaning set forth in Section 11.1(a).

"Substantial Completion" means (i) completion of construction of the Project (excluding tenant improvements) substantially in accordance with the applicable plans and specifications and any change orders approved in accordance with this Agreement, and in compliance with all applicable laws, codes and ordinances, including completion or all fire safety and security systems, and all parking areas, sidewalks, landscaping and perimeter fencing (weather permitting), except for customary punchlist items, (ii) issuance of a final certificate of occupancy or similar certificate for the base building to permit full legal use, operation in occupancy of the Project and all of the improvements, and (iii) removal of all construction equipment, materials and debris from the Land, except that related to ongoing construction of tenant improvements. Substantial Completion shall be certified by the Architect on an AIA Certificate of Substantial Completion (Form G704) and reasonably and timely confirmed by Investor Member's construction consultant.

"Tax Matters Member" has the meaning set forth in Section 9.6.

"Transfer" has the meaning set forth in Section 3.2(a).

Section 1.2 **Captions, References.** Pronouns, wherever used herein, and of whatever gender, shall include natural persons and corporations and associations of every kind and character, and the singular shall include the plural wherever and as often as may be appropriate. Article and section headings are for convenience of reference and shall not affect the construction or interpretation of this Agreement. Whenever the terms "hereof," "hereby," "herein," or words of similar import are used in this Agreement they shall be construed as referring to this Agreement in its entirety rather than to a particular section or provision, unless the context specifically indicates to the contrary. Whenever the word "including" is used herein, it shall be construed to mean including without limitation. Any reference to a particular "Article" or a "Section" shall be construed as referring to the indicated article or section of this Agreement unless the context indicates to the contrary.

1367102 06153670

CONFIDENTIAL

TIAA049428

## ARTICLE 2
## ORGANIZATIONAL MATTERS; PURPOSE; TERM

Section 2.1     **Formation of Company**. The Company has been organized as a Delaware limited liability company by filing a certificate of formation (the "**Certificate**") under the Act.

Section 2.2     **Name**. The name of the Company shall be Union Place Phase I, LLC and all Company business must be conducted in that name or such other name as the Operating Member and Investor Member approve.

Section 2.3     **Registered Office; Registered Agent; Principal Office**.   The registered office and the registered agent of the Company in the State of Delaware shall be as specified in the Certificate or as designated by the Operating Member with Investor Member's approval. The principal office of the Company shall be c/o Operating Member, 2701 Tower Oaks Boulevard Suite 200, Rockville, Maryland 20852, Attn: Ronald Cohen or at such other location as the Operating Member and Investor Member approve.

Section 2.4     **Foreign Qualification**. Before the Company conducts business in the state where the Property is located or any other jurisdiction other than Delaware, the Operating Member shall cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Operating Member, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, or terminate the Company as a foreign limited liability company in all jurisdictions in which the Company may conduct business.

Section 2.5     **Purpose and Scope**. The purposes and scope of the Company's activities are strictly limited to acquiring, developing, redeveloping, renovating, refurbishing, managing, improving, maintaining, owning, leasing, and selling the Property; financing the foregoing activities; and performing all other activities reasonably necessary or incidental to the furtherance of such purposes.

Section 2.6     **Term**. The Company shall commence on the effective date of the Certificate and shall have perpetual existence, unless sooner dissolved as herein provided.

Section 2.7     **No State Law Partnership**.   The Company shall not be a partnership or joint venture under any state or federal law, and no Member shall be a partner or joint venturer of any other Member for any purposes, other than under the Code and other applicable tax laws, or as expressly provided in a separate agreement between the Members, and this Agreement may not be construed otherwise.

Section 2.8     **Representations, Warranties and Covenants of Operating Member**. In order to induce Investor Member to enter into this Agreement and to perform hereunder, and without limiting any other representation, covenant or warranty contained herein or in any other agreement, Operating Member represents, warrants and covenants to Investor Member, to the best of its knowledge, (unless otherwise provided), that:

- 10 -

CONFIDENTIAL

TIAA049429

(a) **Organization**.  Operating Member has been duly organized, is validly existing, and is in good standing as a District of Columbia limited liability company.

(b) **Conflicts and Pending Actions or Proceedings**.  There is no agreement to which Operating Member is a party or, to Operating Member's knowledge, binding on Operating Member which is in conflict with this Agreement, or which challenges or impairs Operating Member's ability to transfer the Property to the Company or perform its obligations under this Agreement.  There is not now pending or, to the best of Operating Member's knowledge, threatened, any action, suit or proceeding before any court or governmental agency or body against the Operating Member that would prevent Operating Member from transferring the Property to the Company or performing its other obligations hereunder or against or with respect to the Property. To Operating Member's knowledge, no condemnation, eminent domain or similar proceedings are pending or threatened with regard to the Property. Operating Member has not received any notice and has no knowledge of any pending or threatened liens, special assessments, impositions or increases in assessed valuations to be made against the Property.

(c) **Leases and Property Agreements**.  There are no lease or occupancy agreements affecting any portion of the Property or the improvements.  There are no leasing or other fees or commissions due in connection with any lease or any renewal or extension or expansion of any lease of the Property.  There are no contracts with respect to the Property in effect except for the Property Agreements.

(d) **Permits, Legal Compliance, and Notice of Defects**.  To Operating Member's knowledge, neither of the Property nor the use of thereof violates any governmental law or regulation or any covenants or restrictions encumbering the Property. Operating Member has not received, nor is aware of, any written notice from any insurance company or underwriter of any defects that would materially adversely affect the insurability of the Property or cause an increase in insurance premiums. Operating Member has not received any notices of violations or alleged violations of any laws, rules, regulations or codes, including building codes, with respect to the Property which have not been corrected to the satisfaction of the issuer of the notice.

(e) **Environmental**.  Except to the extent indicated in the Phase I Report, Operating Member has no knowledge of any violation of Environmental Laws related to the Property or the presence or release of Hazardous Materials on or from the Property.  Neither Operating Member nor, to Operating Member's knowledge, any tenant or other occupant, has manufactured, introduced, released or discharged from or onto the Property any Hazardous Materials or any toxic wastes, substances or materials (including, without limitation, asbestos), and neither Operating Member nor, to Operating Member's knowledge, any tenant or other occupant, has used the Property or any part thereof for the generation, treatment, storage, handling or disposal of any Hazardous Materials in violation of any Environmental Laws.  To Operating Member's knowledge, there are no underground storage tanks located on the Property. The term "**Environmental Laws**" includes without limitation the Resource Conservation and Recovery Act and the Comprehensive Environmental Response Compensation and Liability Act and other federal laws governing the environment as in effect on the date of this Agreement, together with their implementing regulations, guidelines, rules or orders as of the date of this Agreement, and all state, regional, county, municipal and other local laws, regulations, ordinances, rules or orders that are equivalent or similar to the federal laws recited above or that purport to regulate Hazardous Materials. The term "**Hazardous Materials**" includes petroleum,

1367102 06153670

CONFIDENTIAL

TIAA049430

including crude oil or any fraction thereof, natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas or such synthetic gas), and any substance, material, waste, pollutant or contaminant listed or defined as hazardous or toxic under any Environmental Law.

(f)     **Utilities**.     All utilities serving the Property enter it through publicly-dedicated roads or through currently effective public or private easements.

(g)     **Independent Unit**.     The Property are each a separately taxed, duly subdivided, independent unit which do not now rely on any facilities (other than facilities covered by easements appurtenant to the Property or facilities of municipalities or public utilities) located on any property that is not part of the Property, to fulfill any municipal or other governmental requirement, or for the furnishing to the Property, of any essential building systems or utilities (including drainage facilities, catch basins, and retention ponds).  No other building or other property that is not part of the Property relies upon any part of the Property to fulfill any municipal or other governmental requirement, or to provide any essential building systems or utilities.

(h)     **Withholding Obligation**.     Operating Member's contribution of the Property is not subject to any federal, state or local withholding obligation of Operating Member under the tax laws applicable to Operating Member or the Property.

(i)     **Due Diligence Information Complete**.     All documents relating to the Property or the Project provided to Investor Member by or on behalf of Operating Member represent true and correct copies of such documents, and there are no other material side agreements, oral or written, in regard to the acquisition, development and ownership of the Property or the Project which have not been disclosed to Investor Member.

(j)     **Due Diligence Information Accurate**.     No modification, supplement or amendment of any such document since the execution thereof has been made which has not been provided to Investor Member.  No document, certificate or other writing prepared by or for Operating Member and provided to Investor Member by or on behalf of Operating Member in connection with the Property or the Project contains any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.   To the best knowledge of Operating Member, no document, certificate or other writing provided to Investor Member by or on behalf of Operating Member but not prepared by or for Operating Member in connection with the Property contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(k)     **No Other Information**.     Except as disclosed to Investor Member, Operating Member is not aware of any other fact which might reasonably be expected to have a material adverse effect (financial or otherwise) on the Property or the Project.

Section 2.9     **Representations, Warranties and Covenants of Each Member**. Each of the Operating Member and the Investor Member hereby represents, warrants and covenants to the other that:

- 12 -

CONFIDENTIAL

TIAA049431

(a)  **Authority, Due Execution, Enforceability.** Such party has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby; all acts and other proceedings required to be taken by such party to authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby have been duly and properly taken; this Agreement has been duly executed and delivered by such party and constitutes the valid and binding obligation of such party, enforceable against it in accordance with its terms, except as such enforceability may be limited by any applicable bankruptcy, insolvency or similar laws.

(b)  **Approvals.** Such party has obtained all approvals and consents required to be obtained by it in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby from all governmental authorities having any approval rights with respect thereto, and from all other persons having consent rights in cases where failure to consent would have a material adverse effect on the Company or its assets.

(c)  **ERISA.** Such party is not a "foreign person" within the meaning of Section 1445 of the Code; such party is not an "employee benefit plan", as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974 ("**ERISA**"), or a "plan", as defined in Section 4975(e) of the Code, and the assets of such party have not been deemed "plan assets" of one or more such plans for purposes of Title I of ERISA or Section 4975 of the Code; such party is not a "governmental plan" within the meaning of Section 3(32) of ERISA, and no transaction by or with such party is subject to or in violation of any state statutes applicable to regulation of investments of and fiduciary obligations with respect to governmental plans.

(d)  **No Proceedings.** There are no proceedings pending, or to the knowledge of such party, threatened against such party or any of its Affiliates which seek to restrain or enjoin the consummation of or declare unlawful the transactions contemplated hereunder; there are no judgments, injunctions, orders or other judicial or administrative mandates outstanding against such party or any of its Affiliates which would interfere with its or its Affiliate's ability to perform its obligations hereunder or would have a material adverse effect upon the Company; such party is not aware of any threatened litigation against such party or any of its Affiliates which have or could have a material adverse effect on the Company or its ability to consummate the transactions contemplated hereunder.

(e)  **Patriot Act.** Such party is not (i) engaged in any money laundering scheme or activity in violation of applicable anti-money laundering or anti-terrorism laws and regulations, including the Patriot Act, the Executive Order, and the Bank Secrecy Act, or (ii) a Prohibited Person or in violation of any of the laws relating to Prohibited Persons.

## ARTICLE 3
## MEMBERSHIP; DISPOSITION OF INTERESTS

Section 3.1  **Members.**  The initial Members of the Company are Investor Member and Operating Member, each of which is admitted to the Company as a Member as of the date hereof.

1367102 06153670

CONFIDENTIAL

TIAA049432

Section 3.2      Dispositions of Membership Interests.

(a)      **General Restriction**. A Member may not make an assignment, transfer, or other disposition (voluntarily, involuntarily, directly or indirectly, by merger, change of control or by operation of law) (a "**Transfer**") of all or any portion of its Membership Interest, nor pledge, mortgage, hypothecate, grant a security interest in, or otherwise encumber (an "**Encumbrance**") all or any portion of its Membership Interest, except with the consent of the other Member or as permitted in Sections 3.2(b) or 3.2(c). Any attempted Transfer of all or any portion of a Membership Interest, other than in strict compliance with this Section 3.2, shall be void. A Person to whom a Membership Interest is Transferred may be admitted to the Company as a member only with the consent of the other Member, which may be given or withheld in the other Member's sole and absolute discretion. In connection with any Transfer of a Membership Interest or any portion thereof, and any admission of an assignee as a Member, the Member making such Transfer and the assignee shall furnish the other Member with such documents regarding the Transfer as the other Member may request (in form and substance satisfactory to the other Member), including a copy of the Transfer instrument, a ratification by the assignee of this Agreement (if the assignee is to be admitted as a Member),and a legal opinion that the Transfer complies with applicable federal and state securities laws.

(b)      **Permitted Investor Member Transfers to Third Parties**. Investor Member may Transfer or otherwise grant Encumbrances in all or a portion of its Membership Interest to any other Person so long as an Investor Member Affiliate retains management authority over such Membership Interest and the right to make Major Decisions. Ownership interests in any Investor Member may be Transferred so long as such Investor Member is controlled by an Investor Member Affiliate. In addition, Investor Member may Transfer its Membership Interest to a fund whose fund sponsor is an Investor Member Affiliate in accordance with the terms of this Section 3.2; any Transfer caused by the replacement of such Investor Member Affiliate by a third party institutional investor shall be permitted.

(c)      **Permitted Investor Member Affiliate Transfers**. Any Investor Member may at any time, without the consent of any other Member, Transfer all or a portion of its rights, titles and interests as a Member to any other Person who is an Investor Member Affiliate and have such person admitted and recognized as a Member, provided only that only the Investor Member effecting the Transfer and the transferee Investor Member (as if it were an assignee) shall be required to deliver to the non-assigning Members an assumption of the obligations under this Agreement of the transferring Investor Member with respect to such transferred interest.

(d)      **Permitted Operating Member Transfers**. Operating Member may at any time, without the consent of any other Member, Transfer all or a portion of its rights, titles and interests as Operating Member to any other Person who is an Operating Member Permitted Transferee and have such person admitted and recognized as Operating Member, provided only that the Operating Member effecting the Transfer and the transferee Operating Member (as if it were an assignee) shall be required to deliver to the non-assigning Members an assumption of the obligations under this Agreement of the transferring Operating Member with respect to such transferred interest and a consent to the transfer and reaffirmation of obligations under the Operating Member Guaranty signed by Ronald J. Cohen.

Section 3.3      **Creation of Additional Membership Interests**. Additional Membership Interests may be created and issued to existing Members or to other Persons, and

1367102 06153670

CONFIDENTIAL

TIAA049433

such other Persons may be admitted to the Company as Members, with the approval of the Operating Member and Investor Member, on such terms and conditions as the Operating Member and Investor Member may determine at the time of admission. Such admission of any new Members or creation of any new class or group of Members shall be valid if done by an amendment to this Agreement executed by all Members.

Section 3.4   **Resignation**.   A Member may not resign or withdraw from the Company without the consent of the other Members.

Section 3.5   **Information**.   In addition to the other rights specifically set forth in this Agreement, each Member is entitled to the following information as soon as practicable and in no event later than five (5) days after request and under the other circumstances and conditions set forth in the Act: (a) true and full information regarding the status of the business and financial condition of the Company; (b) promptly after becoming available, a copy of the Company's federal, state and local income tax returns for each year; (c) a current list of the name and last known business, residence or mailing address of each Member and Operating Member; (d) a copy of this Agreement, the Company's certificate of formation, and all amendments to such documents; (e) true and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each Member and which each Member has agreed to contribute in the future, and the date on which each became a Member; (f) the opportunity to inspect the Project and Property: and (g) other information regarding the affairs of the Company to which that Member is entitled pursuant to Section 18-305 of the Act (including all Company books and records).   Under no circumstances shall any information regarding the Company or its business be kept confidential from Investor Member or Operating Member.

Section 3.6   **Liability to Third Parties**.   No Member shall be liable for the debts, obligations or liabilities of the Company. Notwithstanding anything in this Agreement to the contrary, upon the Bankruptcy of the Company, Operating Member or Investor Member, and for so long as such Person shall remain in Bankruptcy, then only the affirmative vote of all of the Members not in Bankruptcy can require any Member to make any Capital Contribution to the Company, and the Bankrupt Person shall have no authority to require any such Capital Contribution to be made by any of the Members. Each Member acknowledges and agrees that the terms of <u>Article 6</u> are a part of this Agreement solely for the individual benefit of the Members, are not an asset of the Company and may not be relied on by any creditor of the Company.

## ARTICLE 4
## MANAGEMENT OF THE COMPANY

Section 4.1   **Management**.

(a)   **Management Vested in Members; Routine Matters.**   Management of the Company shall be vested in the Members. Subject to <u>Section 4.1(b)</u>, the Operating Member shall manage the routine, day-to-day affairs of the Company and take all actions and make all expenditures with regard thereto, but only to the extent such specific action or expenditure is included in the then applicable Business Plan and Budget. Investor Member shall have sole authority to enforce any agreement between the Company and Operating   Member or its Affiliates and to make all determinations on behalf of the Company with respect thereto. Each

- 15 -

CONFIDENTIAL

TIAA049434

of Investor Member and Operating Member covenants and agrees to use all commercially reasonable efforts to minimize Operating Expenses and maximize the Operating Revenues of the Property, in the best interest of the Company, and to exercise such efforts as a party not having a conflict of interest. Operating Member agrees to provide access to Investor Member and its construction and other consultants to all meetings concerning the construction of the Project, to the Project site at reasonable times and to any other information or material concerning the Project reasonably requested by Investor Member and its consultants.

