# EXHIBIT 29

UNION PLACE PHASE I, LLC

FINANCIAL STATEMENTS
DECEMBER 31, 2009



DEPOSITION
EXHIBIT
D-53
5·3·13

CONFIDENTIAL

UNION PLACE PHASE I, LLC
FINANCIAL STATEMENTS
DECEMBER 31, 2009

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Independent Auditors' Report | 1 |
| Financial Statements | |
| Balance sheet | 2 |
| Statement of changes in members' equity | 3 |
| Statement of cash flows | 4 |
| Notes to financial statements | 5 |



**INDEPENDENT AUDITORS' REPORT**

To the Members of
Union Place Phase I, LLC

We have audited the accompanying balance sheet of Union Place Phase I, LLC (a "development stage company") as of December 31, 2009, and the related statements of changes in members' equity and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Union Place Phase I, LLC as of December 31, 2009, and the results of their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

*Aarons Grant & Habif, LLC*

Aarons Grant & Habif, LLC

June 7, 2010

3500 Piedmont Road, Suite 600, Atlanta, Georgia 30305, Phone 404-233-5486, Fax 404-237-8325
E-mail cpa@aghllc.com Web Page www.aghllc.com

Members of The American Institute of CPI's, Georgia Society of CPI's, Enterprise Network

CONFIDENTIAL                              TIAA000016

UNION PLACE PHASE I, LLC
BALANCE SHEET
AS OF DECEMBER 31, 2009

### ASSETS

| | | |
|---|---|---:|
| Real Estate | | |
| Land | $ | 17,651,170 |
| Construction in progress | | 48,213,713 |
| Total real estate | | 65,864,883 |
| Cash | | 255,862 |
| Other Assets | | |
| Property tax refund receivable | | 190,744 |
| Deferred financing costs, net | | 1,051,710 |
| Total other assets | | 1,242,454 |
| Total Assets | $ | 67,363,199 |

### LIABILITIES AND MEMBERS' EQUITY

| | | |
|---|---|---:|
| Liabilities | | |
| Construction loan payable | $ | 39,437,735 |
| Accounts payable | | 3,340,933 |
| Accrued interest | | 78,611 |
| Retainage payable | | 2,124,575 |
| Due to affiliate | | 50,554 |
| Total liabilities | | 45,032,408 |
| Members' Equity | | 22,330,791 |
| Total Liabilities and Members' Equity | $ | 67,363,199 |

See Independent Auditors' Report and Accompanying Notes

CONFIDENTIAL

TIAA000017

UNION PLACE PHASE I, LLC
STATEMENT OF CHANGES IN MEMBERS' EQUITY
FOR THE YEAR ENDED DECEMBER 31, 2009

| | Union North Phase I, LLC | TIAA Union Place Phase I, LLC | Total |
|---|---|---|---|
| Balance, January 1, 2009 | $ 2,003,235 | $ 18,029,119 | $ 20,032,354 |
| Contributions from members | 229,842 | 2,068,595 | 2,298,437 |
| Balance, December 31, 2009 | $ 2,233,077 | $ 20,097,714 | $ 22,330,791 |

See Independent Auditors' Report and Accompanying Notes
- 3 -
CONFIDENTIAL

TIAA000018

UNION PLACE PHASE I, LLC
STATEMENT OF CASH FLOWS
FOR THE YEAR ENDED DECEMBER 31, 2009

| | | |
|---|---:|---:|
| Cash flows from operating activities: | | |
| Net income (loss) | $ | 0 |
| Adjustments to reconcile net income (loss) to net cash | | |
| provided by operating activities: | | |
| Amortization, capitalized to construction in progress | | 435,191 |
| Change in: | | |
| Property tax refund receivable | | (190,744) |
| Accounts payable | | 1,948,739 |
| Accrued interest | | 78,611 |
| Retainage payable | | 1,018,597 |
| Due to affiliate | | 72,914 |
| | | |
| Net cash provided by operating activities | | 3,363,308 |
| | | |
| Cash flows from investing activities: | | |
| Additions to real estate | | (24,876,776) |
| | | |
| Cash flows from financing activities: | | |
| Proceeds from construction loan payable | | 19,223,092 |
| Contributions from members | | 2,298,437 |
| | | |
| Net cash provided by financing activities | | 21,521,529 |
| | | |
| Net change in cash | | 8,061 |
| | | |
| Cash, beginning of year | | 247,801 |
| | | |
| Cash, end of year | $ | 255,862 |
| | | |
| Supplemental disclosure of non-cash flow information: | | |
| Capitalized interest | $ | 673,058 |

See Independent Auditors' Report and Accompanying Notes

CONFIDENTIAL

TIAA000019

UNION PLACE PHASE I, LLC
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2009

## Note A – Organization

Union Place Phase I, LLC (the "Company") is a Delaware limited liability company organized on January 17, 2007 for the purpose of acquiring, developing, managing, and leasing a 212 unit multi-family residential project (the Project) in Washington, D.C.

Union North Phase I, LLC (Union North) holds a 10% interest in the Company and TIAA Union Place Phase I, LLC (TIAA) holds a 90% interest in the Company.

On February 1, 2007, Union North sold a 90% interest in a parcel of land to the Company. Union North's remaining 10% interest in the land was deemed an initial capital contribution. Concurrently, TIAA made a capital contribution equivalent to 90% of the purchase price of the land plus acquisition costs. The parcel is the intended future site of the Project.