(b)     **Major Decisions**. Except for management of the routine, day-to-day affairs of the Company by Operating Member consistent with the then applicable Business Plan and Budget as provided in Section 4.1(a), all other decisions regarding the Company and its business, operations and assets ("**Major Decisions**"), including the following matters, shall be made by the Investor Member alone:

(1)     regarding Company assets, the acquisition or disposition of the Property, any mortgage, financing, refinancing, hypothecation or encumbrance of all or any part thereof, any acquisition of any real or personal property in addition to the Property;

(2)     regarding Company financial affairs, (A) approval of each Business Plan and Budget and any amendments thereto; (B) determination of major accounting policies, including selection of depreciation schedules, accounting methods and making various decisions regarding treatment and allocation of transactions for federal and state income, franchise or other tax purposes, (C) determination of the terms and conditions of all Company borrowings and the identity of the Lender thereof, any determination to amend any approved Loan Documents, and the granting of any guaranties or indemnities by the Company, (D) selection of banks for deposit of Company funds, and the designation of Persons with signatory authority over withdrawal of such funds, (E) the determination of any capital or operating reserves necessary or advisable for the Company and the Property not set forth in the approved Business Plan and Budget, (F) the making of any expenditure or incurrence of any obligation by or for the Company which is in excess of such line item in the then current Business Plan and Budget and for which there is no available contingency in either; however, if emergency repairs to the Property are necessary to avoid imminent danger of injury to the Property or to an individual, the Operating Member may make such expenditures as may be necessary to alleviate such situation and shall promptly notify Investor Member of the event giving rise to such repairs and the actions taken with respect thereto, (G) the making of any loan or granting of any guaranty by the Company to any Person, and (H) the approval of all income tax and other tax returns to be filed by the Company;

(3)     regarding Additional Capital Contributions;

(4)     regarding development or redevelopment of the Property, development or redevelopment schedules, budgets and all other material matters relating to the acquisition or the development of the Property; any architects agreements or construction contracts; approval of the plans for the Project and any material change orders or other modifications issued thereto; selection of contractors, subcontractors, architects and engineers; insurance coverages, the underwriters thereof, and claims related thereto; and any variation from or amendment to any of the foregoing;

- 16 -

CONFIDENTIAL

TIAA049435

(5)     regarding all leases of space in the Property, the form of lease agreements, guidelines for minimum rental rates, minimum and maximum length of lease terms, brokerage commissions and, to the extent it requires an action outside the Business Plan and Budget, the approval of any lease or the acceptance of cancellation or surrender of any lease or the forgiveness or release of any lease covenant or requirement;

(6)     regarding Property operations, approval of: property managers, leasing contractors, management and leasing agreements, other material third party agreements, construction contracts, and brokerage agreements, including, specifically, approval of all Affiliates of Operating Member as contractors, subcontractors or service providers; insurance coverages (including property and casualty and title insurance), the underwriters thereof and claims related thereto; zoning changes, any ground lease or master lease, disposition of any interest in the Property, easement, restrictive covenants, reciprocal operating agreement, cross-easement agreement, similar agreements or any amendments thereto, and any matters relating to casualties affecting the Property or any condemnation or eminent domain proceeding affecting the amount of reserves for capital improvements, replacements, and purchases, or any other Company purposes; modifications of any of the foregoing; and all matters relating to the Property's compliance with environmental, health, access, and other applicable laws;

(7)     using or referencing in any way the name of, or any affiliation with, Investor Member, any Investor Member Affiliate, or any of their Affiliates in any business representation or advertising;

(8)     taking of any legal action and any determination to settle any legal action, or making any decision with respect to legal or tax matters which could have a material adverse effect upon the Company, the Property or the Investor Member;

(9)     filing of any petition or consenting to the filing of any petition that would subject the Company to a Bankruptcy; making of an assignment for the benefit of creditors of the Company; the application for appointment of a custodian, receive or trustee by the Company or with respect to any of the Company's property; or admitting in writing that the Company is unable to pay its debts generally as they become due;

(10)     selection of attorneys, accountants, engineers, environmental consultants, or other professionals for the Property or the Company; for avoidance of doubt, the Investor Member must approve any agreement with any such professional on behalf of the Company;

(11)     entering into or amending or granting any approval, consent or waiver under any agreement with Operating Member or an Affiliate of Operating Member;

(12)     regarding any distributions of Net Cash Flow by the Company, and establishing reserves of the Company, other than as set forth in the then-current Business Plan and Budget;

(13)     regarding any environmental, ecological or archaeological matter relating to the Property, including selection of consultants in regard thereto and adoption of and implementation of any operation and maintenance program or any other program to

- 17 -

CONFIDENTIAL

TIAA049436

remove or otherwise remediate hazardous materials or other potential adverse effects on the assets (including goodwill) of the Company;

(14)    regarding merger, consolidation, termination or dissolution of the Company; and

(15)    regarding the delivery of any written notice or communication to the Lender under a Loan secured by a lien encumbering the Property.

If the Operating Member requests that the Investor Member approve any Major Decision, the Operating Member shall deliver a written request to the Investor Member at the notice address set forth herein; provided, however, in the period prior to the adoption of the initial Business Plan and Budget such approvals may be requested by an email sent to Gerald Casimir (gcasimir@tiaa-cref.org) with a copy to Harold Piazza (hpiazza@tiaa-cref.org) and the assigned asset manager from Investor Member and given by an email from any of the above. Thereafter, the Investor Member shall be deemed to have not consented to such Major Decision if it does not respond within fifteen (15) days of the Operating Member's written request for such approval.

(c)    **Duties of the Operating Member.**

(1)    The Operating Member shall discharge its duties in a good and proper manner as provided for in this Agreement. The Operating Member shall on behalf of the Company, in good faith use its best efforts to (i) implement all Major Decisions, (ii) enforce agreements entered into by the Company, (iii) conduct the routine, day-to-day business and affairs of the Company in accordance with good industry practice and this Agreement, including performing, on behalf of the Company, the Company's obligations with respect to any Loan, (iv) procure and maintain all insurance policies and coverages to be obtained and maintained by the Company, as reasonably prescribed by Investor Member from time to time, (v) pay (with Company funds) all obligations of the Company when due, including real estate taxes for the Property, (vi) cause the Project to be marketed and leased in accord with the Business Plan and Budget, and (vii) provide Investor Member with copies of all correspondence and other communications with any Lender pertaining to any Loan, as and when the same are delivered or received.

(2)    The Operating Member shall devote sufficient time to perform its duties hereunder in accordance this Agreement. The Operating Member shall not delegate any of its rights or powers to manage and control the business and affairs of the Company without the prior written consent of Investor Member. Notwithstanding Section 3.2(d), Ronald J. Cohen, and Alan D. Cohen shall each be actively involved in the development, leasing and management of the Property and shall devote a substantial amount of their time in such efforts; provided, however, that so long as Investor Member is satisfied, in its sole judgment, with the capacity and ability of Operating Member to proceed with the development of the Property, it shall not be a default of Operating Member hereunder if either or both of Ronald J. Cohen and Alan D. Cohen are unable to discharge such duties by reason of his death, permanent disability or termination of his employment by Operating Member or its Affiliates.

(3)    Operating Member will conduct OFAC searches on all prospective tenants and the principals thereof (or cause the leasing agent or property manager to conduct such

- 18 -

CONFIDENTIAL

TIAA049437

searches) prior to entering into a lease with any tenant and will retain a record of such searches in the lease file for each tenant. In no event will Operating Member knowingly enter into, or recommend that the Company enter into, any lease with a tenant that is a Prohibited Person. Operating Member will implement procedures approved by Investor Member from time to time intended to assure that the operation, management and leasing activities of the Company will at all times be in compliance with the Patriot Act and other money laundering laws and regulations. Operating Member covenants and agrees to deliver to Investor Member any certification report or other evidence requested from time to time by Investor Member in its reasonable discretion, confirming Operating Member's compliance with this Section.

    (d)    **Sale of the Property.** Investor Member shall have the sole right to sell the Property (or any part thereof or interest therein), and to select the purchaser and determine the timing thereof and the amount and terms thereof.

    Section 4.2    **Business Plan and Budget.** Within sixty (60) days from the date of this Agreement, the Operating Member shall prepare a Business plan and budget for the development and operating of the Project ("**Business Plan and Budget**") which shall contain: (i) a preliminary development and construction budget for the Project, including expected operating expenses and capital expenses and anticipated revenues, (ii) the required governmental approvals for the Project, (iii) a description of any development to be done as part of the Project and a detailed milestone schedule for progress of such development, (iv) leasing guidelines for rental of any space at the Project (if applicable) and (v) such other items as Investor Member may require. From and after Substantial Completion, the Business Plan and Budget shall contain (i) a budget for the Project over the period covered by the Business Plan and Budget, including all budgeted capital and operating Expenses, anticipated Capital Contributions and anticipated revenues from the Project, (ii) a detailed description of the anticipated Operating Expenses, including those anticipated for maintenance, repair and management of the Property and any planned or required improvements to the Property with the schedule for such improvements, (iii) leasing guidelines for rental of any space at the Project (if applicable), (iv) a leasing plan addressing strategies for renting any vacant space (if applicable), (v) a detailed marketing report, which at least sets forth a description of anticipated rents for comparable projects for the applicable year and (vi) such other matters as Investor Member may require. The Business Plan and Budget shall be submitted to Investor Member for approval, and after such approval Operating Member shall use its best efforts to implement the Business Plan and Budget. On or before September 1, October 1 and November 1 of each year, as required in Section 5.1, Operating Member shall submit initial and final drafts of an updated Business Plan and Budget to Investor Member for its approval, and after such approval the updated Business Plan and Budget shall take effect.

    Section 4.3    **Meetings of Members.**

    (a)    **Regular Meetings.** The Members shall hold quarterly meetings to discuss the Property and such other matters regarding Company business as the Members may decide.

    (b)    **Special Meetings.** Special meetings of the Members may be called by the Operating Member or by Investor Member at any time by delivering at least two-business days' prior notice thereof to the other Member to discuss such matters regarding Company business as the Members may decide.

1367102 06153670

CONFIDENTIAL

TIAA049438

(c)   <u>Procedure.</u>  Each Company meeting shall be held at the office of the Operating Member or, at Investor Member's option, by telephone, unless the Members otherwise agree.  If a Person attends (whether in person or telephonically) a meeting such attendance shall constitute a waiver by such Person of notice of such meeting, unless such Person attends the meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.  A Person may vote at such meeting by written proxy executed by that Person and delivered to the Operating Member or Investor Member.  A proxy shall be revocable unless it is stated to be irrevocable.  Any action required or permitted to be taken at such meeting may be taken without a meeting, without prior notice, and without a vote if a consent or consents in writing, setting forth the action so taken, is signed by the Operating Member and the Members that would be necessary to take the action at a meeting at which all Members were present and voted.   Any meeting may take place by means of telephone conference, video conference, or similar communication equipment by means of which all Persons participating therein can hear each other.

Section 4.4      <u>Removal of Operating Member</u>.

(a)      The Operating Member may be removed by Investor Member as provided herein under any of the following circumstances (a "**Removal Event**"):

(1)   if Operating Member or any Affiliate of Operating Member commits a felony or other crime involving moral turpitude;

(2)   if Operating Member or any Affiliate of Operating Member misapplies any funds derived from the Property (including lease payments, security deposits, insurance proceeds and condemnation awards), or commingles funds derived from the Property with other funds, unless the misapplication or commingling was not intentional, the amount involved is not material and Operating Member (or its Affiliate) promptly provides restitution thereof;

(3)   if Operating Member or any Affiliate of Operating Member commits fraud, intentional misrepresentation, gross negligence or willful misconduct;

(4)   if the Company fails to maintain insurance as required by this Agreement or any related agreement as a result of the act or omission of Operating Member or any Affiliate of Operating Member, which default remains uncured upon the earlier of (x) three (3) business days after notice thereof to Operating  Member, and (y) the cancellation of any such insurance;

(5)   if Operating Member or any Affiliate of Operating Member fails to pay any taxes or assessments affecting the Property when due, which default remains uncured upon the earlier of (x) five (5) business days after notice thereof to Operating  Member, and (y) the forfeiture and sale of the Property as the result of any lien arising out of any such taxes;

(6)   If any event of default under any Loan is due to the actions or inactions of Operating  Member or any Affiliate of Operating Member (other than any actions taken by the Operating Member or such Affiliate within the scope of its authority as Operating Member, in good faith and in best interest of the Company, and not in violation of this

- 20 -

CONFIDENTIAL

TIAA049439

Agreement, and other than the failure of Operating Member to make payments under the Loan for which Company funds are not available), and such breach or event of default is not cured within any applicable cure period allowed under the applicable Loan Document(s) and the Lender takes actions to enforce its rights or remedies with respect to such default;

(7)     Bankruptcy of the Company (unless consented to by Investor Member);

(8)     the liquidation or dissolution of the Operating Member;

(9)     Bankruptcy of Operating Member or any Affiliate of Operating Member which has an economic relationship to the Property;

(10)     the occurrence of a default (including misrepresentation or non-disclosure of material facts or breach of any warranties and representations) in any development agreement, property management agreement, leasing agreement or other service contract between the Company and Operating Member or any Affiliate of Operating Member and the continuation of such default for fifteen (15) days after receipt of notice of such default and the expiration of any cure period applicable thereto under such contract;

(11)     the occurrence of a default by Operating Member under Section 3.2 or Section 4.10;

(12)     the failure of Operating Member to make any Additional Capital Contribution as set forth in Section 6.2 or Project Cost Overrun Payments as set forth in Section 6.7;

(13)     if Operating Member or any Affiliate of Operating Member commits any other breach of or default under this Agreement or any related agreement (including a breach of any representations or warranties), which breach or default continues for fifteen (15) days after receipt by such Person of notice of its occurrence from Investor Member; provided, however, that if such breach is susceptible of cure but not capable of being cured within such period, then such 15-day cure period shall be extended for an additional period not exceeding thirty (30) days as Investor Member shall in good faith determine is required for the cure of such breach;

(14)     If at the end of any of the 2010 through 2012 fiscal years, the "Net Cash Flow" of the Property is less than the estimated "Net Cash Flow" for such year as set forth in the Schedule of Pro Forma Net Cash Flow attached hereto as Exhibit D; it being understood for purposes of this calculation only, that debt service and capital expenditures shall not be included in the calculation of "Net Cash Flow"; and

(15)     the failure of the Operating Member to achieve Substantial Completion of the Project by June, 2009.

(b)     Upon delivery of a notice by Investor Member of the occurrence of a Removal Event (i) Investor Member may at its election proceed to purchase the Membership Interest of the Operating Member at the Arbitrated Value determined according to the Arbitration Procedure, and (ii) the rights of Operating Member to initiate the buy-sell mechanism

- 21 -

CONFIDENTIAL

TIAA049440

or sell its Membership Interest set forth in Article 11 shall be suspended. In the event Investor Member elects to purchase the Membership Interest of the Operating Member, the purchase price therefor shall be reduced (except in the case of a Removal Event solely pursuant to Section 4.4(a)(14), in which case there shall be no such reduction) by (x) 100% of the amount of damages, if any, incurred by the Investor Member arising out of the actions constituting such Removal Event and (y) a percentage equal to the Capital Sharing Ratio of the Investor Member of the amount of damages, if any, incurred by the Company arising out of the actions constituting such Removal Event. Within fifteen (15) days of the determination of the Arbitrated Value, Investor Member shall make a deposit equal to five percent (5%) of the Arbitrated Value, and the closing of the transaction shall occur within sixty (60) days of the making of such deposit.

    (c)    Also, upon the occurrence of a Removal Event:

    (1)    Investor Member may appoint itself, an Investor Member Affiliate, or a third party as Operating Member;

    (2)    Net Cash Flow available for distribution pursuant to Section 8.2(b) of this Agreement shall instead be distributed to the Investor Member and the Operating Member in the percentages expressed in their Capital Sharing Ratio (except in the case of a Removal Event solely pursuant to Section 4.4(a)(14), in which case there shall be no such change);

    (3)    Profits to be allocated to the Members pursuant to Section 9.3(a)(iii) shall instead be allocated among the Members in the percentages expressed in their Capital Sharing Ratios (except in the case of a Removal Event solely pursuant to Section 4.4(a)(14), in which case there shall be no such change); and

    (4)    Investor Member may, without cause, terminate all agreements between the Company and Operating Member or any Affiliate of Operating Member as provided in Section 4.7(b), including the agreements described in Section 4.8.

In regard to the foregoing, each Member hereby appoints Investor Member as its attorney in fact (such power of attorney being coupled with an interest and irrevocable) for the purpose of executing, delivering and filing such documents that Investor Member deems necessary or desirable (including any amendment to the Certificate or to this Agreement) for the purpose of effecting (i) such removal of Operating Member, and (ii) the admission of a new Member to the Company as Operating Member thereof. In the event of such admission of a new Member and removal of the Operating Member, the new Operating Member, except as otherwise agreed with the Investor Member, shall have (x) all the authority, powers, rights and obligations of a manager of a limited liability company under the Act, and (y) all of the authority, powers, rights and obligations of the Operating Member in this Agreement.

    Section 4.5    **Reimbursement of Expenses**. Each of Investor Member and the Operating Member shall be reimbursed by the Company for all reasonable out-of-pocket expenses actually incurred by it directly in conjunction with the business and affairs of the Company (but specifically excluding travel and entertainment expenses and general overhead and administrative expenses), only to the extent set forth on an approved Business Plan and Budget. Upon request, Investor Member or the Operating Member, as applicable, shall

1367102 06153670

CONFIDENTIAL

TIAA049441

provide reasonable supporting verification to the other Member for all expenditures for which any reimbursement is requested.

Section 4.6    **Compensation of Members**.    Except as herein otherwise specifically provided, no compensatory payment shall be made by the Company to any Member in connection with this Agreement or the transactions contemplated hereby, including for the services rendered to the Company by such Member (or any member or employee of such Member) as Operating Member.

Section 4.7    **Transactions with Affiliates**.

(a)    **General**. Except as otherwise expressly provided in Section 4.8, when any service or activity to be performed on behalf of the Company is performed by an Affiliate of a Member, the fee payable for such service or activity shall not exceed the fee which would be payable by the Company to an unaffiliated third party of comparable standing providing the same services.

(b)    **Termination Upon Removal of Operating Member**.    If Operating Member is removed as a result of the occurrence of a Removal Event, then the Company may terminate all agreements with Operating Member's Affiliates, and all such agreements must contain a provision that allows for the exercise of the right of termination under this Section 4.7(b).  Investor Member shall have the sole right to enforce this provision on behalf of the Company.

(c)    **Termination Upon Sale**. Upon the sale of the Property, or the acquisition of the interest of one Member by the other Member pursuant to Article 11 hereof, all agreements with Affiliates of the selling Member shall, at the option of the buying Member, terminate automatically without the requirement of further action by the Members.

(d)    **Construction Contract**. The Construction Contract shall be delivered to Investor Member for approval not later than June 1, 2007.  In the event that it is determined by the Investor Member that the guaranteed maximum price in the Construction Contract is in such an amount that it causes the Business Plan and Budget to become unacceptable to Investor Member, then Investor Member may at its option determine, within 30 days of receipt of the proposed Construction Contract, to cause the Property to be sold.  In such an event, Operating Member may elect to purchase the membership interest of Investor Member for a price equal to the amount the Investor Member would have received were the Company to liquidate all of its assets for the Market Value as determined according to the Arbitration Procedure and the Company were to dissolve and distribute the proceeds of liquidation as provided in Section 8.2

Section 4.8    **Member and Affiliate Agreements and Compensation**.    The Company shall enter into agreements with the Operating Member and its Affiliates respecting property management, leasing, development and asset management, if applicable, as indicated in the schedule attached as Exhibit E, with the applicable agreements attached as Exhibits E-1 and following.

- 23 -

CONFIDENTIAL

TIAA049442

Section 4.9        Indemnification; Reimbursement of Expenses; Insurance.