## Note B – Summary of Significant Accounting Policies

### Use of estimates
The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect various amounts reported in the financial statements and accompanying notes. Actual results could differ from those estimates.

### Real estate
Real estate is carried at cost. In accordance with Financial Accounting Standards Board Accounting Standards Codification ("ASC") Subtopic 970-340-25, *Real Estate Project Costs,* development costs, property taxes and insurance are capitalized during the real estate development period. From the date of the Company's formation, these costs have been included in land and development costs and are not subject to depreciation.

The Company evaluates its investment in real estate to assess whether any impairment indicators are present that would impact the recovery of the investment's carrying value. An impairment is deemed to exist if the carrying value of a property exceeds the sum of the property's undiscounted cash flows. If such a situation occurs, the Company will reduce the carrying value to the fair value determined through an independent appraisal and record an impairment loss in earnings. No impairments were noted for the year ended December 31, 2009.

### Deferred financing costs
Deferred financing costs consist of amounts incurred to secure the construction financing. The charges are amortized on a straight-line basis to construction in progress over the 48-month loan term. Accumulated amortization capitalized to construction in progress as of December 31, 2009 totaled $689,052. For the year ended December 31, 2009, amortization expense capitalized to construction in progress totaled $435,191.

### Income taxes
The Company is organized as a limited liability company (LLC) for income tax purposes. As an LLC, the members will include taxable income or loss of the Company on their respective income tax returns. As a result, there is no provision for income taxes in these financial statements.

UNION PLACE PHASE I, LLC
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2009

Note B – Summary of Significant Accounting Policies (concluded)

In accordance with ASC Topic 740, *Income Taxes*, the Company is required to recognize the financial statement affect of certain tax positions when it is more likely than not that the position will not be upheld upon examination by the taxing authority. The Company evaluates its tax positions on an annual basis and addresses any uncertainties as they arise. As of December 31, 2009, there were no uncertain tax positions identified by the Company that would require recognition and disclosure under ASC Topic 740.

Note C – Concentration of Credit Risk

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of cash balances deposited into one financial institution. The Federal Deposit Insurance Corporation ("FDIC") has temporarily increased its insurance protection on cash balances to $250,000 through December 31, 2013. As of December 31, 2009, the Company had $5,862 in uninsured cash balances.

Note D – Construction Loan Payable

On May 23, 2008, the Company obtained a construction loan facility from a third-party lender totaling $55,250,000. The note bears interest monthly based on one-month LIBOR plus 1.875% per annum, not to exceed 8% (2.11% at December 31, 2009). The loan matures on May 23, 2011, at which time the unpaid principal and accrued interest balance is due. The loan has two successive renewal options to extend the maturity date to May 23, 2012 and May 23, 2013. The loan is guaranteed by certain affiliates of the Company and Union North and is secured by the Project. At December 31, 2009, the balance of the construction loan payable was $39,437,735.

Note E – Related Party Transactions

The Company has entered into a development agreement with an affiliate to develop the Project. The agreement requires a fee of 3% of budgeted hard costs (as defined) payable over eighteen installments. Total development fees paid and capitalized to construction in progress as of December 31, 2009 was $1,600,000.

The Company has entered into a construction contract with an affiliate, including approved change orders, in the amount of $43,950,885 to construct the Project. As of December 31, 2009, the Company has incurred $40,594,868 in construction costs and owes $3,243,470 under this contract. Retainage payable to the affiliate totals $2,124,575 under this contract at December 31, 2009.

An affiliate paid certain construction and development costs on behalf of the Company during the current year. As of December 31, 2009, $50,554 was due to the affiliate.

Note F – Fair Value of Financial Instruments

As of December 31, 2009, the carrying amount of certain assets and liabilities that arise from contractual obligations approximates the fair value of these instruments.

UNION PLACE PHASE I, LLC
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2009

**Note G – Subsequent Events**

The Company has evaluated all events subsequent to the balance sheet date of December 31, 2009 through June 7, 2010, which is the date these financial statements were issued. The Company has identified the following subsequent event that requires disclosure under ASC Topic 855, *Subsequent Events*:

The development of the Project was completed and the Company was issued a certificate of occupancy on May 3, 2010.

CONFIDENTIAL                    TIAA000022

SETTLEMENT AGREEMENT

**INTRODUCTION**

1.  The Equal Rights Center (the "ERC") and Cohen Companies and ADC
    Builders, Inc. (collectively referred to as "Cohen") and Union Place Phase
    I, LLC ("Union") (collectively with Cohen referred to as "Respondents"),
    (the ERC and Respondents are collectively referred to as the "Parties"),
    have agreed to enter into this Accessibility Resolution Agreement (the
    "Agreement"), the effective date of which is January 11, 2012,
    in order to fully and finally resolve accessibility issues regarding the
    apartment building knows as "The Loree Grand" initially raised by the
    ERC in its letter dated March 22, 2011, and its Complaint, filed in the
    United States District Court of Maryland on September 1, 2011, as it
    relates only to the ERC's claims that Respondents failed to design and
    construct "The Loree Grand" in accordance with the Fair Housing Act (the
    "FHA"), 42 U.S.C. § 3604(f)(1), (2) & (3)(C), and failed to design and
    construct places of public accommodation associated with that apartment
    building in accordance with the Americans with Disabilities Act (the
    "ADA"), 42 U.S.C. § 12183(a)(1).