(a)        To the fullest extent permitted by the Act: (1) the Company shall indemnify each Member who was, is or is threatened to be made a party to any threatened, pending or completed action, suit or proceedings ("**Proceeding**"), any appeal therein, or any inquiry or investigation preliminary thereto, solely by reason of the fact that it is or was the Operating Member or a Member and was acting within the scope of its duties or under the authority of the Members; (2) the Company shall pay or reimburse any Member for expenses incurred by it (A) in advance of the final disposition of a Proceeding to which such Member was, is or is threatened to be made a party, and (B) in connection with its appearance (or the appearance by an officer, employee or agent of such Member) as a witness or other participation in any Proceeding. The Company, by adoption of a resolution of the Members (or as otherwise agreed in writing), may indemnify and advance expenses to an officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Members under the preceding sentence. The provisions of this Section 4.9 shall not be exclusive of any other right under any law, provision of the Certificate or this Agreement, or otherwise. Notwithstanding the foregoing, this indemnity shall not apply to actions constituting negligence, gross negligence, willful misconduct or bad faith, or involving a breach of this Agreement to the extent not covered by insurance maintained by the Company. The Company shall purchase and maintain insurance required by Investor Member to protect itself and any Member, officer, employee or agent of the Company, whether or not the Company would have the power to indemnify such Person under this Section 4.9. This indemnification obligation shall be limited to the assets of Company and no Member shall be required to make a Capital Contribution in respect thereof.

(b)        Each Member agrees to indemnify, defend and hold harmless the Company and the other Member(s) from any loss, claim, damage or liability resulting from actions of such indemnifying Member constituting (i) negligence not covered by insurance maintained by the Company, (ii) gross negligence, (iii) willful misconduct or (iv) bad faith.

Section 4.10        **Conflicts of Interest.**

(a)        Until the earlier of (i) twenty-four (24) months from the date of this Agreement and (ii) the date Substantial Completion has been achieved and leasing activity begun at the Project, neither Operating Member nor any Affiliate of Operating Member may engage in any residential real estate project (other than the project currently under development by an Affiliate of Operating Member at 76 L Street, S.E., Washington, DC) either inside, or within a one (1) mile radius of, the District of Columbia. Except for Investor Member's rights with respect to Phase II as set forth in Section 4.14 hereof, each Member, and each Affiliate thereof, may engage in and possess interests in other business ventures of any and every type and description, at any location, independently or with others, with no obligation to offer to the Company or any other Member the right to participate therein or to account therefor. Subject to Section 4.7, the Company may transact business with any Member or any Affiliate thereof.

(b)        All business ventures of any and every type and description arising out of or relating or pertaining to the Property or the Company shall be for the account of the Company, and all revenues derived therefrom shall accrue solely to the Company.

- 24 -

1367102 06153670

CONFIDENTIAL                                                                                    TIAA049443

Section 4.11       Appraisals.  At the election of Investor Member, the Company shall at its expense from time to time, but not more frequently than once in every 12-consecutive month period, cause an appraisal to be done on the Property or any portion thereof by an appraiser selected by Investor Member.

Section 4.12       **Brokerage Fee Indemnification**.  The broker's commission due to The Greenwich Group shall be an Operating Expense of the Company.  Operating Member hereby agrees to indemnify, defend and hold harmless the Investor Member from any loss, claim, damage or liability against the Investor Member and its Affiliates for any brokerage commissions or finder's fees claimed by any broker or other party (other than the Greenwich Group) in connection with the formation of the Company or the Company's acquisition of the Property, and any claim by any third party relating to such transaction, which arises from any action of Operating  Member or any of its Affiliates.  Investor Member hereby agrees to indemnify, defend and hold harmless Operating  Member from any loss, claim, damage or liability against Operating Member and its Affiliates for any brokerage commissions or finder's fees claimed by any broker or other party (other than the Greenwich Group), in connection with the formation of the Company or the Company's acquisition of the Property and arising from any action of Investor Member or any Investor Member Affiliate.

Section 4.13       **Property Contribution**.

(a)       Simultaneous with the Initial Capital Contribution made by Investor Member pursuant to Section 6.1, and the special distribution to be made to Operating Member pursuant to Section 8.3, Operating Member shall make the Property Contribution to the Company by special warranty deed in the form attached hereto as Exhibit H subject only to the permitted exceptions shown on the title policy attached hereto as Exhibit I.  As a condition precedent to the funding of the Initial Capital Contribution by Investor Member pursuant to Section 6.1, the Company shall have received an owner's title commitment with the affirmative coverage and endorsements (including a non-imputation endorsement as to knowledge of Operating Member and its principals, the same having supplied an indemnity acceptable to the title company for the issuance of such endorsement), insuring title as to the Property in the Company, subject only to the exceptions shown in the form of title policy attached hereto as Exhibit J.  As of the date hereof, without the need for any other documentation, Operating Member hereby assigns (or shall cause its applicable Affiliate to assign) to the Company all of its right, title and interest under or to all of the Property Agreements, the Intangible Property, and the purchase agreements whereby the applicable affiliate of Operating Member acquired the Property.  Operating Member or its Affiliates shall pay 50% of transfer and recordation fees and escrow fees incurred in connection with the Property Contribution.

(b)       Except to the extent otherwise provided in the Business Plan and Budget, real estate taxes and assessments, including without limitation any assessments imposed by private covenant (collectively, "**taxes**") and utilities and other expenses associated with the Property, shall be prorated on an accrual basis between Operating Member and the Company as of the close of business on the day immediately preceding the Property Contribution. When such taxes become due Operating Member shall pay its share with respect to the period prior to the Property Contribution and the Company shall pay its share with respect to the period after the Property Contribution.  Operating Member shall pay on or prior to the Property Contribution all delinquent and unpaid taxes and liens against the Property of an ascertainable amount.

- 25 -

1367102 06153670

CONFIDENTIAL

TIAA049444

(c)     The parties hereto recognize and acknowledge that the Property includes portions of certain Assessment and Taxation ("A&T") Lots within Square 749 that are not, under current District of Columbia regulations, conveyable by metes and bounds descriptions. Operating Member is currently in the process of resubdividing all of the land consisting of the Property and Phase II into one subdivision parcel and will subsequently divide that parcel to reflect the Property and Phase II as two (2) separate A&T Lots (the "Resubdivision"). Accordingly, and notwithstanding the definition of Property contained herein, the property initially conveyed pursuant to Section 4.13(a) above shall include the Reconveyance Property. Upon completion of the Resubdivision (or, if necessary as part of the resubdivision process, or as may otherwise may be allowable during the Resubdivison process, prior thereto), the Company shall reconvey the Reconveyance Property to K Street Developers, LLC (the grantor of same), for no consideration, by Special Warranty Deed but with no other warranties or representations, provided, however, that any transfer taxes, recording fees and other expenses associated with such reconveyance shall be the sole cost and expense of K Street Developers, LLC.

Section 4.14   **Right of First Offer on Phase II**.  If at any time within five (5) years after the date the Company breaks ground on Phase I, K Street Developers LLC, an Affiliate of Operating Member elects to sell (directly or indirectly) or undertake the development of Phase II, Operating Member shall first give Investor Member notice of such sale or development, in which case Investor Member shall have the option to (i) cause Operating Member to contribute Phase II to the Company, the parties agreeing as of the date hereof that the deemed value upon such a contribution would be equal to 93.5% of the Market Value at the time of the contribution as determined according to the Arbitration Procedure, or, (ii) in the case that the Company has already dissolved, purchase Phase II for a price equal to 93.5% of the Market Value determined in accordance with the Arbitration Procedure and upon other reasonable terms and conditions.  If Investor Member fails to elect either (i) or (ii) within 30 days of the notice by Operating Member of its intention to sell or develop Phase II, Investor Member shall be deemed to have elected neither option, in which case Operating Member may proceed with the sale or development of Phase II on the terms and conditions negotiated by Operating Member, provided that if Operating Member obtains a price in the market less than 93.5% of the Market Value determined in accordance with the Arbitration Procedure, the Operating Member shall first re-offer Phase II at 93.5% of such lesser price to Investor Member (in this case Investor Member shall have five (5) days to respond and if it fails to respond shall be deemed to have elected not to proceed). Operating Member shall record a Memorandum of Understanding against Phase II disclosing the rights of Investor Member contained in this Section.

## ARTICLE 5
## ACCOUNTING AND REPORTING

Section 5.1      **Fiscal Year, Accounts, Reports**.

(a)     The fiscal year of the Company shall be the calendar year unless a different fiscal year is required pursuant to Section 706 of the Code.

(b)     The books of account of the Company, at Company expense, shall be kept and maintained by the Operating Member on an accrual basis and on a tax basis. The Operating Member shall prepare a reconciliation of such books and records to cash receipts and disbursements. Further, the Operating Member at the Company's expense, shall prepare or cause to be prepared all required federal and state Company tax returns, which returns shall be

- 26 -

CONFIDENTIAL

TIAA049445

delivered to the Members within seventy-five (75) days of calendar year end and once approved by Investor Member, timely filed with the appropriate government agencies.

(c)     The Operating Member, at its expense, shall provide, or cause to be provided, in a written format and an electronic file formatted in the manner selected by Investor Member, to each Member at the earliest practicable time, but in no event later than the due date set for quarterly unaudited financial statements in <u>Exhibit F</u>, a series of data files, in form satisfactory to Investor Member, and containing the following:

(A)   quarterly unaudited financial statements as set forth in Exhibit F, (B) a current year cash flow reforecast, (C) any variances between the Business Plan and Budget and the actual income and expenses of the Property, (D) a comparison of the Business Plan and Budget with actual quarterly results, showing dollar and percent variances and containing a narrative discussing major variances, (E) cash flow statements containing columns for quarterly and year-to-date pro forma and quarterly and year-to-date, (F) a rent roll report, (G) a leasing status report that discusses leasing activity, (H) a copy of all written reports produced by the Operating Member that discuss historical or projected performance of the Property, and (I) a competitive market survey for the market in which the Property is competing, reflecting the rents being charged by competing projects and if available, the occupancy levels of such competing projects.

(d)     Operating Member, at the cost and expense of the Company, shall produce for the Company and provide to the Investor Member the reports required in <u>Exhibit F</u>, on or before the deadlines specified therein.  The annual audited financial statements for the Property which are referred to in <u>Exhibit F</u> shall include, as supplementary schedules, a consolidated balance sheet, cash flow statement and income statement for the Property and a statement of the Capital Accounts of each Member, and of all balances of each Member indicating the type and amount of each type of Capital Contribution and any changes in Members' equity.  If requested, such annual financial statements shall be audited by an independent firm of certified public accountants selected by the Operating Member and approved by Investor Member and prepared in accordance with generally accepted accounting principles consistently applied.

(e)     The books and records of the Company shall be kept at the principal place of business of the Company.  Each Member, or its designated agents or employees, at Company expense, may at all reasonable times during usual business hours audit, examine and make copies of or extracts from the books of account records, files and bank statements of the Company.

(f)     The foregoing reports and statements are in addition to any other report or statement specifically required by this Agreement.

Section 5.2      <u>Bank Accounts</u>.  The Operating Member shall open and maintain (in the name of the Company) a special bank account or accounts in a bank or savings and loan association, the deposits of which are insured, up to the applicable limits, by an agency of the United States government, in which shall be deposited all funds of the Company.  Withdrawals therefrom shall be made upon the signatures of such Persons as the Operating Member shall designate with the approval of Investor Member, <u>provided</u>, <u>however</u>, that at least one individual designated and appointed by Investor Member shall at all times be an authorized signatory on all

- 27 -

CONFIDENTIAL

TIAA049446

accounts of the Company. All funds of the Company shall be maintained and held in such special accounts, and shall not be commingled with the funds of any other Person.

## ARTICLE 6
## CAPITAL CONTRIBUTIONS

Section 6.1      **Initial Capital Contributions**.

(a)      Contemporaneously with execution of this Agreement, Operating Member has contributed its interest in the Property to the Company and certain cash, and Investor Member has contributed certain cash. With respect to all Capital Contributions made as of the date hereof all as set forth in the first sentence of this paragraph, Operating Member shall be deemed to have made a Capital Contribution in the amount of $1,787,649.80 as of the date of this Agreement. For avoidance of doubt, as of the date of this Agreement after giving effect to the contributions described in the first sentence of this paragraph, Operating Member shall be deemed to have (a) sold 90% of the Property to the Company in exchange for the special distribution set forth in Section 8.3 and (b) contributed 10% of the Property to the Company as a Capital Contribution. Accordingly, Operating Member shall have aggregate Capital Account credits of $1,787,649.80, and Operating Member's Internal Rate of Return on its Initial Capital Contribution of $1,787,649.80 shall be calculated as though such Initial Capital Contribution was made as of the date of this Agreement. At the same time, Investor Member has made a cash Initial Capital Contribution to the Company in the amount of $ 16,088,848.22. The Initial Capital Contributions made by the Members shall be used to pay for the Acquisition Costs itemized on Exhibit A, the special distribution set forth in Section 8.3 and other operating expenses of the Company.

(b)      Operating Member and Investor Member agree that all expenses paid by them that are to be reimbursed by the Company pursuant to Section 4.5 hereof shall be reimbursed to them by the Company as soon as practicable after they are incurred.

Section 6.2      **Additional Capital Contributions**.

(a)      If and when decided by the Investor Member, Investor Member and Operating Member shall make Capital Contributions to the Company ("**Additional Capital Contributions**") in proportion to their respective Capital Sharing Ratios.

Section 6.3      **Failure to Make Contributions**.

(a)      In the event of a failure by any Member to contribute any Initial Capital Contributions or Additional Capital Contributions or Project Cost Overrun Payments required by Sections 6.1 within 5 Business Days of the date required to be made, or Section 6.2 or 6.7 within 7 Business Days of the date notice is sent of such required Additional Capital Contributions or Project Cost Overrun Payments, then, provided the other Member shall have made its corresponding Capital Contribution, such refusal or failure shall constitute a default by the non-contributing Member (the "**Non-Contributing Member**"), and the other non-defaulting Member (the "**Contributing Member**") may advance (a "**Default Loan**") all or a portion of the Non-Contributing Member's unpaid Capital Contribution (the "**Default Amount**") to the Company on behalf of the Non-Contributing Member. At the option of the Contributing Member, either (i) such Default Loan (which shall include for purposes of a Company Default Loan both the

- 28 -

1367102 06153670

TIAA049447

amount advanced on behalf of the Non-Contributing Member and the amount already advanced by the Contributing Member to the Company) shall be deemed a loan to the Company (a "**Company Default Loan**") or (ii) such Default Loan shall be deemed a loan, with full recourse, to the Non-Contributing Member (a "**Member Default Loan**") secured by a pledge of the Non-Contributing Member's entire Membership Interest in the Company and any fees payable by the Company to such Non-Contributing Member and/or its Affiliates.  The following terms shall apply to each Default Loan.

(1)     Each Default Loan shall bear interest until paid at an annual rate equal to the greater of (i) the Default Rate and (ii) the Company IRR; provided, however, at no time shall such interest rate exceed the maximum lawful interest rate.

(2)     Interest on account of a Default Loan as a matter of course shall be calculated and paid at the Default Rate; provided, however, each time a distribution is to be made to the Members pursuant to Section 8.2, the Company IRR and rate of interest on all Default Loans shall be recalculated.  If the Company IRR at the time of a distribution exceeds the rate used to calculate interest on the Default Loan (which interest rate equals the higher of the Default Rate or the Company IRR as previously calculated), then the interest payable with respect to the Default Loan (including Default Loans already repaid) shall be recalculated based upon the recalculated Company IRR, and any additional interest owed due to such recalculation (plus interest on such difference charged from the date such difference would have been paid through the date of the recalculation based on an annual rate equal to the recalculated Company IRR) shall be paid to the Contributing Member as provided in (3) below in the case of a Company Default Loan and (4) below in the case of a Member Default Loan.  Notwithstanding the foregoing, the interest payable on the Default Loan shall not exceed the interest that would be payable were the interest rate equal to the maximum lawful interest rate.

(3)     Each Company Default Loan, including interest thereon, shall be repaid in full to the Contributing Member out of the first available Net Cash Flow.  Such payments shall be applied first to the payment of accrued but unpaid interest on each such obligation and then to the payment of the outstanding principal until each Company Default Loan is paid in full.

(4)     Each Member Default Loan, including interest thereon, shall be repaid in full to the Contributing Member out of the first available New Cash Flow or other amounts otherwise payable to the Non-Contributing Member pursuant to this Agreement.  Such payments shall be applied first to the payment of accrued but unpaid interest on each such obligation and then to the payment of the outstanding principal until each Member Default Loan is paid in full.  A Non-Contributing Member may, at any time, repay a Member Default Loan without payment of any premium or penalty (other than accrued interest thereon).

(5)     Each Member hereby grants to the other Members and the Company, equally and ratably, a security interest in its Membership Interest and any fees payable to such Member and/or its Affiliates to secure repayment of any Member Default Loan upon demand.  Upon any default in the repayment of any Member Default Loan upon demand, the Contributing Member making such Member Default Loan shall have all the rights and remedies of a secured party under the Uniform Commercial Code with respect

- 29 -

CONFIDENTIAL

TIAA049448

to the security interest granted herein, and the proceeds arising from any foreclosure of the security interest herein granted may be applied to attorneys' fees and expenses incurred by the Contributing Member in exercising such rights and remedies. Each Member shall execute and deliver to the other Members and to the Company all such financing statements and other instruments as may be requested by the other Members to evidence and/or perfect the security interest provided for herein. This Agreement may serve as the necessary financing statement, or the Contributing Member may execute and file a financing statement on behalf of the Non-Contributing Member, and the Non-Contributing Member hereby appoints the Contributing Member as its attorney-in-fact to execute such financing statements and other instruments as may be necessary to evidence or continue the perfection of the security interest herein granted. Such power of attorney is coupled with an interest and is irrevocable.

Section 6.4   **Return of Contributions**.   Except as expressly provided herein, no Member shall be entitled to (a) the return of any part of its Capital Contributions, (b) any interest in respect of any Capital Contribution, or (c) the fair market value of its Membership Interest in connection with a withdrawal from the Company or otherwise. Unpaid Capital Contributions shall not be a liability of the Company or of any Member. No Member shall be required to contribute or lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions to the Company.

Section 6.5   **Balances**.   The Company's books and records shall contain entries indicating the type and amount of Capital Contributions and loans made to the Company and the distributions and payments made by the Company thereon.

Section 6.6   **Limitation of Liability for Capital Contributions**.   No Member shall have any obligation to make any Capital Contribution to the Company except as provided in this Article 6.

Section 6.7   **Project Cost Overrun Payments.**

(a)     The Operating Member shall make payments (such payments being, "Project Cost Overrun Payments") as and when required to timely pay Project Cost Overruns. Project Cost Overrun Payments are not Capital Contributions, and neither Investor Member nor the Company shall have any obligation to reimburse or otherwise compensate Operating Member with respect to any Project Cost Overrun Payment. The obligation of the Operating Member to make Project Cost Overrun Payments shall continue after any Removal Event pursuant to Section 4.4, provided such obligation shall not apply with respect to any Project Cost Overruns caused by Investor Member or its agents or resulting from a change after the removal to the Plans as in effect as of the date of the removal.