2.  Respondents have denied the allegations of the ERC's letter, and deny the
    allegations in the Complaint, and the ERC recognizes that Respondents
    have represented that they acted in good faith and had no intention to
    avoid the requirements of the FHA and ADA. Nothing in this Agreement
    constitutes or may be construed as an admission of liability as to the
    claims of the ERC, all of which are expressly denied by Respondents.

3.  The Parties' mutual, long-term objective in entering into this Agreement
    includes the goals of increasing the total number of residential properties
    in the United States that are accessible to persons with disabilities, and of
    enhancing housing industry compliance with accessibility laws.

4.  The Parties agree that the controversy with respect to the Loree Grand
    should be resolved without further proceedings. Therefore, the Parties
    have agreed to this Agreement as indicated by the authorized signatures
    appearing below. The provisions of this Agreement will be binding on the

1

CONFIDENTIAL

TIAA055247

ERC and Respondents, their respective subsidiaries and their successors and assigns, for a period defined in paragraph H(1), below.

**It is therefore AGREED that:**

## A.   EDUCATION AND TRAINING AND RELATED MATTERS

1.   Within 180 days of the entry of this Settlement Agreement, Cohen will ensure that Eric L. Siegel will attend fair housing training provided by the ERC with specific emphasis on compliance with the accessibility requirements of the FHA and ADA, and will secure a signed statement, in the form attached hereto as **Appendix 1**, from such employee acknowledging that he has received this training. The costs of providing all such training (including reasonable travel expenses for the ERC personnel and trainers) will be paid by Respondents.

2.   Within 180 days of the entry of this Settlement Agreement, the ERC will review and comment on Union's practices related to public notice of its nondiscrimination policy and nondiscrimination in advertising and will assist Union in implementing reasonable changes for compliance if any are necessary.

## B.   CORRECTIVE ACTIONS FOR SETTLEMENT AGREEMENT PROPERTY

1.   Property Subject to the Agreement: The property subject to this Agreement is the multifamily rental property known as "The Loree Grand", located at 250 K Street, N.E., Washington, D.C. The Loree Grand was completed for first occupancy after March 13, 1991. Further, Union was involved in the design and construction process of the Loree Grand as an owner or developer, and Union is the current owner of this property.

2.   Representations. Respondents represent that they have identified the Agreement Property, as defined in Paragraph B (1) above, on **Appendix 2.**

3.   Properties Subject to Remediation: The Agreement Property is subject to the survey, remediation, and final inspection provisions of this section. Union agrees that subject to the provisions of Paragraph B (8) and Paragraph 1 of **Appendix 3**, it will survey, and to the extent necessary, remediate the Agreement Property as provided for in the Property Alteration Agreement ("PAA") described in Paragraph B (5)

4.   Initial Surveys of Agreement Property:

2

CONFIDENTIAL

TIAA055248

a.    The Loree Grand has been surveyed (the "Initial Survey") by a jointly agreed-upon consultant ("Consultant"). Union may also retain an additional consultant ("Union's Expert") who will be permitted to participate and interact with the Consultant in the remediation and final inspection process as to the Loree Grand as determined by Union.

b.    The Consultant has conducted an Initial Survey of the Loree Grand to determine the existence and scope of any deficiencies in compliance with the applicable accessibility requirements of the FHA and the ADA.

c.    The Consultant has provided the Parties with a written report of the Initial Survey.

d.    All expenses related to the Initial Survey will be borne by Union.

5.    <u>Remediation</u>: Union agrees to provide certain accessibility remediation at the Agreement Property (including the public and common use areas and individual units). The accessibility remediation is subject to the following requirements and limitations:

a.    Simultaneously with the execution of this Settlement Agreement, the Parties will execute an agreement on the alterations to be made in the Loree Grand ("Property Alteration Agreement") in accordance with the provisions of Paragraph B (5) (b) below.

b.    The Property Alteration Agreement will detail the Parties' understandings regarding the alterations to the covered dwelling units and the common use and public use areas of the Remediation Property so as to bring the Property into compliance with one or more "Safe Harbors"[1] recognized under the FHA and ADA; however such Safe Harbors are subject to the Remediation Tolerances set forth in **Appendix 3**, and such other requirements or exceptions as may be agreed to by the Parties. Further, it is agreed that different Safe Harbors may apply at the Agreement Property.

c.    Union will cause the Agreement Property to be altered so as to fully comply with the applicable Property Alteration Agreement.

---

[1] "Safe Harbor" means any of the following: a) ANSI A117.1 (1986); the Fair Housing Accessibility Guidelines (HUD, 1991); the Fair Housing Design Manual (1998); the Guidelines and Supplemental Questions and Answers (HUD, June 28, 1994); CABO/ANSI A117.1 (1992); ICC/ANSI A117I.1 (1998); the Code Requirements for Housing Accessibility (CRHA, 2002); the International Building Code (2000, with 2001 Supplement); the International Building Code (2003); the International Building Code (2006); and b) any other Safe Harbor recognized by HUD. To the extent Union relies upon ANSI standards as a Safe Harbor, those standards will be read in conjunction with the Fair Housing Act, HUD's regulations, and the HUD Fair Housing Accessibility Guidelines.

CONFIDENTIAL

TIAA055249

    d.   The Parties will endeavor in good faith to resolve informally any issues regarding the terms of Property Alteration Agreement and Union's compliance therewith prior to seeking to enforce the terms of this Agreement in court.