(b)     The obligation of the Operating Member to make Project Cost Overrun Payments pursuant to paragraph (a) shall be offset by any available Hard Cost Savings, to the extent that the applicable Lender permits such reallocation of line items without increasing the amount of any Loan. In no event shall any Hard Cost Savings be reallocated if such savings resulted from a reduction in the scope or quality of the Project. The Operating Member shall provide to Investor Member, on a monthly basis, a list of any available Hard Cost Savings and the reallocation of any Hard Cost Savings to cover Project Cost Overruns.

- 30 -

1367102 06153670

CONFIDENTIAL

TIAA049449

(c)    Notwithstanding the foregoing, Investor Member and Operating Member shall make Capital Contributions to provide funds for Elective Changes in proportion to their Capital Sharing Ratios.

ARTICLE 7
FINANCING

Section 7.1    Loan.

(a)    The Members intend that the acquisition, development, construction and operation of the Property by the Company be financed with a Loan.

(b)    **Guaranty of Non-Recourse Carveouts**. Operating Member agrees that it will (x) provide to the Lender under any Loan a customary guaranty of the so-called "non-recourse carveouts" for the Loan from a guarantor acceptable to the Lender, and (y) shall promptly provide such Lender with all information in its possession or readily obtainable relating to the Property and the financial conditions of the Company and any guarantor or indemnitor under the guarantees and indemnities referred to in this Section 7.1 which are requested by the Lender in connection with the Loan.

(c)    **Environmental Indemnities**. Operating Member agrees that it will provide to the Lender all environment indemnities customarily required by lenders and required by the terms of any Loan from an indemnitor acceptable to the Lender.

(d)    **Completion and Other Guaranties.** Operating Member agrees that it will provide to the Lender any Completion Guaranty and other guaranties required by Lender from a Guarantor acceptable to Lender.

Section 7.2    **Guaranty Payments**. Any amounts paid by the Operating Member to a third party pursuant to any non-recourse carveout guaranty or environmental indemnity given to a Lender pursuant to this Section 7.2 shall for purposes of this Agreement be a "Guaranty Payment" as of the date paid. Investor Member shall be obligated to reimburse Operating Member for any Guaranty Payment made with respect to "non-recourse carveouts" only to the extent such payment arises out of the willful misconduct or other intentional act of the Investor Member; the Company shall be obligated to reimburse Operating Member for any Guaranty Payment made with respect to "non-recourse carveouts" unless and to the extent such payment arises out of the willful misconduct or gross negligence of Operating Member (in which case neither the Company nor Investor Member shall have any obligation to reimburse Operating Member for any such Guaranty Payment made with respect to "non-recourse carveouts"). The Company shall be obligated to reimburse any Guaranty Payment made by Operating Member with respect to any environmental indemnity or with respect to interest payable on the Loan in excess of the amount set forth in the initial Business Plan and Budget (except to the extent such interest is payable due to a delay in Substantial Completion beyond the date set forth in Section 4.4(o), in which case no reimbursement shall be payable to Operating Member). Neither the Company nor the Investor Member shall be obligated to reimburse any Guaranty Payment made with respect to any completion guaranty given in connection with any Loan. To the extent the Company does not reimburse any Member with respect to a Guaranty Payment as required by this Section 7.2 when the Company is obligated to do so, one Member shall reimburse the other

- 31 -

CONFIDENTIAL      TIAA049450

*Member until each Member has paid its pro rata share of the Guaranty Payment based on its Capital Sharing Ratio.*

# ARTICLE 8
## DISTRIBUTIONS

Section 8.1    **Distributions in General.**  Except as expressly set forth in the approved Business Plan and Budget or expressly consented to by Investor Member, the Operating Member shall distribute, in accordance with Section 8.2, all Net Cash Flow quarterly (or in the case of Net Cash Flow comprising sale proceeds or refinancing proceeds, within fifteen (15) days after the Company receives such sale or refinancing proceeds).

Section 8.2    **Distribution of Net Cash Flow.**  Net Cash Flow for any particular period *shall, subject to Section 6.3, be distributed to the Members in the following order of priority:*

(a)    First, to the Members pro rata in accordance with their respective Capital Sharing Ratios until each Member has received aggregate distributions pursuant to this Section 8.2(a) equal to an Internal Rate of Return of Fourteen and One-half Percent (14.5%); and

(b)    Thereafter, Fifty Percent (50%) to Operating Member and Fifty Percent (50%) to Investor Member.

Section 8.3    **Special Distribution to Operating Member.**  Contemporaneously with the Property Contribution and other Initial Capital Contributions by Operating Member and Investor Member, the Company shall make a special, one-time distribution to the Operating Member of (x) $15,300,000 corresponding to ninety percent (90%) of the value of the Property on contribution plus (y) ninety percent (90%) of the following Project Costs paid by Operating Member or its Affiliates prior to the date hereof:  $233,808.02 for expenses associated with the Architect of the Project.

# ARTICLE 9
## CAPITAL ACCOUNTS, ALLOCATIONS, AND TAX MATTERS

Section 9.1    **Capital Accounts.**

(a)    **Establishment and Maintenance.**  A separate capital account ("**Capital Account**") will be maintained for each Member.  The Capital Account of each Member will be determined and adjusted as follows:

(1)    Each Member's Capital Account will be credited with the Member's Capital Contributions, the Member's distributive share of Profits, any items in the nature of income or gain that are specially allocated to the Member under Sections 9.3(c) or 9.3(d), and the amount of any Company liabilities that are assumed by the Member or secured by any Company property distributed to the Member.

(2)    Each Member's Capital Account will be debited with the amount of cash and the Gross Asset Value of any Company property distributed to the Member under any provision of this Agreement, the Member's distributive share of Losses, any items in the

- 32 -

CONFIDENTIAL

TIAA049451

*nature of deduction or loss that are specially allocated to the Member under Section 9.3(c) or 9.3(d).*

(3)     If any interest in the Company is transferred in accordance with the terms of this Agreement, the transferee will succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(b)     **Modifications by Operating Member**.  The provisions of this Section 9.1 and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Section 704(b) of the Code and the Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions.  The Operating Member may, with the consent of Investor Member, modify the manner in which the Capital Accounts are maintained under this Section 9.1 to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions; however, without the unanimous consent of all Members, the Operating Member may not make any modification to the way Capital Accounts are maintained if such modification would have the effect of changing the amount of distributions to which any Member would be entitled during the operation, or upon the liquidation, of the Company.

Section 9.2     **Adjustment of Gross Asset Value**.  "**Gross Asset Value**", with respect to any asset, is the adjusted basis of that asset for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed (or deemed contributed under Code Sections 704(b) and 752 and the Regulations promulgated thereunder) by a Member to the Company will be the fair market value of the asset on the date of the contribution, as determined by the Operating Member and Investor Member.

(b)     The Gross Asset Values of all Company assets will be adjusted to equal the respective fair market values of the assets, as determined by the Operating Member and Investor Member, as of (1) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution, (2) the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an interest in the Company if an adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company and (3) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g).

(c)     The Gross Asset Value of any Company asset distributed to any Member will be the gross fair market value of the asset on the date of distribution.

(d)     The Gross Asset Values of Company assets will be increased or decreased to reflect any adjustment to the adjusted basis of the assets under Code Section 734(b) or 743(b), but only to the extent that the adjustment is taken into account in determining Capital Accounts under Regulations Section 1.704-1(b)(2)(iv)(m), provided that Gross Asset Values will not be adjusted under this Section 9.2 to the extent that the Operating Member determines that an adjustment under Section 9.2(b) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment under this Section 9.2(d).

- 33 -

1367102 06153670

CONFIDENTIAL

TIAA049452

(e)     After the Gross Asset Value of any asset has been determined or adjusted under Section 9.2(a), 9.2(b) or 9.2(d), Gross Asset Value will be adjusted by the Depreciation taken into account with respect to the asset for purposes of computing Profits or Losses.

Section 9.3     Profits, Losses and Distributive Shares of Tax Items.

(a)     **Profits.**  Except as otherwise provided in Sections 9.3(c), 9.3(d) and 10.2(c), Profits for any taxable year or other period shall be allocated among the Members as follows: (i) first, to the extent Losses have been allocated to the Members pursuant to Section 9.3(b)(iii), 100% to such Members in the same ratio, in reverse order, and to the extent of, such allocation of Losses until the allocation of Losses pursuant to Section 9.3(b)(iii) has been fully offset; (ii) second, 100% to the Members pro rata in accordance with their respective Capital Sharing Ratios until the balance in each Member's Capital Account is equal to an amount that would cause such Member to achieve an Internal Rate of Return of 14.5% (taking into account all prior distributions to such Member pursuant to Section 8.2(a)) if such amount were distributed to such Member at the time of such allocation; and (iii) thereafter, (A) fifty percent (50%) to the Investor Member and (B) fifty percent (50%) to the Operating Member.

(b)     **Losses.**  Except as otherwise provided in Sections 9.3(c), 9.3(d) and 10.2(c), Losses for any taxable year or other period shall be allocated among the Members as follows: (i) first, to the extent Profits have been allocated to the Members pursuant to Section 9.3(a)(iii), 100% to the Members in the same ratio and in reverse order of such allocations of Profits until the allocation of Profits pursuant to Section 9.3(a)(iii) has been fully offset; (ii) second, to the extent that Profits have been allocated to the Members pursuant to Section 9.3(a)(ii), one hundred percent (100%) to the Members in the same ratio and in reverse order of such allocations of Profits until the allocation of Profits pursuant to Section 9.3(a)(ii) has been fully offset; and (iii) thereafter, one hundred percent (100%) to the Members pro rata in accordance with their respective Capital Sharing Ratios.

(c)     **Special Allocations.**  The following special allocations will be made in the following order and priority before allocations of Profits and Losses:

(1)     **Partnership Minimum Gain Chargeback.**  If there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, before any other allocation under this Agreement, each Member will be specially allocated items of Company income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to such Member's share of the net decrease in Partnership Minimum gain during such year determined in accordance with Regulations Section 1.704-2(g)(2).   The items to be allocated will be determined in accordance with Regulations Section 1.704-2(g).   This Section 9.3(c)(1) is intended to comply with the Partnership Minimum Gain chargeback requirements of the Regulations, will be interpreted consistently with the Regulations and will be subject to all exceptions provided therein.

(2)     **Partner Nonrecourse Debt Minimum Gain Chargeback.**  Notwithstanding any other provision of this Section 9.3 (other than Section 9.3(c)(1) which shall be applied first), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations were previously made, any Member with a share of such Partner Nonrecourse Debt

- 34 -

CONFIDENTIAL

TIAA049453

Minimum Gain (determined under Regulations Section 1.704-2(i)(5)) as of the beginning of the year will be specially allocated items of Company income and gain for that period (and, if necessary, subsequent periods) in an amount equal to such Member's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during such year determined in accordance with Regulations Section 1.704-2(g)(2). The items to be so allocated will be determined in accordance with Regulations Section 1.704-2(g). This Section 9.3(c)(2) is intended to comply with the Partner Nonrecourse Debt Minimum Gain chargeback requirements of the Regulations, will be interpreted consistently with the Regulations and will be subject to all exceptions provided therein.

(3) **Qualified Income Offset**. A Member who unexpectedly receives any adjustment, allocation or distribution described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) will be specially allocated items of Company income and gain in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible.

(4) **Nonrecourse Deductions**. Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated among the Members in proportion to their relative Capital Contributions.

(5) **Partner Nonrecourse Deductions**. Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i).

(6) . **Code Section 754 Adjustments**. To the extent an adjustment to the adjusted tax basis of any Company asset under Code Sections 734(b) or 743(b) is required to be taken into account in determining Capital Accounts under Regulations Section 1.704-1(b)(2)(iv)(m), the amount of the adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis), and the gain or loss will be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted under Regulations Section 1.704-1(b)(2(iv)(m).

(7) **Loss Limitation**. Notwithstanding anything to the contrary in Section 9.2(b), Losses allocated pursuant to Section 9.2(b) shall not exceed the maximum amount that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any allocation year. In the event that some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation pursuant to Section 9.2(b), the limitation set forth in this Section 9.2(c)(7) shall be applied on a Member-by-Member basis so as to allocate the maximum permissible Losses to each Member under Regulations Section 1.704-1(b)(2)(ii)(d).

(d) **Curative Allocations**. The allocations set forth in Section 9.3(c) (the "**Regulatory Allocations**") are intended to comply with certain requirements of Regulations Sections 1.704-1(b) and 1.704-2. The Regulatory Allocations may effect results which would be inconsistent with the manner in which the Members intend to divide Company distributions. Accordingly, the Operating Member is authorized to divide allocations of Profits, Losses, and

- 35 -

1367102 06153670

CONFIDENTIAL

TIAA049454

other items (other than Regulatory Allocations) among the Members, to the extent that they exist, so that the net amount of the Regulatory Allocations and the special allocations to each Member is zero. The Operating Member will have discretion to accomplish this result in any reasonable manner that is consistent with Code Section 704 and the related Regulations.

(e)     **Tax Allocations - Code Section 704(c)**.  For federal, state and local income tax purposes, Company income, gain, loss, deduction or expense (or any item thereof) for each fiscal year shall be allocated to and among the Members in accordance with their respective shares of Profits or Losses, or other items specially allocated pursuant to Sections 9.3(c) and 9.3(d), *to which such items relate*. *In accordance with Code Section 704(c) and the related Regulations*, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis to the Company of the property for federal income tax purposes and the initial Gross Asset Value of the property (computed in accordance with Section 9.2). If the Gross Asset Value of any Company asset is adjusted under Section 9.2(b), subsequent allocations of income, gain, loss and deduction with respect to that asset will take account of any variation between the adjusted basis of the asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the related Regulations.  Any elections or other decisions relating to allocations under this Section 9.3(e) will be made in any manner that the Members determine reasonably reflects the purpose and intention of this Agreement.  Allocations under this Section 9.3(e) are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into account in computing, any Member's Capital Account.

(f)     **Reporting**.  Members shall be bound by the provisions of this Section 9.3 in reporting their shares of Company income and loss for income tax purposes.

Section 9.4     **Tax Returns**.  The Operating Member shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in Section 9.5.  Each Member shall furnish to the Operating Member all pertinent information in its possession relating to Company operations that is necessary to enable such income tax returns to be prepared and filed.  In addition, the Operating Member shall cause *Schedule K-1s to be delivered to each Member on or before March 15 of each year for the preceding year*.

Section 9.5     **Tax Elections**.  The elections shall be made on the appropriate returns of the Company:

(a)     to adopt the calendar year as the Company's fiscal year (unless otherwise required by codes or regulations);

(b)     to adopt the accrual method of accounting and to keep the Company's books and records (other than Capital Accounts, which shall be maintained in accordance with Section 9.2 hereof) on the income-tax method;

(c)     if there is a distribution of Company property as described in Section 734 of the Code or if there is a transfer of a Company interest as described in Section 743) of the Code, upon written request of any Member, to elect, pursuant to Section 754 of the Code, to adjust the basis of Company properties; and

- 36 -

1367102 06153670

TIAA049455

(d)     to elect to amortize the organizational expenses of the Company as permitted by Section 709(b) of the Code.

No election shall be made by the Company or any Member to (x) exclude the Company from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state laws, or (y) treat the Company as an association taxable as a corporation for federal income tax purposes pursuant to Regulations Section 301.7701-3(c).

Section 9.6     **Tax Matters Member**.  The Member serving as Operating Member shall be the "tax matters partner" of the Company pursuant to section 6231(a)(7) of the Code and Section 301.6231(a)(7)-2 of the Regulations (the "**Tax Matters Member**").  As Tax Matters Member, such Member shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of section 6223 of the Code.  Such Member shall inform each other Member of all significant matters that may come to its attention in its capacity as tax matters partner by giving notice thereof within ten days after becoming aware thereof and, within such time, shall forward to each other Member copies of all significant written communications it may receive in such capacity.  Such Member shall not take any action contemplated by Sections 6222 through 6231 of the Code without the consent of Investor Member.  This provision is not intended to authorize such Member to take any action left to the determination of an individual Member under Sections 6222 through 6231 of the Code.

Section 9.7     **Allocations on Transfer of Interests**.  All items of income, gain, loss, deduction, and credit allocable to any interest in the Company that may have been transferred shall be allocated between the transferor and the transferee based upon that portion of the calendar year during which each was recognized as owning such interest, without regard to the results of Company operations during any particular portion of such calendar year and without regard to whether cash distributions were made to the transferor or the transferee during such calendar year; however, such allocation shall be made in accordance with a method permissible under Section 706 of the Code and the Regulations thereunder.

# ARTICLE 10
## WITHDRAWAL, DISSOLUTION, LIQUIDATION, AND TERMINATION

Section 10.1     **Dissolution, Liquidation, and Termination Generally**.  The Company shall be dissolved upon the first to occur of any of the following:

(a)     The sale or disposition of all of the assets of the Company and the receipt, in cash, of all consideration therefor;

(b)     The mutual decision of the Operating Member and Investor Member to dissolve the Company; and

(c)     The occurrence of any event which, as a matter of law, requires that the Company be dissolved.

Section 10.2     **Liquidation and Termination**.  Upon dissolution of the Company, unless it is continued as provided above, the Operating Member shall act as liquidator or may appoint one or more other Persons as liquidator; however, if the Company is dissolved because of an event occurring with respect to the Operating Member, the liquidator shall be one or more

- 37 -

1367102 06153670

CONFIDENTIAL

TIAA049456

Persons selected in writing by the other Members. The liquidator shall proceed diligently, and if at all possible within the same tax year as the commencement of liquidation, to wind up the affairs of the Company and make final distributions as provided herein. The costs of liquidation shall be a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Operating Member hereunder. The steps to be accomplished by the liquidator are as follows:

(a)     as promptly as possible after dissolution and again after final liquidation, the liquidator shall cause a proper accounting to be made by a firm of certified public accountants acceptable to Investor Member of the Company's assets, liabilities, and operations through the last day of the calendar month in which the dissolution shall occur or the final liquidation shall be completed, as applicable;

(b)     the liquidator shall pay all of the debts and liabilities of the Company or otherwise make adequate provision therefor (including the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(c)     all remaining assets of the Company shall be distributed to the Members as follows:

(1)     the liquidator may sell any or all Company property and the sum of (A) any resulting gain or loss from each sale plus (B) the fair market value of such property that has not been sold shall be determined and notwithstanding the provisions of Article 9, Profit or Loss so realized or inherent in such property (that has not been reflected in the Capital Accounts previously) shall be allocated among the Members to the extent possible to cause the Capital Account balance of each Member to equal the amount  distributable to such Member under Section 10.2(c)(2); and

(2)     Company property shall be distributed to the Members in accordance with Section 8.2.