6.   <u>Sale of Agreement Property</u>: If the Agreement Property, or a unit in the Agreement Property, requiring remediation is to be sold to an individual or entity unrelated to Respondents, Union will ensure that the Agreement Property, or the unit in the Agreement Property subject to sale, and that all of the required common and public areas at the Agreement Property, have been remediated or provision has been made with the buyer to allow Union to remediate those areas after the transfer of the property consistent with the timing provisions in Paragraph B (7) below.

7.   <u>Time of Completion of Remediation Activities</u>: The Parties agree to the completion of the remediation work contemplated in this Paragraph B as soon as practicable, but in no event later than the following:

    a.   Alterations relating to public use and common use areas will be completed within two (2) years of the execution of an applicable Property Alteration Agreement, provided that this period may be extended for good cause in the event that Union is unable to complete such Remediation Activities after reasonable good faith efforts.

    b.   Alterations relating to the interiors of covered dwelling units will be completed at the time of turnover of occupancy for those units but in no event later than three (3) years after the execution of the applicable Property Alteration Agreement. Notwithstanding the foregoing, should any tenant request alterations in his/her unit to bring the same into compliance with the design standards required by Paragraph B (4), Union will, within 180 days (or such greater period of time as may be reasonably necessary under the circumstances), complete the alterations called for in the applicable Property Alteration Agreement relating to all common use and public use facilities reasonably affecting that tenant's day-to-day activities.

8.   <u>Actions as to Individual Tenants</u>:

    a.   Within 90 days of the date of the effective date of this Agreement, Union will submit its written policies regarding reasonable accommodations and reasonable modifications to the ERC for review, comment and agreement.

    b.   Within 90 days after ERC and Union have reached agreement as to Union's written policy regarding reasonable accommodations and

4

TIAA055250

reasonable modifications, an addendum with such polices will be incorporated into Union's form lease agreements. Thereafter a form of lease agreement containing such addendum will be used in connection with the renewal of all then current tenants, as well as with all new tenants, at the Agreement Property. A statement of such policy will be available to all tenants upon request within 90 days after ERC and Union have reached agreement as to such policy.

9. <u>Dislocation of Tenants</u>: Union will attempt to minimize any dislocation to current and future tenants caused by the remediation work. Union will reimburse current or future tenants for their reasonable and necessary costs of temporary housing and for their reasonable and necessary out of pocket expenses directly caused by the remediation work.

10. <u>No Pass-Through of Costs to Tenants</u>: Union agrees that no additional rent, deposit, or other fee may be charged solely because of contemplated or completed remediation work performed at the Agreement Property.

11. <u>Inspection and Certification of Completed Remediations</u>

   a. The Consultant will be retained by Union to conduct on-site inspections of the remediation work which has been performed at the Agreement Property to determine if such work has been completed in accord with the Property Alteration Agreement. Upon completing the remediation work at the Agreement Property, Union will provide notice (a "Completion Notice") to the ERC and the Consultant.

   b. Within twenty-one (21) days after a Completion Notice is sent, and upon not less than seven (7) days notice to Union, if reasonably possible, the Consultant will conduct the on-site inspection. Inspections will be carried out so as to minimize, to the extent possible, disruption to tenants.

   c. Within fourteen (14) days following each on-site inspection, the Consultant will provide the results of each inspection, if reasonably possible, including deviations in compliance with the Property Alteration Agreement, if any, in writing, to the Parties.

   d. Union will make a good faith effort to correct any deviations from the Property Alteration Agreement in all units requiring the same alteration within 90 days following receipt of the report from the Consultant. All costs associated with these inspections and any corrections to remedy deviations will be paid by Union. Upon final completion of the Alterations, and certification by the

5

CONFIDENTIAL

TIAA055251

Consultant, the ERC will provide Union with a release in the form attached hereto as **Appendix 4**.

    e.    If the Consultant cannot complete the inspection in the time provided, reasonable additional time will be permitted.

12.    <u>Future Compliance</u>

Cohen, its subsidiaries and its successors and assigns, shall comply with the relevant provisions of the FHA and ADA in connection with the design and construction of their future covered multi-family housing.

**C.**    **RELEASE**

1    As to the Agreement Property, the ERC releases all claims relating to accessibility under the design and construction provisions of the FHA, the ADA, and any similar state or local accessibility law related to that Remediation Property, except for the obligations under this Settlement Agreement.  The ERC agrees that for the Agreement Property, upon completion of remediation, final inspection and certification by the Consultant, the ERC releases Respondents from all claims under the FHA, ADA, and any similar state or local accessibility law related to the design or construction of that Agreement Property that were brought or could have been brought as of the date of the release.

**D.**    **NEW RESIDENTIAL MULTIFAMILY RESIDENTIAL PROJECTS**

1.    For the term of this Agreement, Cohen will have all future multifamily residential projects designed, constructed, and/or owned by Cohen or its subsidiaries or affiliates, except for those projects in which the Cohen-Related entity for the project is only acting as the General Contractor, reviewed during design and construction by a third-party fair housing and ADA consultant with knowledge and expertise in the requirements of the FHA and the ADA.

2.    During the term of this Agreement, the ERC will review and comment on Cohen's program of third-party reviews.

**E.**    **REPORTING**

In addition to any other reporting and disclosure requirements set forth throughout this Settlement Agreement, within 180 days after the effective date of this Agreement, and on the annual anniversary date of the effective date of this Agreement until the expiration of this Agreement, Respondents will submit to the ERC a report containing a description of Respondents' actions in the preceding period to comply with the training, remediation, and other requirements of this Agreement.