Section 10.3   **Deficit Capital Accounts**.   No Member shall be required to pay to the Company, to any other Member or to any third party any deficit balance which may exist from time to time in the Member's Capital Account.

Section 10.4   **Cancellation of Certificate**.   On completion of the distribution of Company assets, the Operating Member (or such other person as the Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to Section 2.4, and take such other actions as may be necessary to terminate the existence of the Company.

1367102 06153670

CONFIDENTIAL

TIAA049457

# ARTICLE 11
## BUY-SELL OPTION

Section 11.1   Buy-Sell.

(a)   At any time after the earlier of (x) 36 months from the date of this Agreement and (y) the date the Property has been 90% leased and occupied (the "**Lockout Period**"), either Operating Member or Investor Member (the "**Initiating Member**") may at any time give the other (the "**Other Member**") a written notice (the "**Buy-Sell Notice**") setting forth (x) the value ("**Specified Value**") that the Initiating Member places on all the assets of the Company, (y) the selling price, which selling price must consist wholly of cash (the "**Cash Selling Price**"), for such Initiating Member's Membership Interest in the Company and (z) the purchase price, which purchase price must consist wholly of cash (the "**Cash Purchase Price**"), for the Other Member's Membership Interest in the Company.   The Cash Selling Price and the Cash Purchase Price specified in the Buy-Sell Notice shall be the amounts that such Member would receive (after repayment of any Company Default Loans outstanding, as required pursuant to Section 11.3(c)) if the Company were to liquidate all of its assets at the Specified Value and the Company were to dissolve and distribute the proceeds of liquidation as provided in Section 8.2 effective as of the date of the Buy-Sell Notice.   In making the calculation required by the preceding sentence, no deduction from the hypothetical liquidation proceeds shall be made with respect to transfer and other taxes or other transaction costs incurred in connection with the hypothetical transfer of the Membership Interest.   The Buy-Sell Notice must be accompanied by an earnest money deposit in an amount equal to Three and One-Half Percent (3.5%) of the value of the Other Member's Membership Interest to be purchased (each said amount, together with any interest earned thereon, being hereinafter called the "**Buy/Sell Deposit**").

(b)   The Other Member may, on or before the date that is twenty-one (21) days after the date of receipt of the Buy-Sell Notice, either accept the offer to sell the Other Member's Membership Interest to the Initiating Member, or accept the offer of the Initiating Member to sell such Initiating Member's Membership Interest to the Other Member by delivering notice of such election.   If such Other Member elects to accept the Initiating Member's offer to sell the Initiating Member's Membership Interest to the Other Member, its notice of such election must be accompanied by (i) the return of the Buy/Sell Deposit; and (ii) its own earnest money deposit in an amount equal to Three and One-Half Percent (3.5%) of the Initiating Member's Membership Interest to be purchased (said amount, together with any interest earned thereon, being hereinafter called such "**Other Member's Deposit**").   If the Other Member fails to respond to the Buy-Sell Notice within such 21-day period, the failure to respond shall be deemed to constitute such Other Member's election to accept the offer of the Initiating Member to purchase the Membership Interest of such Other Member in accordance with the Buy-Sell Notice.

(c)   Closing of the purchase and sale pursuant to this Section 11.1 shall occur on the date that is not later than sixty (60) days after the delivery of the election or deemed election of the Other Member pursuant to Section 11.1(b), or at such other time as may be otherwise agreed to in writing by the Other Member and the Initiating Member.   The closing shall occur at the office of the buying Member's counsel, unless otherwise agreed by the Other Member and the Initiating Member.   The Buy/Sell Deposit or the Other Member's Deposit, as

- 39 -

CONFIDENTIAL

TIAA049458

the case may be, shall be credited against the total purchase price for the Membership Interest being purchased pursuant to this Section 11.1; provided, however, if the closing shall fail to occur because of a default by the purchasing Member, the selling Member shall have the right, as its exclusive remedy, either to (i) retain the earnest money deposit received by it as liquidated damages, it being agreed that in such instance such selling Member's actual damages would be difficult, if not impossible, to ascertain or (ii) compel the defaulting Member to sell its Membership Interest to the selling Member for the price set forth in the Buy-Sell Notice and the other terms hereof.

Section 11.2  **Right of First Offer on Sale of Membership Interest**.    (a) Notwithstanding Section 3.2, at any time after the expiration of the Lockout Period, either Member (a "**Selling Member**") may elect to sell its Membership Interest to a third party, provided such Selling Member first offers to sell its Membership Interest to the other Member ("**Non-Selling Member**") by written notice to such other Member including all of the material terms (including price) of the proposed sale ("**Notice of Proposed Sale of Membership Interest**"). The Non-Selling Member shall have twenty-one (21) days from the date of receipt of the Notice of Proposed Sale of Membership Interest to elect to either purchase or not purchase the Membership Interest of the Selling Member in accordance with the terms set forth in the notice. A failure by the Non-Selling Member to respond within such twenty-one (21) day period shall be deemed an election not to purchase the Membership Interest of the Selling Member.

(b)  If the Non-Selling Member elects to purchase the Membership Interest, the Non-Selling Member shall make an earnest money deposit in an amount equal to Ten Percent (10%) of the price of the Membership Interest to be purchased. The closing of such purchase shall occur on a date that is not later than sixty (60) days after the delivery of the election by the Non-Selling Member to purchase the Membership Interest, or at such other time as may be otherwise agreed to in writing by the Non-Selling Member and the Selling Member. The closing shall occur at the office of the Non-Selling Member's counsel, unless otherwise agreed by the Non-Selling Member and the Selling Member. The deposit shall be credited against the total purchase price for the Membership Interest being purchased pursuant to this Section 11.2(b); provided, however, if the closing shall fail to occur because of a default by the Non-Selling Member, the Selling Member shall have the right, as its exclusive remedy, to retain the earnest money deposit received by it as liquidated damages, it being agreed that in such instance such Selling Member's actual damages would be difficult, if not impossible, to ascertain.

(c)  In the event the Non-Selling Member elects (or is deemed to have elected) not to purchase the Membership Interest of the Selling Member, the Selling Member may proceed to market and sell its Membership Interest to a third party, provided it shall not sell its Membership Interest to a third party for a price less than or on terms less favorable than those set forth in the Notice of Proposed Sale of Membership Interest. The Selling Member shall use proceeds from the sale to pay off any Member Default Loans it owes. Any approved sale by Selling Member to a third-party in accordance with the terms hereof shall be conditioned on Non-Selling Member's receipt from the third-party purchaser of an express assumption (in a form reasonably acceptable to the Non-Selling Member) by the third-party purchaser of all of the Selling Members' obligations hereunder and agreement by the third-party to comply with all of the covenants of the Selling Member hereunder.

- 40 -

CONFIDENTIAL

TIAA049459

Section 11.3   **General Transfer Provisions**. All of the subsections of this Section 11.3 shall apply to the sale of one Member's Membership Interest to any other Member pursuant to Section 11.1 or 11.2:

(a)     In the event of such a sale of a Membership Interest, the purchase price shall be paid, at the selling Member's option, by certified check drawn to the order of the selling Member, or by wire transfer of immediately available funds to an account that is designated by the selling Member. At the closing there shall be an accounting as of the closing of the Company's books and any accrued income and expenses as of the closing date shall be prorated as may be required so that the selling Member receives all distributions of Net Cash Flow to which it is entitled pursuant to this Agreement (*i.e.*, Net Cash Flow accruing on or prior to the closing date). Within ninety (90) days after the closing, the accountants for the Company shall complete an audit of such accounting and proration and shall deliver their audit report to the selling Member and the purchasing Member. If such audit report shall adjust such proration, the party in whose favor such adjustment is made shall promptly be paid by the other party the amount of such adjustment. At the closing any Member shall have the right to require to be placed in escrow with an escrow agent reasonably acceptable to the purchasing Member an amount not to exceed the maximum likely post-closing adjustment of the proration as agreed by the Members or, if they shall be unable to agree, as estimated by the Accountants, and the escrow agent shall distribute the escrowed amount to the party or parties entitled thereto promptly after the delivery of the audit report. If such escrow is established at the request of the purchasing Member, a portion of the purchase price shall be set aside for such purpose, and if such escrow is established at the request of the selling Member, additional funds shall be deposited by the purchasing Member at closing. At closing, each selling Member shall deliver to each purchasing Member a "nonforeign affidavit" as referred to in the Foreign Investment in Real Property Tax Act in form and substance reasonably satisfactory to the purchasing Member.

(b)     If the purchasing Member desires to receive a new or updated title insurance policy or survey or both, it shall pay for same at its own expense.

(c)     If there shall be any outstanding Member Default Loans, such Member Default Loans, including interest thereon accrued and unpaid, shall be repaid by the Non-Contributing Member prior to the closing of such sale. If there shall be any outstanding Company Default Loans, such Company Default Loans, including interest thereon accrued and unpaid, shall be repaid by the Non-Contributing Member prior to the closing of such sale.

(d)     On payment of the purchase price, each purchasing Member shall, at its option, as to each Company debt for which the selling Member or any of its Affiliates is or may be personally liable, elect one of the following options: (i) obtain a release of the selling Member and its Affiliates from all liability, direct or contingent, by all holders of each such Company debt, obligation or claim, or (ii) cause the same to be paid in full at the closing to the satisfaction of the selling Member. Notwithstanding the foregoing, if any release cannot be obtained and the purchasing Member elects not to pay off such debt, the purchasing Member (and, if the net worth of purchasing Member is less than the amount of such debt not released or paid off, other Persons whose aggregate net worth is at least as great as the amount of such debt) shall defend, indemnify and hold the selling Member and its Affiliates harmless for, from and against all debts, liabilities and obligations of, and all claims against, the Company, whether then existing or thereafter to arise, not paid in full or released pursuant to the preceding sentence. All

- 41 -

1367102 06153670

CONFIDENTIAL

TIAA049460

Members and the Company shall also execute a mutual general release pursuant to which the selling Member shall release the Company and the purchasing Member and its or their Affiliates and the purchasing Member shall release the Company and the selling Member and its or their Affiliates from all liabilities and obligations (whether known or unknown, foreseen or unforeseen or previously accrued or thereafter accruing) relating to the Company or the Property, other than those arising from the indemnities given pursuant to this subsection 11.3(d).

      (e)   All Members (including the selling Member) shall be entitled to any distributions of Net Cash Flow from the Company following the giving of the Buy-Sell Notice pursuant to Section 11.1 or Notice of Proposed Sale of Membership Interest pursuant to Section 11.2 and until the closing (prorated through the day of closing). The purchasing Member shall receive all distributions of Net Cash Flow after the closing (subject to the foregoing proration).

      (f)   If the Property is damaged by fire or other casualty, or if any entity possessing the right of eminent domain shall give notice of an intention to take or acquire a substantial part of the Property, and such damage occurs, or such notice is given, between the date of the giving of the Buy-Sell Notice pursuant to Section 11.1 or Notice of Proposed Sale of Membership Interest pursuant to Section 11.2 and the closing date of the purchase of a Membership Interest in the Company, the following shall apply:

      (1)   If the Property is damaged by a casualty not resulting in substantial damage (as defined below) or if the taking or acquisition does not constitute a substantial condemnation (as defined below), then the Members shall be required to complete the transaction and the purchasing Member shall in lieu of any reduction in the purchase price payable by such purchasing Member (except as provided in Section 11.3(f)(3)) accept an assignment of the insurance or condemnation proceeds.

      (2)   If the Property is damaged by a casualty resulting in substantial damage (as defined below), or if the taking or acquisition constitutes a substantial condemnation (as defined below), then the purchasing Member shall have the option (to be exercised within thirty (30) days from the date of the occurrence of the casualty or receipt of the notice of condemnation) to either (i) accept the Property in an "as is" condition together with the right to receive any insurance proceeds, settlements and awards, or (ii) cancel the purchase.

      (3)   The aggregate purchase price otherwise to be paid at closing shall be adjusted downwards by an amount equal to the deductible, if any, for any insured casualty or, in the case of the closing of the sale of a Member's Membership Interest in the Company, the amount by which the purchase price payable to the selling Member would be reduced if the amount of the deductible were a liability of the Company.

If the purchase is canceled by the purchasing Member pursuant to the above provisions, the terms of this Agreement shall remain in effect and continue to be binding on the Members. For purposes of this Section 11.3(f), "substantial damage" to the Property shall mean damage which would cost $1,000.000 in the aggregate or more to repair, and a "substantial condemnation" will be deemed to occur if the taking or acquisition would result in (i) a reduction in the value of the Property by $1,000,000 or more, (ii) the violation of a law that cannot be cured or remediated at a cost that is less than $1,000,000, or (iii) the termination of leases for the Property covering in excess of 10% of the aggregate square footage of the Property.

- 42 -

1367102 06153670

CONFIDENTIAL

TIAA049461

(g)    In the case of the sale of a Membership Interest in the Company, each selling Member shall execute an assignment of such Interest, free and clear of all liens, encumbrances and adverse claims (and selling Member shall be obligated to discharge any security interest, lien or encumbrance encumbering its Interest), which assignment shall otherwise be in form and substance reasonably satisfactory to the purchasing Member, and such other instruments as the purchasing Member shall reasonably require to assign the Membership Interest of the selling Member to such Person as the purchasing Member may designate. Such documents shall be prepared by the purchasing Member and closing costs and all other charges involved in closing the sale (except for attorneys' fees (each party paying its own) and title insurance costs (to be paid by the purchaser)) shall be shared equally by the Members.

(h)    Subject to Article X, in the case of the sale of an Interest in the Company, the Company shall not be dissolved, but the Members will execute and file on the closing date such amendment to the Certificate as may be appropriate to reflect the change in the identity of the Members.

(i)    The requirements or obligations, if any, of one Member to sell its Membership Interest in accordance with the provisions of Sections 11.1 or 11.2 shall be enforceable by an action for specific performance of a contract relating to the purchase of real property or an interest therein. The requirements or obligations, if any, of one Member to purchase the Membership Interest of any other Member pursuant to Sections 11.1 or 11.2 shall be subject to the liquidated damages provisions contained in Sections 11.1 or 11.2. If any selling Member shall have created or suffered any unauthorized liens, encumbrances or other adverse interest against either the Property or the selling Member's Interest in the Company, the purchasing Member shall be entitled either to an action for specific performance to compel the selling Member to have such defects removed, in which case the closing shall be adjourned for such purpose, or, at the purchasing Member's option, to an appropriate offset against the purchase price.

(j)    In the event of the purchase of a Membership Interest in the Company of a selling Member by a purchasing Member, at the option of the purchasing Member, the Interest will be transferred to a nominee of the purchasing Member.

## ARTICLE 12
## MISCELLANEOUS PROVISIONS

Section 12.1    Notices. All notices provided for or permitted to be given pursuant to this Agreement must be in writing and shall be given or served by (a) depositing the same in the United States mail addressed to the party to be notified, postpaid and certified with return receipt requested, (b) depositing the same with a national overnight delivery service company which tracks deliveries, addressed to the party to be notified, with all charges paid and proof of receipt requested, (c) by delivering such notice in person to such party, or (d) by email, with a copy to follow by method (a) or (b) above. All notices are to be sent to or made at the addresses set forth on the signature pages hereto. All notices given in accordance with this Agreement shall be effective upon delivery at the address of the addressee. Each Member shall have the right from time to time to change its address by written notice to the other Member(s).

Section 12.2    Governing Law; WAIVER OF JURY TRIAL. This Agreement and the obligations of the Members hereunder shall be construed and enforced in accordance with the

1367102 06153670

CONFIDENTIAL

TIAA049462

laws of the State of Delaware, excluding any conflicts of law rule or principle which might refer such construction to the laws of another state or country. Each Member submits to the jurisdiction of the federal courts sitting in the State of New York. EACH MEMBER FURTHER WAIVES ANY RIGHT TO A TRIAL BY JURY IN THE EVENT OF A DISPUTE ARISING UNDER THIS AGREEMENT.

Section 12.3 **Entire Agreement; Amendments**. This Agreement and its exhibits constitute the entire agreement between the Members relative to the formation of the Company. Except as otherwise provided herein, no amendments to this Agreement shall be binding upon any Member unless set forth in a document duly executed by such Member.

Section 12.4 **Waiver**. No consent or waiver, express or implied, by any Member of any breach or default by any other Member in the performance by the other Member of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other Member of the same or any other obligation hereunder. Failure on the part of any Member to complain of any act or to declare any other Member in default, irrespective of how long such failure continues, shall not constitute a waiver of rights hereunder.

Section 12.5 **Severability**. If any provision of this Agreement or the application thereof to any Person or circumstances shall be invalid or unenforceable to any extent, and such invalidity or unenforceability does not destroy the basis of the bargain between the parties, then the remainder of this Agreement and the application of such provisions to other Persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

Section 12.6 **Ownership of Property and Right of Partition**. A Member's interest in the Company shall be personal property for all purposes. No Member shall have any right to partition the property owned by the Company.

Section 12.7 **Involvement of Members in Certain Proceedings**. Should any Member become involved in legal proceedings unrelated to the Company's business in which the Company is required to provide books, records, an accounting, or other information, then such Member shall indemnify the Company from all expenses incurred in conjunction therewith.

Section 12.8 **Interest**. No amount charged as interest on loans hereunder shall exceed the maximum rate from time to time allowed by applicable law.

Section 12.9 **Duplicate Originals**. For the convenience of the parties hereto, any number of counterparts hereof may be executed. Each such counterpart shall be deemed to be an original instrument, and all of such counterparts shall together be deemed one and the same instrument.

Section 12.10 **Section Titles**. The titles of the sections and subsections herein have been inserted as a matter of convenience of reference only and shall not control or affect the meaning or construction of any of the terms or provisions herein.

1367102 06153670

CONFIDENTIAL

TIAA049463

Section 12.11 **Attorneys' Fees**.  In the event of any action or proceeding brought by either Member against the other under this Agreement, and each party shall bear its own attorneys' fees.

[Signature page follows]

1367102 06153670

CONFIDENTIAL

TIAA049464

IN WITNESS WHEREOF, the parties hereto have caused the signatures of their duly authorized representatives to be set forth below on the day and year first above written.

TIAA UNION PLACE PHASE I, LLC

By: _____

*Assistant Secretary*

Address for Notice

c/o Teachers Insurance and Annuity Association
730 Third Avenue
New York, NY 10017
Attn: Gerald Casimir
Fax Number: (212) 916-4527
Email: gcasimir@tiaa-cref.org

With Copies To:

Teachers Insurance and Annuity Association
730 Third Avenue
New York, NY 10017
Attn: Harold D. Piazza, Esq.
Fax Number: (212) 916-6392
Email: hpiazza@tiaa-cref.org

and

Teachers Insurance and Annuity Association
730 Third Avenue
New York, NY 10017
Attn: Harry St.Clair
Fax Number: (212) 916-4527
Email: hstclair@tiaa-cref.org

and

Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, IL 60606
Attn: John Gearen, Esq.
Fax Number: (312) 706-8707
Email: jgearen@mayerbrownrowe.com

- 46 -

1367102 06153670

CONFIDENTIAL

TIAA049465

UNION NORTH PHASE I, LLC

By: _____

Address for Notice

c/o Ronald Cohen Management Company
2701 Tower Oaks Boulevard Suite 200
Rockville, Maryland 20852
Attn: Ronald Cohen

Email Address: Rjcohen@cohencompanies.com


with a copy to:
c/o Ronald Cohen Management Company
2701 Tower Oaks Boulevard Suite 200
Rockville, Maryland 20852
Attn: Michael Hollander, Esq.