6

CONFIDENTIAL

TIAA055252

**F.    MONETARY PROVISIONS**

1.    Union will pay to the ERC the sum of Forty-five Thousand Dollars $45,000.00 by wire transfer to the Washington Lawyers' Committee for Civil Rights and Urban Affairs within five (5) business days of the effective date of this Agreement;

2.    During the term of this Agreement, Union will reimburse the ERC, at the standard billing rates then in effect, for the reasonable attorneys' fees and costs actually incurred by the ERC and its counsel in the event that the Property Alteration Agreement, if appropriate, requires modification because less than all remediation can be made, which amounts shall not exceed $1,000 per calendar quarter. Such costs shall not include any charges for administrative time by employees of the ERC. All requests for reimbursement by the ERC shall be accompanied by itemized timesheets and supporting documentation for expenses. At the ERC's option, its counsel may submit its invoices directly to Union for payment, provided such invoices are accompanied by itemized timesheets and supporting documentation for expenses. In the event that all of the remediations are made as per the PAA, ERC shall not charge Respondents, or any of them, for accepting the final certifications in writing and providing the release of claims to Respondents.

**G.    PUBLIC STATEMENTS**

The parties agree that this Agreement is a public document.

**H.    MISCELLANEOUS**

1.    Term

This Agreement will remain in effect for three (3) years and, as to completion of unfinished remediation work, longer until such time as final certification of all remediation work contemplated hereunder is complete.

2.    Choice of Forum

The parties agree that all actions relating to this Agreement shall be brought exclusively in the federal courts in the District of Columbia. The parties hereby consent to the jurisdiction of the federal courts in the District of Columbia and waive any and all objections to venue and forum non conveniens.

3.    Dispute Resolution

The ERC and Respondents will each act reasonably and endeavor in good faith to resolve informally any differences regarding interpretation of, and compliance with, this Agreement prior to bringing such matters to a court

7

CONFIDENTIAL

TIAA055253

for resolution. However, in the event of a failure by either Party to perform any act required by this Agreement in a timely manner or otherwise to act in accordance with any provision hereof, the other Party may seek to enforce this Agreement in court and ask such court to impose any remedy authorized by law or equity, including, but not limited to, an order requiring performance of such act or deeming such act to have been performed, and an award of any damages, costs, and reasonable attorneys' fees which may have been occasioned by the violation or failure to perform.

4.    Time for Performance

The time frames imposed by this Agreement for the performance of certain acts may be extended by the mutual written agreement of the ERC and Respondents.

5.    Notice to the Parties

Notice to the Parties may be given by facsimile or email (if also mailed by first-class mail), in which case notice will be deemed to have been received on the day of transmission, as follows:

If to the ERC:

Executive Director,
Equal Rights Center
11 Dupont Circe, N.W., Suite 450
Washington, D.C. 20036
Facsimile:  202-234-3106
Current email:
dkahl@equalrightscenter.org

*And*

Director, Fair Housing Project
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, N.W., Suite 400
Washington, D.C.  20036
Facsimile:  202-319-1010
Current email:
megan_whyte@washlaw.org

If to Respondents:

Eric Siegel
Cohen Companies
2701 Tower Oaks Boulevard
Suite 200
Rockville, Maryland 20852
(301) 692-1900

8

CONFIDENTIAL

TIAA055254

esiegel@cohencompanies.com

6.   <u>Reservation of Other Claims</u>

a.   This Agreement, and any release hereunder will have no force or effect with respect to the ERC's claims as against any person or entity other than the Respondents, all such claims have been specifically reserved by the ERC, except Respondents and Respondents-Released Parties will initially have the sole right to pursue claims against their design professionals and contractors/subcontractors who performed design or construction work at the Settlement Agreement Property. The ERC agrees not to pursue any claims arising out of the Settlement Agreement Property against any of the design professionals and contractors/subcontractors unless Respondents expressly waive the right to bring any such claims.

b.   The parties recognize that this Settlement Agreement does not resolve the dispute between the parties as to the property known as Velocity located at 1025 First Street, S.E., Washington, D.C. 20003 ("Velocity") and that they desire to continue working towards such a settlement. However, such a settlement cannot be completed as of the date of this Settlement Agreement. Therefore the parties agree that after this Settlement Agreement is executed by the parties and the monies identified in paragraph F.1 have been paid, the ERC, with the agreement, if necessary, of Respondents, will file a First Amended Complaint which will alter the initial Complaint to delete the claims for the Loree Grand, including deletion of Union and ADC Builders, Inc. as defendants. Further, the ERC agrees that it will not seek at add ADC Builders, Inc. as a defendant in the suit involving accessibility claims at Velocity nor will it bring any such claims in the future against ADC Builders, Inc. based on ADC Builders, Inc.'s involvement in construction of Velocity. In addition, if and when the parties settle the dispute as to Velocity and remediations are completed as to that property, the General Release of Claims that the defendants shall be entitled to shall include ADC Builders, Inc.

c.   Within five (5) business days of the filing of the First Amended Complaint, Cohen agrees to provide written notice of the ERC's claims related to Velocity to all those with a financial interest in this property including any Cohen partners and financial institutions. Such notice shall include a copy of the First Amended Complaint. Within ten (10) business days of the filing of the First Amended Complaint, Cohen shall provide the ERC with evidence that such notice has been given

9

CONFIDENTIAL

TIAA055255

7.  <u>Titles and References</u>

The titles and paragraph references used in this Agreement are non-substantive descriptions included solely for the Parties' ease of reference and will not be construed to alter the substantive provisions of this Agreement.