Email Address:
mhollander@cohencompanies.com

- 47 -

CONFIDENTIAL

TIAA049466

JOINDER

The undersigned, the transferor of the Property to the Company pursuant to the Property Contribution, hereby joins in this Agreement for the sole purpose of making the representations and warranties with respect to the Property set forth in Section 2.8 for the benefit of the Company and Investor Member and to reflect the agreement of K Street Developers, LLC to the provisions of Section 4.14.  The undersigned understands that the Investor Member is relying upon this joinder as an inducement to enter into this Agreement.  The undersigned shall have no rights pursuant to this Agreement.

**K STREET DEVELOPERS, LLC**

By:   K Street Manager, Inc., its Manager

By: _____ [SEAL]
    Ronald J. Cohen, President

**CASCO, INC.**

By: _____ [SEAL]
Name: Ronald J. Cohen
Title: Vice President

**THREE CEE INVESTORS, LLC**

By: _____ [SEAL]
    Ronald J. Cohen, Authorized Member

**UNION NORTH CORPORATION**

By: _____ [SEAL]
    Ronald J. Cohen, President

1367102 06153670

TIAA049467

INDEX TO EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
| Exhibit A | Schedule of Acquisition Costs |
| Exhibit B | Operating Member Guaranty |
| Exhibit C-1 | Legal Description of the Property |
| Exhibit C-2 | Legal Description of the Phase II |
| Exhibit C-3 | Legal Description of Reconveyance Property |
| Exhibit D | Schedule of Pro Forma Net Cash Flow |
| Exhibit E | Schedule of Agreements with Operating Member and its Affiliates with Forms of Agreements Attached |
| Exhibit F | Reporting Requirements |
| Exhibit G | Project Costs |
| Exhibit H | Special Warranty Deed |
| Exhibit I | Title Policy |
| Exhibit J | Property Agreements |

1367102 06153670

CONFIDENTIAL

TIAA049468

## EXHIBIT A

Schedule of Acquisition Costs

[See costs of Company shown on attached settlement statement]

CONFIDENTIAL                                                    TIAA049469

| CHICAGO TITLE INSURANCE COMPANY<br>1129 20TH STREET N.W., SUITE 300<br>WASHINGTON, D.C. 20036<br>(202) 466-2266<br>FAX (202) 955-5769 | SELLER'S SETTLEMENT<br>STATEMENT | |
|---|---|---|
| SELLER:<br><br>K Street Developers, LLC<br>Three Cee Investors, LLC<br>CASCO, Inc.<br>Union North Corporation<br><br><br>BUYER:<br><br>Union Place Phase I, LLC | CTIC CASE NO.:   116060139<br><br>CLOSING OFFICER:   DEB<br><br>CLOSING DATE:   2/1/2007<br><br>PROPERTY DESCRIPTION:<br><br>Union Place, Washington DC | |

| DESCRIPTION | DEBIT | CREDIT |
|---|---|---|
| Contract Purchase Price | | $17,000,000.00 |
| Seller Credit to Buyer | $1,700,000.00 | |
| | | |
| Payoff to Penn Business Bank | $1,207,233.33 | |
| Payoff to Industrial Bank, NA | $3,529,090.83 | |
| Payoff to United Bank (Loan #7803364-0101) | $145,517.97 | |
| Payoff to United Bank (Loan #7802028-0102) | $91,310.96 | |
| Payoff to United Bank (Loan #7802028-0101) | $165,593.92 | |
| | | |
| DC Treasurer | | |
| Transfer Tax - Deed | $246,500.00 | |
| Release fees | $180.00 | |
| | | |
| Cohen Company Contribution Towards DC Treasurer Fees | | |
| | | |
| Recoration Tax - Deed | $24,650.00 | |
| Clerk's Fees - Deed | $9.00 | |
| | | |
| | | |
| Cohen Company Contribution Towards Chicago Title Fees | | |
| | | |
| Owner's Premium | $1,190.00 | |
| Endorsement Premium | $170.00 | |
| | | |
| | | |
| TIAA Pro Rata Payment of Architect Fees paid by Cohen | | $210,427.22 |
| | | |
| | | |
| Cohen Company Contribution towards Greenwich Group | | |
| Fee | $38,250.00 | |
| | | |
| | | |
| | | |
| TOTAL | $7,149,696.01 | $17,210,427.22 |
| DUE TO SELLER | | $10,060,731.21 |

The undersigned hereby authorizes Chicago Title Insurance Company to receive funds and
disburse them in accordance with the above.

SELLER:

BY:

BY:

Buyer and Seller Settlement Statement (3),  Sheet1
Page 1 of 2
2/1/2007  3:54 PM

CONFIDENTIAL

TIAA049470

| | | |
|---|---|---|
| CHICAGO TITLE INSURANCE COMPANY<br>1129 20TH STREET N.W., SUITE 300<br>WASHINGTON, D.C. 20036<br>(202) 466-2266<br>FAX (202) 955-5769 | BUYER'S SETTLEMENT<br>STATEMENT | |
| SELLER:<br><br>K Street Developers, LLC<br>Three Cee Investors, LLC<br>CASCO, Inc.<br>Union North Corporation<br><br>BUYER:<br><br>Union Place Phase I, LLC | CTIC CASE NO        116060139<br><br>CLOSING OFFICER:    DEB<br><br>CLOSING DATE        2/1/2007<br><br>PROPERTY DESCRIPTION:<br><br>Union Place, Washington, DC | |

| DESCRIPTION | DEBIT | CREDIT |
|---|---|---|
| Contract Purchase Price | $17,000,000.00 | |
| Seller Credit to Buyer | | $1,700,000.00 |
| | | |
| DC Treasurer | | |
| Recordation Tax - Deed | $246,500.00 | |
| Clerk's fees - Deed | $50.00 | |
| Cohen Company Contribution Towards DC Treasurer Fees | | |
| Recoration Tax - Deed | | $24,650.00 |
| Clerk's Fees - Deed | | $9.00 |
| Chicago Title Insurance Company | | |
| Owner's Premium | $11,900.00 | |
| Endorsement Premium | $1,700.00 | |
| Cohen Company Contribution Towards Chicago Title Fees | | |
| Owner's Premium | | $1,190.00 |
| Endorsement Premium | | $170.00 |
| | | |
| TIAA Pro Rata Payment of Architect Fees paid by Cohen | $210,427.22 | |
| Mayer Brown & Rowe | $49,500.00 | |
| The Greenwich Group Fee | $382,500.00 | |
| Cohen Company Contribution towards Greenwich Group Fee | | $38,250.00 |
| TOTAL | $17,902,617.22 | $1,764,269.00 |
| DUE FROM BUYER | $16,138,348.22 | |

The undersigned hereby authorizes Chicago Title Insurance Company to receive funds and
disburse them in accordance with the above.

BUYER:

BY

.Y:

CONFIDENTIAL                                                                TIAA049471

## EXHIBIT B

## OPERATING MEMBER GUARANTY

THIS GUARANTY is made as of _____, 2007 (this "Guaranty"), by Ronald J. Cohen ("Guarantor"), having an address 2701 Tower Oaks Boulevard, Suite 200, Rockville, Maryland 20852, to and for the benefit of Union Place Phase I, LLC, a Delaware limited liability company (together with its successors and assigns, the "Company") and TIAA Union Place Phase I, LLC, a Delaware limited liability company, (together with its successors and assigns, the "Investor Member"), both having an office at c/o Teachers Insurance & Annuity Association, 730 Third Avenue, new York, NY 10017, Attn: Gerald Casimir.

### WITNESSETH:

WHEREAS, Investor Member and Union North Phase I, a District of Columbia limited liability company ("Operating Member") have entered into that certain Limited Liability Company Agreement of Union Place Phase I, LLC (the "Agreement"), dated as of the date hereof;

WHEREAS, Guarantor controls the Operating Member, and owns, directly or indirectly, a ten percent (10%) membership interest in, Operating Member and will derive substantial benefit from the consummation of the transaction under the Agreement;

WHEREAS, as a condition to entering into the Agreement, the Company and Investor Member have required Guarantor to deliver this Guaranty for the benefit of the Company; and

WHEREAS, the forgoing recitals are intended to form an integral part of this Guaranty.

NOW, THEREFORE, in consideration of the foregoing premises, Ten Dollars ($10.00) paid in hand, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Guarantor agrees as follows:

1.    **Definitions.**  Capitalized terms used herein and not defined shall have the meaning provided in the Agreement unless the context of this Guaranty clearly requires otherwise.

2.    **Guaranty.**   Guarantor hereby absolutely, unconditionally and irrevocably guarantees to the Company the obligations of Operating Member under the Agreement (collectively, the "Guaranteed Obligations").

3.    **Guaranty of Payment.**  This Guaranty is a guaranty of performance and payment and not merely a guaranty of collection and the Company or Investor Member may, at their option, proceed, collectively or individually, directly and at once, without notice, to enforce the Guaranteed Obligations against Guarantor without proceeding against Operating Member.

4.    **Continuing Guaranty.**  This is a continuing guaranty and the obligations of Guarantor hereunder are and shall be absolute under any and all circumstances, without regard to the validity, regularity or enforceability of the Agreement or any provision thereof.

CONFIDENTIAL                                      TIAA049472

5.   **Expenses.**   Guarantor agrees that, promptly after notice or demand, Guarantor will reimburse the Company and Investor Member for all expenses, including reasonable counsel fees and disbursements, incurred by the Company or Investor Member through all levels of trial, appeal and bankruptcy in connection with the collection and/or performance of the Guaranteed Obligations or any portion thereof and/or in connection with the enforcement of this Guaranty or the rights of the Company hereunder.

6.   **Waivers.**   (a) Guarantor hereby waives notice of the acceptance hereof, presentment, demand for payment, protest, notice of protest, or any and all notice of non-payment, nonperformance or non-observance, or other proof, or notice or demand, whereby to charge Guarantor therefor.

(b)   Guarantor agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected or impaired by reason of (i) the assertion by the Company or Investor Member of any rights or remedies which it may have under the Agreement against any Person obligated thereunder; (ii) the Company's or Investor Member's failure to exercise, or delay in exercising, any such right or remedy or any right or remedy which the Company or Investor Member may have hereunder or in respect to this Guaranty; (iii) the commencement of a case under the Bankruptcy Code by or against any Person obligated under the Agreement; (iv) any payment made on the Guaranteed Obligations which is required to be refunded pursuant to any bankruptcy or insolvency law; it being understood that no payment so refunded shall be considered as a payment of any portion of the Guaranteed Obligations, nor shall it have the effect of reducing the liability of Guarantor hereunder.

(c)   This Guaranty shall remain and continue in full force and effect as to any modification of the Agreement and that other indulgences or forbearance may be granted under the Agreement, all of which may be made, done or suffered without notice to, or further consent of, Guarantor.

7.   **Miscellaneous.**

(a)   **Waiver of Rights.** GUARANTOR AGREES THAT ANY PAYMENTS REQUIRED TO BE MADE HEREUNDER SHALL BECOME DUE AND PAYABLE TEN (10) DAYS AFTER DEMAND.   GUARANTOR EXPRESSLY WAIVES AND RELINQUISHES ALL RIGHTS AND REMEDIES (INCLUDING ANY RIGHTS OF SUBROGATION) ACCORDED BY APPLICABLE LAW TO GUARANTOR.

(b)   **Notices.** Any notice, election, request, demand, report or statement which by any provision of this Guaranty is required or permitted to be given or served hereunder shall be in writing and shall be given or served by (i) hand delivery against receipt, (ii) next day delivery by any nationally recognized overnight courier service providing evidence of the date of delivery, or (iii) by certified mail return receipt requested, postage prepaid. Any notice shall be addressed to the addresses set forth below or to such other address as shall be designated by such party in a written notice to the other party.

If to Guarantor:

1367102 06153670                                B-2

CONFIDENTIAL                                                        TIAA049473

If to the Company:

Union Place Phase I, LLC
c/o Teachers Insurance and Annuity Association
730 Third Avenue
New York, NY 10017
Attn: Gerald Casimir

with copies to:

Teachers Insurance and Annuity Association
730 Third Avenue
New York, NY 10017
Attn: Harold D. Piazza, Esq.

and:

Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, IL 60606
Attn: John Gearen, Esq.

All notices, elections, requests and demands under this Guaranty shall be effective and deemed received upon the earliest of (i) the actual receipt of the same by personal delivery or otherwise, (ii) one (1) Business Day after being deposited with a nationally recognized overnight courier service as required above, or (iii) three (3) Business Days after being deposited in the United States mail as required above. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given as herein required shall be deemed to be receipt of the notice, election, request, or demand sent.

    (c)    **Entire Guaranty.** This Guaranty constitutes the entire and final Guaranty between Guarantor and the Company with respect to the subject matter hereof and may only be changed, amended, modified or waived by an instrument in writing signed by Guarantor and the Company.

    (d)    **No Waiver.** No waiver of any term or condition of this Guaranty, whether by delay, omission or otherwise, shall be effective unless in writing and signed by the party sought to be charged, and then such waiver shall be effective only in the specific instance and for the purpose for which given. No delay on the Company's part in exercising any right, power or privilege under this Guaranty or the Agreement shall operate as a waiver of any privilege, power or right hereunder.

    (e)    **Successors and Assigns.** This Guaranty shall be binding upon Guarantor and its successors and assigns and shall inure to the benefit of the Company and its successors and permitted assigns. Guarantor, without the prior written consent of the Company in each instance, may assign, transfer or set over to another, in whole or in part, all or any part of its

1367102 06153670

B-3

TIAA049474

benefits, rights, duties and obligations hereunder, including, but not limited to, performance of and compliance with conditions hereof, provided that such assignment shall not release Guarantor of its obligations hereunder.

(f)    **Captions.**  All paragraph, section, exhibit and schedule headings and captions herein are used for reference only and in no way limit or describe the scope or intent of, or in any way affect, this Guaranty.

(g)    **Counterparts.**  This Guaranty may be executed in counterparts, each of which shall be an original and all of which, when taken together, shall constitute one binding Guaranty.

(h)    **Severability.**  The provisions of this Guaranty are severable, and if any one clause or provision hereof shall be held invalid or unenforceable in whole or in part, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, and not any other clause or provision of this Guaranty.

(i)    **Governing Law, Venue.**  THIS GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO CHOICE OF LAW RULES.  GUARANTOR AGREES THAT ANY SUIT FOR THE ENFORCEMENT OF THIS GUARANTY SHALL BE BROUGHT IN THE COURTS OF NEWCASTLE COUNTY, DELAWARE, OF OR ANY FEDERAL COURT SITTING THEREIN, AND CONSENTS TO THE NONEXCLUSIVE JURISDICTION OF SUCH COURT AND THE SERVICE OF PROCESS IN ANY SUCH SUIT BEING MADE UPON GUARANTOR IN THE MANNER AND AT THE ADDRESS SPECIFIED FOR NOTICES IN THIS GUARANTY.  GUARANTOR HEREBY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH SUIT OR ANY SUCH COURT OR THAT SUCH SUIT IS BROUGHT IN AN INCONVENIENT COURT.

(j)    **JURY TRIAL WAIVER.**  GUARANTOR AND ALL PERSONS CLAIMING BY, THROUGH OR UNDER IT, HEREBY EXPRESSLY, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (I) ARISING UNDER THIS GUARANTY, INCLUDING ANY PRESENT OR FUTURE MODIFICATION THEREOF OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF GUARANTOR OR THE COMPANY WITH RESPECT TO THIS GUARANTY (AS NOW OR HEREAFTER MODIFIED) OR ANY OTHER INSTRUMENT, DOCUMENT OR GUARANTY EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN AGREEMENT OR TORT OR OTHERWISE; AND GUARANTOR HEREBY AGREES AND CONSENTS THAT AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION MAY BE FILED WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT HERETO TO THE WAIVER OF ANY RIGHT TO TRIAL BY JURY. GUARANTOR ACKNOWLEDGES THAT IT HAS CONSULTED WITH LEGAL COUNSEL REGARDING THE MEANING OF THIS WAIVER AND ACKNOWLEDGES THAT THIS WAIVER IS AN ESSENTIAL

CONFIDENTIAL                                                                                          TIAA049475

INDUCEMENT FOR COMPANY'S ACCEPTANCE OF THIS GUARANTY, THIS WAIVER SHALL SURVIVE CLOSING OF THE TRANSACTIONS UNDER THE AGREEMENT.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date first set forth above.

_____

Ronald J. Cohen, an individual

1367102 06153670

B-5

CONFIDENTIAL

TIAA049476

EXHIBIT C-1

METES AND BOUNDS

DESCRIPTION

**Proposed Lot, Phase 1**
**Square 749**
**District of Columbia**

BEING all of the lots numbered 2, 3, 28, 29, 32 through 42, Part of 43, 44 through 46, 57 through 59 and parts of lots numbered 4, 27, 47, 56 and parts of various Public Alleys in Square 749 in accordance with a Subdivision Plat recorded among the Records of the Office of the Surveyor of the District of Columbia in Subdivision Book C.H.B. at page 137 and all of the lots numbered 64 and 65 of Square 749 in accordance with the Subdivision Plat recorded among the Records of the Office of the Surveyor of the District of Columbia in Subdivision Book 122 at Page 135, being more particularly described as follows:
BEGINNING for the same at the southeast corner of Lot 64, said point also being the intersection of the northerly line of K Street, NE (147.67 feet wide), and the westerly line of 3rd Street, NE (90 feet wide), thence running with the northerly line of K Street, NE (147.67 feet wide)

1. **West, 149.50 feet** to a point, thence departing the northerly line of K Street, NE (147.67 feet wide) and running in, through and across Lots 4, 27, 47, and 56 and various Public Alleys so as to include portions thereof
2. **North, 323.833 feet** to a point on the southerly line L Street, NE (90 feet wide), thence running with the southerly line of L Street, NE (90 feet wide)
3. **East, 49.50 feet** to a point, said point also being the intersection of the southerly line of L Street, NE (90 feet wide) and the westerly line of a Public Alley (10 feet wide), thence running with the westerly line of said Public Alley (10 feet wide)
4. **South, 55.736 feet** to a point, thence departing the westerly line of the Public Alley (10 feet wide) and running in, through and across the Public Alley (10 feet wide) to include a portion thereof
5. **East, 100.00 feet** to a point on the westerly line of 3rd Street, NE (90 feet wide), thence running with the westerly line of 3rd Street, NE, (90 feet wide)
6. **South, 268.097 feet** the point of beginning, containing 42,839.4 square feet of land, more or less.