8.  <u>Counterparts</u>

This Agreement may be executed in counterparts, all of which when taken together shall constitute a single instrument.

9.  <u>Integration Clause</u>

This Agreement, including the appendices attached hereto, constitute the entire agreement and understanding between the Parties and supersede all prior communications or negotiations between the Parties and their representatives regarding the matters contained in this Agreement. Evidence of prior negotiations (including but not limited to drafts of this Agreement and its related documents) may not be introduced in any proceeding to enforce the terms of this Agreement. Except as explicitly set forth in this Agreement, there are no representations, warranties, promises, or inducements, whether oral, written, expressed, or implied, that in any way affect or condition the validity of this Agreement or alter its terms. This Agreement may be amended only by a contemporaneous or subsequent written instrument executed by all of the Parties hereto. The wording of this Agreement was reviewed by legal counsel for each Party, and both Parties had sufficient opportunities to propose and negotiate changes in wording prior to its execution. Neither the ERC nor Respondents will be entitled to have any wording of this Agreement construed against the other based on any contention as to which of the Parties drafted the language in question.

*Agreed this day,*

THE EQUAL RIGHTS CENTER

By: _____

Name: ___Donald L. Kahl___

Title: ___Executive Director___

10

CONFIDENTIAL

TIAA055256

UNION PLACE PHASE I, LLC, a
Delaware limited liability company,
By: Union North Phase I, LLC, a District of
Columbia limited liability company, its
Operating Member

By:

Name:   Ronald J. Cohen

Title:   Manager


COHEN COMPANIES

By:

Name:   Eric Siegel

Title:   Executive Vice President


ADC BUILDERS, INC.

By:

Name:   Alan O. Cohen

Title:   President


11

CONFIDENTIAL

TIAA055257

## LIST OF APPENDICES

| No. | Description |
| --- | --- |
| 1. | Employee Training Acknowledgment |
| 2. | Settlement Agreement Property |
| 3. | Remediation Tolerances |
| 4. | Form of Release |

12

CONFIDENTIAL

TIAA055258

## APPENDIX 1

## FORM OF EMPLOYEE TRAINING CERTIFICATION

### Employee Acknowledgement

I, _____, an employee of Cohen Companies hereby acknowledge that I have received fair housing training with specific emphasis on compliance with the accessibility requirements of the FHA and ADA.


_____

[Employee Name]


_____

Date

13

CONFIDENTIAL

TIAA055259

## APPENDIX 2

### AGREEMENT PROPERTY

The Loree Grand at Union Place, 250 K Street, N.E., Washington, D.C. 20001

14

CONFIDENTIAL

TIAA055260

## APPENDIX 3

## REMEDIATION TOLERANCES

With respect to the Agreement Property, remediations will be made to conform to one or more "safe harbors," selected by Union, and modified as follows[2]:

a.   Thresholds: all thresholds, in units, having a vertical rise of more than 1/4" but no more than 3/4" will either be beveled or replaced with a conforming threshold. Thresholds having a vertical rise in excess of 3/4" will be replaced with conforming thresholds.

b.   French Door Thresholds: vertical rise on French door threshold may, if ramped at a ratio of 1:12, be up to 1".

c.   Patio/Balcony Thresholds: at all patio and balcony thresholds having an interior vertical rise of more than 1/4", but no more than 1" a ramping mechanism at 1:2 from 1/4" to 3/4", or at 1:12 from 3/4" to 1", may be installed so as to make the doorway accessible to persons using wheelchairs. Thresholds with an interior vertical rise of more than 1" will be replaced with one meeting all other criteria of a safe harbor.

d.   Doors:

(i)   In the event that a door to an accessible bathroom is in compliance with the selected safe harbor, a second door to that same bathroom will not be required to be remediated;

(ii)   The interior door width requirements of 32" nominal (31.5") may be met through the use of offset hinges;

(iii)   Closets of 26" or lesser depth will not be required to meet 32" nominal width door requirements.

e.   Kitchens (unless otherwise agreed upon):

(i)   Clear floor space on sinks and applicable appliances may be off-center by up to 2"

---

[2] "Safe Harbor" means any of the following: a) ANSI A117.1 (1986); the Fair Housing Accessibility Guidelines (HUD, 1991); the Fair Housing Design Manual (1998); the Guidelines and Supplemental Questions and Answers (HUD, June 28, 1994); CABO/ANSI A117.1 (1992); ICC/ANSI A117.1 (1998); the Code requirements for Housing Accessibility (CRHA, 2000); the International Building Code (2000, with 2001 Supplement); the International Building Code (2003); the International Building Code (2006); and b) any other Safe Harbor recognized by HUD. To the extent Union relies upon ANSI standards as a Safe Harbor, those standards shall be read in conjunction with the Fair Housing Act, HUD's regulations, and the HUD Fair Housing Accessibility Guidelines.

CONFIDENTIAL

TIAA055261

(ii)    In U-shaped kitchens, no remediation would be required if turning diameter is no less than 59". If diameter is less than 59" removable base cabinets sufficient to allow for "T-turns" would be sufficient;

(iii)   In galley kitchens, no remediation would be required if the distance between the faces of the opposable elements (cabinets and appliances) is 39" or greater.