Subject to any and all easements, rights-of-way, and encumbrances of record.

1367102 06153670

C1-1

CONFIDENTIAL

TIAA049477

EXHIBIT C-2

Legal Description of Phase II

METES AND BOUNDS

DESCRIPTION

## Proposed Lot, Phase 2
## Square 749
## District of Columbia

BEING all of the lots numbered 5 through 8, 15 through 18, 23 through 26, 48 through 55, and parts of lots numbered 4, 27, 47, 56 and parts of Public Alleys in Square 749 in accordance with a Subdivision Plat recorded among the Records of the Office of the Surveyor of the District of Columbia in Subdivision Book C.H.B. at page 137, and Lot 63 of Square 749 in accordance with a Subdivision Plat recorded among the Records of the Office of the Surveyor of the District of Columbia in Subdivision Book 107 at Page 168, and Lot 66 of Square 749 in accordance with a Subdivision Plat recorded among he Records of the Office of the Surveyor of the District of Columbia in Subdivision Book 181 at Page 31 being more particularly described as follows: BEGINNING for the same at the southwest corner of Lot 66, said point also being the intersection of the northerly line of K Street, NE (147.67 feet wide), and the easterly line of 2nd Street, NE (90 feet wide), thence running with the easterly line of 2nd Street, NE (90.0 feet wide)

1. **North, 323.833 feet** to point on the southerly line of L Street, SE (90 feet wide), thence departing the easterly line of 2nd Street, NE (90.0 feet wide) and running with the southerly line on L Street, SE (90 feet wide)
2. **East, 179.917 feet** to a point on the southerly line of L Street, NE (90 feet wide), thence departing the southerly line of L Street, NE (90 feet wide) and running in, through and across Lots 4, 27, 47, and 56 and various Public Alleys so as to include portions thereof
3. **South, 323.833 feet** to a point on the northerly line of K Street, NE (147.67) feet wide), thence running with the northerly line of K Street, NE (147.67 feet wide)
4. **West, 179.917 feet** to the point of beginning, containing 58,263.1 square feet of land, more or less.

Subject to any and all easements, rights-of-way, and encumbrances of record.

CONFIDENTIAL                                              TIAA049478

## EXHIBIT C-3

**Part of Lot 4, Phase 2**
**Square 749**
**District of Columbia**

BEING Part of Lot 4, Square 749 as recorded among the Records of the Office of the Surveyor of the District of Columbia in Subdivision Book C.H.B. at page 137, said part being more particularly described as follows:

BEGINNING for the same at a point on the northerly line of K Street NE (147.67 feet wide), said point also being the southwest corner of Lot 4, thence running along the westerly line of Lot 4,

1.    North, 90.00 feet to a point on the northerly line of Lot 4 and the southerly line of a 10' public alley, thence running with said line

2.    East, 6.604 feet to a point, thence running in, through and across Lot 4 to include a portion thereof

3.    South, 90.00 feet to a point on the southerly line of Lot 4 and the northerly line of K Street NE (147.67 feet wide), thence running with said line

4.    West, 6.604 feet to the point of beginning, containing 594.4 square feet of land, more or less.

Subject to any and all easements, rights-of-way, and encumbrances of record.

CONFIDENTIAL                                                                          TIAA049479

Part of Lot 47, Phase 2
Square 749
District of Columbia

BEING Part of Lot 47, Square 749 as recorded among the Records of the Office of the Surveyor of the District of Columbia in Subdivision Book C.H.B. at page 137, said part being more particularly described as follows:

BEGINNING for the same at a point on the northerly line of a 10' public alley, said point also being the southwest corner of Lot 47, thence running along the westerly line of Lot 47,

1.      North, 54.417 feet to a point on the northerly line of Lot 47 and the southerly line of a 15' public alley, thence running with said line

2.      East, 15.207 feet to a point, thence running in, through and across Lot 47 so as to include a portion thereof

3.      South, 54.417 feet to a point on the southerly line of Lot 47 and the northerly line of a 10' public alley, thence running with said line

4.      West, 15.207 feet to the point of beginning, containing 827.6 square feet of land, more or less.

Subject to any and all easements, rights-of-way, and encumbrances of record.

CONFIDENTIAL

TIAA049480

Part of Lot 56, Phase 2
Square 749
District of Columbia

BEING Part of Lot 56, Square 749 as recorded among the Records of the Office of the Surveyor of the District of Columbia in Subdivision Book C.H.B. at page 137, said part being more particularly described as follows:

BEGINNING for the same at a point on the southerly line of a 10' public alley, said point also being the northwest corner of Lot 56, thence running along said line

1.      East, 15.207 feet to a point on the northerly line of Lot 56 and the southerly line of a 10' public alley, thence running in, through and across Lot 56 to include a portion thereof

2.      South, 54.417 feet to a point on the southerly line of Lot 56 and the northerly line of a 15' public alley, thence running with said line

3.      West, 15.207 feet to a point, thence running with the westerly line of Lot 56

4.      North, 54.417 feet to the point of beginning, containing 827.6 square feet of land, more or less.

Subject to any and all easements, rights-of-way, and encumbrances of record.

CONFIDENTIAL                                                                     TIAA049481

Part of Lot 27, Phase 2
Square 749
District of Columbia

BEING Part of Lot 27, Square 749 as recorded among the Records of the Office of the Surveyor of the District of Columbia in Subdivision Book C.H.B. at page 137, said part being more particularly described as follows:

BEGINNING for the same at a point on the southerly line of L Street NE (90 feet wide), said point also being the northwest corner of Lot 27, thence running along the southerly line of said L Street NE (90 feet wide),

1.     East, 5.958 feet to a point on the northerly line of Lot 27 and the southerly line of said L Street NE (90 feet wide), thence running in, through and across Lot 27 to include a portion thereof

2.     South, 90.00 feet to a point on the southerly line of Lot 27 and the northerly line of a 10' public alley, thence running with said line

3.     West, 5.958 feet to a point, thence running with the westerly line of Lot 27

4.     North, 90.00 feet to the point of beginning, containing 536.8 square feet of land, more or less.

Subject to any and all easements, rights-of-way, and encumbrances of record.

CONFIDENTIAL                                                          TIAA049482

<u>EXHIBIT D</u>

Schedule of Pro Forma Net Cash Flow

CONFIDENTIAL

TIAA049483

EXHIBIT D

Schedule of Pro Forma Net Cash Flow

CONFIDENTIAL

TIAA049483

CONFIDENTIAL

TIAA049484

CONFIDENTIAL

TIAA049485

CONFIDENTIAL

TIAA049486

CONFIDENTIAL

TIAA049487

CONFIDENTIAL

TIAA049488



CONFIDENTIAL

TIAA049489

<u>EXHIBIT E</u>

Schedule of Agreements with Operating Member
and its Affiliates with Forms of Agreements Attached

Development Agreement

CONFIDENTIAL                                                      TIAA049490

## EXHIBIT F

### Reporting and Software Requirements

****All reports should be sent by hard copy to the asset manager of the Project from time to time designated by Owner and by email address with the project name in the subject line to the asset manager of the Project and to **redevelop@tiaa.cref.org**.

| Date(s) by which Document Must Be Furnished | Document |
|---|---|
| February 14 | Draft year end audited financial statements[1] of the Company for the prior fiscal* year |
| February 26 | Accrual basis five-year projection of net operating income and depreciation |
| March 3 | Final year end audited financial statements[2] of the Company for the prior year |
| April 21, July 20, October 19, January 15 | Quarterly unaudited financial statement, including year to date and remainder of the year estimated net operating income, depreciation, and scheduled contributions and distributions |
| | Balance of Loan payable to any Lender and statement of all pending or threatened actions and proceedings to which the Company may be a party |
| | Any revisions or updates to the Business Plan and Budget |
| September 1 | Initial Draft of revisions or updates to the Business Plan and Budget for the following year |
| October 1 | Second Draft of revisions or updates to the Business Plan for the following year |
| November 1 | Final Draft of revisions or updates to the Business Plan for the following year |

*  In all cases, the fiscal year shall be the calendar year.

---

[1] Financial statements must contain all items customarily included in such statements, including a statement of each Member's Capital Account balance and changes therein for the prior fiscal year.

[2] Financial statements must contain all items customarily included in such statements, including a statement of each Member's Capital Account balance and changes therein for the prior fiscal year.

1367102 06153670                                        F-1

CONFIDENTIAL                                                               TIAA049491

EXHIBIT G

Projects Costs

CONFIDENTIAL

TIAA049492

# 200 K Street - Union Place

DEVELOPMENT BUDGET

| | Total | Phase I | | | | Phase II | | | Phase I & II | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | $/Net SF | $/Gross F.A.R | $/Unit | Total | $/Net SF | $/Gross F.A.R | Total | $/Net SF | $/Gross F.A.R |
| Total Units | 212 | | | | | | | | | | |
| Market Rate Units | 188 | | | | | | | | | | |
| ADU Units | 24 | | | | | | | | | | |
| Average Unit Size (sf) | 926 | | | | | | | | | | |
| Estimated Gross FAR | 236,905 | | | | | 604,000 | | | 806,905 | | |
| Estimated Residential Net Sq. Ft. | 196,396 | | | | | 610,000 | | | 806,396 | | |
| Estimated A.D.U. Net Sq. Ft. | 24,000 | | | | | | | | | | |
| Estimated Net Market Sq. Ft. | 172,396 | | | | | | | | | | |
| Retail/Clubhouse/Daycare Facility | 5,568 | | | | | 22,000 | | | 27,568 | | |
| Estimated Net Sq. Ft. | 201,964 | | | | | 631,064 | | | 833,064 | | |
| Parking Spaces | 177 | | | | | 525 | | | 702 | | |
| | Total | Total | $/Net SF | $/Gross F.A.R | $/Unit | Total | $/Net SF | $/Gross F.A.R | Total | $/Net SF | $/Gross F.A.R |
| Land Value | $17,000,000 | | $84 | $72 | $80,189 | $55,000,000 | $84 | $80 | $70,000,000 | $80 | $78 |
| Hard Costs (1) | $19,584,844 | | $196 | $167 | $186,721 | $126,000,000 | $207 | $194 | $162,584,844 | $201 | $187 |
| HC Contingency (2) | $1,979,247 | | $10 | $8 | $9,336 | $6,000,000 | $10 | $9 | $7,979,247 | $10 | $9 |
| Soft Costs (3) | $10,391,048 | | $52 | $84 | $49,014 | $54,000,000 | $54 | $52 | $64,391,048 | $53 | $49 |
| Interest Reserve (4) | $4,357,733 | | $22 | $18 | $20,555 | $12,000,000 | $22 | $18 | $16,357,733 | $20 | $18 |
| Construction Lender Fees | $560,000 | | $3 | $2 | $2,642 | | | | | | |
| Investment Banking Fees | $599,038 | | $3 | $3 | $2,825 | | | | | | |
| Total Development Costs w/ out Land | $56,911,910 | | $279 | $238 | $268,452 | $180,000,000 | $288 | $273 | $236,112,972 | $273 | $265 |
| Total Development Cost | $74,471,910 | | $360 | $314 | $351,283 | $235,000,000 | $370 | $353 | $307,471,910 | $370 | $343 |

| | Total | Phase I | Phase II | Phase I & II |
|---|---|---|---|---|
| Projected LTC | | 75% | 80% | 80% |
| Construction Loan Proceeds | | $56,000,000 | $186,400,000 | $242,400,000 |
| Equity Required | | $18,471,910 | $46,600,000 | $55,071,910 |

NOTES:
(1) Hard Cost taken from budget
(2) HC Contingency assumed at 5% of total land costs
(3) Soft Cost estimated at 25% of total hard cost. It is assumed to include fees and conditions
(4) Financing assumes 80% LTC, 7% interest etc. 24 month development period
(5) Phase II development budget not available. Used PH I $/SF figures and added 5% escalation

CONFIDENTIAL

TIAA049493

<u>EXHIBIT H</u>

Special Warranty Deed

CONFIDENTIAL                                                  TIAA049494

EXHIBIT I

Title Policy

CONFIDENTIAL

TIAA049495

Issued By:

CHICAGO TITLE INSURANCE COMPANY                    Schedule A

ALTA Owner's Policy (10-17-92)                    Policy No: | 1160-60139

Amount of Insurance:    $17,000,000.00
Date of Policy:         Pro Forma Policy        Date and Time
                                               of Recordation

1.   Name of Insured:

     Union Place Phase I, LLC, a Maryland limited liability company

2.   The estate or interest in the land which is covered by this policy is:

     Fee Simple

3.   Title to the estate or interest in the land is vested in:

     Union Place Phase I, LLC, a Maryland limited liability company

*This Policy valid only if Schedule A Item 4 and Schedule B are attached.*

Page A1 - 1

POLA1561 7/95          DB                        02/01/07   11:44:54

CONFIDENTIAL                                     TIAA049496

---

*Issued By:*

### CHICAGO TITLE INSURANCE COMPANY    Schedule A - Description

---

Policy No:    | 1160-60139 |

4.  The land referred to in this policy is described as follows:

All those certain lots, pieces or parcels of land lying, being and situate in the District of Columbia and more particularly described as follows:

TRACT I

PARCEL 1:

Lots Twenty-seven (27), Twenty-eight (28) and Twenty-nine (29) in Patrick O'Donoghue's subdivision of lots in Square Seven Hundred Forty-nine (749), as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber C.H.B. at folio 137.

NOTE: At the date hereof the above described land is now known for assessment and taxation purposes as Lot 815 in Square 749.

PARCEL 2:

Lots Forty-four (44), Forty-five (45), Forty-six (46) and Forty-seven (47) in Patrick O'Donoghue's subdivision of lots in Square Seven Hundred Forty-nine (749), as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber C.H.B. at folio 137.

NOTE: At the date hereof the above-described land is known for assessment and taxation purposes as part of Lot 822 in Square 749.

PARCEL 3:

Lots Fifty-six (56), Fifty-eight (58) and Fifty-nine (59) in Patrick O'Donoghue's subdivision of Lots in Square Seven Hundred Forty-nine (749), as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber C.H.B. at folio 137.

NOTE: At the date hereof the above described land is known for assessment and taxation purposes as Lots 807, 808, 809 and part of 814 in Square 749.

PARCEL 4:

Lots Two (2), Three (3) and Four (4), Thirty-four (34), Forty-two (42) and Fifty-seven (57) in Patrick O'Donoghue's subdivision of lots in Square Seven Hundred Forty-nine (749), as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber C.H.B. at folio 137.

BEING part of the same real estate conveyed to K Street Developers, LLC, a District of Columbia limited liability company, by Deed from 200 K Limited Partnership, a District of Columbia limited partnership, dated December 30, 2002, recorded January 3, 2003 as Document No.2003000720 among the land records of the District of Columbia.

TRACT II

\*\*\*  CONTINUED  \*\*\*

Page A2 - 1

POLA2F  7/95        DB                                                    02/01/07   11:44:54

CONFIDENTIAL                                                                 TIAA049497

Issued By:

**CHICAGO TITLE INSURANCE COMPANY**                    Schedule A - Description (cont'd)

Policy No:    1160-60139

PARCEL 1:

Lots numbered *Sixty-four* (64) and *Sixty-five* (65) in Square numbered Seven Hundred Forty-nine (749) in a subdivision made by Rose K. Wallerstein and Harry Wallerstein, as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber 122 at folio 135.

NOTE: At the date hereof the above described land is known for assessment and taxation purposes as Lot 820 in Square 749.

BEING the same real estate conveyed to Three Cee Investors, LLC, a Maryland limited liability company, by Deed from Sheldon A. Wallerstein, Gloria W. Derkay, Paul H. Kiell and Haley Shreeves, dated August 8, 2002, recorded August 13, 2002 as Doc. No. 2002093780 among the land records of the District of Columbia.

PARCEL 2:

Lot numbered Forty (40) in Square numbered Seven Hundred Forty-nine (749) in a subdivision made by Patrick O'Donnaghue, as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber C.H.B. at folio 137.

BEING the same real estate conveyed to Three Cee Investors, LLC, by Deed from Thomas P. Brooks, dated July 10, 2002, recorded July 11, 2002 as Doc. No. 2002080955 among the land records of the District of Columbia.

TRACT III

PARCEL 1:

The north 18.00 feet front on Third Street, N.E. by the full depth thereof of Lot numbered Forty-three (43) in Square numbered Seven Hundred Forty-nine (749) in a subdivision made by Patrick O'Donoghue, as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber C.H.B. at folio 137.

NOTE: At the date hereof the above described land is known for assessments and taxation purposes as Lot 806 in Square 749.

BEING the same real estate conveyed to CASCO, Inc., a Maryland corporation, by Deed from Brendan C. Magner and Mary K. Magner, dated June 15, 2001, recorded June 28, 2001 as Doc. No. 2001058076 among theland records of the District of Columbia.

PARCEL 2:

Lots numbered Thirty-two (32), Thirty-three (33), Thirty-six (36), Thirty-seven (37) and Thirty-eight (38) in Patrick O'Donoghue's subdivision of lots in Square numbered Seven Hundred Forty-nine (749) as per plat recorded in the Office of

POLA2C 3/85          DB                                    02/01/07   11:44:54

CONFIDENTIAL                                                      TIAA049498

Policy No:    1160-60139

the Surveyor for the District of Columbia in Liber CHB at folio 137.

BEING the same real estate conveyed to CASCO, Inc., a Maryland corporation, by Deed from Capitol Cab Cooperative Association, Inc., a District of Columbia corporation, dated Septembe 13, 1999, recorded September 16, 1999 as Doc. No. 9900082385 (as to Lot 32), by Deed from Clidy Mae Jones, dated January 3, 1995, recorded February 7, 1995 as Doc. No. 9500009019 (as to Lot 33), and by Deed from Mayme G. Quick, dated September 24, 2001, recorded October 3, 2001 as Doc. No. 2001096611 (as to Lots 36, 37 and 38), all among the land records of the District of Columbia.

TRACT IV

PARCEL 1:

Lot numbered Thirty-five (35) in Square numbered Seven Hundred Forty-nine (749) in a subdivision made by Patrick O' Donnoghue, as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber C.H.B. at folio 137.

BEING the same real estate conveyed to Union North Corporation, a District of Columbia corporation by Deed from Lucretia Robinson dated June 30, 2004, recorded September 21, 2004 as Doc. No. 2004130159 among the land records of the District of Columbia.

PARCEL 2:

Lot numbered Thirty-nine (39) in Square numbered Seven Hundred Forty-nine (749) in a subdivision made by Patrick O' Donnoghue, as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber C.H.B. at folio 137.