(iv)    If the clear floor space is impinged by an appliance, the resident will be offered a smaller replacement appliance at no cost.

f.  <u>Switches, Outlets, and Environmental Controls</u>:

(i)     Maximum height of 49" and minimum height of 14", each measured to the centerline of, respectively, the higher or lower receptacle or an outlet or switch or the centerline of the highest operable control of the thermostat; if higher than 49", lower to 47" or lower, and if lower than 14" raise to 16" or above; and

(ii)    Outlets over kitchen counters in inaccessible locations could remain if an equal number of outlets with comparable electrical capacity are provided in accessible locations within the same area. For purposes of this provision, the "same area" means that an accessible outlet is located within 36" or serves the same uninterrupted countertop as the inaccessible outlet, and is not within 32" of any corner.

g.  <u>Bathrooms (unless otherwise agreed upon)</u>:

(i)     Clear floor space on sinks, toilet and tub may be off-center by up to 2";

(ii)    toilets at least 16" from the "grab bar" side wall and 14" from the "non-grab bar" side wall need not be repositioned. Off-set flanges may be used to reposition toilets requiring remediation;

(iii)   countertop heights in unit bathrooms need not be altered if no higher than 35" AFF; and

(iv)    wing-its may be used in lieu of cross-bracing as reinforcement for grab bars.

h.  <u>Mailboxes</u>

(i)     If the lower rows of mailboxes are less than 49" they will not need to be repositioned so long as any tenant with a disability is

16

CONFIDENTIAL

TIAA055262

provided the option to be assigned (or moved to) a mailbox on a level below 48".

i.   Common Use Areas:

    (i)   At least one route to the primary door and various parts of the clubhouse and leasing office must be "accessible" as defined by a recognized safe harbor;

    (ii)   reflective mirrors need not be altered if no more than 45" AFF, and mirror is tiltable;

    (iii)   signage need not be altered if it meets all other FHA and ADA criteria and is no more than 62" AFF measured to the center of the sign;

    (iv)   grab bars for toilets need not be altered if no more than 35"-37" AFF.

j.   Accessible Routes

    (i)   Site or legal constraints will be acknowledged as a basis to provide an accessible route to a secondary entrance.

    (ii)   Running Slopes and Cross Slopes:  unless otherwise agreed to by the parties (a) walkways (excluding at entries and landings) need not be altered as to running slope if their running slope is 5.25% or less, and the walkways are otherwise FHA and ADA compliant. Walkway slopes above 5.25% % will be altered to 5.00%, or will be considered ramps not walkways, and will have handrails on both sides except at curb ramps; (b) ramps with running slopes of up to 8.75% (but complying with all other requirements for ramps) need not be altered.  Ramps with running slopes above 8.75% will be altered to no more than 8.33%; (c) cross-slopes of walkways and ramps (but not at entries or landings) need not be altered as to cross-slope if the existing cross-slope is no greater than 4% and the walkways and ramps are otherwise FHA and ADA compliant. Walkways and ramps with cross-slopes in excess of 4% will be altered to no more than 2.00%;

    (iii)   accessible parking spaces need not be altered if they meet all other FHA and ADA requirements, and width is no less than 12';

    (iv)   handrail extensions need not be altered if they are no less than 11".

k.   Protruding Objects:  Sconces or other objects that protrude 5" or less as measured from the baseboards of the walls in hallways (if such baseboards

17

TIAA055263

are a uniform distance from the wall) or which are higher than 78" AFF and protrude any distance may remain.

I.    <u>General Provisions</u>:

(i)    The Parties recognize that some remediation efforts would be impossible or substantially burdensome balanced against the objectives of the FHA and ADA. In such circumstances, the Parties will, in good faith, seek alternative accessibility modifications to mitigate the violation and maximize accessibility. The applicability of this provision is limited to those situations in which remedying a particular deficiency in any single unit would result in a substantial magnitude or burden. This provision does not apply in situations where the cumulative effect of several alleged deficiencies results in a substantial magnitude or burden for fixing a single unit, nor will it be applied to any alleged deficiency that causes a retrofit with a substantial magnitude or burden only because a retrofit is necessary for a large number of units.

(ii)    If, after negotiating in good faith to agree on alternative accessibility modifications under this provision, the Parties remain in disagreement, either Party may promptly petition the Court for a determination as to the extent of the retrofit to be performed, or for a determination that no retrofit need be made.

(iii)    Notwithstanding any other provision of this Settlement Agreement or this **Appendix 3**, Union shall not be required to move a load bearing wall or a wall that would include relocating plumbing, electrical panels, or an HVAC chase, or to install an elevator as part of a retrofit, or to provide any remediation when no feasible alternative is identified.

18

CONFIDENTIAL

TIAA055264

## APPENDIX 4

## FORM OF RELEASE FOR LOREE GRAND, 250 K STREET, N.E., WASHINGTON, D.C. 20001

The Equal Rights Center (and its affiliates, successors, or assigns) covenants and agrees that it will forever refrain from instituting, maintaining, prosecuting, or continuing to maintain or prosecute any suit or action or proceeding or assisting others with any suit or action or proceeding against Union Place Phase I, LLLC, Cohen Companies, ADC Builders, Inc., its subsidiaries and affiliates, and other entities or individuals which have or, in the past, had an ownership interest in any of the Agreement Property or which had a role in the design or construction of any of the Agreement Property as well as the officers, directors, managers, trustees, employees and agents of such entities or individuals and the respective successors and assigns of all of those herein, (collectively, the "Respondents-Released Parties"), alleging claims under the Fair Housing Act Amendments of 1988 related to the design and construction of multifamily housing, the Americans with Disabilities Act, and any state or local accessibility law relating to any of the Agreement Property, except related to changes (other than those made pursuant to the Agreement) made after the survey, remediation if necessary and final inspection pursuant to the Agreement.