BEING the same real estate conveyed to Union North Corporation, a District of Columbia corporation by Deed from Gladys E. Daniels dated June 30, 2004, recorded September 21, 2004 as Doc. No. 2004130158 among the land records of the District of Columbia.

PARCEL 3:

Lot numbered Forty-one (41) in Square numbered Seven Hundred Forty-nine (749) in a subdivision made by Patrick O' Donohue, as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber C.H.B. at folio 137.

BEING the same real estate conveyed to Union North Corporation, a District of Columbia corporation by Deed from Waltraut Reed dated June 30, 2004, recorded September 21, 2004 as Doc. No. 2004130160 among the land records of the District of Columbia.

POLA2C 3/95     DB         02/01/07   11:44:54

CONFIDENTIAL         TIAA049499

| Issued By: | |
|---|---|
| CHICAGO TITLE INSURANCE COMPANY | Schedule B |

Policy No: 1160-60139

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Real Estate Taxes subsequent to those levied for the installment period ending September 30, 2006, a lien but not yet due and payable.

2. Water and Sewer charges in connection with the land.

3. Planned Unit Development and Affordable Housing Covenant dates as of ~ and recorded ~ as Document No. ~.

NOTE: This is a PRO FORMA POLICY furnished to or on behalf of the party to be insured. It does not reflect the present status of title and is NOT A COMMITMENT to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any affirmative coverage shown herein. Any such commitment must be an express written undertaking on appropriate forms of the Company. All Schedule B, Part 1 requirements of the Company's Commitment for Title Insurance must still be satisfied.

_____
Authorized Signatory

( ** THIS IS THE FINAL PAGE ** )

POLB 3/95          DB                                      02/01/07   11:44:54

CONFIDENTIAL                                         TIAA049500

Fidelity National Financial Group of Companies' Privacy Statement
July 1, 2001

We recognize and respect the privacy expectations of today's consumers and the requirements of applicable federal and state privacy laws. We believe that making you aware of how we use your non-public personal information ("Personal Information"), and to whom it is disclosed, will form the basis for a relationship of trust between us and the public we serve. This Privacy Statement provides that explanation. We reserve the right to change this Privacy Statement from time to time consistent with applicable privacy laws.

In the course of our business, we may collect Personal Information about you from the following sources:

- From applications or other forms we receive from you or your authorized representative;
- From your transactions with, or from the services being performed by, us, our affiliates, or others;
- From our internet web sites;
- From the public records maintained by governmental entities that we either obtain directly from those entities, or from our affiliates or others; and
- From consumer or other reporting agencies.

Our Policies Regarding the Protection of the Confidentiality and Security of Your Personal Information

We maintain physical, electronic and procedural safeguards to protect your Personal Information from unauthorized access or intrusion. We limit access to the Personal Information only to those employees who need such access in connection with providing products or services to you or for other legitimate business purposes.

Our Policies and Practices Regarding the Sharing of Your Personal Information

We may share your Personal Information with our affiliates, such as insurance companies, agents, and other real estate settlement service providers. We may also disclose your Personal Information:

- to agents, brokers or representatives to provide you with services you have requested;
- to third-party contractors or service providers who provide services or perform marketing or other functions on our behalf; and
- to others with whom we enter into joint marketing agreements for products or services that we believe you may find of interest.

In addition, we will disclose your Personal Information when you direct or give us permission, when we are required by law to do so, or when we suspect fraudulent or criminal activities. We also may disclose your Personal Information when otherwise permitted by applicable privacy laws such as, for example, when disclosure is needed to enforce our rights arising out of any agreement, transaction or relationship with you.

One of the important responsibilities of some of our affiliated companies is to record documents in the public domain. Such documents may contain your Personal Information.

Right to Access Your Personal Information and Ability To Correct Errors Or Request Changes Or Deletion

Certain states afford you the right to access your Personal Information and, under certain circumstances, to find out to whom your Personal Information has been disclosed. Also, certain states afford you the right to request correction, amendment or deletion of your Personal Information. We reserve the right, where permitted by law, to charge a reasonable fee to cover the costs incurred in responding to such requests.

All requests must be made in writing to the following address:

Privacy Compliance Officer
Fidelity National Financial, Inc.
601 Riverside Drive
Jacksonville, FL 32204

Multiple Products or Services

If we provide you with more than one financial product or service, you may receive more than one privacy notice from us. We apologize for any inconvenience this may cause you.

FNFPRIV 7/01 DGG

CONFIDENTIAL

TIAA049501

*Issued By:*

**CHICAGO TITLE INSURANCE COMPANY**                    Endorsement

Attached to and forming a part of
Policy Number  1160-60139

Re:  Access

The Company hereby insures the Insured against loss or damage by reason of the failure of the land to abut a physically open street known as North K Street, North L Street and 3rd Street East via public alleys.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated : ~

CHICAGO TITLE INSURANCE COMPANY

By

                                                                              *President*

Attest

                                                                              *Secretary*

_____
*Authorized Signatory*

Note:   This endorsement shall not be valid or binding
          until countersigned by an authorized signatory.

END  3/05                    DB                                        02/01/07    11:44:54

Issued By:

## CHICAGO TITLE INSURANCE COMPANY

Endorsement

Attached to and forming a part of
Policy Number  1160-60139

Re: ALTA Form 9.1 (Restrictions, Encroachments, Minerals)
Owner's Comprehensive - Unimproved Land

The Company insures the Insured against loss or damage sustained by reason of:

1. The existence, at Date of Policy, of any of the following unless expressly excepted in Schedule B:
   (a) Present violations on the land of any enforceable covenants, conditions or restrictions.

   (b) Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land which, in addition, (i) establishes an easement on the land; (ii) provides for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant; or (iii) provides a right of reentry, possibility of reverter or right of forfeiture because of violations on the land of any enforceable covenants, conditions or restrictions.

   (c) Any encroachment onto the land of existing improvements located on adjoining land.

   (d) Any notices of violation of covenants, conditions and restrictions relating to environmental protection recorded or filed in the public records.

2. Damage to buildings constructed on the land after Date of Policy resulting from the future exercise of any right existing at Date of Policy to use the surface of the land for the extraction or development of minerals excepted from the description of the land or excepted in Schedule B.

Wherever in this endorsement the words "covenants, conditions or restrictions" appear, they shall not be deemed to refer to or include the terms, covenants, conditions or limitations contained in an instrument creating a lease.

As used in paragraph 1(a), the words "covenants, conditions or restrictions" shall not be deemed to refer to or include any covenants, conditions or restrictions relating to environmental protection.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated : ~

CHICAGO TITLE INSURANCE COMPANY

By

President

Attest

Secretary

_____
Authorized Signatory

Note:   This endorsement shall not be valid or binding
until countersigned by an authorized signatory.

END 3/05                      DB                                                    02/01/07    11:44:54

CONFIDENTIAL

TIAA049503

| *Issued By.* | |
|---|---|
| CHICAGO TITLE INSURANCE COMPANY | Endorsement |

Attached to and forming a part of
Policy Number  1160-60139

## SURVEY ENDORSEMENT

The Company hereby insures the Insured against loss or damage sustained by the Insured by reason of the failure of the insured property to be the same as that delineated on the plat of survey prepared by Bowman Consulting Group, Ltd dated September 7, 2004 designated as Job No. 1809-01.

This endorsement is made a part of the policy. It is subject to all the terms of the commitment or policy and prior endorsements.  Except as expressly stated on this endorsement, the terms, date, and amount of the policy and prior endorsements are not changed.

Dated: ~

CHICAGO TITLE INSURANCE COMPANY

By

_____
President

Attest

_____
Secretary

_____
Authorized Signatory

*Note:   This endorsement shall not be valid or binding
until countersigned by an authorized signatory.*

END 3/85                    DB

02/01/07   11:44:54

CONFIDENTIAL

TIAA049504

*Issued By:*

| CHICAGO TITLE INSURANCE COMPANY | Endorsement |
|---|---|

Attached to and forming a part of
Policy Number 1160-60139

Re: Tax Parcel

The Company hereby insures the Insured against loss or damage which the Insured shall sustain by reason of the failure of the insured property to be taxed separately under tax reference known as Lots 2, 3, 4, 34, 42, 57, 807, 808, 809, part of 814, 815 and 822 In Square 749, or by reason of said tax reference containing real estate other than the land described as the insured premises.

The total liability of the Company under said Policy and any endorsements therein shall not exceed, in the aggregate, the face amount of said Policy and costs which the Company is obligated under the Conditions and Stipulations thereof to pay.

This endorsement is made a part of the policy. It is subject to all the terms of the commitment or policy and prior endorsements. Except as expressly stated on this endorsement, the terms, dates and amount of the policy and prior endorsements are not changed.

DATED: ~

CHICAGO TITLE INSURANCE COMPANY

By

*President*

Attest

*Secretary*

_____
*Authorized Signatory*

Note:   This endorsement shall not be valid or binding
         until countersigned by an authorized signatory.

END 3/95          DB                                    02/01/07   11:44:54

Issued By:

CHICAGO TITLE INSURANCE COMPANY                                    Endorsement

Attached to and forming a part of
Policy Number  1160-60139

The issuance of this endorsement is conditioned on the recordation of the Planned Unit Development
and Affordable Housing Covenant required by the Order referenced herein.

ALTA Endorsement - Form 3
(Zoning)

The Company insures the Insured against loss or damage sustained in the event that, at Date of Policy:

1.  According to applicable zoning ordinances and amendments thereto, the land is not classified Zone C-3-C.

2.  The following use or uses are not allowed under that classification:

    202 residential units and 3,699 square feet of first floor retail as  provided by Zoning Commission
    connected Order No. 05-36.

There shall be no liability under this endorsement based on:

(a) Lack of compliance with any conditions, restrictions or requirements contained in the zoning ordinances
    and amendments thereto mentioned above, including but not limited to the failure to secure necessary
    consents or authorizations as a prerequisite to the use or uses.

(b) The invalidity of the ordinances and amendments thereto mentioned above until after a final decree of a
    court of competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses.

(c) The refusal of any person to purchase, lease or lend money on the estate or interest covered by this policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms
and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the
Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an
express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of
the terms and provisions of the policy and of any prior endorsements.

Dated:  --

                                                         CHICAGO TITLE INSURANCE COMPANY

                                                         By

                                                                                         President

                                                         Attest

_____
        Authorized Signatory                                                             Secretary

Note:   This endorsement shall not be valid or binding
        until countersigned by an authorized signatory.

END  3/95              DB                                        02/01/07    11:44:54

CONFIDENTIAL                                                                    TIAA049506

Issued By:

## CHICAGO TITLE INSURANCE COMPANY

Endorsement

Attached to and forming a part of
Policy Number  1160-60139

Re:  Contiguity

The Company hereby insures the Insured against loss or damage sustained by the Insured by reason of the failure of the land described in Lots 28, 29 and 27 in Square 749 to be contiguous to each other, the land described in Lots 44, 45, 46 and 47 in Square 749 to be contiguous to each other, the land described in Lots 57, 58, 59 and 56 in Square 749 to be contiguous to each other, the land described in Lots 2, 3 and 4 in Square 749 to be contiguous to each other, Lots 820, 806, 42, 41, 40, 39, 38 and 37 in Square 749 to be contiguious to each other, and Lots 36, 35, 34, 33, and 32 to be contiguious to each other.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated: ~

CHICAGO TITLE INSURANCE COMPANY

By

President

Attest

Secretary

_____
Authorized Signatory

Note:   This endorsement shall not be valid or binding
until countersigned by an authorized signatory.

END 3/95             DB

02/01/07    11:44:54

TIAA049507

Issued By:

**CHICAGO TITLE INSURANCE COMPANY**                                   Endorsement

Attached to and forming a part of
Policy Number  1160-60139

## FAIRWAY ENDORSEMENT

The Company agrees that it will not interpose as a defense to a claim of coverage under this Policy the fact that a dissolution of the insured partnership has occurred, or a new partnership has been formed solely by reason of the withdrawal or replacement of one or more of the partners of the original insured partnership so long as the insured remains as the title holder, and no new partnership is explicitly formed.  The Company reserves all of its rights against the insured or its constituent partners before or after any withdrawal or replacement.

This endorsement is made a part of the Policy and is subject to all of the terms and provisions thereof.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

IN WITNESS WHEREOF, the Company has caused its corporate name and seal to be affixed hereto by its duly authorized officers on the ~  day of ~ , ~ .

CHICAGO TITLE INSURANCE COMPANY

By

                                                                          President

Attest

                                                                          Secretary

_____
        *Authorized Signatory*

*Note:   This endorsement shall not be valid or binding
             until countersigned by an authorized signatory.*

END 3/95                    DB                                          02/01/07   11:44:55

CONFIDENTIAL                                                          TIAA049508

*Issued By:*

**CHICAGO TITLE INSURANCE COMPANY**                                  Endorsement

Attached to and forming a part of
Policy Number  1160-60139

Original Signature (Electronic) Endorsement

The Company hereby assures the Insured that the Company will not deny liability under the policy or any endorsements issued therewith solely on the grounds that the policy and/or endorsements were issued electronically and/or lack signatures in accordance with Paragraph (c) of the Conditions of Stipulations.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

DATED: ~

CHICAGO TITLE INSURANCE COMPANY

By

                                                                    President

Attest

                                                                    Secretary

_____
           Authorized Signatory

Note:   *This endorsement shall not be valid or binding*
        *until countersigned by an authorized signatory.*

END 3/95              DB                          02/01/07   11:44:55

CONFIDENTIAL                                                    TIAA049509

| Issued By: | |
|---|---|
| CHICAGO TITLE INSURANCE COMPANY | Endorsement |

Attached to and forming a part of
Policy Number  1160-60139

ALTA Endorsement - Form 15.1
(Nonimputation-Additional Insured) (Adopted 10/22/03)

(NOTE:  ENTITY AS THE NAMED INSURED IN THE POLICY AND VESTEE OF THE INSURED ESTATE OR INTEREST IDENTIFIED IN SCHEDULE A)

For purposes of the coverage provided by this endorsement,

(Identify the "Incoming" partner, member or shareholder)

TIAA Union Place Phase I, LLC and Teachers Insurance Association of America are added as an insured under the policy.  By execution below, the insured named in Schedule A acknowledges that any payment made under this endorsement shall reduce the amount of insurance as provided in Section 10 of the Conditions and Stipulations.

The Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b), or (e) to deny liability to the Additional Insured for loss or damage otherwise insured against under the terms of the policy solely by reason of the action or inaction or knowledge, as of Date of Policy, of K Street Developers, LLC, Three Cee Investors, LLC, CASCO, Inc., Union North Corporation and Union North Phase I, LLC.

(Identify, as applicable, the existing and/or exiting partner(s) of the insured partnership entity, member(s) or manager(s) of the insured limited liability company entity, or officer(s) and/or director(s) of the insured corporate entity).

AGREED AND CONSENTED TO: Union Place Phase I, LLC

_____
    INSURED

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

CHICAGO TITLE INSURANCE COMPANY

By

                                                              President

Attest

                                                              Secretary

_____
    Authorized Signatory

Note:   This endorsement shall not be valid or binding
        until countersigned by an authorized signatory.

END  3/95              DB                                02/01/07    11:44:55

CONFIDENTIAL                                                    TIAA049510

| *Issued By:* | |
|---|---|
| **CHICAGO TITLE INSURANCE COMPANY** | Endorsement |

Attached to and forming a part of
Policy Number  1160-60139

CREDITORS' RIGHTS ENDORSEMENT  (Owner's Policy)

Section 4 of the Exclusions from Coverage is deleted, this deletion to have the same effect as if said Section had never existed.

Notwithstanding Sections 3(a) and 3(d) of the Exclusions from Coverage, the Company insures the insured against loss or damage the insured shall sustain by reason of the voidability, in whole or in part, of the insured mortgage or the title to the estate or interest shown in Schedule A because of the occurrence on or before Date of Policy of a *Fraudulent Transfer* or preference, in either case under federal bankruptcy, state insolvency or similar creditors' rights laws.

The coverage provided by this endorsement shall include the payment of costs, attorneys' fees and expenses necessary to defend the insured against those counts of any litigation seeking court orders which will result in loss or damage against which this endorsement provides insurance, and no others, to the extent provided in the Conditions and Stipulations which is not consistent with this paragraph.

As used in this endorsement, the phrase "Fraudulent Transfer" means a fraudulent transfer or conveyance other than one which the insured, at the time it acquired the insured mortgage, knew was actually intended to hinder, delay or defraud any creditor.

This endorsement is made a part of the commitment or policy. It is subject to all the terms of the commitment or policy and prior endorsements. Except as expressly stated on this endorsement, the terms, date, and amount of the commitment or policy and prior endorsements are not changed.

DATED: ~

CHICAGO TITLE INSURANCE COMPANY

By

*President*

Attest

*Secretary*

Authorized Signatory

Note:   This endorsement shall not be valid or binding
        until countersigned by an authorized signatory.

END 3/95              DB                                      02/01/07   11:44:55

CONFIDENTIAL

TIAA049511

*Issued By:*

CHICAGO TITLE INSURANCE COMPANY | Endorsement

Attached to and forming a part of
Policy Number  1160-60139

Re:  Arbitration  (Owner's Policy)

The sentences contained in Paragraph 14 of the *Conditions and Stipulations* of the Policy that read as follows:

"All arbitrable matters when the Amount of Insurance is $1,000,000 or less shall be arbitrated at the option of either the Company or the insured.  All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the insured."

are hereby deleted. The following sentence is inserted in lieu thereof:

"All arbitrable matters shall be arbitrated only when agreed to by both the Company and the insured."

All remaining language in Paragraph 14 remains unchanged.

This endorsement is made a part of the commitment or policy. It is subject to all the terms of the commitment or policy and prior endorsements. Except as expressly stated on this endorsement, the terms, dates and amount of the commitment or policy and prior endorsements are not changed.

Dated : ~

CHICAGO TITLE INSURANCE COMPANY

By

*President*

Attest

*Secretary*

_____
Authorized Signatory

Note:   This endorsement shall not be valid or binding
        until countersigned by an authorized signatory.

END  3/96            DB                           02/01/07   11:44:55

CONFIDENTIAL

TIAA049512

## EXHIBIT J

### Property Agreements

1.    GTM Architects,. Inc., Standard Form of Agreement between Owner and Architect dated as of September 14, 2006


2.    Meyers Consulting Engineers Corporation (Structural Engineering), dated November 6, 2006


3.    Bansal & Associates, Inc, (mechanical, electrical, plumbing and fire protection) dated November 7, 2006


4.    CAS ENginddering (civil), dated November 9, 2006


5.    Landscape Architecture Bureau, LLC (landscape architecture) dated November 3, 2006


6.    Utility Systems C&E LLC (utility design services) dated November 19, 2006

CONFIDENTIAL                                                    TIAA049513