19

CONFIDENTIAL

TIAA055265

## *PROPERTY ALTERATION AGREEMENT*

*Loree Grand Apartments*

This Property Alteration Agreement (this "Agreement"), dated as of January 11 , 2012, is entered into by and among Union Place Phase I, LLC and the Equal Rights Center, a not-for-profit corporation (the "ERC"), with respect to the Loree Grand Apartments, Washington D.C. (the "Property").

## RECITALS

WHEREAS, Union Place Phase I, LLC and the ERC (collectively, the "Parties") have entered into a Settlement Agreement (the "Settlement Agreement") which provides, among other things, that the Parties will agree upon alterations (the "Alterations") to be made to the Property with which Union Place Phase I, LLC has been involved, and

WHEREAS, a survey has been conducted of the Property, and

WHEREAS, the Parties desire to enter into an agreement concerning Alterations to be made at the Property,

NOW THEREFORE, pursuant to the terms of the Settlement Agreement, the Parties agree as follows:

### I.   **General Provisions**

A.   Release. Upon completion, inspection and certification of the Alterations in accordance with this Agreement, the ERC will provide the Release specified in Paragraph C and Appendix 4 of the Settlement Agreement. Provision of the Release will be conclusive evidence of the satisfactory completion, inspection and certification of the Alterations in accordance with this Agreement.

B.   Counterparts. This Agreement may be executed in counterparts, all of which when taken together will constitute a single instrument.

### II.   **Alterations to Public Areas:**

See attached FHA Survey Report by Mark J. Mazz, dated October 31, 2011. All cited non-complying features in the Report will be brought into compliance.

### III.   **Alterations to Common Areas:**

See attached FHA Survey Report by Mark J. Mazz, dated October 31, 2011. All cited non-complying features in the Report will be brought into compliance.

CONFIDENTIAL

**IV.**   <u>Alterations to Units:</u>

See attached FHA Survey Report by Mark J. Mazz, dated October 31, 2011.  All cited non-complying features in the Report will be brought into compliance.

EQUAL RIGHTS CENTER

By: _____

Name: _DONALD L. KAHL_____

Title: _EXECUTIVE DIRECTOR_____

Union Place Phase I, LLC, a Delaware Limited Liability Company, by Union North Phase I, LLC, a District of Columbia limited liability Company, its operating Member

By: _____

Name: _Ronald J. Cohen_____

Title: _Manager_____

CONFIDENTIAL

TIAA055267



# Mark J. Mazz, AIA



# Loree Grand Apartments
# Washington, D.C.

## Fair Housing Act
## Survey

Report October 31, 2011

---

Architecture     Consulting     Barrier-Free Design

4016 Jefferson Street, Hyattsville, MD 20781    301-440-4276    mark.j.mazz@verizon.net    www.markjmazz.com

CONFIDENTIAL                                                    TIAA055268

On August 23 and 25, 2011, I conducted a physical survey of the Loree Grand Apartments in Washington, D.C. to identify features that do not comply with the design and construction requirements of the Fair Housing Act (FHA) and the Americans with Disabilities Act (ADA). All public and common use areas were surveyed. There are 95 unit types, nine of which match others with respect to accessibility features. Therefore, I surveyed 86 unit types.

The Loree Grand Apartment structure was built for first occupancy after March 13, 1991. Therefore, the entire structure must comply with the Fair Housing Act design and construction requirements (§100.205(a)). Only the rental office is a place of public accommodation. Therefore, only the rental office and spaces associated with the rental office are covered by the ADA.

The noncomplying features that I found are in the attached chart. I provide a citation for each noncomplying feature. Fair Housing citations begin with "Req." ADA citations begin with "ADA." I gave ADA citations only when the feature was not also a Fair Housing violation.

It should be noted that the Loree Grand Apartments might be the most compliant structure that I have surveyed that is being subjected of litigation. I have surveyed hundreds of developments. Although it is not perfect, consider the following:

1. I did not see any more stringent ADA violations.
2. I cited only 21 items in the common use areas.
3. There was an interior accessible route from the residential loading dock to the elevators.
4. When looking at the 212 units as a whole:
   a. Nothing was cited in 33% of the units.
   b. Only 1% of the units may have the toilet too close to the sidewall (15" instead of at least 16").
   c. Only 4% have a lavatory vanity top that is too tall (35 ½").
   d. In the kitchens, 21% do not have half the electrical outlets at least 32" from the corners.
   e. In 48% of the units, the balcony thresholds are not properly beveled. Many of these thresholds were as much as ½" too tall. (Given that no residential sliding door manufacturer makes a compliant threshold, and given that the thresholds cannot be recessed in post-tension slabs, it is understandable how this issue appears in most multistory developments.)
5. Several typical violations were absent, such as:
   a. Insufficient clear floor spaces in bathrooms
   b. Narrow doors to walk-in closets
   c. Insufficient clear widths in kitchens
   d. Off-center clear floor space at kitchen appliances

Architecture                 Consulting            Barrier-Free Design
4016 Jefferson Street, Hyattsville, MD 20781   301-440-4276   mark.j mazz@verizon.net   www.markjmazz.com

CONFIDENTIAL                                                      TIAA055269