# EXHIBIT 47

# LOAN AND SECURITY AGREEMENT

## MADE BY AND BETWEEN

## UNION PLACE PHASE I, LLC

## AND

**WESTDEUTSCHE IMMOBILIENBANK AG, as Administrative Agent**
**and Lender and certain other Co-Lenders who may exist from time to time**

**Dated as of May 23, 2008**

EXHIBIT

110

5/14/13 LB

PENGAD 800-631-6989

CONFIDENTIAL

TIAA049636

Table of Contents

Page

Article 1 INCORPORATION OF RECITALS AND EXHIBITS ............................................. 1
    1.1    Incorporation of Recitals. ................................................................. 1
    1.2    Incorporation of Exhibits. ................................................................ 1

Article 1A DEFINITIONS ............................................................................................... 2
    Defined Terms. ............................................................................................. 2

Article 2      17
    2.1    Making of the Loan ......................................................................... 18
    2.2    Payment of Interest ......................................................................... 18
    2.3    Conversion and Continuation Options ............................................. 19
    2.4    Minimum Amounts and Maximum Number of Interest Periods ......... 20
    2.5    Computation of Interest and Fees ................................................... 20
    2.6    Increased Costs .............................................................................. 20
    2.7    Illegality or Inability to Determine LIBO Rate ............................... 21
    2.8    Payment of Outstanding Principal ................................................... 21
    2.9    Prepayment .................................................................................... 21
    2.10   Late Charge. .................................................................................. 22
    2.11   Payments. ...................................................................................... 22
    2.12   Taxes. ............................................................................................ 23
    2.13   Distribution to Lenders. .................................................................. 24
    2.14   Protective Advances. ...................................................................... 25

Article 3 BORROWER'S REPRESENTATIONS AND WARRANTIES ................................. 25
    3.1    Representations and Warranties. ..................................................... 25
    3.2    Survival of Representations and Warranties ..................................... 29

Article 4 LOAN AND LOAN DOCUMENTS ................................................................... 29
    4.1    Agreement to Borrow and Lend; Administrative Agent's Obligation to Disburse;
          Excess Disbursements. .................................................................... 29
    4.2    Loan Documents. ........................................................................... 30
    4.3    Term of the Loan. .......................................................................... 31
    4.4    Prepayments. ................................................................................. 33
    4.5    Required Principal Payments. .......................................................... 33
    4.6    Termination of Unfunded Commitment. ......................................... 33

Article 5 INTENTIONALLY OMITTED ......................................................................... 33

Article 6 INTENTIONALLY OMITTED ......................................................................... 33

Article 7 LOAN EXPENSE AND ADVANCES .................................................................. 33
    7.1    Loan and Administration Expenses. ................................................ 34
    7.2    Availability of Advances. ............................................................... 34
    7.3    Intentionally Omitted. .................................................................... 34
    7.4    Intentionally Omitted. .................................................................... 34
    7.5    Administrative Agent's Attorneys' Fees and Disbursements. ............. 34
    7.6    Time of Payment of Fees and Expenses. ......................................... 34
    7.7    Expenses and Advances Secured by Loan Documents. ..................... 35

i

TIAA049637

7.8    Right of Lender to Make Advances to Cure Borrower's Defaults. ........................35

Article 8 NON-CONSTRUCTION REQUIREMENTS PRECEDENT TO THE OPENING OF
      THE LOAN ...................................................................................................35
      8.1    Non-Construction Conditions Precedent. ...............................................35

Article 9 CONSTRUCTION REQUIREMENTS PRECEDENT .........................................39
      9.1    Required Construction Documents. .........................................................39

Article 10 BUDGET AND CONTINGENCY FUND.........................................................42
      10.1   Budget. ......................................................................................................42
      10.2   Budget Line Items. ...................................................................................42
      10.3   Contingency Fund. ...................................................................................43
      10.4   Optional Method for Payment of Interest. ..............................................43

Article 11 SUFFICIENCY OF LOAN ...........................................................................44
      11.1   Loan In Balance. .......................................................................................44

Article 12 CONSTRUCTION PAYOUT REQUIREMENTS .............................................45
      12.1   Applicability of Sections. .........................................................................45
      12.2   Advances; Method of Disbursement of Loan Proceeds. ..........................45
      12.3   Monthly Payouts. .....................................................................................46
      12.4   Documents to be Furnished for Each Disbursement. ..............................46
      12.5   Retainages. ...............................................................................................47
      12.6   Stored Materials. ......................................................................................48
      12.7   Intentionally Omitted. ..............................................................................48
      12.8   Specific Limitation on Disbursements and Payments to Affiliates. .......48

Article 13 FINAL DISBURSEMENT FOR CONSTRUCTION .........................................49
      13.1   Final Disbursement for Construction. .....................................................49

Article 14 INTENTIONALLY OMITTED .......................................................................50

Article 15 COVENANTS .............................................................................................50
      15.1   Borrower covenants and agrees as follows: .............................................50
      15.2   Single Purpose Entity Covenants. ...........................................................58
      15.3   Authorized Representative. .......................................................................60

Article 16 CASUALTIES AND CONDEMNATION ..........................................................60
      16.1   Casualty and Condemnation. ....................................................................60
      16.2   Disbursement of Net Proceeds. ................................................................62

Article 17 ASSIGNMENTS BY LENDER AND BORROWER...........................................66
      17.1   Assignments and Participations. ..............................................................66
      17.2   Prohibition of Assignments and Transfers by Borrower. ........................67
      17.3   Prohibition of Transfers in Violation of ERISA. ....................................67
      17.4   Successors and Assigns. ...........................................................................67

Article 18 TIME OF THE ESSENCE .............................................................................67

Borrower agrees that time is of the essence under this Agreement. ...............................67

Article 19 EVENTS OF DEFAULT ...............................................................................68
      19.1   Events of Default. .....................................................................................68

ii

                                      TIAA049638

Article 20 LENDER'S REMEDIES IN EVENT OF DEFAULT ............................................71
    20.1    Remedies Conferred Upon Administrative Agent................................................71

Article 21 GENERAL PROVISIONS .................................................................................72
    21.1    Administrative Agent Approvals...................................................................72
    21.2    Captions....................................................................................................72
    21.3    Modification; Waiver..................................................................................72
    21.4    Governing Law..........................................................................................73
    21.5    Acquiescence Not to Constitute Waiver of Administrative Agent's Requirements.73
    21.6    Disclaimer by Administrative Agent............................................................73
    21.7    Partial Invalidity; Severability....................................................................74
    21.8    Definitions Include Amendments.................................................................74
    21.9    Execution in Counterparts. .........................................................................74
    21.10   Entire Agreement.......................................................................................74
    21.11   Waiver of Damages....................................................................................74
    21.12   Jurisdiction...............................................................................................75
    21.13   Set-Offs....................................................................................................75
    21.14   Binding Effect...........................................................................................75
    21.15   Waiver of Accord and Satisfaction..............................................................76
    21.16   Usury Savings. ..........................................................................................76

Article 22 NOTICES ........................................................................................................76

Article 23 WAIVER OF JURY TRIAL ...............................................................................78
    24.1    Authorization and Action ...........................................................................78
    24.6    Successor Administrative Agents .................................................................81
    24.8    Certain Actions After an Event of Default ...................................................82
    24.9    Defaulting Lender......................................................................................83

EXHIBITS TO LOAN AGREEMENT

Exhibit A....................Legal Description of Land
Exhibit B....................Intentionally Omitted
Exhibit C....................Title Requirements
Exhibit D....................Form of Survey Certification
Exhibit E ...................Insurance Requirements
Exhibit F....................Intentionally Omitted
Exhibit G...................Initial Budget
Exhibit H...................Draw Request Forms
Exhibit I ....................Ratable Share
Exhibit J....................Approved Plans and Specifications
Exhibit K...................Bailment Letter (Warehousemen)
Exhibit L...................Bailment Letter (Other Than Warehousemen)
Exhibit M..................Outstanding Government Approvals

CONFIDENTIAL

TIAA049639

Exhibit N....................Certificate as to compliance with Minimum Net Worth Requirement and the Minimum Liquidity Requirement

SCHEDULES

Schedule 2.1...............Rate Cap Coverage Schedule

CONFIDENTIAL

TIAA049640

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT ("Agreement") is made as of May 23, 2008, by and between UNION PLACE PHASE I, LLC, a Delaware limited liability company ("Borrower"), and WESTDEUTSCHE IMMOBILIENBANK AG, a German banking corporation, as a lender and as administrative agent (including any of its successors and assigns in such capacity, the "Administrative Agent") for itself, and such other co-lenders as may exist from time to time (collectively, with their successors and assigns, the "Lenders" and each individually, a "Lender").

### W I T N E S S E T H:

### RECITALS

A.       Borrower is the owner in fee simple of a parcel of land located at 250 K Street, N.E., Washington, D.C., and legally described in Exhibit A attached hereto (the "Land"). Borrower proposes to construct on the Land a residential building, which will consist of 212 residential units (the "Units"), together with 212 parking spaces, 3,200 square feet of retail space and related amenities.  The project is known as "Union Place - Phase I."

B.       Borrower has applied to the Lenders for a loan in the maximum amount of up to FIFTY-FIVE MILLION TWO HUNDRED FIFTY THOUSAND DOLLARS ($55,250,000.00) (the "Loan") the proceeds of which will be used to pay construction costs in connection with construction of the Project.

C.       The Lenders are willing to make the Loan on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

### Article 1
### INCORPORATION OF RECITALS AND EXHIBITS

**1.1      Incorporation of Recitals.**

The foregoing preambles and all other recitals set forth herein are made a part hereof by this reference.

**1.2      Incorporation of Exhibits.**

Exhibits A through N to this Agreement, attached hereto, are incorporated in this Agreement and expressly made a part hereof by this reference.

CONFIDENTIAL

## Article 1A
## DEFINITIONS

**Defined Terms.**

The following terms as used herein shall have the following meanings:

Administrative Agent:  As defined in the opening paragraph of this Agreement, and including any successor holder of the Loan from time to time.

Administrative Agent's Consultant:  An independent consulting architect, inspector, and/or engineer designated by Administrative Agent in Administrative Agent's sole discretion.

Administration Fee:  An annual fee, (i) commencing on the first Payment Date following the Closing Date and each Payment Date thereafter until Final Completion, of $30,000.00, payable in equal monthly installments of $2,500.00, and (ii) commencing on the first Payment Date following Final Completion and each Payment Date thereafter until the Maturity Date, of $24,000.00, payable in equal monthly installments of $2,000.00.

Advance:  Any disbursement of the proceeds of the Loan by Administrative Agent or Lenders pursuant to the terms of this Agreement.

Affiliate:  With respect to a specified person or entity, any individual, partnership, corporation, limited liability company, trust, unincorporated organization, association or other entity which, directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such person or entity, including, without limitation, any general or limited partnership in which such person or entity is a partner.

Affiliate Contracts:  As defined in Section 15.1(jj).

Agreement:  This Loan and Security Agreement.

Applicable Margin Means: (i) with respect to any Base Rate Loan, 125 basis points (1.25%); and (ii) with respect to any LIBOR Loan, 187.5 basis points (1.875%).

Appraisal.  An MAI certified appraisal of the Project performed in accordance with FIRREA and Administrative Agent's appraisal requirements by an appraiser selected and retained by Administrative Agent.

Approval or Approved Means, as the context so determines, an approval in writing given to the party seeking approval after full disclosure to the party giving Approval of all material facts reasonably necessary in order to determine whether approval should be granted.

Approved Finish Standards:  As defined in Section 9.1(g).

Approved Plans and Specifications:  As such term is defined in Section 9.1(g).  A list of the Approved Plans and Specifications is attached hereto as Exhibit J.  The Approved Plans and Specifications shall also include the Approved Finish Standards described in Section 9.1(g).

-2-

TIAA049642

Architect: GTM Architects, Inc.

As Stabilized Value: Means, the appraised value of the Property on an "as stabilized" basis (using the Initial Maturity Date as the date of stabilization) as determined by the Appraisal and approved by Administrative Agent.

Authorized Representative: Any officer duly appointed by Borrower.

Availability Period: As defined in Section 7.2.

Bankruptcy Code: Title 11 of the United States Code entitled "Bankruptcy" as now or hereafter in effect, or any successor thereto or any other present or future bankruptcy or insolvency statute.

Base Rate: Means the rate of interest per annum determined by Administrative Agent on a daily basis equal to the sum of the Prime Rate plus the Applicable Margin per annum.

Base Rate Loan: Means any portion of the Unfunded Commitment which is not designated by the Borrower at least three (3) Business Days before the end of the then current Interest Period to be a LIBOR Loan, or when LIBOR is unavailable in accordance with Section 2.7.

Borrower: As such term is defined in the opening paragraph of this Agreement.

Borrower's Sworn Statement: A certificate of an authorized representative of Borrower in form and substance reasonably acceptable to Administrative Agent.

Budget: The budget for the Project specifying all costs and expenses of every kind and nature whatsoever, including, but not limited to, Hard Costs, Soft Costs, and any other cost relating to the acquisition, development and construction of the Project to be incurred by Borrower in connection with the Project prior to the Maturity Date, as approved by Administrative Agent as set forth in Section 10.1.

Budget Line Item: As such term is defined in Section 10.2.

Building: As such term is defined in the Recitals.

Business Day: Any Monday through Friday, excluding days on which Administrative Agent is closed for business.

Certificates: Any certificates, notes or other securities issued in connection with a Securitization.

Change Order: Any change in the Approved Plans and Specifications (other than minor field changes involving no extra cost) or change to the amount payable under the General Contract.

Closing Date: Means May 23, 2008.

CONFIDENTIAL

TIAA049643

Collateral Means all property that is or is intended to be subject to any Lien in favor of the Administrative Agent for the benefit of the Lenders.

Commitment: The Lenders' maximum funding obligation of the Loan under the Loan Documents of up to FIFTY-FIVE MILLION TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($55,250,000.00), less any reduction thereof in accordance with the terms of this Agreement.

Completion Date: August 23, 2010.

Completion Guaranty: Means a guaranty of performance and completion, executed by Guarantor and pursuant to which Guarantor guarantees the lien-free and timely completion of the Project in accordance with all provisions of this Agreement and Borrower's obligation to keep the Loan In Balance and to pay for all cost overruns, and all Hard Costs, Soft Costs and expenses incurred in connection with such completion.

Construction or construction: The construction and equipping of the Improvements in accordance with the Approved Plans and Specifications and the Approved Finish Standards.

Construction Commencement Date: The earlier of (a) the date construction of the Project has commenced, or (b) the date that is thirty (30) days after the Closing Date.

Construction Consultant: Inspection of Valuation International.

Construction Schedule: A schedule reasonably satisfactory to Administrative Agent, establishing a timetable for completion of the Construction, showing, on a monthly basis, the anticipated progress of the Construction, and showing that the Improvements can be completed on or before the Completion Date.

Contingency Fund: The "Hard Cost Contingency" and "Soft Cost Contingency" Budget Line Items, which shall represent amounts necessary to provide reasonable assurances to Administrative Agent that additional funds are available to be used if additional costs and expenses are incurred or unanticipated events or problems or Unavoidable Delays occur.

Control: As such term is used with respect to any person or entity, including the correlative meanings of the terms "controlled by" and "under common control with", shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such person or entity, whether through the ownership of voting securities, by contract or otherwise.

Debt Service Coverage Ratio: means, for any Test Period, the ratio of the Project's Net Operating Income for such Test Period to the greater of (a) the actual interest paid on the Loan during such Test Period, and (b) seven and one half percent (7.5%). The Debt Service Coverage Ratio shall be calculated at the end of each calendar month on a trailing 12-month basis.

Deed of Trust: A deed of trust, assignment of leases and rents, security agreement and fixture filing, executed by Borrower for the benefit of Administrative Agent securing this Agreement, the Note, and all obligations of Borrower in connection with the Loan, granting a

CONFIDENTIAL

TIAA049644

first priority lien on Borrower's fee interest in the Project, subject only to the Permitted Exceptions.

Default or default: Any event, circumstance or condition, which, if it were to continue uncured, would, with notice or lapse of time or both, constitute an Event of Default hereunder.

Default Rate: Means a rate of interest per annum equal at all times to the lesser of (i) the maximum non-usurious rate permitted by Law and (ii) five percent (5.0%) above the Base Rate plus the Applicable Margin.

Deficiency Deposit: As such term is defined in Section 11.1.

Deferred Equity Guaranty: Means, a guaranty of payment of deferred equity, executed by Guarantor and pursuant to which Guarantor guarantees to pay deferred equity in the amount of $3,677,500.00 for the payment of actual, out of pocket Project Costs and $3,000,000.00 for the payment of the interest after the Initial Maturity Date.

Design Professionals: As defined in Section 9.1(c).

Determination Date: Has the meaning given to such term in the definition of LIBO Rate.

Developer: Means Union North Phase I, LLC, a District of Columbia limited liability company.

Development Fee: Means that certain development fee payable by Borrower to Developer, pursuant to that certain Development Agreement, dated as of January 31, 2007, between Borrower and Developer, which development fee shall be paid to Developer in eighteen (18) equal monthly installments, the first installment being paid in connection with the initial Advance.

District: The District of Columbia.

Draw Request: Means, with respect to each Advance, the Borrower's request for such Advance, together with the documents and deliveries required by this Agreement to be furnished to the Administrative Agent as a condition to such Advance.

Eligible Account: means (a) a segregated account maintained with a federal or state chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts maintained with the corporate trust department of a federal depository institution or state chartered depository institution which has an investment grade rating and is subject to regulations regarding fiduciary funds on deposit under, or similar to, Title 12 of the Code of Federal Regulations Section 9.10(b) which, in either case, has corporate trust powers, acting in its fiduciary capacity.

CONFIDENTIAL

TIAA049645

Eligible Lender: means (i) a real estate investment trust, bank, savings and loan association, investment bank, financial institution, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, (ii) an investment fund, limited liability company, limited partnership or general partnership (a "Permitted Investment Fund") where an Eligible Lender or a Permitted Fund Manager acts as the general partner, managing member or fund manager and at least 50% of the equity interests in such Permitted Investment Fund are owned, directly or indirectly, by one or more of the following: Eligible Lenders, institutional "accredited investors", within the meaning of Regulation D promulgated under the Securities Act of 1933, as amended, or "qualified institutional buyers" or both within the meaning of Rule 144A promulgated under the Securities Exchange Act of 1934 (provided each institutional "accredited investor" or "qualified institutional buyer" meets the test set forth in clause (iv) (A) below), as amended, (v) a commercial paper conduit that satisfies the following criteria: (A) an independent third party provides the conduit with credit enhancement in the form of liquidity support to satisfy the conduit's obligations, which liquidity support provider is otherwise an Eligible Lender and (B) the conduit is directly administered by a Person that is otherwise an Eligible Lender or an Affiliate thereof; (iii) any other lender or entity (including any opportunity funds) regularly engaged in the business of making loans with respect to real estate companies, assets or projects and which has been approved as an Eligible Lender hereunder by the Agent, (iv) an institution substantially similar to any of the foregoing entities described in clause (i) or (ii) of this definition, and as to each of the entities described in clauses (i) and (iii) provided such entity (A) has total assets (in name or under management) in excess of $2,000,000,000;  and (B) is regularly engaged in the business of making or owning loans with respect to real property companies, assets or projects, including  commercial loans secured by a pledge of interests in a mortgage borrower or (viii) any Affiliate of any one or more of the entities described in this definition.

Environmental Indemnity:   An environmental indemnity from the Borrower and Guarantor, jointly and severally, indemnifying the Lenders with regard to all matters related to Hazardous Material and other environmental matters, as provided for in such agreement.

Environmental Proceedings:  Any environmental proceedings, whether civil (including actions by private parties), criminal, or administrative proceedings, relating to the Project.

Environmental Report:   The Phase I Environmental Site Assessment, prepared at Borrower's expense by Engineering Consulting Services, LLC, dated October 19, 2001, Update Report dated December 26, 2002 and Report of Confirmation of Removal of Petroleum Impacted Soils dated February 25, 2008 and the Phase I Environmental Site Assessment prepared by ECS Mid-Atlantic, LLC (Project No. 13-3299) dated March 17, 2008.

ERISA:  The Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder from time to time.

Escrow Agent:  A Person approved in writing by Administrative Agent, which approval shall not be unreasonably withheld.

CONFIDENTIAL

TIAA049646

<u>Event of Default</u>: As such term is defined in <u>Article 19</u>.

<u>Extension Fee</u>: As defined in <u>Section 4.3(b)(iv</u>

<u>Extension Options</u>: As such term is defined in <u>Section 4.3(a)</u>.

<u>Federal Funds Rate</u>: means, for any period, a fluctuating interest rate per annum (based on a 360 day year) equal, for each day of such period, to the rate of interest quoted at 11:00 A.M. New York time charged on overnight federal funds transactions with member banks of the Federal Reserve System.

<u>Final Completion</u>: Means the date when Substantial Completion shall have occurred, all material Punchlist Items shall have been completed, a final certificate of occupancy shall have been issued for the each element of the Improvements and all other conditions precedent to the final Advance in respect of Retainage shall have been satisfied.

<u>FIRREA</u>: The Financial Institutions Reform, Recovery And Enforcement Act of 1989, as amended from time to time.

<u>First Extended Maturity Date</u>: May 23, 2012.

<u>Future Minimum Equity</u>: Means, $3,677,500.00, which amount shall be paid in eight (8) equal monthly installments of at least $459,687.50 commencing on the date Borrower submits a Draw Request for an Advance occurring in October 2008 (or, if no Draw Request is submitted by Borrower in October 2008, the next Draw Request submitted by Borrower after October 2008) and for the following eight (8) dates on which Borrower submits a Draw Request for an Advance.

<u>GAAP</u>: Means generally accepted accounting principles in effect in the United States of America from time to time, consistently applied.

<u>General Contract</u>: That certain Agreement Between Owner and Contractor dated May 14, 2008 between Borrower and General Contractor, pertaining to the construction of all onsite and offsite Improvements for the Project.

<u>General Contractor</u>: ADC Builders, Inc. or a general contractor approved by Administrative Agent in its reasonable discretion and as set forth in the General Contract.

<u>Governmental Approvals</u>: Collectively, all consents, licenses, and permits and all other authorizations or approvals required from any Governmental Authority for the Construction in accordance with the Approved Plans and Specifications and operation, management and marketing of the Property.

<u>Governmental Authority</u>: Any federal, state, county or municipal government, or political subdivision thereof, any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality, or public body, or any court, administrative tribunal, or public utility.

CONFIDENTIAL

TIAA049647

Guaranties:   Means, collectively, the Completion Guaranty, the Deferred Equity Guaranty, the Limited Payment Guaranty, and the Recourse Carveout Guaranty.

Guarantor:  Means collectively, Ronald J. Cohen, an individual and Union North Phase I, LLC, a District of Columbia limited liability company, and Ronald Cohen Management Company, a Maryland corporation, on a joint and several basis.

Hard Cost Contingency:  The portion of the Contingency Fund allocated in the Budget for Hard Costs.

Hard Costs:  Any and all costs related to or incurred in connection with the Construction of the Project, including, without limitation, the cost of all labor, materials and equipment, but excluding any fees for architectural and engineering services, marketing fees, financing costs, developers' fees and other similar soft fees and costs.  The Hard Costs include the items delineated as such on the Budget.

Hazardous Material:   Means and includes gasoline, petroleum, asbestos containing materials, explosives, radioactive materials or any hazardous or toxic material, substance or waste which is defined by those or similar terms or is regulated as such under any Law of any Governmental Authority having jurisdiction over the Project or any portion thereof or its use, including: (i) any "hazardous substance" defined as such in (or for purposes of) the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C.A. § 9601(14) as may be amended from time to time, or any so-called "superfund" or "superlien" Law, including the judicial interpretation thereof; (ii) any "pollutant or contaminant" as defined in 42 U.S.C.A. § 9601(33); (iii) any material now defined as "hazardous waste" pursuant to 40 C.F.R. Part 260; (iv) any petroleum, including crude oil or any fraction thereof; (v) natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel; (vi) any "hazardous chemical" as defined pursuant to 29 C.F.R. Part 1910; (vii) any mold or fungus which may cause an allergic, toxic or inflammatory response in humans arising from exposure to such mold or fungus in indoor air; and (viii) any other toxic substance or contaminant that is subject to any other Law or other past or present requirement of any Governmental Authority.  Any reference above to a Law, includes the same as it may be amended from time to time, including the judicial interpretation thereof.

Hurdle DSCR:  Means, for any Test Period, a Debt Service Coverage Ratio of 1.20 to 1.00 or greater.

Impositions: Means and includes all taxes, assessments for public improvements or benefits and any payments in lieu thereof, whether or not commenced or completed prior to the date hereof or while any portion of the Loan is outstanding, water rates and sewer rents, charges, license fees, permit fees, inspection fees and other governmental levies or payments, of every kind and nature whatsoever, general and special, foreseen or unforeseen, ordinary and extraordinary, which now or at any time hereafter may be assessed, levied, confirmed, imposed or which may become a lien upon the Property, or any portion thereof, or which are payable with respect thereto, or upon the rents, issues, revenue, income, proceeds or profits thereof, or on the occupancy, operation, use, possession or activities thereof, whether any or all of the same be

CONFIDENTIAL

TIAA049648

levied directly or indirectly or as excise or income or franchise taxes in lieu of taxes which are otherwise imposed upon property of the same type as the Property, together with any penalties or other charges with respect to the late payment or non-payment thereof.

Improvements:  The improvements referred to in Recital A hereto and more particularly described in the Approved Plans and Specifications and any offsite improvements required to be constructed by Borrower in connection therewith.

In Balance or in balance:  As such term is defined in Article 11.

Including or including:  Including but not limited to.

Initial Loan Advance:  Proceeds of the Loan advanced by the Administrative Agent and the Lenders to Borrower on the Closing Date.

Initial Maturity Date:  May 23, 2011.

Initial Minimum Equity:  Means $17,000,000.00.

Interest Period: Means, for any LIBOR Loan, the time during which the applicable LIBO Rate is in effect with respect to such LIBOR Loan, which period and shall be the period commencing, (a) with respect to the initial Interest Period, on the date on which the Initial Loan Advance is funded by the Lenders or (b) with respect to each subsequent Interest Period, on the first day of each calendar month occurring after the date of the Initial Loan Advance and ending and ending thirty (30), sixty (60), ninety (90), one hundred eighty (180) or three hundred sixty (360) days thereafter provided that (i) whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day unless such extension would cause the last day of such Interest Period to occur in the next following calendar month, in which case the last day of such Interest Period shall occur on the immediately preceding Business Day, and (ii) no Interest Period shall commence or end after the Maturity Date.

Insurance Policy:  As such term is defined in Section 8.1(f).

Internal Revenue Code:  The Internal Revenue Code of 1986, as amended from time to time.

Land:  As such term is defined in Recital A.

Laws:  Collectively, all federal, state and local laws, statutes, codes, ordinances, orders, rules and regulations, including judicial opinions or precedential authority in the applicable jurisdiction.

Leases:  The collective reference to all leases, subleases and occupancy agreements affecting the Project or any part thereof now existing or hereafter executed and all amendments, modifications or supplements thereto approved in writing by Administrative Agent.

CONFIDENTIAL

TIAA049649

Lender:  As defined in the opening paragraph of this Agreement, and including any successor holder of the Loan from time to time.

LIBOR Loan:  Means any portion of the Unfunded Commitment of the Loan, designated by the Borrower, at least three (3) Business Days before the end of the then current Interest Period, to bear interest at the LIBO Rate plus the Applicable Margin.

LIBO Rate:  Means, as to any LIBOR Loan with respect to the applicable Interest Period, (a) the rate per annum equal to the offered rate for deposits in United States Dollars for amounts comparable to the applicable LIBOR Loan for the Interest Period in question, that appears on Reuters Screen LIBOR01 Page as of 11:00 A.M. (London time) two Business Days prior to the first day of the applicable Interest Period (the "Determination Date") divided by (b) one amount minus the LIBO Reserve Percentage.  "Reuters Screen LIBOR01 Page" means the display designated as "LIBOR01 Page" on the Reuters Screen (or such other page as may replace LIBOR01 Page on that service or such other service as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying British Bankers' Association Interest Settlement Rates for U.S. Dollar deposits).  If such rate does not appear on Reuters Screen LIBOR01 Page as of approximately 11:00 A.M. (London time) on the Determination Date, the LIBO Rate for the Interest Period will be determined by the Administrative Agent on the basis of the offered rates for deposits in U.S. Dollars for an amount comparable to the principal amount of the applicable LIBOR Loan for the same period of time as such Interest Period that are offered by four major banks in the London interbank market at approximately 11:00 A.M. (London time) on the Determination Date.  The Administrative Agent will request that the principal London office of each of the four major banks provide a quotation of its U.S. Dollar deposit offered rate.  If at least two such quotations are provided, the LIBO Rate will be the arithmetic mean of the quotations.  If fewer than two quotations are provided as requested, the LIBO Rate will be determined by the Administrative Agent on the basis of the rates quoted for loans in U.S. Dollars to leading European banks for amounts comparable to the principal amount of the applicable LIBOR Loan for the same period of time as such Interest Period offered by major banks in New York, New York at approximately 11:00 A.M. (New York time) on the Determination Date.  If at least two such rates are so provided, the LIBO Rate will be the arithmetic mean of the quotations.  If fewer than two rates are provided, the LIBO Rate which was used to determine the last LIBO Rate in effect with respect to the applicable LIBOR Loan shall be deemed to be the LIBO Rate.

LIBO Rate Cap:  Means 6.125%.

LIBO Rate Cap Fee:  As the term is defined in Section 2.2(b).

LIBO Reserve Percentage:  Means the percentage representing the reserve requirement applicable to Eurocurrency Liabilities pursuant to Regulation D of the Board of Governors of the Federal Reserve System (or any successor thereto).  In determining the LIBO Reserve Percentage, the Administrative Agent shall take into account any transitional adjustment or phase-in provisions of the reserve requirements otherwise applicable to Eurocurrency Liabilities during the applicable Interest Period, and, in the event of any change or variation in the reserve requirements during the applicable Interest Period, the Administrative Agent may use any reasonable averaging or attribution methods which it deems appropriate.  The determination by

CONFIDENTIAL

TIAA049650

the Administrative Agent of any applicable LIBO Reserve Percentage shall be conclusive, absent manifest error. Failure by the Administrative Agent to take into account the LIBO Reserve Percentage when calculating interest due with respect to a LIBOR Loan shall not constitute, whether by course of dealing or otherwise, a waiver by the Administrative Agent or any Lender of its right to collect such amounts for any future period.

Lien: Means any lien, security interest, deed or other charge or encumbrance of any kind, including, without limitation, the lien or retained security title of a conditional vendor and any easement, right of way or other encumbrance on title to real property.

Limited Payment Guaranty: Means a guaranty of payment, executed by Guarantor and pursuant to which Guarantor guarantees the payment of ten percent (10%) of the outstanding principal balance of the Loan, all interest on the Loan (including penalties, late charges and cost of collection), and all real estate taxes and operating expenses necessary to operate the Property.

Loan: As defined in Recital B.

Loan Amount: An amount equal to the lesser of (a) seventy percent (70.0%) of the actual, out of pocket Project Costs, (b) seventy percent (70.0%) of the As Stabilized Value of the Project and (c) FIFTY-FIVE MILLION TWO HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($55,250,000.00).

Loan Documents: The collective reference to this Agreement, the documents and instruments listed in Section 4.2 and all the other documents and instruments entered into from time to time, evidencing or securing the Loan or any obligation of payment thereof or performance of Borrower's or Guarantor's obligations in connection with the transaction contemplated hereunder, each as amended.

Loan Party: Means each of the Borrower, and the Guarantor.

Major Subcontractor: Any subcontractor under a Major Subcontract.

Major Subcontracts: All subcontracts between the General Contractor and any subcontractors and material suppliers which provide for an aggregate contract price equal to or greater than $250,000.00.

Marketing Agreement: Means any marketing or agreement executed in connection with the rental of Units.

Material Adverse Change or material adverse change: If, in Lender's reasonable discretion, the financial condition of a person, entity or property has changed, other than as a result of a change in market conditions, in a manner which would reasonably likely impair in a material way the value of Lender's security for the Loan, prevent timely repayment of the Loan or otherwise prevent the applicable person or entity from timely performing any of its material obligations under the Loan Documents.

Maturity Date: As such term is defined in Section 4.3(a).

-11-

CONFIDENTIAL

TIAA049651

Maximum Remaining Exposure:  As of any date, the sum of (x) the outstanding principal balance of the Loan and (y) the Unfunded Commitment.

Minimum Equity:  Shall mean the sum of the Initial Minimum Equity and the Future Minimum Equity.

Minimum Liquidity Requirement:  Means $5,000,000.00.

Minimum Net Worth Requirement:  Means $70,000,000.00.

Net Operating Income:  Means, for any period, the actual cash gross income from operations of the Project (excluding pre-paid rents and deposits and payments received from insurance claims and condemnation awards and any other non-recurring payments) less actual cash operating expenses (such as cleaning, utilities, administrative, landscaping, security and management expenses, cost of insurance, real estate taxes and other taxes incurred from owning and operating the Property), repairs and maintenance.  All operating expenses must be related to the Project and shall be for services from arm's length third party transactions or equivalent to the same.  Notwithstanding the foregoing, operating expenses shall exclude all expenses for capital improvements and replacements, debt service and depreciation or amortization of capital expenditures and other similar non-cash items.

Net Proceeds:  Means: (a) the net amount of all insurance proceeds received by the Administrative Agent as a result of any damage or destruction to the Property, after deduction of the Administrative Agent's reasonable out-of-pocket costs and expenses (including, but not limited to, reasonable counsel fees), if any, actually incurred in collecting same ("Net Proceeds"); or (b) the net amount of all condemnation awards, proceeds and payments received by the Administrative Agent with respect to any Partial Condemnation or Total Condemnation (as applicable), after deduction of the Administrative Agent's reasonable out-of-pocket costs and expenses (including, but not limited to, reasonable counsel fees), if any, actually incurred in collecting same ("Condemnation Proceeds"), whichever the case may be.

Net Proceeds Deficiency:  Means, if at any time the Net Proceeds or the undisbursed balance thereof shall not be sufficient to pay the balance of the total costs which are estimated by the Construction Consultant to be incurred in connection with the completion of the Restoration, the cash or cash equivalents in the amount of such deficiency.

Note:  A promissory note in the amount of $55,250,000.00, executed by Borrower and payable to the order of the Administrative Agent, evidencing the Loan.

Opening of the Loan or Loan Opening:  The date of the first disbursement of Loan proceeds.

Outstanding Principal:  Means, with respect to the Loan, the aggregate principal amount of Advances remaining unpaid under the Note from time to time.

Partial Condemnation:  means any condemnation or eminent domain proceeding or action (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such

-12-

TIAA049652

taking) by any Governmental Authority, whether for any permanent or temporary use, occupancy or other interest affecting such portion of the Property other than a Total Condemnation.

Partnership Distributions: As such term is defined in Section 12.8.

Payment Date:  Means the first Business Day of each calendar month during the term of the Loan.

Permitted Exceptions: (i) the Deed of Trust and the liens and encumbrances of the Loan Documents in favor of Administrative Agent, (ii) the items shown in Schedule B to the Title Policy, (iii) future liens for property taxes and assessments not then delinquent, and (iv) any other lien or encumbrance to which Administrative Agent may expressly consent in writing.

Permitted Fund Manager: means any Person which is not subject to a bankruptcy proceeding and (a) is a nationally-recognized manager of investment funds investing in debt or equity interests relating to commercial real estate which is investing through a fund and (b) has committed capital of at least $250,000,000.

Permitted Transfer:  Means, shall mean (i) Leases entered into in accordance with the terms of this Agreement and (ii) transfers of interests in Borrower's Members or its constituents so long as, after giving effect to each such transfer, all of the following conditions are satisfied:

(a)    Such transfer shall not constitute a change in Control of Borrower or of its Members and Union North Phase I, LLC at all times maintains its current (as of the Closing Date) interest in the Borrower and continues to be the Operating Member which handles the day to day affairs of the Borrower.  Notwithstanding the conditions contained within this subsection (a): (i) in the event of any change in management made pursuant to the provisions of Section 4.4 of the Borrower's Operating Agreement; or (ii) in the event of an exercise of the buy-sell options pursuant to the provisions of Article 11 of the Borrower's Operating Agreement, this condition shall be deemed to be satisfied;

(b)    Ronald J. Cohen at all times maintains a ten percent (10%) interest in Developer and continues to act as the Manager thereof, provided, however that in the event of the death or disability of Ronald J. Cohen: (i) if Alan D. Cohen shall succeed as Manager thereof, such succession shall be a Permitted Transfer hereunder; and (ii) so long as Alan D. Cohen is manager thereof, any transfer of the interests of Ronald J. Cohen in Developer to a guardian, or personal representative of the estate of Ronald J. Cohen shall be a Permitted Transfer hereunder;

(c)    No Event of Default shall have occurred and be continuing at the time of such transfer;

(d)    Borrower shall have given the Administrative Agent at least ten (10) days' prior notice of the proposed Transfer, which notice shall identify (with such information as Agent shall reasonably request) the proposed transferee(s) and the proposed percentage interest to be Transferred;

CONFIDENTIAL

TIAA049653

(e)   The Agent shall have been reimbursed for any and all out-of-pocket expenses incurred by the Agent, if any, in connection with such proposed Transfer, including reasonable attorneys' fees and disbursements;

(f)   The proposed Transfer shall not result in Borrower, the transferor or the transferee being in default under any Loan Document or under any other agreement, instrument, document or understanding relating to the Loan of which any of the foregoing Persons is a party, either upon such Transfer or but for the passage of time or the giving of notice or both; and

(g)   All taxes (other than income taxes), including, stamp taxes, mortgage recording taxes, transfer taxes, and other taxes, charges and fees incurred in connection with such Transfer shall have been paid by Borrower, the transferor or the proposed transferee at the time of such proposed transfer.

Notwithstanding anything to the contrary provided in this definition: (i) any transfer to an affiliate of TIAA Union Place Phase I, LLC, or to an affiliate of Teachers Insurance and Annuity Association shall be a Permitted Transfer.

Person:  Any natural person, partnership, limited liability company, corporation, trust, Governmental Authority or other entity.

Personal Property: means materials, furnishings, fixtures, machinery, equipment and all items of tangible and intangible personal property now or hereafter owned by the Borrower, wherever located, and: (a) to be incorporated into the Improvements; (b) used in connection with the construction of the Improvements; or (c) to be used in connection with the operation of the Property.

Plans and Specifications:  Detailed plans and specifications for the Improvements to be approved by Administrative Agent pursuant to Section 9.1(g) and 9.1(h).

Punchlist Items:  Means details of construction, decoration and mechanical and electrical adjustment which, in the aggregate, are minor in character and are not necessary for the issuance of a temporary certificate of occupancy for the Property.

Prepayment Charge:  As defined in the Note.

Prime Rate:  As determined on a daily basis, the rate of interest publicly announced by JPMorgan Chase Bank, N.A. in New York, New York from time to time as its prime commercial lending rate.

Proceeds:  As defined in Section 16.1(a).

Pro-Forma Projection:  The pro forma statement of projected income and expenses of the Project.

Project:  The collective reference to (i) the Land, together with all buildings, structures and improvements located or to be located thereon, including the Improvements, (ii) all rights,

-14-

CONFIDENTIAL

TIAA049654

privileges, easements and hereditaments relating or appertaining thereto, and (iii) all personal property, fixtures and equipment required or beneficial for the operation thereof.

Project Costs:  Means the aggregate amount of project costs set forth on the Budget.

Loan:  Shall have the meaning provided in the Recitals hereto.

Property means the Land, Improvements and Personal Property.

Proposed Finish Standards:  As defined in Section 9.1(g).

Protective Advance:  Means any advance by the Administrative Agent or any Lender with respect to (a) the payment of any delinquent Impositions or insurance premiums owed by the Borrower with respect to the Project, (b) the removal of any Lien or encumbrance on the Property or the defense of the Borrower's title thereto or of the validity, enforceability, perfection or priority of the liens and security interests granted pursuant to the Loan Documents, (c) the payment of the cost of completing the Project or (d) preservation of the value of the Project, including, without limitation, for payment of heating, gas, electric and other utility bills.

Ratable Share or Ratably:  Means, with respect to any Lender, its share of Advances of the Loans based on the proportion of the outstanding principal of the Loans advanced by such Lender to the total outstanding principal of the Loans.

Rate Cap Coverage Schedule:  Has the meaning set forth in Section 2.2(b).

Rating Agencies: means, (a) unless there has been a final Securitization of the Loan, each of Standard & Poor's Ratings Services, Inc., a division of The McGraw-Hill Companies, Inc. ("S&P"), Moody's Investors Service, Inc. ("Moody's") and Fitch, Inc., or any other nationally-recognized statistical rating agency which has been designated by the Agent, together with any successor to any of them or (b) if there has been a final Securitization of the Loan, any of the foregoing agencies that have rated any of the Certificates issued in such Securitization.

Recourse Carveout Guaranty: that certain Recourse Carveout Guaranty by Guarantor in favor of Administrative Agent dated as of the date hereof.

Required Permits:  Each building permit, environmental permit, utility permit, land use permit, wetland permit and any other permits, approvals or licenses issued by any Governmental Authority which are required in connection the Construction or operation of the Project.

Required Special Servicer Rating: Means in the case of S&P, a servicer on its approved list of special servicers in the case of S&P and, in the case of Moody's, a special servicer that is acting as special servicer in a commercial mortgage loan securitization that was rated by Moody's within the six (6) month period prior to the date of determination and that Moody's has not downgraded or withdrawn the then-current rating on any class of commercial mortgage securities or placed any class of commercial mortgage securities on watch citing the continuation of such special servicer as special servicer of such commercial mortgage securities.   The requirement of any agency not a Rating Agency shall be disregarded.

-15-

TIAA049655

Requisite Lenders:  Means, at any time, Lenders owed more than fifty percent (50%)] of the then-aggregate unpaid principal amount of the Loan.

Restoration: Means the repair and restoration of the Property as nearly as reasonably possible to the condition that the Property was in immediately prior to any Casualty, Partial Condemnation or Total Condemnation (as applicable) together with such alterations as may be Approved by the Administrative Agent.

Second Extended Maturity Date:  May 23, 2013.

Securitization:  means to securitize the Loan or any portion thereof in one or more single asset securitizations or pooled loan securitizations.

Soft Cost Contingency:  The portion of the Contingency Fund allocated in the Budget to Soft Costs.

Soft Costs:  All costs incurred or to be incurred in connection with the Project, other than the Hard Costs, including, without limitation, interest on the Loan, fees incurred in connection with the Loan, commissions, appraisal fees, architectural and engineering fees, title and recording charges, legal fees, real estate taxes and other impositions and sales and marketing costs.  Soft Costs shall include the items delineated as such on the Budget.

Soil Report:  A soil test report prepared by a licensed engineer satisfactory to Administrative Agent indicating to the satisfaction of Administrative Agent that the soil and subsurface conditions underlying the Project will support the Improvements.

Subcontracts:  Subcontracts for labor or materials to be furnished to the Project.

Substantial Completion:  The Improvements have been substantially completed and equipped in accordance with the Approved Plans and Specifications and are ready for occupancy.

Taxes: As defined in Section 2.12 below.

Tenant:  The tenant under a Lease.

Test Period:  Means, as of the applicable date of determination, the calendar quarter ending on the last day of the calendar quarter immediately prior to such date.

Title Insurer:  Collectively, Chicago Title Insurance Company, or such other title insurance company licensed in the District as may be approved in writing by Administrative Agent.

Title Policy:  An ALTA Mortgagee's Loan Title Insurance Policy with extended coverage issued by the Title Insurer insuring the lien of the Deed of Trust as a valid first, prior and paramount lien upon the Project and all appurtenant easements, and subject to no other exceptions other than the Permitted Exceptions and otherwise satisfying the requirements of

-16-

TIAA049656

Exhibit C attached hereto and made a part hereof, all to the extent permitted by the Laws of the District.

Total Condemnation: means any condemnation or eminent domain proceeding or action (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking) by any Governmental Authority, whether for any permanent or temporary use, occupancy or other interest affecting such portion of the Property as, when so taken or condemned, would leave, in the Administrative Agent's sole determination, a balance of the Property that, due either to the area so taken or the location of the part so taken in relation to the part not taken, would not, under economic conditions, physical constraints, zoning laws, building regulations and other Laws then existing, readily accommodate a new or reconstructed building or buildings and other improvements of a type comparable in all material respects to the Improvements existing as of the date of such taking or condemnation.

Transfer:  Any sale, transfer, lease (other than a Lease approved by Administrative Agent), conveyance, alienation, pledge, assignment, mortgage, encumbrance hypothecation or other disposition of (a) all or any portion of the Project or any portion of any other security for the Loan, (b) all or any portion of the Borrower's right, title and interest (legal or equitable) in and to the Project or any portion of any other security for the Loan, or (c) any interest in Borrower or any interest in any entity which directly or indirectly holds an interest in, or directly or indirectly controls, Borrower.

Unavoidable Delay:  Any delay in the construction of the Project, caused by natural disaster, fire, earthquake, hurricanes, tropical storms, floods, explosion, extraordinary adverse weather conditions, war or acts of terrorism, inability to procure or a general shortage of labor, equipment, facilities, energy, materials or supplies in the open market, failure of transportation, strikes or lockouts, extraordinary delays beyond the control of Borrower in obtaining government inspections or approvals or like causes, so long as such cause is not within the control of Borrower.

Unfunded Commitment:  The Commitment (as reduced from time to time pursuant to the provisions of this Agreement), less all disbursements of the Loan made prior to the date on which the amount of the Unfunded Commitment is being calculated.

Units:  As defined in Recital A hereto.

Other Definitional Provisions.

All terms defined in this Agreement shall have the same meanings when used in the Note, Deed of Trust, any other Loan Documents, or any certificate or other document made or delivered pursuant hereto.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement.

**Article 2**
**Agreement to Lend and Payment of Loan**

-17-

TIAA049657

2.1    **Making of the Loan**

(a)   Upon the terms and subject to the conditions set forth in this Agreement, each Lender severally and not jointly agrees to make such Lender's Ratable Share of Advances of the Loan to the Borrower from time to time, in accordance with the provisions hereof, prior to the Maturity Date, in an aggregate principal amount of up to the Loan Amount.  Upon the Administrative Agent's receipt of such funds and upon fulfillment of the applicable conditions in Article 3, the Administrative Agent will make such funds available to the Borrower by wire transfer of immediately available funds to an account of the Borrower designated in writing by the Borrower to the Administrative Agent and otherwise in accordance with the terms hereof. Amounts borrowed under this Section 2.1 and repaid or prepaid may not be re-borrowed.

(b)   The obligations of the Lenders hereunder are several and not joint.  Failure of any Lender to fulfill its obligations hereunder shall not result in any other Lender becoming obligated to advance more than its Ratable Share nor shall such failure release or diminish the obligations of any Lender to fund its Ratable Share.

(c)   The Loan shall be secured by (i) the Deed of Trust and (ii) the other security interests and Liens granted in the Collateral pursuant to this Agreement and in the other Loan Documents.

(d)   The proceeds of the Loan shall be used only to pay (or reimburse the Borrower for) a portion of (i) actual, out of pocket Project Costs (for clarification, excluding cost savings), and (ii) transaction costs related to the making of the Loan.

(e)   The funds to be advanced by Lenders shall be disbursed in accordance with Section 4.1 and Article 12 of this Agreement.

2.2    **Payment of Interest**

(a)   Base Rate Loans and LIBOR Loans.  The Borrower shall pay interest on the Outstanding Principal at the following rates per annum:

(i)    Base Rate Loans.  During Interest Periods during which the Loan or any portion thereof shall be a Base Rate Loan, with respect thereto, a rate per annum equal at all times during such Interest Periods to the sum of (A) the Base Rate in effect from time to time plus (B) the Applicable Margin.

(ii)   LIBOR Loans.  During Interest Periods during which the Loan or any portion thereof shall be a LIBOR Loan, with respect thereto, a rate per annum equal at all times to the sum of (A) the LIBO Rate for such Interest Period plus (B) the Applicable Margin.

Interest on the Outstanding Principal (including, without limitation, on each LIBOR Loan) shall be due and payable in arrears on the first Business Day of each calendar month.

(b)   LIBO Rate Cap.  Borrower acknowledges and agrees that Administrative Agent shall purchase a LIBO Rate Cap on the Closing Date at Borrower's sole cost and expense,

-18-

CONFIDENTIAL                                                     TIAA049658

and that Administrative Agent shall apply funds from the Loan Amount as an Advance to pay for such cost. Administrative Agent shall advise Borrower of the cost of the LIBO Rate Cap (the "LIBO Rate Cap Fee") shortly after the purchase thereof. Subject to the limitations in the following sentence, with respect to any LIBOR Loan, at no point shall Borrower pay interest on the Outstanding Principal at a rate higher than the LIBO Rate Cap plus the Applicable Margin. Notwithstanding the foregoing or anything to the contrary, to the extent an individual Advance together with any prior Advances made exceed the total of all Advances contemplated to have been made by the corresponding date set forth on the Rate Cap Coverage Schedule attached hereto as Schedule 2.1 (the "Rate Cap Coverage Schedule"), then (i) the portion of such Advances up to the amount set forth on the Rate Cap Coverage Schedule shall bear interest at the LIBO Rate Cap plus the Applicable Margin, and (ii) the portion of such Advances exceeding the amount set forth on the Rate Cap Coverage Schedule shall bear interest at the LIBO Rate plus the Applicable Margin.

(c) Default Interest. Upon the occurrence and during the continuance of an Event of Default, the Borrower shall pay on demand interest on (i) the Outstanding Principal and (ii) the unpaid amount of any interest, fee or other amount payable hereunder that is not paid when due, from the date such amount shall be due until such amount shall be paid in full, whether before or after maturity or acceleration of the applicable Note, at a rate per annum equal to the Default Rate.

## 2.3    Conversion and Continuation Options.

(a) Base Rate Loan to LIBOR Loan. Subject to Section 2.7, the Borrower may elect pursuant to a Rate Request to convert all or any portion of any outstanding Base Rate Loan to a LIBOR Loan; provided that no Base Rate Loan may be converted to a LIBOR Loan if any Event of Default has occurred and is continuing.

(b) LIBOR Loan to Base Rate Loan. The Borrower may elect pursuant to a Rate Request to convert all or any portion of any outstanding LIBOR Loan to a Base Rate Loan. Notwithstanding the foregoing, during the last 60 days prior to the Maturity Date, Borrower may elect pursuant to a Rate Request to convert all outstanding LIBOR Loans to a single Base Rate Loan, provided that Administrative Agent may from time to time, at Administrative Agent's discretion, make available to Borrower Administrative Agent's overnight rate.

(c) LIBOR Loan to LIBOR Loan. Any LIBOR Loan may be continued upon the expiration date of its then current Interest Period by Borrower pursuant to a Rate Request; provided that no LIBOR Loan may be continued when any Event of Default has occurred and is continuing. If the Borrower fails to submit a Rate Request to the Administrative Agent in accordance with the provisions of this Section 2.3(c) with respect to any outstanding LIBOR Loan, such outstanding LIBOR Loan shall automatically be continued as a one month LIBOR Loan; provided, that if the applicable Interest Period is less than 30 days, the Administrative Agent shall convert the LIBOR Loan tranche to a Base Rate Loan tranche, provided that Administrative Agent may from time to time, at Administrative Agent's discretion, make available to Borrower Administrative Agent's overnight rate.

CONFIDENTIAL

TIAA049659

**2.4     Minimum Amounts and Maximum Number of Interest Periods.** All borrowings, conversions and continuations of the Loan shall be in such amounts and be made pursuant to such elections so that, after giving effect thereto, the aggregate principal amount of any LIBOR Loan shall be at least equal to ONE MILLION AND 00/100 DOLLARS ($1,000,000.00). In addition, provided that no Event of Default exists and is continuing, Administrative Agent's overnight option may be made available to Borrower on an interim basis, in Administrative Agent's discretion. No more than six (6) LIBOR Loan tranches or one (1) Base Rate Loan tranche in the aggregate may be outstanding at any time under this Agreement and the Note.

**2.5     Computation of Interest and Fees.** All interest and fees shall be computed on the basis of a year of 360 days and paid for the actual number of days elapsed, including the first day and excluding the last day of each Interest Period. If all or any portion of an Advance is repaid on the same day on which it is made, one day's interest shall be paid on the Loan. Any change in the Administrative Agent's "Prime Rate" or the Federal Funds Rate shall be effective as of the day on which such change in rate occurs. Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower in the absence of manifest error.

**2.6     Increased Costs.**

(a) If, during any Interest Period with respect to any LIBOR Loan due to either (i) the introduction of or any change in or in the judicial or regulatory interpretation of any Law or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), there shall be any increase in the cost to any Lender of maintaining such LIBOR Loan (including, but not limited to, a reserve requirement), then the Borrower shall from time to time, within 10 days after demand therefor by the Administrative Agent, pay to the Administrative Agent additional amounts sufficient to compensate any such Lender for such increased cost; provided that any Lender claiming additional amounts under this Section 2.6 shall use commercially reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to designate a different applicable lending office if the making of such designation would avoid the need for, or reduce the amount of, such increased cost that may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender. Borrower shall have the right to replace a Lender that imposes such increased costs with an Eligible Lender. A certificate as to the amount of such increased cost, explaining the reason for and showing the calculation of such amounts, all in reasonable detail, submitted to the Borrower by the Administrative Agent or the affected Lender, shall be conclusive and binding for all purposes in the absence of manifest error.

(b) If the Administrative Agent determines that compliance with any Law or any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law) affects or would affect the amount of capital required or expected to be maintained by any Lender or any corporation controlling any Lender and that the amount of such capital is increased by or based upon the existence of the Note, then, within 10 days after demand therefor by the Administrative Agent, the Borrower shall pay to the Administrative Agent, from time to time as specified by the Administrative Agent, additional amounts sufficient to compensate each Lender or such corporation in the light of such circumstances, to

-20-

CONFIDENTIAL

TIAA049660

the extent that the Administrative Agent reasonably determines such increase in capital to be allocable to the Loan; provided that such Lender shall calculate the amounts allocable to the Loan in good faith.  A certificate as to such amounts, explaining the reason for and showing the calculation of such amounts, all in reasonable detail, submitted to the Borrower by the Administrative Agent or the affected Lender, shall be conclusive and binding for all purposes in the absence of manifest error.

The provisions of this Section 2.6 shall survive the payment of all amounts payable under the Note or the other Loan Documents.

**2.7    Illegality or Inability to Determine LIBO Rate.**

(a) Notwithstanding any other provision of this Agreement or the Note, if the Administrative Agent or any Lender shall notify the Borrower that the introduction of or any change in or in the interpretation of any Law makes it unlawful, or any central bank or other Governmental Authority asserts that it is unlawful, for a Lender to perform its obligations hereunder to make or maintain any LIBOR Loan, the Interest Rate in effect for the Outstanding Principal shall automatically convert to the Prime Rate.

(b) If the Administrative Agent notifies the Borrower that (i) the Administrative Agent is unable to determine the LIBO Rate or (ii) due to circumstances affecting the London interbank market generally, the LIBO Rate for any Interest Period will not adequately reflect the cost to the Lenders of making or maintaining LIBOR Loans in effect for such Interest Period, the Interest Rate applicable to the Outstanding Principal shall automatically convert to the Prime Rate, unless, in the case of clause (ii) of this Section 2.8(b), within five Business Days of notice from the Administrative Agent thereof, the Borrower pays the difference in cost to the Administrative Agent of maintaining such LIBOR Loan in effect for such Interest Period.

(c) If the illegality of or the Administrative Agent's inability to determine the LIBO Rate as described in Sections 2.7(a) or Section 2.7(b) is eliminated, the Interest Rate shall automatically convert to the LIBO Rate plus the Applicable Margin.

**2.8    Payment of Outstanding Principal.**

The Borrower shall repay to the Administrative Agent for the ratable account of the Lenders the Outstanding Principal of the Loan in full on the Maturity Date, together with all accrued and unpaid interest thereon to (and including) the date of repayment and all other amounts due to the Lenders or the Administrative Agent under this Agreement, the Note or any other Loan Document.

**2.9    Prepayment.**

(a) Optional Prepayment.  Upon not less than ten (10) days' prior written notice to the Administrative Agent, the Borrower may, at any time after the Closing Date, prepay in full (but not in part) the entire Outstanding Principal balance of the Loan without premium or penalty, but subject to Sections 2.9(c) and (d).

-21-

TIAA049661

(b) Intentionally Omitted.

(c) Funding Losses. Upon demand of the Administrative Agent from time to time, the Borrower shall promptly compensate the Lenders for and hold the Lenders harmless from any actual loss, cost or expense incurred by any of them as a result of (all such amounts referenced in this Section 2.9(c) being referred to herein, collectively, as "LIBOR Breakage Costs"):

(i)     any continuation, payment or prepayment of any LIBOR Loan on a day other than the last day of the Interest Period for such LIBOR Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(ii)    any failure by the Borrower to prepay or continue any LIBOR Loan on the date or in the amount notified by the Borrower; or

(iii)   any loss or expense arising from the liquidation of funds obtained by it to maintain such LIBOR Loan or from fees payable to terminate the deposits from which such funds were obtained. The Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrower to the Lender under this Section 2.9(c), each Lender shall be deemed to have funded each LIBOR Loan at the LIBO Rate by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such LIBOR Loan was in fact so funded.

(d) Prepayments Generally. Any prepayment must be accompanied by payment by the Borrower of all applicable accrued and unpaid interest on the Outstanding Principal balance of the Loan and any Hedge Breakage. Except as otherwise expressly permitted or required in this Agreement, the Outstanding Principal balance of the Loan may not be prepaid, in whole or in part.

**2.10   Late Charge.** Any and all regularly scheduled amounts due hereunder, under the Note, the Deed of Trust or any other Loan Document (other than the payment of the Outstanding Balance at Maturity) which remain unpaid more than five Business Days after the date said amount was due and payable shall incur a fee (the "Late Charge") of five percent (5%) of said amount, which Late Charge shall be payable by the Borrower on demand by the Administrative Agent. The Administrative Agent's rights to collect the Late Charge shall be in addition to all other rights and remedies of the Administrative Agent or the Lenders under the Loan Documents.

**2.11   Payments.**

(a) Payments and prepayments of Outstanding Principal, and interest on, the Note and all fees, expenses and other obligations under this Agreement payable to the Administrative Agent or the Lenders shall be made without setoff or counterclaim in immediately available funds not later than 10:00 A.M. (New York City time) on the dates called for under this Agreement and the Note to the Administrative Agent by wire transfer to the following account of the Administrative Agent (or to such other account as may be specified in writing from time

-22-

TIAA049662

to time by the Administrative Agent): Bank: JPMorgan Chase Bank, New York Branch (Swift ID: CHAUSUS33), Account #: 400 129 868, ABA#: 021 000 021, Account Name: Westdeutsche ImmobilienBank, Mainz, Germany, Reference: 4 352 260 000/Union Place. Funds received after such time shall be deemed to have been received on the next Business Day.

(b) The Borrower hereby authorizes the Administrative Agent, if and to the extent payment due by the Borrower under any Loan Document is not made when due (subject to any applicable grace periods) under any Loan Document, to charge from time to time against any and all of the Borrower's accounts with the Administrative Agent or any of the Lenders any amount so due.

(c) Whenever any payment hereunder shall be stated to be due on a day other than a Business Day, as applicable, such payment shall be made on the immediately preceding Business Day.

(d) All payments received by the Administrative Agent upon the Loan, while an Event of Default is continuing, may be applied to accrued interest, Outstanding Principal of the Loan, Hedge Payments, Hedge Breakage or any other Obligations evidenced or secured by the Loan Documents in such order and amounts as the Administrative Agent may in its sole discretion elect.

**2.12   Taxes**. All payments made by the Borrower to the Administrative Agent or any Lender shall be made without any setoff or counterclaim, and free and clear of, and without deduction for any withholdings or on account of, any present or future income, excise and other taxes of whatever nature (other than taxes generally assessed on net income or receipts of any Lender or any franchise (or similar) taxes imposed upon any Lender by the jurisdiction in which it is organized or in which it maintains an agency, it being understood that the preceding clause shall not apply to withholding taxes), or any levies, imposts, duties, charges or fees of any nature now or hereafter imposed by any Governmental Authority (collectively, "Taxes"). If the Borrower is compelled by any Law to make any such deductions or withholdings, it will pay such additional amounts as may be necessary in order that the net amount received by the Administrative Agent or such Lender after such deductions or withholdings (including any required deduction or withholding on such additional amounts) shall equal the amount each Lender would have received had no such deductions or withholdings been made, and it will promptly provide the Administrative Agent with evidence satisfactory to the Administrative Agent that it has paid such deductions or withholdings.   Moreover, if any Taxes are directly assessed against any Lender, such Lender may pay such Taxes and the Borrower shall, within ten (10) days after the Administrative Agent's demand therefor, pay such additional amount as may be necessary in order that the net amount received by such Lender after the payment of such Taxes (including any Taxes on such additional amount) shall equal the amount such Lender would have received had not such Taxes been assessed; provided that any Lender claiming additional amounts under this Section 2.12 shall use commercially reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to designate a different applicable lending office if the making of such designation would avoid the need for, or reduce the amount of, such increased cost that may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender.   Borrower shall have the right to replace a Lender

-23-

CONFIDENTIAL                                                     TIAA049663

that imposes such increased costs with an Eligible Lender. The provisions of this Section 2.12 shall survive payment of all other amounts payable under the Loan Documents. Each Lender shall, on or prior to the Closing Date, provide the Borrower with Internal Revenue Service Form W8BEN or W8ECI, as appropriate, or any successor form prescribed by the Internal Revenue Service, certifying that such Lender is entitled to benefits under an income tax treaty to which the United States is a party that eliminates withholding tax on payments under the Note or certifying that the income receivable pursuant to the Note is effectively connected with the conduct of a trade or business in the United States. If any form or document referred to in this Section 2.12 requires the disclosure of information, other than information necessary to compute the tax payable and information required on the date hereof by Internal Revenue Service Form W8BEN or W8ECI, that each such Lender reasonably considers to be confidential, such Lender shall give notice thereof to the Borrower and shall not be obligated to include in such form or document such confidential information.

**2.13   Distribution to Lenders.**

(a) In the event the Administrative Agent receives current funds, in payment of principal, interest or any other sums due hereunder, on or prior to 10:00 A.M.. (New York time) on any Business Day, then, on such date, the Administrative Agent will notify Lenders of the same and will distribute like funds by wire transfer of immediately available funds to the Lenders Ratably to such accounts at such places as have been designated by the respective Lenders in writing from time to time. If such funds are received after 10:00 A.M. (New York time) on any Business Day, then the Administrative Agent shall distribute such funds no later than the next succeeding Business Day. Upon the Administrative Agent's receipt of any other amounts payable by the Borrower or any other Person for items other than principal of or interest on the Loan, the Administrative Agent shall promptly cause the payment to be applied in accordance with this Agreement. The Administrative Agent shall promptly remit to the Lenders their Ratable Shares of any payment received from the Borrower or from another source on account of sums payable by the Borrower. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Lenders hereunder that the Borrower will not make such payment in full, the Administrative Agent may assume that the Borrower has made such payment in full to the Administrative Agent on such date and the Administrative Agent may, in reliance upon such assumption, cause to be distributed to each Lender on such due date an amount equal to the amount then due such Lender. If and to the extent the Borrower shall not have so made such payment in full to the Administrative Agent, each Lender shall repay to the Administrative Agent forthwith on demand the portion of such amount distributed to such Lender for which the Administrative Agent did not in fact receive payment from or on account of the Borrower, together with interest thereon, for each day from the date such amount is distributed to such Lender until the date such Lender makes such repayment to the Administrative Agent, at the overnight Federal Funds Rate.

(b) If any Lender obtains any payment (whether voluntary or involuntary, through the exercise of any right of set-off, or otherwise) on account of the Loan owing to it in excess of its Ratable Share of payments on account of the Loan obtained by all of the Lenders, such Lender shall forthwith purchase from the other Lenders such participations in the Loan owing

CONFIDENTIAL

TIAA049664

to them as shall be necessary to cause such purchasing Lender to share the excess payment Ratably with each of them; provided, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and each other Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's Ratable Share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered. The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this Section 2.13(b) may, to the fullest extent permitted by Law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Lender were the direct creditor or the Borrower in the amount of such participation.

(c) The Lenders agree, among themselves, that unless otherwise agreed to by the Administrative Agent and the Requisite Lenders, all monies collected or received by the Administrative Agent after the occurrence of an Event of Default in respect of any security for the Loan shall be applied first to (a) the fees and costs of collection and maintenance of the Collateral, and then (b) *pari passu* to either interest on, or the Outstanding Principal of, the Loan as recommended by the Administrative Agent.

**2.14   Protective Advances.**      Notwithstanding anything to the contrary contained in this Agreement, at all times after Administrative Agent has given notice to Borrower of its intention to make a Protective Advance and Borrower's failure to effectuate same, the Administrative Agent shall be permitted to make any Protective Advance that the Administrative Agent may determine in good faith to be reasonably necessary or appropriate to protect the Collateral.

## Article 3
## BORROWER'S REPRESENTATIONS AND WARRANTIES

**3.1   Representations and Warranties.**

To induce Administrative Agent and the Lenders to execute this Agreement and perform its obligations hereunder, Borrower hereby represents and warrants to Administrative Agent and the Lenders as follows:

(a) Borrower has good and marketable fee simple title to the Project, subject only to the Permitted Exceptions.

(b) Except as previously disclosed to Administrative Agent in writing, no litigation or proceedings are pending, or to the Borrower's actual knowledge threatened, against Borrower, which could, if adversely determined, be reasonably expected to cause a Material Adverse Change with respect to Borrower or the Project. Except as set forth in the Environmental Report, there are no pending Environmental Proceedings and Borrower has no knowledge of any threatened Environmental Proceedings or any facts or circumstances which may give rise to any future Environmental Proceedings.

-25-

CONFIDENTIAL

TIAA049665

(c) Borrower is a duly organized and validly existing Delaware limited liability company and has full power and authority to execute, deliver and perform all Loan Documents to which Borrower is a party, and such execution, delivery and performance have been duly authorized by all requisite action on the part of Borrower.

(d) No consent, approval or authorization of or declaration, registration or filing with any Governmental Authority or nongovernmental person or entity, including any creditor, partner, or member of Borrower, is required in connection with the execution, delivery and performance of this Agreement or any of the Loan Documents other than the recordation of the Deed of Trust and the filing of UCC Financing Statements, except for such consents, approvals or authorizations of or declarations or filings with any Governmental Authority or non-governmental person or entity where the failure to so obtain would not have an adverse effect on Borrower or which have been obtained as of any date on which this representation is made or remade.

(e) The execution, delivery and performance of this Agreement, the execution and payment of the Note and the granting of the Deed of Trust and other security interests under the other Loan Documents have not constituted and will not constitute, upon the giving of notice or lapse of time or both, a breach or default under any other agreement to which Borrower or Guarantor is a party or may be bound or affected, or a violation of any law or court order which may affect the Project, any part thereof, any interest therein, or the use thereof.

(f) There is no default under this Agreement or the other Loan Documents, nor any condition which, after notice or the passage of time or both, would constitute a default or an Event of Default under said documents.

(g) (i) No condemnation of any portion of the Project, (ii) no condemnation or relocation of any roadways abutting the Project, and (iii) no proceeding to deny access to the Project from any point or planned point of access to the Project, has commenced or, to Borrower's knowledge, is contemplated by any Governmental Authority.

(h) The amounts set forth in the Budget present a full and complete itemization by category of all costs, expenses and fees which Borrower reasonably expects to pay or reasonably anticipates becoming obligated to pay to complete the Construction, operate the Project and market and rent the Units. Borrower is unaware of any other such costs, expenses or fees which are material and are not covered by the Budget. The Budget does not include any amount paid or to be paid to Borrower or Guarantor or any Affiliate of Borrower or Guarantor except as otherwise expressly set forth in this Agreement.

(i) Neither the construction of the Improvements nor the use of the Project when completed in accordance with the Approved Plans and Specifications and the contemplated accessory uses will violate (i) any Laws (including subdivision, zoning, building, environmental protection and wetland protection Laws), or (ii) any building permits, restrictions of record, or agreements affecting the Project or any part thereof. Neither the zoning authorizations, approvals or variances nor any other right to construct or to use the Project is to any extent dependent upon or related to any real estate other than the Land. All

-26-

CONFIDENTIAL

TIAA049666

Government Approvals required for the Construction in accordance with the Approved Plans and Specifications have been obtained (except for those Governmental Approvals which cannot or need not be obtained until a later stage of the Construction or Completion of Construction which are listed on Exhibit M attached hereto, in which case such Governmental Approvals will be obtained by Borrower on a timely basis as approved by Agent and its Construction Consultant and copies will be delivered to Administrative Agent and its Construction Consultant on the earliest possible date), and all Laws relating to the Construction and operation of the Improvements have been complied with and to Borrower's actual knowledge, after due inquiry all permits and licenses, required for the operation of the Project which cannot be obtained until the Construction is completed can be obtained if the Improvements are completed in accordance with the Approved Plans and Specifications.

(j) The Project will have adequate water, gas and electrical supply, storm and sanitary sewerage facilities, other required public utilities, and means of access between the Project and public highways; none of the foregoing will be foreseeably delayed or impeded by virtue of any requirements under any applicable Laws.

(k) No brokerage fees or commissions are payable by or to any person in connection with this Agreement or the Loan to be disbursed hereunder other than to The Greenwich Group International, LLC.

(l) All financial statements and other information previously furnished by Borrower or Guarantor to Administrative Agent in connection with the Loan are true, complete and correct in all material respects and fairly present in all material respects the financial conditions of the subjects thereof as of the respective dates thereof, and no Material Adverse Change with respect to Borrower has occurred since the dates of such statements and information. Borrower does not, as of the date of such statements, have any liability, contingent or otherwise, not disclosed in such financial statements which would result in a Material Adverse Change with respect to Borrower.

(m) Except as disclosed by Borrower to Administrative Agent or except as set forth in the Environmental Report, (i) the Project is in a clean, safe and healthful condition, and, except for small quantities of Hazardous Materials lawfully used in the ordinary course of construction, maintenance and operation of the Project, is free of all Hazardous Material and is in compliance with all applicable Laws; (ii) except for small quantities of Hazardous Materials lawfully used in the ordinary course of construction, maintenance and operation of the Project, neither Borrower nor, to the actual knowledge of Borrower after reviewing the Environmental Report, any other person or entity except to the extent set forth in such reports, has ever caused or permitted any Hazardous Material to be placed, held, located or disposed of on, under, at or in a manner to affect the Project, or any part thereof, and the Project has never been used (whether by Borrower or, to the actual knowledge of Borrower after reviewing the Environmental Report, by any other person or entity) except to the extent set forth in such reports, for any activities involving, directly or indirectly, the use, generation, treatment, storage, transportation, or disposal of any Hazardous Material; (iii) neither the Project nor Borrower is subject to any existing, pending, or, to Borrower's actual knowledge after reviewing the Environmental Report, threatened investigation or inquiry by any Governmental Authority, and the Project is not subject to any remedial obligations under any applicable

-27-

CONFIDENTIAL

TIAA049667

Laws pertaining to health or the environment; and (iv) to the actual knowledge of Borrower after reviewing the Environmental Report, there are no underground tanks, vessels, or similar facilities for the storage, containment or accumulation of Hazardous Materials of any sort on, under or affecting the Project except for small quantities of Hazardous Materials lawfully used in accordance with all environmental Laws in the ordinary course of construction, maintenance and operation of the Project.

(n) The Project is taxed separately without regard to any other property and for all purposes the Project may be mortgaged, conveyed and otherwise dealt with as an independent parcel.

(o) Borrower and its agents have not entered into any Leases, subleases or other arrangements for occupancy of space within the Project other than Leases entered into from and after the date hereof in accordance with the terms of this Agreement.

(p) When the Construction is completed substantially in accordance with the Approved Plans and Specifications, no building or other improvement will encroach upon any property line, building line, setback line, side yard line or any recorded or visible easement (or other easement of which Borrower is aware) in violation thereof.

(q) The Loan is not being made for the purpose of purchasing or carrying "margin stock" within the meaning of Regulation T, U or X issued by the Board of Governors of the Federal Reserve System, and Borrower agrees to execute all instruments necessary to comply with all the requirements of Regulation U of the Federal Reserve System.

(r) Borrower is not a party in interest to any plan defined or regulated under ERISA, and the assets of Borrower are not "plan assets" of any employee benefit plan covered by ERISA or Section 4975 of the Internal Revenue Code.

(s) Borrower is not a "foreign person" within the meaning of Section 1445 or 7701 of the Internal Revenue Code.

(t) Borrower uses no trade name other than its actual name set forth herein.  The principal place of business of Borrower is as stated in Article 22.

(u) Borrower's place of formation or organization is the State of Delaware.

(v) None of Borrower or, to the actual knowledge of Borrower, any other person owning an interest in Borrower is (or will be) a person with whom Administrative Agent is restricted from doing business with under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury of the United States of America (including, those persons named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not knowingly engage in any dealings or transactions or otherwise be associated with such persons.  In addition, Borrower hereby agrees to provide the Administrative Agent with any additional information that the

-28-

TIAA049668

Administrative Agent deems reasonably necessary from time to time in order to ensure compliance with all applicable Laws concerning money laundering and similar activities.

(w) All statements set forth in the Recitals are true and correct.

## 3.2    Survival of Representations and Warranties.

Borrower agrees that all of the representations and warranties set forth in Section 3.1 and elsewhere in this Agreement are true as of the date hereof, will be true in all material respects at the Loan Opening and, except for matters which have been disclosed by Borrower and approved by Administrative Agent in writing, at all times thereafter shall be true in all material respects until the Loan has been repaid and Borrower's obligations hereunder have been satisfied in full. Each request for a disbursement under the Loan Documents shall constitute a reaffirmation of such representations and warranties, as deemed modified in accordance with the disclosures made and approved as aforesaid, as of the date of such request. It shall be a condition precedent to the Loan Opening and each subsequent disbursement that each of said representations and warranties is true and correct in all material respects as of the date of such requested disbursement. Each disbursement of Loan proceeds shall be deemed to be a reaffirmation by Borrower that each of the representations and warranties is true and correct in all material respects as of the date of such disbursement, except for matters which have been disclosed by Borrower and/or approved by Administrative Agent in writing. In addition, at Administrative Agent's request, Borrower shall reaffirm such representations and warranties in writing prior to each disbursement hereunder.

### Article 4
### LOAN AND LOAN DOCUMENTS

## 4.1    Agreement to Borrow and Lend; Administrative Agent's Obligation to Disburse; Excess Disbursements.

Subject to the terms, provisions and conditions of this Agreement and the other Loan Documents, Borrower agrees to borrow from Administrative Agent and the Lenders and Administrative Agent and the Lender agree to lend to Borrower the Loan. If Administrative Agent or any Lender consists of more than one party, the obligations of each such party with respect to the amount it has agreed to loan to Borrower shall be several (and not joint and several) and shall be limited to its proportionate share of the Loan and of each Advance.

(a) The maximum principal amount of the Loan to be funded under the Loan Documents shall not exceed $55,250,000.00, provided that in no event shall the maximum principal amount to be funded under the Loan Documents exceed the actual costs of the Project incurred pursuant to the approved Budget, as approved by Administrative Agent from time to time in its sole discretion, less the sum of the Minimum Equity. (The foregoing shall not be deemed to limit Administrative Agent's right to advance funds to cure defaults of Borrower as specified in Section 7.8 or otherwise to make Protective Advances.)

(b) Administrative Agent agrees, upon Borrower's compliance with and satisfaction of all conditions precedent to the Initial Loan Advance set forth in this Agreement, including, but

CONFIDENTIAL

TIAA049669

not limited to, the conditions described in Article 12, and provided (i) the Loan is In Balance, (ii) no Material Adverse Change has occurred with respect to Borrower, Guarantor or the Project, (iii) no material casualty to the Project has occurred which has not been repaired or is in the process of being repaired, subject to the terms and conditions of Sections 16.1(b) and 16.2 hereof and there is no existing or threatened condemnation or taking or other material pending or threatened litigation which could cause a Material Adverse Change with respect to Borrower or the Project and (iv) no default or Event of Default has occurred and is continuing hereunder, to open the Loan to reimburse Borrower for a portion of the costs incurred by Borrower in connection with the acquisition and development of the Project and the construction of the Improvements, to the extent provided for in the Budget.

(c) After the Opening of the Loan, Borrower shall be entitled to receive further successive disbursements of the proceeds of the Loan in accordance with Articles 9, 12 and 13 following compliance with all conditions precedent thereto set forth in this Agreement (or following waiver thereof by Administrative Agent) provided that (i) the Loan remains In Balance; (ii) Borrower has complied with all conditions precedent to disbursement from time to time set forth in this Agreement including the requirements of Section 3.2 and Articles 8, 9, 12 and 13; (iii) no Material Adverse Change has occurred with respect to Borrower, Guarantor or the Project, (iv) no material casualty to the Project has occurred which has not been repaired or is in the process of being repaired, subject to the terms and conditions of Sections 16.1(b) and 16.2 hereof and there is no existing or threatened condemnation or taking which could cause a Material Adverse Change with respect to Borrower or the Project and (v) no Event of Default and no material default exists hereunder or under any other Loan Document. Administrative Agent shall make commercially reasonable efforts to fund such subsequent disbursements within (but not including) seven (7) Business Days after receipt of the documents required under this Agreement by 12 p.m. in the Central European Standard Time Zone, including a draw request together with all items listed in Section 12.3, which documents draw request shall be subject to approval by the Construction Consultant.

(d) To the extent that Administrative Agent may have acquiesced in noncompliance with any requirements set forth in this Agreement precedent to the Opening of the Loan or precedent to any subsequent disbursement of Loan proceeds, such acquiescence shall not constitute a waiver by Administrative Agent, and Administrative Agent may at any time after such acquiescence require Borrower to comply with all requirements for any future disbursements.

(e) All payments by Borrower on account of the Loan shall be made as such amounts become due or are declared due pursuant to the terms of this Agreement and the other Loan Documents. All payments shall be made without deduction, defense, setoff or counterclaim.

## 4.2   Loan Documents.

Borrower agrees that it will, on or before the Closing Date, execute and deliver or cause to be executed and delivered to Administrative Agent the following documents in form and substance acceptable to Administrative Agent:

(a) The Note.

CONFIDENTIAL

TIAA049670

(b) The Deed of Trust.

(c) The Completion Guaranty.

(d) The Environmental Indemnity.

(e) The Recourse Carveout Guaranty.

(f) The Limited Payment Guaranty.

(g) The Deferred Equity Guaranty.

(h) A collateral assignment, to the extent assignable, of construction documents, including, without limitation, the General Contract, all architecture and engineering contracts, Plans and Specifications, permits, licenses, approvals and development rights, together with consents to the assignment and continuation agreements from the General Contractor, the architect and other parties reasonably specified by Administrative Agent.

(i) Intentionally Omitted.

(j) Intentionally Omitted.

(k) Intentionally Omitted..

(l) Such UCC financing statements as Administrative Agent determines are advisable or necessary to perfect or notify third parties of the security interests intended to be created by the Loan Documents.

(m) Such other documents, instruments or certificates as Administrative Agent and its counsel may reasonably require, including such documents as Administrative Agent in its sole but reasonable discretion deems necessary or appropriate to effectuate the terms and conditions of this Agreement and the Loan Documents, and to comply with the laws of the District.

**4.3    Term of the Loan.**

(a) All principal, interest and other sums due under the Loan Documents shall be due and payable in full on the Initial Maturity Date, provided, that Borrower shall have two options ("Extension Options") to extend the Maturity Date for two (2) additional twelve (12) month terms to the First Extended Maturity Date and the Second Extended Maturity Date. Such Extension Options shall be exercisable by written notice to the Administrative Agent delivered no later than sixty (60) days prior to the Maturity Date. All references herein to the "Maturity Date" shall mean the Initial Maturity Date, or, in the event Borrower satisfies the conditions to the exercise of the Extension Options in accordance with this Section 4.3, the "Maturity Date" shall mean the First Extended Maturity Date or the Second Extended Maturity Date, as applicable.

-31-

CONFIDENTIAL

TIAA049671

(b) Borrower may only exercise the Extension Options upon satisfying the following conditions:

(i)      Borrower shall have (i) entered into an agreement with Administrative Agent, in form and substance acceptable to Administrative Agent to either (a) cap the LIBO Rate at LIBO Rate Cap, if available as determined by Administrative Agent or (b) fix the interest rate of the Loan at an interest rate no higher than eight percent (8%) per annum (which interest rate shall not take into account any fees paid to Administrative Agent in connection with its exercise of an Extension Option), if available as determined by Administrative Agent and (ii) paid to Administrative Agent a fee, which fee shall be calculated at the time such Extension Option is exercised by Administrative Agent in its sole discretion, taking into account the then current pricing of interest rate caps and interest rate swaps and other costs incurred by Administrative Agent. It being understood if Borrower is not able, as a result of then current interest rates, to cap the LIBO Rate at the LIBO Rate Cap or to fix the interest rate of the Loan at an interest rate no higher than eight percent (8%), then the extension Options shall not be granted;

(ii)     The Project shall have been completed as determined in writing by the Construction Consultant;

(iii)    The most recent Appraisal (prepared within the previous six (6) months) indicates a maximum loan to value ratio of no greater than seventy percent (70.0%) of the appraised As Stabilized Value of the Property;

(iv)    Borrower has paid an extension fee (the "Extension Fee") equal to one eighth of one percent (0.125%) of the amount of the Loan not less than sixty (60) days prior to the Initial Maturity Date or the First Extended Maturity Date, as applicable;

(v)     No Default or Event of Default exists under the Loan Documents;

(vi)    No defaults that are in the process of being cured exist, and those that are being cured are not material or monetary

(vii)   Borrower delivers a certificate to Administrative Agent certifying that all representations and warranties contained in this Agreement are true and correct as of the date of such certification

(viii)  With respect to the second Extension Option, either (i) the Project has achieved the Hurdle DSCR for the last two (2) consecutive quarters, or (ii) the amount of the Loan has been reduced so that the Project achieves the Hurdle DSCR for the last two (2) consecutive calendar quarters; and

(viii)  Borrower has funded all necessary reserves requested by Administrative Agent in Administrative Agent's reasonable discretion.

-32-

CONFIDENTIAL

TIAA049672

(c) Notwithstanding the above provisions of this Section 4.3, in the event that (x) Borrower does not repay the Loan in full on the Initial Maturity Date, and (y) the Maturity Date is not extended pursuant to the provisions of Section 4.3(b) (whether because Borrower did not request the extension or Borrower requested the extension but did not qualify for such extension) then the Extension Fee shall be due and payable from Borrower to Administrative Agent on the Initial Maturity Date.

If Borrower sends written notice of Borrower's election to exercise the Extension Options, pursuant to Section 4.3(b), Administrative Agent shall, no later than the earlier of (i) 20 days after Administrative Agent's receipt of Borrower's election to extend the Loan, or (ii) twenty (20) days prior to the Initial Maturity Date, notify Borrower ("Administrative Agent's Response Notice") whether the conditions set forth in Section 4.3(b), have been satisfied and accordingly the Maturity Date has been extended. If Administrative Agent fails to timely send Administrative Agent's Response Notice but Borrower has not qualified for such extension, then Administrative Agent's Response Notice shall not thereby be deemed to have waived the Extension Fee payable under subparagraph (c) above; provided, however that in such circumstance, if Borrower repays the Loan in full on or before the later of (x) the Initial Maturity Date and (y) thirty (30) days after receipt of Administrative Agent's Response Notice, then no Extension Fee shall be owed under this subparagraph (c).

**4.4    Prepayments.**

Borrower shall have the right to make prepayments of the Loan in accordance with and subject to the terms of Section 2.9 hereof.

**4.5    Required Principal Payments.**

All principal shall be paid on or before the Maturity Date.

**4.6    Termination of Unfunded Commitment.**

Upon the repayment in full of the outstanding principal balance of the Loan, Administrative Agent's and the Lenders' obligation to fund the Unfunded Commitment shall thereupon terminate and Administrative Agent and the Lenders shall have no further obligation to fund Loan proceeds hereunder.

## Article 5
### INTENTIONALLY OMITTED

## Article 6
### INTENTIONALLY OMITTED

## Article 7
### LOAN EXPENSE AND ADVANCES

-33-

TIAA049673

**7.1    Loan and Administration Expenses.**

Borrower unconditionally agrees to pay all reasonable expenses of the Loan, including all amounts payable pursuant to Sections 7.3 and any and all other fees owing to Administrative Agent pursuant to the Loan Documents, and also including, without limiting the generality of the foregoing, all recording, filing and registration fees and charges, mortgage, intangible or documentary taxes, all insurance premiums, title insurance premiums and other charges of the Title Insurer, printing and photocopying expenses, survey fees and charges, cost of certified copies of instruments, charges of the Title Insurer or other escrowee for administering disbursements, all fees and disbursements of Administrative Agent's Consultant, all appraisal fees, insurance consultant's fees, environmental consultant's fees, reasonable travel related expenses (subject to the following sentence) and all reasonable out of pocket expenses incurred by Administrative Agent in connection with the determination of whether or not Borrower has performed the obligations undertaken by Borrower hereunder or has satisfied any conditions precedent to the obligations of Administrative Agent hereunder, provided, however, that any amounts chargeable for out of pocket costs incurred by Administrative Agent in connection with syndicating the Loan shall not exceed $20,000.00, subject to Section 17.1 hereof.  Borrower agrees to pay all brokerage, finder or similar fees or commissions payable in connection with the transactions contemplated hereby and shall indemnify and hold Administrative Agent harmless against all claims, liabilities. costs and expenses (including attorneys' fees and expenses) incurred in relation to any such claim by broker, finder or similar person alleging to have dealt with Borrower in connection with this transaction.

**7.2    Availability of Advances.**

Borrower shall be entitled to Advances until the Initial Maturity Date (the *Availability Period*).  After the Availability Period, Borrower shall not be entitled to any Advances, including, without limitation, any Advances for the payment of interest.  If, at the end of the Availability Period, funds remain in the Contingency Fund, Borrower shall not be entitled to such funds.

**7.3    Intentionally Omitted.**

**7.4    Intentionally Omitted.**

**7.5    Administrative Agent's Attorneys' Fees and Disbursements.**

Borrower agrees to pay Administrative Agent's reasonable outside counsel attorneys fees and disbursements incurred in connection with the Loan, including (i) the preparation of this Agreement, and the other Loan Documents and the preparation of the closing binders, (ii) the administration of the Loan and (iii) the enforcement of the terms of this Agreement and the other Loan Documents.

**7.6    Time of Payment of Fees and Expenses.**

Borrower shall pay all expenses and fees incurred as of the date of this Agreement upon execution hereof.  At the time of the Opening of the Loan, Administrative Agent may pay from

CONFIDENTIAL

TIAA049674

the proceeds of the initial disbursement of the Loan all Loan expenses and all fees payable to Administrative Agent. Administrative Agent may require the payment of outstanding fees and expenses as a condition to any disbursement of the Loan. Administrative Agent is hereby authorized, without any specific request or direction by Borrower, to the extent not paid by Borrower within ten (10) Business Days after billing by Administrative Agent, to make disbursements from time to time in payment of or to reimburse Administrative Agent for all reasonable Loan expenses and fees (whether or not, at such time, there may be any undisbursed amounts of the Loan allocated in the Budget for the same). Administrative Agent may charge any such disbursement to any applicable Budget Line Item or the Contingency Fund or, if in Administrative Agent's judgment there is no available source of funds in the Budget, may require Borrower to pay excess expenses from Borrower's own funds.

**7.7     Expenses and Advances Secured by Loan Documents.**

Any and all advances or payments made by Administrative Agent under this <u>Article 7</u> from time to time, and any amounts expended by Administrative Agent pursuant to <u>Section 20.1(a)</u>, shall, as and when advanced or incurred, constitute additional indebtedness evidenced by the Note and secured by the Deed of Trust and the other Loan Documents and shall bear interest at the rate then applicable under the Note (including the Default Rate, when applicable).

**7.8     Right of Lender to Make Advances to Cure Borrower's Defaults.**

In the event that Borrower fails to perform any of Borrower's covenants, agreements or obligations contained in this Agreement or any of the other Loan Documents (after the expiration of applicable grace or cure periods set forth in the Loan Documents, except in the event of an emergency or other exigent circumstances), Administrative Agent may (but shall not be required to) perform any of such covenants, agreements and obligations, and any amounts expended by Administrative Agent in so doing shall constitute additional indebtedness evidenced by the Note and secured by the Deed of Trust and the other Loan Documents and shall bear interest at the Default Rate. Administrative Agent may expend any such reasonable amounts even if such advance would result in the balance owing to Administrative Agent exceeding the stated amount of the Note.

**Article 8**
**NON-CONSTRUCTION REQUIREMENTS PRECEDENT**
**TO THE OPENING OF THE LOAN**

**8.1     Non-Construction Conditions Precedent.**

Borrower agrees that Administrative Agent's obligation to fund the Initial Loan Advance and thereafter to make further disbursements of proceeds thereof is conditioned upon Borrower's delivery, performance and satisfaction of the following conditions precedent in form and substance satisfactory to Administrative Agent in its reasonable discretion:

(a) <u>Equity</u>: Borrower's minimum cash equity invested in the Project for costs in the Budget shall be not less than the sum of the Initial Minimum Equity and the accrued monthly installments of the Future Minimum equity, provided, that Borrower's Minimum Equity

-35-

TIAA049675

requirement shall be increased by the amount of any Deficiency Deposit made pursuant to Section 11.1(b). All such equity must be used to pay actual, out of pocket Project Costs contained in the Budget and approved by Administrative Agent with evidence of payment delivered to Administrative Agent prior to the first disbursement of Loan proceeds.

Borrower's Minimum Equity shall be increased as necessary to maintain the Loan In Balance as described in Section 11.1. In the event that Borrower expends more than the Minimum Equity (excluding equity expended as a result of the Loan not being In Balance), the Commitment shall be reduced by such excess equity amount unless Borrower delivers to Administrative Agent a written request for an advance of Loan proceeds to refund such excess equity within sixty (60) days after the expenditure of such amount (provided that such request shall not be required earlier than sixty (60) days after the Loan Opening), and Administrative Agent shall advance such amount so long as (i) all requirements for the disbursement of Loan proceeds pursuant to Article 12 have been satisfied, (ii) Borrower provides Administrative Agent with copies of paid invoices for said expenses in connection with Borrower's draw request, and (iii) said expenses were included within the Budget. Administrative Agent shall not be required to disburse any proceeds to reimburse Borrower for its equity investment. Borrower shall evidence its expenditures of the Minimum Equity from time to time by providing Administrative Agent with copies of paid invoices for said expenses, which must be included within the Budget. In order to qualify as equity, Borrower shall have received the funds as a contribution of capital from its members, and Borrower may not be indebted to its members or any other Person for such contribution of capital.

On or before May 31, 2009, Borrower shall provide Administrative Agent with evidence satisfactory to Administrative Agent that Borrower has invested the Future Minimum Equity in the Project.

(b) Fees and Expenses: Borrower shall have paid all of Administrative Agent's fees and reasonable expenses as required by Article 7 or elsewhere in this Agreement, to the extent due and payable.

(c) Title and Other Documents: Borrower shall have furnished to Administrative Agent the Title Policy together with legible copies of all title exception documents cited in the Title Policy and all other legal documents affecting the Project or the use thereof.

(d) Easements: Borrower shall have furnished to Administrative Agent all easements reasonably required for the construction, maintenance or operation of the Project, and such easements shall be insured by the Title Policy.

(e) Survey: Borrower shall have furnished to Administrative Agent a survey of the Project in form reasonably satisfactory to Administrative Agent. Said survey shall be dated no earlier than ninety (90) days prior to the Loan Opening, shall be made (and certified to have been made) as set forth in Exhibit D attached hereto and made a part hereof. Such survey shall be sufficient to permit issuance of the Title Policy in the form required by this Agreement. Such survey shall include the legal description of the Land.

CONFIDENTIAL

TIAA049676

(f) <u>Insurance Policies</u>:   Borrower shall have furnished to Administrative Agent policies or binders evidencing that insurance coverages are in effect with respect to the Project and Borrower, in accordance with the Insurance Requirements attached hereto as <u>Exhibit E</u> and incorporated herein by reference as if fully set forth herein, for which the premiums have been fully prepaid with endorsements satisfactory to Administrative Agent.   If Borrower furnishes Administrative Agent with binder on the Closing Date, then on or before the date that is thirty (30) days after the Closing Date, Borrower shall provide a copy of the insurance policy(ies) with respect to the Project and Borrower in accordance with <u>Exhibit E</u> (individually or collectively, as the context shall infer, the "<u>Insurance Policy</u>").

(g) <u>No Litigation</u>:   Borrower shall have furnished evidence that no litigation or proceedings shall be pending or threatened which could or might cause a Material Adverse Change with respect to Borrower, Guarantor or the Project.

(h) <u>Loan Documents</u>: Borrower shall have delivered to Administrative Agent executed originals of all Loan Documents.

(i) <u>Attorney Opinions</u>:   Borrower shall have furnished to Administrative Agent an opinion from counsel for Borrower, and Guarantor covering due authorization, execution and delivery and enforceability of the Loan Documents and also containing such other legal opinions as Administrative Agent shall reasonably require.

(j) <u>Appraisal</u>:   Administrative Agent has received an Appraisal satisfactory to Administrative Agent in all respects.

(k) <u>Searches</u>:   Borrower shall have furnished to Administrative Agent current bankruptcy, federal tax lien and judgment searches and searches of all Uniform Commercial Code financing statements filed in each place UCC Financing Statements are to be filed hereunder, demonstrating the absence of adverse claims.

(l) <u>Financial Statements. Tax Returns</u>:   Borrower shall have furnished to Administrative Agent current annual financial statements, balance sheets, income statements, cash flow statements and contingent liability statements of Borrower and Guarantor, in form and substance and certified by such individual acceptable to Administrative Agent in its reasonable discretion.   Borrower shall have furnished to Administrative Agent Guarantor's federal and state tax returns for the past two (2) years and, to the extent requested by Administrative Agent, Borrower shall have signed and delivered to Administrative Agent an Internal Revenue Service Tax Return Verification Form (IRS Form 4506-T).   Borrower and Guarantor shall provide such other additional financial information as Administrative Agent reasonably requires, including a certificate in the form of Exhibit N attached hereto from Ronald J. Cohen and Ronald Cohen Management Company certifying to their compliance in the aggregate with the Minimum Net Worth Requirement and the Minimum Liquidity Requirement (including current financial statements from both parties and supporting bank or brokerage statements sufficient to confirm satisfaction thereof).

(m) Borrower and Guarantor shall provide such other additional financial information as Administrative Agent reasonably requires, including a certificate from Guarantor certifying

-37-

TIAA049677

to Guarantor's compliance with the Minimum Net Worth Requirement and the Minimum Liquidity Requirement.

(n) Intentionally Omitted:

(o) Other Agreements:   Borrower shall have delivered to Administrative Agent executed copies of any management, marketing, brokerage and development agreements entered into by Borrower in connection with the Construction and/or the leasing of Units (or other Project components), each of which Administrative Agent shall have approved in Administrative Agent's reasonable discretion.

(p) Flood Hazard:  Administrative Agent has received evidence that the Project is not located in an area designated by the Secretary of Housing and Urban Development as a special flood hazard area, or flood hazard insurance acceptable to Administrative Agent in its reasonable discretion.

(q) Zoning:  If the Title Policy does not include a zoning endorsement, Borrower shall have furnished to Agent a legal opinion as to compliance of the Project with zoning and similar laws.  Borrower shall also provide a zoning compliance letter from the applicable governmental authority.

(r)  Utilities:  Borrower shall have furnished to Agent (by way of utility letters or otherwise) evidence establishing to the satisfaction of Lender that the Project when constructed will have adequate water supply, storm and sanitary sewerage facilities, telephone, gas, electricity, fire and police protection, means of ingress and egress to and from the Project and public highways and any other required public utilities and that the Project is benefited by insured easements as may be required for any of the foregoing;

(s) Pro-Forma Projection:  Borrower shall have furnished to Agent the Pro-Forma Projection;

(t) Organizational Documents:  Borrower shall have furnished to Administrative Agent proof satisfactory to Administrative Agent of authority, formation, organization and good standing in the state of its incorporation or formation and, if applicable, qualification as a foreign entity in good standing in the state of its incorporation or formation, of all corporate, partnership, trust and limited liability company entities (including Borrower and Guarantor) executing any Loan Documents, as well as each member of Borrower, whether in their own name or on behalf of another entity.  Borrower shall also provide an organizational chart as well as certified resolutions in form and content satisfactory to Administrative Agent, authorizing execution, delivery and performance of the Loan Documents, and such other documentation as Administrative Agent may reasonably require to evidence the authority of the persons executing the Loan Documents.

(u) No Default:  There shall be no uncured Event of Default by Borrower hereunder nor any event, circumstance or condition which with notice or passage of time or both would be an Event of Default.

-38-

CONFIDENTIAL

TIAA049678

(v) LIBOR Cap Fee: Borrower shall have paid to Administrative Agent a fee, which fee shall be calculated by Administrative Agent in its sole discretion, taking into account the current pricing of interest rate caps and other costs incurred by Administrative Agent.

(w) Additional Documents: Borrower shall have furnished to Administrative Agent such other materials, documents, papers or requirements regarding the Project, Borrower or Guarantor as Administrative Agent shall reasonably request.

### Article 9
### CONSTRUCTION REQUIREMENTS PRECEDENT

9.1    **Required Construction Documents.**

Borrower shall cause to be furnished to Administrative Agent and to Administrative Agent's Consultant the following, in form and substance reasonably satisfactory to Administrative Agent in all respects, for Administrative Agent's approval prior to the disbursement of any Loan proceeds as a condition precedent thereto:

(a) Fully executed copies of the following, each satisfactory to Administrative Agent in all respects: (i) the General Contract with the General Contractor and (ii) the Major Subcontracts. The General Contract must be a fixed price or guaranteed maximum price contract. The General Contractor must be acceptable to Administrative Agent and the Construction Consultant, in Administrative Agent's reasonable discretion, based on Administrative Agent's evaluation of the General Contractor's experience and financial strength. The General Contractor may not be replaced without Administrative Agent's prior written consent, which shall not be unreasonably withheld or delayed. Any General Contractor's fees and costs for general conditions must be approved by Administrative Agent in its reasonable discretion. The contractor's fee shall be disbursed on a pro rata basis according to the percentage of trade construction completed;

(b) Delivery of payment and performance bonds for all Major Subcontracts in form and substance reasonably satisfactory to Administrative Agent (including co-obligee riders naming Administrative Agent as co-obligee);

(c) All contracts with architects, engineers and other design professionals or consultants (all of the foregoing, collectively, the "Design Professionals") shall be satisfactory to Administrative Agent in all respects. No Design Professional may be replaced without Administrative Agent's prior written consent, which consent shall not be unreasonably withheld or delayed;

(d) A schedule of values, including a trade payment breakdown, setting forth a description of all contracts let by Borrower and/or the General Contractor for the design, engineering, construction and equipping of the Improvements;

(e) An initial sworn statement of the General Contractor, approved by Borrower, and Administrative Agent covering all work done and to be done, together with lien waivers

-39-

TIAA049679

covering all work and materials for which payments have been made by Borrower prior to the Loan Opening;

(f) Copies of each of the Required Permits, except for those Required Permits which cannot be issued until a later stage or completion of Construction, in which event such Required Permits will be obtained by Borrower on a timely basis in accordance with all recorded maps and conditions, and applicable building, land use, zoning and environmental codes, statutes and regulations and will be delivered to Administrative Agent promptly thereafter.;

(g) Borrower shall submit to Administrative Agent and Administrative Agent's Construction Consultant 90% Plans and Specifications and construction drawings prepared by the Architect, which Plans and Specifications and construction drawings must be approved by the Construction Consultant no later than the Closing Date.

(h) Borrower shall submit to Administrative Agent and Administrative Agent's Construction Consultant final Plans and Specifications and construction drawings prepared by the Architect, which Plans and Specifications and construction drawings must be approved by the Construction Consultant no later than April 15, 2008.

Without limiting the foregoing, such plans and specifications must be predicated on, among other things, floor layouts and elevations substantially similar to those which have been previously submitted to Administrative Agent. Administrative Agent must also be satisfied, in its reasonable discretion, that the mechanical, electrical, plumbing, fire protection and life safety, structural and site plans are sufficient for the Project. Upon Administrative Agent's written approval, the Plans and Specifications shall be the "Approved Plans and Specifications". Other than Change Orders permitted pursuant to the terms of this Agreement, no changes to the Approved Plans and Specifications shall be permitted without Administrative Agent's prior written approval (which approval shall be subject to the Construction Consultant's approval), which shall not be unreasonably withheld or delayed. In addition to furnishing Administrative Agent with Plans and Specifications for the base building, Borrower has furnished to Administrative Agent and Administrative Agent's Consultant, for Administrative Agent's approval, detailed plans and specifications setting forth Finish Standards ("Proposed Finish Standards") for the individual Units. Administrative Agent must be satisfied, in its reasonable discretion, that the quality level of the Proposed Finish Standards is comparable to other residential developments in the same price range and located in the same area. "Finish Standards" shall refer to the detailed description and quality level of materials used for each Unit and of all fixtures and personal property that will be included in the standard of price of the individual Units. The Finish Standards shall pertain to items that include, without limitation, floor coverings, wall coverings, electrical systems, lighting plans, bathroom and kitchen fixtures and countertops, cabinetry and appliances. Upon Administrative Agent's. written approval, the Proposed Finish Standards shall be the "Approved Finish Standards". No material changes to the Approved Finish Standards shall be permitted without the prior written approval by Administrative Agent, which approval shall be granted or withheld in Administrative Agent's reasonable discretion, provided that such approval shall not be required for changes that result in finishes to Units of the same or better quality (but Borrower must in all events comply with Section 15.1(c) of this Agreement).

-40-

TIAA049680

Borrower shall finish all Units to the Approved Finish Standards as part of the Construction required hereunder;

    (i) The Construction Schedule;

    (j) The Soil Report;

    (k) The Environmental Report.  The Environmental Report shall, at a minimum, (A) demonstrate the absence of any existing or potential Hazardous Material contamination or violations of environmental Laws at the Project, except as acceptable to Administrative Agent in its sole and absolute discretion, (B) include the results of all sampling or monitoring to confirm the extent of existing or potential Hazardous Material contamination at the Project, including the results of leak detection tests for each underground storage tank located at the Project, if any, (C) describe response actions appropriate to remedy any existing or potential Hazardous Material contamination, and report the estimated cost of any such appropriate response, (D) confirm that any prior removal of Hazardous Material or underground storage tanks from the Project was completed in accordance with applicable Laws, and (E) confirm whether or not the Land is located in a wetlands district.  Borrower shall also have caused to be furnished to Administrative Agent any environmental disclosure statement required pursuant to the law of the District;

    (l) A report from Administrative Agent's Consultant which contains an analysis of the Plans and Specifications, the Budget, the Construction Schedule, the General Contract, all subcontracts then existing, the Soil Report and all other documents or items deemed necessary by Administrative Agent or the Construction Consultant. Such report shall be solely for the benefit of Administrative Agent and shall contain (i) an analysis satisfactory to Administrative Agent, in Administrative Agent's reasonable discretion, demonstrating the adequacy of the Budget to complete the Project and (ii) a confirmation that the Construction Schedule is realistic.  Administrative Agent's Consultant shall monitor construction of the Project and shall visit the Project at least one (1) time each month, and shall certify as to amounts of construction costs for all requested fundings, the percentage of completion of the Construction, the adequacy of the remaining balance of the Loan to complete the Project, and the quality of the workmanship of the Construction; each report of Administrative Agent's Consultant is for the sole benefit of Administrative Agent and Administrative Agent shall not be bound by any recommendation or conclusion of Administrative Agent's Consultant;

    (m) A Budget in form and substance approved by Administrative Agent;

    (n) Certification from an engineer or other professional reasonably acceptable to Administrative Agent in a form acceptable to Administrative Agent in its reasonable discretion confirming that any wetlands located on the Land will not preclude the development of the Project; and

    (o) With respect to the disbursement of any Loan proceeds for Hard Costs for payment to any subcontractor listed in Schedule 9.1(n), Borrower shall have delivered Bonds (as defined in Exhibit E) to Administrative Agent in form and substance reasonably satisfactory to Administrative Agent from such subcontractor.  In addition, failure of Borrower to deliver

-41-

TIAA049681

Bonds in form and substance reasonably satisfactory to Administrative Agent from all subcontractors listed in Schedule 9.1(n) within ninety (90) days after the Closing Date shall be an Event of Default hereunder.

(p) No later than July 15, 2008, evidence that trade contracts, the aggregate value of which at least fifty percent (50%) of the total Hard Costs of the Project, have been executed and bonded.

(q) Such other papers, materials and documents as Administrative Agent may reasonably require with respect to the Construction.

## Article 10
## BUDGET AND CONTINGENCY FUND

### 10.1   Budget.

Disbursement of the Loan shall be governed by the Budget for the Project, in form and substance acceptable to Administrative Agent in Administrative Agent's reasonable discretion. Borrower shall only be entitled to disbursements which are in accordance with the Budget. The Budget shall specify the amount of cash equity invested in the Project, and all costs and expenses of every kind and nature whatever to be incurred by Borrower in connection with the Project, including, but not limited to, Hard Costs and Soft Costs. The Budget shall include, in addition to the Budget Line Items described in Section 10.2 below, the Contingency Fund described in Section 10.3 below, and amounts satisfactory to Administrative Agent for Hard Costs, Soft Costs and other reserves acceptable to Administrative Agent in Administrative Agent's reasonable discretion. The Budget shall not include any Budget Line Items payable to Borrower, Guarantor or an Affiliate of Borrower or Guarantor (other than any payment to the General Contractor or payment of the Development Fee to Developer). The initial Budget is attached hereto as Exhibit G and made a part hereof. All changes to the Budget shall in all respects be subject to the prior written approval of Administrative Agent.

### 10.2   Budget Line Items.

The Budget shall include as line items ("Budget Line Items"), to the extent determined to be applicable by Administrative Agent in its reasonable discretion, the cost of all labor, materials, equipment, fixtures and furnishings needed for the completion of the Construction, and all other costs, fees and expenses relating in any way whatsoever to the Construction of the Improvements, marketing and sales costs, commissions, operating deficits, real estate taxes, and all other sums due in connection with Construction and operation of the Project, the Loan, and this Agreement. Each line item in the trade breakdown of the General Contract shall be considered a separate Budget Line Item for all purposes of this Agreement whether or not separately shown as Budget Line Items on the Budget attached hereto. Borrower agrees that all Loan proceeds disbursed by Administrative Agent shall be used only for the Budget Line Items for which such proceeds were disbursed, except as reallocated in accordance with this Agreement or otherwise permitted by Administrative Agent in its reasonable discretion.

CONFIDENTIAL

TIAA049682

Upon Administrative Agent's reasonable approval, Borrower shall have the right to reallocate cost savings from a Budget Line Item that has been completed to another Budget Line Item, which cost savings have been effected by final Change Order or other appropriate final documentation to other Budget Line Items; provided that cost savings from a Hard Cost Budget Line Item may only be moved to another Hard Cost Budget Line Item, and cost savings from a Soft Cost Budget Line Item may only be moved to another Soft Cost Budget Line Item.

Except as reallocated in accordance with this Agreement or otherwise permitted by Administrative Agent in its reasonable discretion, Administrative Agent shall not be obligated to disburse any amount for any category of costs set forth as a Budget Line Item which is greater than the amount set forth for such category in the applicable Budget Line Item. Borrower shall pay as they become due all amounts set forth in the Budget with respect to costs to be paid for by Borrower.

**10.3   Contingency Fund.**

The initial amount of the Contingency Fund in the Budget shall not be less than five percent (5%) of Hard Costs (not including any contingency provided for in any Subcontract or any development fees) and five percent (5%) of Soft Costs (not including any contingency provided for in any Subcontract, and not including any development fee or any costs incurred in connection with obtaining the Loan).

In determining whether the Project Loan is In Balance, the Contingency Fund shall not be deemed available to pay any cost except to the extent a portion of the Contingency Fund has been reallocated for payment of such cost in accordance with this Agreement or otherwise permitted by Administrative Agent in its reasonable discretion. Borrower agrees the decision with respect to utilizing portions of the Contingency Fund in order to keep the Project Loan In Balance shall be made by Administrative Agent in its sole discretion, and that Administrative Agent may require Borrower to make a Deficiency Deposit even if funds remain in the Contingency Fund.

**10.4   Optional Method for Payment of Interest.**

For Borrower's benefit, the Budget includes a Budget Line Item for interest on the Loan. Borrower hereby authorizes Administrative Agent from time to time, for the mutual convenience of Administrative Agent and Borrower, to disburse Loan proceeds to pay all the then accrued interest on the Note, regardless of whether Borrower shall have specifically requested a disbursement of such amount. Any such disbursement, if made, shall be added to the outstanding principal balance of the Note and shall, when disbursed, bear interest pursuant to the Note. So long as no Event of Default then exists and to the extent that sufficient funds are available as reflected in the Budget Line Item for interest, Administrative Agent shall make disbursements of the Loan for interest payments.

CONFIDENTIAL

T!AA049683

## Article 11
## SUFFICIENCY OF LOAN

11.1    **Loan In Balance.**

(a) The Loan is required to be In Balance at all times.  The Loan shall be "In Balance" only when the Available Sources of Funds equal or exceed Administrative Agent's Estimate of Remaining Costs, all as determined by Administrative Agent and the Construction Consultant from time to time in its reasonable discretion in accordance with the provisions of this Article 11.  Any cost savings in the Budget shall not be advanced to Borrower, provided, that Borrower shall have the right to reallocate cost savings in accordance with Section 10.2. Administrative Agent and Borrower shall meet the last Business Day of the month following the Closing Date, and every quarter thereafter ("Budget Meetings"), to evaluate the status of the projected Project Costs as compared to the Project Costs set forth in the Budget and for Administrative Agent to determine whether the Loan is "In Balance".  The determination by Administrative Agent at any Budget Meeting that the Loan is In Balance shall not preclude Administrative Agent from determining at a later time that the Loan is materially not In Balance.   Borrower will provide Administrative Agent with evidence that the Loan is In Balance with each Draw Request. Administrative Agent shall not be obligated to make any disbursements unless the Loan is In Balance.

(b) Borrower agrees that if either Administrative Agent or the Construction Consultant determines in its reasonable discretion that the Loan is not In Balance, regardless of how such condition may have been caused, Borrower shall, subject to the provisions of Section 10.3, within ten (10) Business Days after written request by Administrative Agent (and in any event prior to any further disbursement of the Loan) deposit the deficiency with Administrative Agent ("Deficiency Deposit"). The Deficiency Deposit shall be first exhausted for costs of the Project before any further disbursements of the Loan shall be made. Disbursement of a Deficiency Deposit shall be subject to the same conditions precedent and the same requirements as apply to a disbursement of the Loan pursuant to this Agreement.  If a Deficiency Deposit is not to be immediately expended, Administrative Agent shall deposit the Deficiency Deposit in a non-interest bearing account. Borrower pledges to Administrative Agent any Deficiency Deposit as security for the Loan.

(c) "Administrative Agent's Estimate of Remaining Costs" shall mean the amount which Administrative Agent estimates in its reasonable discretion is necessary to pay for all Hard Costs and Soft Costs of the Project which have not yet been paid, including, without limitation, the following:  (i) all costs of the Construction in accordance with the Construction Schedule; (ii) amounts to be paid as retainages to persons who have supplied labor or materials to the Project, (iii) all costs required to complete the lien free construction of the Project in accordance with the Approved Plans and Specifications, the Budget, and the Construction Schedule; (iv) marketing costs; (v) the amount required to pay interest on the Loan through the Maturity Date; (vi) all expenses payable or reimbursable to Administrative Agent under the terms of this Agreement; (vii) all real estate taxes, insurance premiums and operating costs of the Project; and (viii) all other amounts of any type or nature incurred or expected to be incurred in connection with the acquisition, Construction, marketing and sale of

-44-

TIAA049684

the Project or in order for Borrower to comply with the Loan Documents or the requirements of any Governmental Authority.

(d) In determining Administrative Agent's Estimate of Remaining Costs, Administrative Agent shall be entitled to take into account all conditions, facts and circumstances related to the Project or the Loan then existing, and all other considerations which Administrative Agent, in its reasonable discretion, determines are relevant to, or reasonable likely to have an impact upon, any of the amounts included in Administrative Agent's Estimate of Remaining Costs. By way of example and not limitation, Administrative Agent shall have the right, in making Administrative Agent's Estimate of Remaining Costs, to consider in such manner and to such extent as Administrative Agent determines is appropriate in its reasonable discretion: (i) all existing and proposed modifications to the Construction Schedule (whether or not Administrative Agent has the right to approve the same), whether the same are proposed by Borrower or by a contractor, (ii) all existing construction contracts and purchase orders or, in those instances where construction contracts or purchase orders have not yet been let, written bids from responsible contractors, tradesmen and material suppliers acceptable to Administrative Agent in its reasonable discretion, or Administrative Agent's estimate of such costs, (iii) all Change Orders and pending or anticipated Change Orders (whether or not Administrative Agent has the right to approve the same), (iv) all claims by any contractors or suppliers for increased or additional amounts and (v) the effect of actual or anticipated delays, whether or not permitted by the terms of this Agreement.

## Article 12
## CONSTRUCTION-PAYOUT REQUIREMENTS

### 12.1   Applicability of Sections.

The provisions contained in this Article 12 shall apply to the Opening of the Loan and to all disbursements of proceeds during Construction.

### 12.2   Advances; Method of Disbursement of Loan Proceeds.

The Budget shall separately reflect, by category and line items, the purposes and the amounts for which funds to be advanced by the Lenders under this Agreement are to be used. The Lenders shall not be required to disburse for any category or line item of Hard Costs or Soft Costs any amount in excess of the amount specified therefor in the Budget, subject to reallocations as set forth in Section 10.2 hereof and any reallocations approved by the Administrative Agent in its sole discretion. Any such fees or payments to be made pursuant to any agreement (certified true, accurate and complete copies of such agreements shall promptly be delivered to the Administrative Agent upon execution) shall only be disbursed hereunder at such times provided under and otherwise in accordance with said agreement. No Lender shall be obligated to fund, either in the aggregate or in respect of any Advance, amounts in excess of its Ratable Share of the Loan Amount as set forth on Exhibit I, but if the Loan Amount is increased or the Administrative Agent makes funds available in excess of the Loan Amount, each Lender shall have the right to elect at its own discretion whether to provide funds to the Administrative Agent to fund amounts in excess of the Loan Amount. Notwithstanding the foregoing and anything herein to the contrary, each Lender shall be obligated to fund its Ratable Share of any

CONFIDENTIAL

TIAA049685

and all Protective Advances in the event such Protective Advances are deemed necessary by the Administrative Agent (in its sole and absolute discretion) to preserve the Lien of the Loan Deed of Trust or the Lien on any other Collateral or the Administrative Agent's or any Lender's rights under any of the Loan Documents. If and to the extent any Lender shall fund amounts in excess of the Loan Amount for any purpose, such Lender's Ratable Share of the Loan shall be adjusted from time to time based on the total amounts advanced by all of Lenders from time to time in respect of the Loan.

**12.3    Monthly Payouts.**

After the Opening of the Loan, further disbursements shall be made during Construction from time to time as the Construction progresses, but no more frequently than once in each calendar month, except to pay interest from the "Interest Reserve" Budget Line Item in accordance with Section 10.4 or as Administrative Agent may otherwise permit in its sole but reasonable discretion. Advances made to General Contractor under the General Contract may not exceed the lesser of: (x) the value of the work performed under the General Contract less the Retainage and (y) the remaining available funds allocated to the Budget Line Item as determined by the Construction Consultant. At Administrative Agent's option, disbursements may be made by Administrative Agent either through a construction escrow or directly to the General Contractor and other applicable payees. If such option is exercised, those Loan proceeds shall be deemed to be disbursed to Borrower from the date of disbursement by Administrative Agent and interest shall accrue on those proceeds from that date.

**12.4    Documents to be Furnished for Each Disbursement.**

As a condition precedent to each disbursement of the Loan proceeds (including the initial disbursement at the Opening of the Loan), Borrower shall furnish or cause to be furnished to Administrative Agent and the Construction Consultant the following documents covering each disbursement, in form and substance reasonably satisfactory to Administrative Agent:

(a) At or before 10:00 A.M. no less than seven (7) Business Days prior to such time the Borrower shall obtain an Advance, a completed draw request in the form attached as Exhibit H hereto and made a part hereof, including a Borrower's Sworn Statement executed by an Authorized Representative and a completed standard AIA Form G702 and Form G703 (or similar forms acceptable to Administrative Agent) signed by the General Contractor and certified by the Architect, together with General Contractor's sworn statements and unconditional waivers of lien, and all subcontractors', material suppliers' and laborers' conditional waivers of lien, covering all work, paid with the proceeds of the prior draw requests, together with such invoices, contracts or other supporting data as Administrative Agent may require, in its reasonable discretion, to evidence that all costs for which disbursement is sought have been incurred. Such Draw Request shall constitute the Borrower's representation and warranty to the Lenders that: (A) all costs for the payment of which the Lenders have previously advanced funds have in fact been paid; (B) all the representations and warranties of each Loan Party contained in the Loan Documents, including those set forth in Article 3, were true, correct and complete in all material respects as of the date of execution of this Agreement, as of the date of any previous Advance and continue to be true and correct in all material respects as of the date of such Draw Request; (C)

-46-

CONFIDENTIAL

TIAA049686

no Default or Event of Default shall have occurred and be continuing hereunder beyond all applicable Default notices and cure periods; and (D) the Borrower continues to be in compliance in all material respects with all of the other terms, covenants and conditions contained in this Agreement and the other Loan Documents beyond all Default notices and cure periods; and (E) any completed construction is substantially in accordance with the Plans and Specifications;

(b) Paid invoices or other evidence satisfactory to Administrative Agent that fixtures and equipment, if any, have been paid for and are free of any lien or security interest therein;

(c) A date down endorsement to the Title Policy issued to Administrative Agent covering the date of disbursement and showing the Deed of Trust as a first, prior and paramount lien on the Project subject only to the Permitted Exceptions and real estate taxes that have accrued but are not yet due and payable and particularly that nothing has intervened to affect the validity or priority of the Deed of Trust. If the Title Policy is subject to a pending disbursement endorsement, the amount of such endorsement must be increased to the full amount funded;

(d) A report from Administrative Agent's Consultant which contains an analysis satisfactory to Administrative Agent demonstrating the adequacy of the Budget to complete the Project, a confirmation that Construction is proceeding in accordance with the Construction Schedule and the Approved Plans and Specifications, and a certification as to amounts of Construction costs for the applicable requested funding, provided, however, that the opinion of the Consultant shall not be binding on Administrative Agent;

(e) Copies of any proposed or executed Change Orders on standard AIA G701 form which have not been previously furnished to Administrative Agent;

(f) Copies of all construction contracts (including subcontracts) which have been executed since the last disbursement;

(g) All Required Permits which have not previously been furnished to Administrative Agent;

(h) If applicable, a written request of the Borrower for any necessary changes in the Plans and Specifications, the Budget, reallocation of Budget Line Items in accordance with Section 10.2 or the Construction Schedule; and

(i) Such other instruments, documents and information as Administrative Agent or the Title Insurer may reasonably request.

## 12.5   Retainages.

At the time of each disbursement of Loan proceeds, ten percent (10%) of the total amount then due to the General Contractor and the various contractors, subcontractors and material suppliers for Hard Costs (excluding the General Contractor's general conditions) shall be withheld from the amount disbursed (the "Retainage"). Upon the satisfactory completion of fifty

CONFIDENTIAL                                                                 TIAA049687

percent (50%) of the work or delivery of materials with respect to any contractor or subcontractor as determined by Administrative Agent in its reasonable discretion, the Retainage shall reduce to five percent (5%) until such contractor or subcontractor is complete. Upon satisfactory completion of all work and delivery of all materials with respect to any contractor or subcontractor, as determined by Administrative Agent in its reasonable discretion, the balance of the Retainage with respect to such contractor or subcontractor shall be disbursed by Administrative Agent. If determined necessary by Administrative Agent, Administrative Agent may amend the Retainage requirements set forth herein on a case by case basis.

**12.6   Stored Materials.**

The Administrative Agent shall not be required to disburse any funds for any materials, machinery or other Personal Property not yet incorporated into the Improvements ("Stored Materials"), unless the Administrative Agent receives satisfactory evidence that: (i) the Stored Materials are components in substantially final form ready for incorporation into the Improvements; (ii) the Stored Materials are stored at the Property, in a bonded warehouse in the District of Columbia, or at such other site as the Administrative Agent shall reasonably approve, and are protected against theft and damage; (iii) the Stored Materials will be paid for in full with the funds to be disbursed, and all Lien rights or claims of the supplier will be released upon full payment; (iv) the Administrative Agent shall have received, or will receive upon payment of such Advance, UCC financing statements, warehouseman's receipts or other evidence satisfactory to the Administrative Agent of the Lenders' first priority security interest in such materials; (v) the Borrower shall provide proof satisfactory to the Administrative Agent that such materials are insured against loss by casualty or theft for their full replacement cost; (vi) the aggregate cost of Stored Materials stored at the Property is certified by the Construction Consultant; and (vii) the cost of Stored Materials not stored at the Property, in the aggregate at any time, is not more than Five Hundred Thousand AND 00/100 DOLLARS ($500,000.00). In the event that the Borrower shall at any time store materials at any one location other than the Property, the cost of which exceeds the maximum amount permitted under clause (vii) above, the Borrower shall pay the excess cost of such materials with its own funds and shall not be entitled to any proceeds from an Advance in respect of such excess until such time as such excess is relocated to the Property. Any costs incurred in connection with additional inspection and review of Stored Materials shall be borne by the Borrower.

**12.7   Intentionally Omitted.**

**12.8   Specific Limitation on Disbursements and Payments to Affiliates.**

No amounts in the Budget shall be disbursed to Borrower, Guarantor or any Affiliate of Borrower or Guarantor (other than any payment to the General Contractor or payment of the Development Fee to Developer) (*Partnership Distributions*). Notwithstanding the foregoing, if the Hurdle DSCR has been met for two (2) consecutive Test Periods, Partnership Distributions shall be permitted, until such time as the Hurdle DSCR is no longer met.

-48-

CONFIDENTIAL                                                                 TIAA049688

**Article 13**
**FINAL DISBURSEMENT FOR CONSTRUCTION**

**13.1    Final Disbursement for Construction.**

Administrative Agent will advance to Borrower the final disbursement for the cost of the Construction (including Retainages not yet disbursed) when the following conditions have been complied with, provided that all other conditions in this Agreement for disbursements have been complied with:

(a) The Construction Consultant has certified that the Improvements have been completed and equipped in accordance with the Approved Plans and Specifications free and clear of materialmen's liens and security interests and are ready for occupancy;

(b) a temporary certificate of occupancy has been issued by the applicable Governmental Authority;

(c) All Units subject or intended to be subject to a retail Lease are completed in either "white box" condition, or according to the specifications of the applicable Lease for such Unit;

(d) Borrower shall have furnished to Administrative Agent evidence that no Liens have been field against the Project;

(e) copies of all final waivers of lien and sworn statements from contractors, subcontractors and material suppliers and an affidavit from the General Contractor and all Major Subcontractors in accordance with the mechanic's lien law of the District (other than for matters which have been bonded by Borrower);

(f) Intentionally Omitted;

(g) There are no defaults or Events of Default under this Agreement or any other Loan Document;

(h) Borrower shall have furnished an "as-built" survey covering the completed Improvements in compliance with Section 8.1(e);

(i) All fixtures, furnishings, furniture, equipment and other property required for the operation of the Project shall have been installed free and clear of all liens and security interests, except in favor of Administrative Agent (other than for matters which have been bonded by Borrower;

(j) Borrower shall have furnished to Administrative Agent a certificate from the Architect or other evidence satisfactory to Administrative Agent in Administrative Agent's reasonable discretion dated at or about the Completion Date stating that (i) the Improvements have been completed substantially in accordance with the Approved Plans and Specifications, and (ii) the Improvements as so completed comply with all applicable Laws;

-49-

CONFIDENTIAL

TIAA049689

(k) A final date down endorsement to the Title Policy issued to Administrative Agent covering the date of disbursement and showing the Deed of Trust as a first, prior and paramount lien on the Project subject only to the Permitted Exceptions and real estate taxes that have accrued but are not yet due and payable and particularly that nothing has intervened to affect the validity or priority of the Deed of Trust.

## Article 14
## INTENTIONALLY OMITTED

## Article 15
## COVENANTS

**15.1   Borrower covenants and agrees as follows:**

(a)  Intentionally Omitted

(b)  Construction of Improvements.  The Improvements shall be constructed and fully equipped in a good and workmanlike manner with materials of high quality, substantially in accordance with the Approved Plans and Specifications (or in accordance with any changes therein that may be approved in writing by Administrative Agent or as to which Administrative Agent's approval is not required), and such construction and equipping will be commenced on or before the Construction Commencement Date and prosecuted with due diligence and continuity in accordance with the Construction Schedule and fully completed not later than the Completion Date.  The Completion Date shall be extended in writing by Administrative Agent by the number of days resulting from any Unavoidable Delay in the construction of the Project, (but under no circumstances shall Administrative Agent be obligated to extend the Completion Date by more than sixty (60) days, provided that Administrative Agent shall not be obligated to grant any such extension unless (a) Borrower gives prompt notice of the event resulting in such delay to Administrative Agent, and (b) after giving effect to the consequences of such delay, the Loan shall remain "In Balance" and, and provided further that no such extension of the Completion Date shall invalidate the General Contract or any Major Subcontract.  No such extension of the Completion Date shall be deemed to extend the Maturity Date.

(c)  Change Orders.  No Change Orders will be made without the prior written approval of Administrative Agent and its Construction Consultant; provided, however, that Borrower may make changes to the Approved Plans and Specifications or otherwise agree to Change Orders if (i) Borrower notifies Administrative Agent and the Construction Consultant in writing of such change prior to the next disbursement of Loan Proceeds; (ii) Borrower obtains the approval of all parties whose approval is legally required, including any sureties, and any Governmental Authority to the extent approval from such parties is required; (iii) the structural integrity of the Improvements is not impaired; (iv) no material change in architectural appearance is effected; (v) the performance of the mechanical, electrical, and life safety systems of the Improvements is not negatively affected; (vi) the quality, functionality or marketability of the Project as described in the Approved Plans is not adversely affected; (vii) the cost of, or reduction in cost resulting from any one such change does not exceed $100,000.00 or exceed $300,000.00 in the aggregate for one or more changes, provided that

-50-

TIAA049690

such change does not result in a net increase in the amount of the Budget, and (viii) such change will not cause the Loan to cease to be "In Balance" (after giving effect to any reallocation of the Contingency Fund or of other Budget Line Items which Borrower has qualified for pursuant to Article 10). Changes in the scope of construction work or to any construction related contract must be documented with a change order on the AIA Form G 701 or equivalent form. If an approved Change Order reduces the cost of a Budget Line Item and such Budget Line Item is then complete, such cost savings may be moved to another Budget Line Item; provided that cost savings from a Hard Cost Budget Line Item may only be moved to another Hard Cost Budget Line Item, and cost savings from a Soft Cost Budget Line Item may only be moved to another Soft Cost Budget Line Item.

(d) Inspection by Administrative Agent. Borrower will cooperate with Administrative Agent in arranging for inspections by representatives of Administrative Agent of the progress of the Construction from time to time including an examination of (i) the Improvements, (ii) all materials to be used in the Construction, (iii) all plans and shop drawings which are or may be kept at the construction site, (iv) any contracts, bills of sale, statements, receipts or vouchers in connection with the Improvements, (v) all work done, labor performed, materials furnished in and about the Improvements, (vi) all books, contracts and records with respect to the Improvements, and (vii) any other documents relating to the Improvements or the Construction. Borrower shall cooperate with Administrative Agent's Consultant to enable him to perform his functions hereunder and will, subject to Architect's concurrence, promptly comply with Administrative Agent's requirements and correct any defect regarding the Construction of the Improvements or the progress thereof.

(e) Materialmen's Liens and Contest Thereof. Borrower will not suffer or permit any materialmen's lien claims to be filed or otherwise asserted against the Project or any funds due to the General Contractor, and will promptly discharge the same in case of the filing of any claims for lien or proceedings for the enforcement thereof, provided, however, that Borrower shall have the right to contest in good faith by appropriate legal proceeding and with reasonable diligence the validity of any such lien or claim provided that Borrower either (i) posts a statutory lien bond in form and substance required by such legal proceeding, if any, which removes such lien from title to the Project or (ii) deposits with Administrative Agent, in cash, an amount equal to the lien plus any interest and penalties which in Administrative Agent's reasonable judgment may accrue thereon during such contest, within thirty (30) days of Borrower's knowledge of the existence of the lien, the choice of option (i) or (ii) being at Borrower's election. Administrative Agent will not be required to make any further disbursements of the proceeds of the Loan until any materialmen's lien claims have been removed or bonded and Administrative Agent may to the extent a statutory lien bond has not been obtained, in form and substance reasonably acceptable to Administrative Agent, at its option, restrict disbursements to reserve sufficient sums to pay 125% of the face amount of the lien.

(f) Settlement of Materialmen's Lien Claims. If Borrower shall fail promptly either (i) to discharge any such lien, or (ii) post a statutory lien bond in the manner provided in Section 15.1(e), Administrative Agent may, at its election (but shall not be required to), procure the release and discharge of any such claim and any judgment or decree thereon and, further, may

-51-

in its sole discretion effect any settlement or compromise of the same, or may furnish such security or indemnity to the Title Insurer, and any amounts so expended by Administrative Agent, including premiums paid or security furnished in connection with the issuance of any surety company bonds, shall be deemed to constitute disbursement of the proceeds of the Loan hereunder. In settling, compromising or discharging any claims for lien, Administrative Agent shall not be required to inquire into the validity or amount of any such claim.

(g) Renewal of Insurance. Borrower shall cause insurance policies to be maintained in compliance with Exhibit E. or such other insurance requirements as may be reasonably approved by Administrative Agent, at all times. Borrower shall timely pay all premiums on all insurance policies required hereunder, and as and when additional insurance is required, from time to time, during the progress of Construction, and as and when any policies of insurance may expire, furnish to Administrative Agent, premiums prepaid, additional and renewal insurance policies with companies, coverage and in amounts reasonably satisfactory to Administrative Agent in accordance with Section 8.1(f).

(h) Payment of Taxes. Borrower shall pay all real estate taxes and assessments and charges of every kind upon the Project before the same become delinquent. Borrower may use Loan proceeds for such purpose to the extent available in the Budget for such purpose upon meeting all conditions precedent to this Agreement to any such disbursement. Borrower shall have the right to pay such tax under protest or to otherwise contest any such tax or assessment, but only if (i) such contest has the effect of preventing the collection of such taxes so contested and also of preventing the sale or forfeiture of the Project or any part thereof or any interest therein, (ii) Borrower has notified Administrative Agent of Borrower's intent to contest such taxes, and (iii) Borrower has deposited security in form and amount reasonably satisfactory to Administrative Agent, in its sole discretion, and has increased the amount of such security so deposited promptly after Administrative Agent's request therefor. If Borrower fails to commence such contest or, having commenced to contest the same, and having deposited such security required by Administrative Agent for its full amount, shall thereafter fail to prosecute such contest in good faith or with due diligence, or, upon adverse conclusion of any such contest, shall fail to pay such tax, assessment or charge, Administrative Agent may, at its election (but shall not be required to), pay and discharge any such tax, assessment or charge, and any interest or penalty thereon, and any amounts so expended by Administrative Agent shall be deemed to constitute disbursements of the Loan proceeds hereunder (even if the total amount of disbursements would exceed the face amount of the Note). Borrower shall furnish to Administrative Agent evidence that taxes are paid at least five (5) days prior to the last date for payment of such taxes and before imposition of any penalty or accrual of interest.

(i) Tax Escrow Accounts. After the earlier to occur of (i) an Event of Default or (ii) the Budget Line Item for real estate taxes having been exhausted, Borrower shall make monthly tax escrow deposits in the amount of one-twelfth (1/12) of one hundred ten percent (110%) of the annual real estate taxes as reasonably estimated by Administrative Agent, such deposit to be held in an interest bearing escrow account held by Administrative Agent in Administrative Agent's name and under its sole dominion and control. If at any time Administrative Agent determines in its reasonable discretion that the amount of the monthly

CONFIDENTIAL

TIAA049692

escrow payments made pursuant to this Section 15.1(i) are not sufficient to pay in full the next installment of real estate taxes then due, then upon written notice from Administrative Agent of the amount of any expected deficiency, Borrower shall then deposit funds equal to such amount with Administrative Agent.  All payments deposited in the escrow account, and all interest accruing thereon, are pledged as additional collateral for the Loan. Notwithstanding Administrative Agent's holding of the escrow account, nothing herein shall obligate Administrative Agent to pay any real property taxes with respect to any portion of the Project at any time an Event of Default exists.  If no Event of Default exists, Administrative Agent shall make available to Borrower such funds, and any and all interest accruing thereon, as may be deposited in the escrow account from time to time for Borrower's payment of real property taxes due with respect to the Project.

(j) _Personal Property._  All of Borrower's personal property, fixtures, attachments and equipment delivered upon, attached to or used in connection with the Construction or the operation of the Project shall always be located at the Project and shall be kept free and clear of all liens, encumbrances and security interests, other than as otherwise permitted under the Loan Documents.

(k) _Leases_.  Without the prior written consent of Agent (not to be unreasonably withheld or delayed), Borrower and Borrower's agents shall not (i) enter into any Leases, (ii) modify or amend any material Lease, (iii) terminate any material Lease or (iv) accept any rental payment more than one month in advance of its due date.  Notwithstanding the foregoing, Borrower may, without Agent's prior written consent, enter into any Lease without Agent's consent so long as the following conditions are satisfied: (x) such Lease is a residential Lease with a term not to exceed one (1) year, (y) such Lease is substantially on a standard form of lease approved by Agent and (z) such Lease is at net rental rates at or above the approved rentals set forth in the Pro Forma Projection (factoring in any abatements or concessions).  At Agent's request, Borrower shall deposit all security deposits with Agent.

(l) _Defaults Under Leases._  Borrower will not suffer or permit any breach or default to occur in any of Borrower's obligations under any of the Leases nor suffer or permit the same to terminate by reason of any failure of Borrower to meet any requirement of any Lease including those with respect to any time limitation within which any of Borrower's work is to be done or the space is to be available for occupancy by the lessee.  Borrower shall notify Agent promptly in writing in the event a non-residential Tenant commits a material default under a Lease.

(m) _Administrative Agent's Attorneys' Fees for Enforcement of Agreement_.  In case of any Event of Default hereunder, Borrower (in addition to Administrative Agent's reasonable attorneys' fees, if any, to be paid pursuant to Section 7.5) will pay Administrative Agent's reasonable attorneys' and paralegal fees (including, without limitation, any reasonable attorney and paralegal fees and costs incurred in connection with any litigation or bankruptcy or administrative hearing and any appeals therefrom and any post-judgment enforcement action including, without limitation, supplementary proceedings) in connection with the enforcement of this Agreement; without limiting the generality of the foregoing, if at any time or times hereafter Administrative Agent employs counsel (whether or not any suit has been or shall be filed and whether or not other legal proceedings have been or shall be instituted) for

CONFIDENTIAL

TIAA049693

advice or other representation with respect to the Project, this Agreement, or any of the other Loan Documents, or to protect, collect, lease, sell, take possession of, or liquidate any of the Project, or to attempt to enforce any security interest or lien in any portion of the Project, or to enforce any rights of Administrative Agent or Borrower's obligations hereunder, then in any of such events all of the reasonable attorneys' fees arising from such services, and any reasonable out-of-pocket expenses, actual costs and charges relating thereto (including fees and costs of paralegals), shall constitute an additional liability owing by Borrower to Administrative Agent, payable within ten (10) Business Days after written demand for payment.

(n) Appraisals. Administrative Agent shall have the right to obtain a new or updated Appraisal of the Project from time to time, but not more frequently than one (1) time per every twelve (12) months or after an Event of Default. Borrower shall cooperate with Administrative Agent in this regard. Borrower shall pay the reasonable costs for any such Appraisal upon Administrative Agent's request.

(o) Financial Statements. Borrower shall deliver or cause to be delivered to Administrative Agent audited annual financial statements with respect to Borrower and an annual budget within ninety (90) days after the end of each fiscal year of Borrower. Borrower shall deliver or cause Guarantor to deliver to Administrative Agent annual financial statements with respect to Guarantor, including a detailed balance sheet, an income statement, an annual cash flow statement, and a contingent liability statement, within ninety (90) days after the end of each fiscal year of Guarantor. All such financial statements shall be in a format approved in writing by Administrative Agent in Administrative Agent's reasonable discretion, prepared by a certified public accountant reasonably acceptable to Administrative Agent, and in the case of Borrower, in accordance with GAAP, and in a format acceptable to Administrative Agent. All such financial statements shall include verifications, supporting schedules or additional statements necessary to substantiate the information contained in such financial statements. Each financial statement shall be certified as true, complete and correct by its preparer. Borrower shall deliver to Administrative Agent Borrower's and Guarantor's federal tax returns within one hundred eighty (180) days of filing any such returns (except that if the date on which such returns may be filed is extended, then Borrower shall provide Administrative Agent with a copy of the extension request and shall furnish such tax returns to Administrative Agent within ten (10) Business Days of the date such returns are filed). Until the Units are ninety percent (90%) leased, on a monthly basis, Borrower shall provide Administrative Agent with a rent roll in form acceptable to Administrative Agent. After Final Completion, on a quarterly basis, within forty-five (45) days after the end of each quarter, Borrower shall deliver or cause to be delivered to Administrative Agent monthly rent roll, budget reconciliation and marketing reports and other such information and reports as Administrative Agent reasonably requests. Ninety (90) days after the end of Guarantor's fiscal year, and the date which is six (6) months following such date, Guarantor shall deliver to Administrative Agent certification in form and substance reasonably acceptable to Administrative Agent and any other documentation reasonably requested by Administrative Agent, evidencing Guarantor's compliance in the aggregate with the Minimum Net Worth Requirement and Minimum Liquidity Requirement contained in each of the Guaranties. Borrower shall within five (5) Business Days upon learning thereof inform Administrative

-54-

TIAA049694

Agent of any pending or threatened litigation or judgments concerning Borrower, and any pending or threatened litigation or judgments concerning Guarantor that may cause a Material Adverse Change with respect to such Guarantor. Borrower and the Guarantor shall provide such additional financial information as Administrative Agent reasonably requires. Borrower shall during regular business hours permit Administrative Agent or any of its agents or representatives to have access to and examine all of its books and records regarding the development and operation of the Project; provided Administrative Agent gives Borrower prior reasonable notice. Borrower agrees that Administrative Agent may retain an investigator, at Administrative Agent's sole cost, to research available public records and information relating to, and the reputation of, Borrower, the principals of Borrower and Guarantor.

(p) Sign and Publicity.   Upon Administrative Agent's request and provision of appropriate artwork, Borrower shall, at Borrower's sole cost and expense, incorporate into Borrower's signage at the Project during the Construction indicating that the financing for the Project is provided by Administrative Agent; so long as such sign complies with Laws and requirements of all Governmental Authority. Administrative Agent reserves the right to publicize the making of the Loan. Without limiting the foregoing, following Loan Opening, Administrative Agent shall have the right to publicly announce in print or otherwise that Administrative Agent has made and closed the Loan to Borrower. In connection therewith, Administrative Agent shall have the right to describe the Loan, including Borrower's name, the type of loan and the amount thereof and identify the Project and the location thereof by way of description and/or photographs of the Project.

(q) Lost Note.   Upon Administrative Agent's furnishing to Borrower an affidavit to such effect, Borrower shall, if the Note is mutilated, destroyed, lost or stolen, deliver to Administrative Agent, in substitution therefor, a new note containing the same terms and conditions as the Note provided that Administrative Agent indemnifies Borrower against any liability arising out of a claim by a third party that it is a holder of the lost Note.

(r) Indemnification.   Borrower shall indemnify Administrative Agent, including each party owning an interest in the Loan and their respective officers, directors, employees and consultants (each, an "Indemnified Party") and defend and hold each Indemnified Party harmless from and against all actual claims, injury, damage, actual loss and liability, actual cost and expense (including reasonable attorneys' fees, costs and expenses but excluding consequential damages) of any and every kind to any persons or property by reason of (i) the Construction; (ii) the sale, operation or maintenance of the Project; (iii) intentionally omitted; (iv) any breach of representation or warranty, default or Event of Default under this Agreement or any other Loan Document or related Document; or (v) any other matter arising in connection with the Loan, Borrower, Guarantor or the Project. No Indemnified Party shall be entitled to be indemnified against its own gross negligence, bad faith or willful misconduct. The foregoing indemnification shall survive repayment of the Loan.

(s) No Additional Debt.   Except for the Loan, Borrower shall not incur any indebtedness (whether personal or nonrecourse, secured or unsecured) other than, after the completion of Construction, customary trade payables paid within sixty (60) days after they are incurred.

CONFIDENTIAL

TIAA049695

(t) Compliance With Laws. Borrower shall in all material respects comply with all applicable requirements (including applicable Laws) of any Governmental Authority having jurisdiction over Borrower or the Project. Borrower shall not be required to follow any Lender directives which would force Borrower to be in violation of applicable Laws, provided, however that to the extent such compliance is or was within Borrower's control, notwithstanding budget or time restraints, such action shall constitute an Event of Default.

(u) Organizational Documents. Borrower shall not, without the prior written consent of Administrative Agent, permit or suffer (i) a material amendment or modification of its organizational documents, (ii) the admission of any new member, partner or shareholder in violation of Section 17.2 of this Agreement, or (iii) any dissolution or termination of its existence.

(v) Furnishing Reports. Upon Administrative Agent's request, Borrower shall provide Administrative Agent with copies of all inspections, reports, test results and other information received by Borrower, which in any way relate to the Project or any part thereof. Borrower shall maintain records to substantiate all improvements, including, without limitation, all plans and specifications, change orders, and as-built drawings.

(w) Management Contracts. Borrower shall not enter into, modify, amend, terminate or cancel any management, sales or marketing contracts for the Project other than on account of a Default thereunder (excluding, however, contracts with employees at the Project), without the prior written approval of Administrative Agent, such approval not to be unreasonably withheld or delayed. Notwithstanding the foregoing, Borrower shall not enter into any management contract without the prior written approval of Administrative Agent.

(x) Furnishing Notices. Borrower shall provide Administrative Agent with copies of all material notices pertaining to the Project received by Borrower from any Governmental Authority or insurance company within five (5) Business Days after such notice is received.

(y) Construction Contracts. Other than in connection with Change Orders, Borrower shall not enter into, modify, amend, terminate or cancel any material contracts for the Construction, without the prior written approval of Administrative Agent, which approval shall not be unreasonably withheld or delayed. Borrower will furnish Administrative Agent promptly after execution thereof executed copies of all contracts between Borrower, architects, engineers and contractors and all subcontracts between the General Contractor or contractors and all of their subcontractors and suppliers, which contracts and subcontracts may not have been furnished pursuant to Section 9.1(a) at the time of the Opening of the Loan.

(z) Correction of Defects. Within ten (10) Business Days after Borrower acquires knowledge of or receives notice of a material defect in the Improvements or any material departure from the Approved Plans and Specifications, or any other requirement of this Agreement, Borrower will proceed with diligence to correct all such defects and departures.

(aa) Hold Disbursements in Trust. Borrower shall receive and hold in trust for the sole benefit of Administrative Agent (and not for the benefit of any other person, including, but not limited to, contractors or any subcontractors) all advances made hereunder directly to

-56-

TIAA049696

Borrower, for the purpose of paying costs of the Construction in accordance with the Budget. Borrower shall use the proceeds of the Loan solely for the payment of costs as specified in the Budget. Borrower will pay all other costs, expenses and fees relating to the acquisition, equipping, use, sale and operation of the Project.

(bb) <u>Alterations</u>. Without the prior written consent of Administrative Agent, which consent shall not unreasonably be withheld or delayed, Borrower shall not make any material alterations to the Project (other than completion of the Construction in accordance with the Approved Plans and Specifications), as the same may be modified pursuant to Section 15.1(c).

(cc) <u>Cash Distributions</u>. Except as otherwise provided in this Agreement, Borrower shall not make any distributions to partners, members or shareholders until the Loan has been repaid.

(dd) <u>Debt Service Coverage Ratio</u>: Commencing on the earlier to occur of either (a) Leases have been executed for ninety percent (90%) of the Units, or (b) the Property has achieved the Hurdle DSCR for (2) consecutive calendar quarters, Borrower shall, within thirty (30) days after the end of each Test Period, submit to Administrative Agent evidence satisfactory to Administrative Agent that the Hurdle DSCR has been met for such Test Period.

(ee) <u>Lockbox Account</u>. If Borrower fails to demonstrate to Administrative Agent that the Hurdle DSCR has been met for an applicable Test Period, Administrative Agent reserves the right to establish a "lockbox account" into which all operating revenue from the Project shall be deposited.

(ff) <u>Retail Tenants</u>. Prior to entering into any Lease with a retail Tenant, Administrative Agent shall have the right to approve such Lease, and the creditworthiness of such Tenant.

(gg) <u>Final Plans and Specifications</u>. Borrower shall submit to Administrative Agent and Administrative Agent's Construction Consultant final Plans and Specifications and construction drawings, and such final Plans and Specifications and construction drawings shall be approved by the Construction Consultant no later than April 15, 2008. If Borrower fails to comply with this <u>Section 15.1(gg)</u>, Advances of the Loan shall be suspended until such time as Borrower has complied with this <u>Section 15.1(gg)</u>.

(hh) <u>Trade Contracts</u>. No later than July 15, 2008, Borrower shall submit to Administrative Agent and Administrative Agent's Construction Consultant evidence satisfactory to Administrative Agent that trade contracts, the aggregate value of which at least fifty percent (50%) of the total Hard Costs of the Project, have been executed and bonded. If Borrower fails to comply with this <u>Section 15.1(hh)</u>, Advances of the Loan shall be suspended until such time as Borrower has complied with this <u>Section 15.1(hh)</u>.

(ii) <u>Retainage</u>. Administrative Agent shall retain ten percent (10%) of all Advances for Hard Costs, until such time as (a) final Plans and Specifications have been approved by the Construction Consultant in accordance with <u>Section 15.1(gg)</u>, (b) executed and bonded trade contracts, the aggregate value of which is at least eighty percent (80%) of the total Hard Costs

CONFIDENTIAL

TIAA049697

of the Project, have been received and approved by Administrative Agent, (c) the Loan is In Balance, and (d) no default or Event of Default exists hereunder. At such time as Borrower has satisfied the conditions of this Section 5.1(ii), Administrative Agent shall Advance all amounts retained pursuant to this Section 5.1(ii) to Borrower. All amounts retained under this Section 15.1(ii) shall be in addition to the Retainages set forth in Section 12.5.

(jj) Subordination of Fees and Agreements. All management fees or other fees payable to any Affiliate, subsidiary or related party of Borrower or Borrower's members (other than payment to General Contractor of its fees approved by Lender and its Construction Consultant and general conditions under the General Contract), and any contracts between Borrower and any such party ("Affiliate Contracts"), shall be subordinate to the Lien of the Deed of Trust. Upon the acceleration of the Loan, Administrative Agent may, at its option, terminate such Affiliate Contracts without incurring or triggering any termination fees or penalties.

**15.2    Single Purpose Entity Covenants.**

Borrower hereby represents, warrants and covenants that without Administrative Agent's prior written consent, which may be withheld in Administrative Agent's sole discretion, and except as otherwise expressly permitted hereunder, Borrower:

(a) shall not enter into any transaction of merger or consolidation, or liquidate or dissolve itself (or suffer any liquidation or dissolution), or acquire by purchase or otherwise all or substantially all the business or assets of, or stock or other evidence of beneficial ownership of, any Person;

(b) has not and shall not guarantee or otherwise become liable on or in connection with any obligation of any other Person;

(c) does not own and shall not own any asset other than the Project;

(d) is not engaged and shall not engage, directly or indirectly, in any business other than the ownership, management and operation of the Project and shall remain organized solely for the purpose of the ownership, management and operation of the Project;

(e) shall not enter into any contract or agreement with any Affiliate, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms' length basis with third parties other than an Affiliate;

(f) has not incurred and shall not incur any indebtedness, secured or unsecured, direct or contingent (including any contingent obligation), other than indebtedness expressly permitted hereunder;

(g) has not made and shall not make any loans or advances to any third party;

(h) is and expects to remain solvent and pay its own liabilities, indebtedness and obligations of any kind, including all administrative expenses, as the same shall become due; it shall pay all such liabilities, indebtedness and obligations from its own separate assets;

CONFIDENTIAL

TIAA049698

(i) has done or caused to be done and shall do all things necessary to preserve its existence, and shall not, nor will any member or partner, amend, modify or otherwise change its articles of organization, partnership agreement or operating agreement in a manner which adversely affects each such Person's existence as a single purpose entity;

(j) shall conduct and operate its business generally as presently conducted and operated subject to such operational changes as may be reasonably necessary or appropriate to construct, operate and maintain the Project;

(k) shall maintain bank accounts separate from any other Person;

(l) shall maintain separate books and records and shall prepare separate financial statements which are not consolidated or combined with the financial statements of any other Person, unless, pursuant to GAAP, same may be combined but separately noted;

(m) shall be, and at all times shall not hold itself out to the public as being other than, a legal entity separate and distinct from any other Person (including any Affiliate);

(n) shall file its own tax returns, shall not permit its financial results to be consolidated or combined with those of any other Person for financial reporting purposes (other than in accordance with GAAP and applicable Law), and shall not permit any of its funds to be distributed, loaned or otherwise transferred to any other person;

(o) is and expects to be at all times adequately capitalized for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(p) shall not seek its dissolution or winding up, in whole or in part;

(q) shall not commingle its funds and assets with those of any other Person;

(r) has and shall maintain its assets in such manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(s) does not and shall not hold itself out to be responsible for the debts or obligations of any other Person;

(t) shall not do any act which would make it impossible to carry on its ordinary business;

(u) except as otherwise permitted in the Loan Documents, shall not possess or assign the Project for other than a business purpose;

(v) except as expressly permitted in the Loan Documents, shall not sell, encumber or otherwise dispose of all or substantially all of the Project;

(w) shall not hold title to its assets other than in its name;

CONFIDENTIAL

TIAA049699

(x) shall not institute proceedings to be adjudicated bankrupt or insolvent; or consent to the institution of bankruptcy or insolvency proceedings against it; or file a petition seeking, or consent to, reorganization or relief under any applicable federal or state law relating to bankruptcy; or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of it or a substantial part of its property; or make any assignment for the benefit of creditors; or admit in writing its inability to pay its debts generally as they become due;

(y) shall maintain its books, records, resolutions and agreements as official records;

(z) has observed and will continue to observe all limited liability company or partner-ship formalities;

(aa) has not and will not fail to correct any known misunderstandings regarding its separate identity; and

(bb) shall not amend any provisions of its organizational documents in any material respect without Administrative Agent's express written consent, which consent shall not unreasonably be withheld or delayed.

**15.3   Authorized Representative.**

Borrower hereby appoints the Authorized Representative as its authorized representative for purposes of dealing with Administrative Agent on behalf of Borrower in respect of any and all matters in connection with this Agreement, the other Loan Documents, and the Loan. The Authorized Representative shall have the power, in his discretion, to give and receive all notices, monies, approvals, and other documents and instruments, and to take any other action on behalf of Borrower. All actions by the Authorized Representative shall be final and binding on Borrower. Administrative Agent may rely on the authority given to the Authorized Representative until actual receipt by Administrative Agent of a duly authorized resolution substituting a different person as the Authorized Representative.

**Article 16
CASUALTIES AND CONDEMNATION**

**16.1   Casualty and Condemnation.**

(a) <u>Net Proceeds</u>. If there is a Casualty or Partial Condemnation, and the Net Proceeds are less than TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00), Administrative Agent shall make the Net Proceeds available to Borrower for Restoration.

(b) <u>Casualty</u>

(i)    <u>Notice; Restoration</u>. The Borrower shall give the Administrative Agent prompt written notice of the occurrence of any casualty (each a "<u>Casualty</u>") affecting all or any portion of the Property. In the event of any Casualty, the Borrower shall promptly commence and diligently prosecute Restoration of the Property, subject to <u>Section 16.1(g)</u>.

-60-

TIAA049700

(ii)   <u>Availability of Proceeds for Restoration</u>. Subject to <u>Section 16.1(a)</u>, if there is a Casualty to the Property, (A) and (x) the Restoration of the Property can be reasonably completed within twelve (12) months of the occurrence of such Casualty (such period to be measured from the date of such Casualty) and no later than three (3) months prior to the Maturity Date (each such determination to be made by the Administrative Agent and its Construction Consultant, in their reasonable judgment), or (y) the reasonably estimated cost of the Restoration is not more than Fifty One Percent (51%) of Full Replacement Cost and (B) all of the conditions and deliveries set forth in <u>Section 16.2(a)</u> are satisfied, then the Net Proceeds shall be disbursed by the Administrative Agent to the Borrower for Restoration in accordance with the terms and manner set forth in <u>Section 16.2</u>. If the Net Proceeds are not required to be made available for Restoration pursuant to this clause (ii), all Net Proceeds may be retained by the Administrative Agent in accordance with the terms of <u>Section 16.2(b)</u>.

(c) <u>Condemnation.</u>

(i)   <u>Notice; Restoration</u>. The Borrower shall give the Administrative Agent written notice of the actual or threatened commencement of any Partial Condemnation or Total Condemnation affecting the Property promptly following the Borrower's receipt of notice thereof and shall deliver to the Administrative Agent copies of any and all documents received or prepared by the Borrower in connection therewith. The Borrower shall, at its expense, diligently prosecute any such proceeding. The Administrative Agent shall not be limited to the interest paid on the award by the condemning authority but shall be entitled to receive out of the award interest at the Interest Rate provided for herein. If the Property or any portion thereof is the subject of a Partial Condemnation or Total Condemnation, all Condemnation Proceeds relating thereto shall be paid to the Administrative Agent and, subject to <u>Section 16.1(g)</u>, the Borrower shall promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of <u>Section 16.2</u>.

(ii)   <u>Partial Condemnation</u>. If, in the event of Partial Condemnation, (A) (x) the Restoration of the Property can be reasonably completed within six (6) months of the occurrence of such Partial Condemnation and no later than six (6) months prior to the Maturity Date (each such determination to be made solely by the Administrative Agent and its Construction Consultant), or (y) the reasonably estimated cost of the Restoration is not more than TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00), and (B) all of the conditions and deliveries set forth in <u>Section 16.2(a)</u> are satisfied, the Net Proceeds shall then be disbursed by the Administrative Agent to the Borrower for Restoration in accordance with the terms and manner set in <u>Section 16.2</u>. If the Net Proceeds are not required to be made available for Restoration pursuant to this clause (ii), all Net Proceeds may be retained by the Administrative Agent in accordance with the terms of <u>Section 16.2(b)</u>.

CONFIDENTIAL

TIAA049701

(iii)    Total Condemnation.  In the event of a Total Condemnation, all Net Proceeds shall be retained by the Administrative Agent in accordance with the terms of Section 16.2(b).

(d) Assignment of Proceeds; Adjustment of Claims.    All Net Proceeds and Condemnation Proceeds relating to the Property are hereby irrevocably assigned to and shall be paid to the Administrative Agent for the benefit of the Lenders, and the Administrative Agent shall deposit such amounts received hereunder into an escrow account designated by the Administrative Agent for disbursement in accordance with this Article 16, and, to the extent such amounts are not disbursed to Borrower in accordance with this Article 16, such amounts shall be held by Administrative Agent as additional collateral for application towards the outstanding principal of the Loan. In the event of any action, suit or proceeding relating to any Net Proceeds, causes of action, claims, compensation, awards or recoveries where the loss does not exceed TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00), Borrower may settle and adjust such claim; provided that (a) no Event of Default has occurred and is continuing and (b) such adjustment is carried out in a commercially reasonable and timely manner. In the event of any action, suit or proceeding relating to any Net Proceeds, causes of action, claims, compensation, awards or recoveries where the loss exceeds TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00) or if an Event of Default then exists, Borrower may settle and adjust such claim only with the consent of Administrative Agent and Administrative Agent shall have the opportunity to participate, at Borrower's cost, in any such settlements and adjustments.

(e) No Effect on Obligations.    Notwithstanding any Partial Condemnation, Total Condemnation or Casualty the Borrower shall continue to make all payments required to be made pursuant to this Agreement at the time and in the manner provided for herein and the Outstanding Principal shall not be reduced until any Net Proceeds shall have been actually received and applied by the Administrative Agent to the reduction or discharge of the Outstanding Principal.

(f) Sale of Property Prior to Receipt of Proceeds.  If the Property is sold, through foreclosure or otherwise, prior to the receipt by the Administrative Agent of the Net Proceeds or Condemnation Proceeds (as applicable), the Administrative Agent shall have the right, whether or not a deficiency judgment shall have been sought, recovered or denied, to receive such Net Proceeds or Condemnation Proceeds (as applicable), or a portion thereof sufficient to pay the Outstanding Principal, plus all other amounts owed by the Borrower under the Loan Documents.

**16.2    Disbursement of Net Proceeds.**  Requirements; Manner of Disbursement.    If Net Proceeds are required to be made available for Restoration pursuant to either Section 16.1(a) or 16.1(b) above, the Administrative Agent shall make such Net Proceeds available for Restoration in accordance with the following:

(i)    The Net Proceeds shall be made available to the Borrower for the Restoration provided that each of the following conditions are met:

-62-

CONFIDENTIAL

TIAA049702

(1) no Default or Event of Default shall have occurred and be continuing;

(2) the Borrower promptly commences Restoration and diligently pursues the same to the Administrative Agent's satisfactory completion;

(3) the Property and the use thereof after Restoration will be in material compliance with and permitted under applicable Laws;

(4) Restoration is done and diligently completed by the Borrower in material compliance with all applicable Laws;

(5) the quality, character of and access to the Property after Restoration shall be at least equivalent to the quality, character of and access to the Property immediately prior to such Casualty or Partial Condemnation taking into consideration the Property's use as a residential building;

(6) (i) the estimated time to complete the Restoration, as estimated by the Construction Consultant, does not exceed the effective period of business interruption insurance available to the Administrative Agent on account of such Casualty or Partial Condemnation;

(7) The Borrower can satisfactorily demonstrate to Administrative Agent by an updated Appraisal or other method satisfactory to Administrative Agent, that, in Administrative Agent's and its Construction Consultant's sole discretion, the value of the Property shall be, subsequent to Restoration, at least equal to the value of the Property prior to the Casualty;

(8) the Borrower delivers to the Administrative Agent a written undertaking that it will expeditiously commence and satisfactorily complete with due diligence Restoration in accordance with the terms of this Agreement; and

(9) evidence that the Net Proceeds, together with any Net Proceeds Deficiency, are sufficient to cover all costs of the Restoration as determined by the Construction Consultant.

-63-

TIAA049703

In the event any of the foregoing conditions are not satisfied at any time, the disbursement of Net Proceeds shall be paid in accordance with Section 16.2(b).

(ii)  The Net Proceeds shall be held in a secured escrow account designated by the Administrative Agent, and until disbursed in accordance with the provisions of this Section shall constitute additional security for repayment of the Borrower's obligations under the Loan Documents. The Administrative Agent shall deposit the Net Proceeds in an interest bearing account and all interest earned thereon shall be added to and become part of the Net Proceeds. The Net Proceeds shall be disbursed by the Administrative Agent to the Borrower from time to time during the course of Restoration, upon receipt of evidence (including lien waivers) satisfactory to the Administrative Agent, provided that all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full.

(iii)  there exist no notices of pendency, stop orders, mechanic's or materialman's Liens or notices of intention to file same (other than notices of lien or other inchoate Liens with respect to amounts not yet due and payable), or any other liens or encumbrances of any nature whatsoever effecting the Property arising out of the Restoration which have not either been fully bonded to the satisfaction of the Administrative Agent and its Construction Consultant and discharged of record or in the alternative fully insured to the satisfaction of the Administrative Agent and its Construction Consultant by the Title Insurer insuring the Lien of the Deed of Trust.

(iv)  All plans and specifications required in connection with any Restoration shall be reviewed and reasonably Approved by the Administrative Agent and its Construction Consultant. The Administrative Agent and its Construction Consultant shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration. The identity of the contractors, subcontractors and materialmen engaged in such Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and reasonable approval by the Administrative Agent and the Construction Consultant. All out-of-pocket costs and expenses incurred by the Administrative Agent in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable attorney's fees and disbursements and the Construction Consultant's fees, shall be paid by the Borrower.

(v)  In no event shall the Administrative Agent be obligated to make disbursements of Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Construction Consultant, minus the Casualty Retainage. "Casualty Retainage" means an amount equal to ten percent (10%) of the costs actually incurred for work in place as part of the Restoration, as certified by the Construction

-64-

CONFIDENTIAL

TIAA049704

Consultant until Restoration is 50% completed and thereafter zero percent (0%) of the costs actually incurred for the work, until the Restoration has been completed. The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section, be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until (A) thirty (30) days after the Construction Consultant certifies to the Administrative Agent that (y) the Restoration has been completed in accordance with the provisions of this Section, and (z) all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, (B) the Administrative Agent receives evidence satisfactory to the Administrative Agent that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage, and (C) the Administrative Agent receives and Approves an endorsement to the Title Policy insuring that the Lien of the Deed of Trust has not changed; provided that the Administrative Agent will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Construction Consultant certifies to the Administrative Agent that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of such contractor's, subcontractor's or materialman's contract, and the contractor, subcontractor or materialman delivers Lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested in writing by the Administrative Agent or by the Title Insurer insuring the Lien of the Deed of Trust and such Title Insurer issues its endorsement insuring that the priority of the lien of the Deed of Trust has not changed.

(vi)     The Administrative Agent shall not be obligated to make disbursements of the Net Proceeds more frequently than once in any calendar month.

(vii)    If at any time the Net Proceeds or the undisbursed balance thereof shall not be sufficient to pay the balance of the total costs which are reasonably estimated by the Construction Consultant to be incurred in connection with the completion of the Restoration, the Borrower shall promptly deposit with the Administrative Agent cash or cash equivalents in an amount equal to the deficiency (the "Net Proceeds Deficiency") before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with the Administrative Agent shall be held by the Administrative Agent and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section shall constitute additional security for the Borrower's Obligations.

(viii)   Provided no Default or Event of Default shall have occurred and be continuing, if at any time the Net Proceeds, together with any Net Proceeds Deficiency, or the undisbursed balance thereof, shall be in excess of the balance of the total costs which are estimated by the Construction Consultant to be incurred in connection

-65-

CONFIDENTIAL

TIAA049705

with the completion of the Restoration, the Administrative Agent shall pay such excess to the Borrower. No payment made to the Borrower pursuant to this Section shall in any event prevent the Administrative Agent from requiring the Borrower to make further Net Proceeds Deficiency deposits in the event same shall be required pursuant to the foregoing Section.

(ix)     After the Construction Consultant certifies to the Administrative Agent that Restoration has been substantially completed in accordance with the provisions of this Section and the receipt by the Administrative Agent of evidence satisfactory to the Administrative Agent that all costs incurred in connection with Restoration have been paid in full and, **provided** no Default or Event of Default shall have occurred and be continuing under this Agreement, any excess of Net Proceeds (together with any earnings thereon) and the remaining balance, if any, of the Net Proceeds Deficiency deposited with the Administrative Agent (together with any earnings thereon) shall be remitted by the Administrative Agent to the Borrower,

(b) Retention of Net Proceeds by Administrative Agent.  All Net Proceeds (together with any earnings thereon) not required (i) to be made available for the Restoration, or (ii) to be returned to the Borrower as excess Net Proceeds pursuant to **Section 16.2(a)(vii)** or **(viii)** hereof, may be retained and applied by the Administrative Agent after such funds are received toward the payment of the Outstanding Principal of the Loan and all other amounts provided for under this Agreement or any of the other Loan Documents, whether or not then due and payable or, at the discretion of the Administrative Agent, the same may be paid, either in whole or in part, to the Borrower.  If the Administrative Agent shall receive and retain Net Proceeds, at Borrower's option, such funds shall be applied toward the Outstanding Principal of the Loan on a Payment Date.  If the Administrative Agent shall receive and retain Net Proceeds, the Lien of the Deed of Trust shall be reduced only by the amount thereof received and retained by the Administrative Agent and actually applied by the Administrative Agent in reduction of the Outstanding Principal or such other amounts.

## Article 17
## ASSIGNMENTS BY LENDER AND BORROWER

**17.1    Assignments and Participations.**

Each Lender may assign its rights and obligations under this Agreement (including, without limitation, such portion of the Advances owing to it and the Note held by it) to an Eligible Lender; provided, that each such assignment shall require the consent of the Administrative Agent.  Borrower agrees to cooperate with Administrative Agent's efforts to do any of the foregoing and to execute all documents reasonably required by Administrative Agent in connection therewith which do not materially adversely affect Borrower's rights under the Loan Documents, provided, that Borrower's cost shall not exceed an aggregate of $20,000.00.

CONFIDENTIAL

TIAA049706

**17.2    Prohibition of Assignments and Transfers by Borrower.**

Borrower shall not assign or attempt to assign its rights under this Agreement and any purported assignment shall be void.  Without the prior written consent of Administrative Agent, in Administrative Agent's sole discretion, Borrower shall not suffer or permit (a) any change in the management (whether direct or indirect) of the Project other than as permitted hereunder, or (b) any Transfer other than a Permitted Transfer.  Notwithstanding the foregoing, Administrative Agent shall not unreasonably withhold its consent to the following transfers of membership interests in Borrower:  (i) transfers among existing members of Borrower; (ii) transfers to immediate family members or a trust for the benefit of an immediate family member; and/or (iii) upon the death of any member of Borrower, transfers to the estate or the beneficiaries of the estate of a member of Borrower.  Additionally, the sale and conveyance of Units shall be permitted in accordance with Article 14 hereof.

**17.3    Prohibition of Transfers in Violation of ERISA.**

In addition to the prohibitions set forth in Section 17.2 above, Borrower shall not assign, sell, pledge, encumber, transfer, hypothecate or otherwise dispose of its interest or rights in this Agreement or in the Project, or attempt to do any of the foregoing or suffer any of the foregoing, nor shall any party owning a direct or indirect interest in Borrower assign, sell, pledge, mortgage, encumber, transfer, hypothecate or otherwise dispose of any of its rights or interest (direct or indirect) in Borrower, attempt to do any of the foregoing or suffer any of the foregoing, if such action would cause the Loan, or the exercise of any of Administrative Agent's rights in connection therewith, to constitute a prohibited transaction under ERISA or the Internal Revenue Code or otherwise result in Administrative Agent being deemed in violation of any applicable provision of ERISA.  Borrower agrees to indemnify and hold Administrative Agent free and harmless from and against all actual losses, costs (including reasonable attorneys' fees and expenses), taxes, damages and expenses Administrative Agent may suffer by reason of the investigation, defense and settlement of claims and in obtaining any prohibited transaction exemption under ERISA necessary or desirable in Administrative Agent's sole judgment or by reason of a breach of the foregoing prohibitions.  The foregoing indemnification shall be a recourse obligation of Borrower and shall survive repayment of the Note, notwithstanding any limitations on recourse contained herein or in any of the Loan Documents.

**17.4    Successors and Assigns.**

Subject to the foregoing restrictions on transfer and assignment contained in this Article 17, this Agreement shall inure to the benefit of and shall be binding on the parties hereto and their respective successors and permitted assigns.

**Article 18**
**TIME OF THE ESSENCE**

Borrower agrees that time is of the essence under this Agreement.

-67-

                                                                TIAA049707

**Article 19**
**EVENTS OF DEFAULT**

19.1    Events of Default.

The occurrence of any one or more of the following shall constitute an "Event of Default" as said term is used herein:

(a) Failure of Borrower (i) (A) to make any principal payment when due, (B) to pay any interest when due or (C) to observe or perform any of the other monetary covenants or conditions by Borrower to be performed under the terms of this Agreement or any other Loan Document, for a period of five (5) days after written notice from Administrative Agent that the same is due and payable; or (ii) for a period of ten (10) days after written notice from Administrative Agent, to observe or perform any non-monetary covenant or condition contained in this Agreement or any other Loan Documents; provided that if any such failure concerning a non-monetary covenant or condition is susceptible to cure and cannot reasonably be cured within said ten (10) day period, then Borrower shall have an additional twenty (20) day period to cure such failure and no Event of Default shall be deemed to exist hereunder so long as Borrower commences such cure within the initial ten (10) day period and diligently and in good faith pursues such cure to completion within such resulting thirty (30) day period from the date of Administrative Agent's notice; and provided further that if a different notice or grace period is specified under any other subsection of this Section 19 with respect to a particular breach, or if another subsection of this Section 19 applies to a particular breach and does not expressly provide for a notice or grace period, the specific provision shall control. Notwithstanding the foregoing, if, on no more than two (2) occasions, Borrower fails to pay any interest when due in accordance with Section (i) (B) above because of an administrative error, Administrative Agent may in its reasonable discretion deem such failure to not be an Event of Default, provided that Borrower shall pay such interest within five (5) days of the date when originally due in accordance with Section (i) (B) above and further provided that, in the event that Administrative Agent or any Lender shall fail or refuse to fund the payment of interest from the Interest Reserve for any reason (other than the prior full expenditure of such Interest Reserve), such five (5) day period shall not run until Administrative Agent notifies Borrower of such failure or refusal to fund and its reasons therefor.

(b) Failure by Borrower to provide Administrative Agent with any of the financial statements as set forth in Section 15.1(o).

(c) (i) Failure of Borrower to commence construction by the Construction Commencement Date; (ii) a discontinuance in the Construction for a period of thirty (30) consecutive days (other than Unavoidable Delays), or in any event a delay in the Construction so that the same is not, in Administrative Agent's reasonable judgment, likely to be substantially completed within sixty (60) days after the Completion Date; (iii) failure to complete any item set forth on the Construction Schedule within the time frame contemplated therein, and, in the reasonable opinion of the Construction Consultant, such failure shall cause the Project not to be completed by the Completion Date; or (iv) failure to complete Construction of the Improvements substantially in accordance with the Approved Plans and Specifications (or in accordance with any changes therein that may be approved in writing by

-68-

CONFIDENTIAL

TIAA049708

Administrative Agent or as to which Administrative Agent's approval is not required) within sixty (60) days after the Completion Date, subject to Unavoidable Delays.

(d) The bankruptcy or insolvency of the General Contractor and failure of Borrower to procure a new contractor satisfactory to Administrative Agent within thirty (30) days from the occurrence of such bankruptcy or insolvency and to obtain an executed contract with such new contractor with within sixty (60) days from the occurrence of such bankruptcy or insolvency.

(e) Any Transfer or other disposition in violation of <u>Section 17.2</u> or <u>17.3</u>.

(f) Any warranty, representation, statement, report or certificate made now or hereafter by Borrower or Guarantor is untrue or incorrect in any material respect at the time made or delivered, provided that if such breach is reasonably susceptible of cure, then no Event of Default shall exist so long as Borrower cures said breach (i) within the notice and cure period provided in (a)(i) above for a breach that can be cured by the payment of money or (ii) within the notice and cure period provided in (a)(ii) above for any other breach.

(g) Borrower or Guarantor shall commence a voluntary case concerning Borrower or Guarantor under the Bankruptcy Code; or an involuntary proceeding is commenced against Borrower or Guarantor or under the Bankruptcy Code and relief is ordered against Borrower or Guarantor, or the petition is controverted but not dismissed or stayed within sixty (60) days after the commencement of the case, or a custodian (as defined in the Bankruptcy Code) is appointed for or takes charge of all or substantially all of the property of Borrower or Guarantor; or the Borrower or Guarantor commences any other proceedings under any reorganization, arrangement, readjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar Law of any jurisdiction whether now or hereafter in effect relating to the Borrower or Guarantor; or there is commenced against Borrower or Guarantor any such proceeding which remains undismissed or unstayed for a period of sixty (60) days; or the Borrower or Guarantor fails to controvert in a timely manner any such case under the Bankruptcy Code or any such proceeding, or any order of relief or other order approving any such case or proceeding is entered; or the Borrower or Guarantor by any act or failure to act indicates its consent to, approval of, or acquiescence in any such case or proceeding or the appointment of any custodian or the like of or for it for any substantial part of its property or suffers any such appointment to continue undischarged or unstayed for a period of sixty (60) days.

(h) Borrower shall make an assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due, or shall consent to the appointment of a receiver or trustee or liquidator of all of its property or the major part thereof or if all or a substantial part of the assets of Borrower are attached, seized, subjected to a writ or distress warrant, or are levied upon, or come into the possession of any receiver, trustee, custodian or assignee for the benefit of creditors.

(i) Cancellation, material modification, or assignment of any Lease or agreement for the operation of the Property which is not otherwise permitted under the terms of this Agreement or the other Loan Documents without the prior written consent of Administrative Agent.

CONFIDENTIAL

TIAA049709

(j)  Borrower is enjoined, restrained or in any way prevented by any court order from constructing or operating the Project or marketing or renting Units.

(k)  Failure by Borrower to make any Deficiency Deposit with Administrative Agent within the time and in the manner required by Article 11 hereof.

(l)  One or more final, unappealable judgments not covered by insurance are entered against Borrower in amounts aggregating in excess of One Hundred Thousand Dollars ($100,000), and said judgments are not satisfied, stayed or bonded over within thirty (30) days after entry.

(m) Borrower shall fail to pay any debt owed by it or is in default under any agreement with Administrative Agent or any other party and such failure or default continues after any applicable grace period specified in the instrument or agreement relating thereto.

(n)  If a Material Adverse Change occurs with respect to Borrower, Guarantor or the Project.

(o)  The occurrence of any other event or circumstance denominated as an Event of Default in this Agreement or under any of the other Loan Documents and the expiration of any applicable grace or cure periods, if any, specified for such Event of Default herein or therein, as the case may be.

(p)  Borrower shall fail to timely deliver any of the Bonds required pursuant to Section 9.1(m).

(q)  After Substantial Completion, the occurrence of a material demolition, structural alteration or change in use or occupancy of the Project without the prior written consent of Administrative Agent.

(r)  Borrower shall grant an easement over any portion of the Project (other than utility easements) which easement has a material adverse effect on the Property, or Borrower shall default under any easement agreement, covenant or restriction affecting the property.

(s)  Borrower shall commit intentional waste upon the Project.

(t)  At any time Guarantors in the aggregate shall fail to satisfy the Minimum Net Worth Requirement and Minimum Liquidity Requirement.

(u)  Borrower shall fail to satisfy within thirty (30) days of notice thereof, any material Liens (including Liens for real estate taxes), claims or judgments against Borrower or the Project, and said Liens, claims or judgments are not stayed or bonded over.

(v)  Borrower shall at any time fail to maintain the Insurance Policies.

(w) Borrower shall fail to invest the accrued Minimum Equity in the Project.

CONFIDENTIAL

TIAA049710

(x) At any time Ronald J. Cohen shall not own 100% of the ownership interests in Cohen Management,

(y) If Administrative Agent has elected to establish a "lockbox account" in accordance with Section 15.1(ee), and Borrower has not demonstrated to Administrative Agent, within thirty (30) days of such election by Administrative Agent, that Borrower has executed such documentation necessary to establish such "lockbox account" and any other necessary accounts, to the satisfaction of Administrative Agent.

## Article 20
## LENDER'S REMEDIES IN EVENT OF DEFAULT

**20.1   Remedies Conferred Upon Administrative Agent.**

Upon the occurrence and during the continuance of any Event of Default, Administrative Agent may pursue any one or more of the following remedies concurrently or successively, it being the intent hereof that none of such remedies shall be to the exclusion of any other:

(a) Take possession of the Project and complete the Construction and do anything which is necessary or appropriate in its sole judgment to fulfill the obligations of Borrower under this Agreement and the other Loan Documents, including either the right to avail itself of and procure performance of existing contracts or let any contracts with the same contractors or others.  Without restricting the generality of the foregoing and for the purposes aforesaid, Borrower hereby appoints and constitutes Administrative Agent its lawful attorney-in-fact with full power of substitution in the Project to complete the Construction in the name of Borrower; to use unadvanced funds remaining under the Note or which may be reserved, escrowed or set aside for any purposes hereunder at any time, or to advance funds in excess of the face amount of the Note, to complete the Construction; to make changes in the Plans and Specifications which shall be necessary or desirable to complete the Construction in substantially the manner contemplated by the Plans and Specifications; to retain or employ new general contractors, subcontractors, architects, engineers and inspectors as shall be required for said purposes; to pay, settle or compromise all existing bills and claims, which may be liens or security interests, or to avoid such bills and claims becoming liens against the Project; to execute all applications and certificates in the name of Borrower; prosecute and defend all actions or proceedings in connection with the Improvements or Project; and to do any and every act which the Borrower might do in its own behalf; it being understood and agreed that this power of attorney shall be a power coupled with an interest and cannot be revoked;

(b) Withhold further disbursement of the proceeds of the Loan and/or terminate Administrative Agent's obligations to make further disbursements hereunder;

(c) Declare the Note to be immediately due and payable;

(d) Use and apply any monies or letters of credit deposited by Borrower with Administrative Agent, regardless of the purposes for which the same was deposited, to cure

-71-

CONFIDENTIAL

TIAA049711

any such default or to apply on account of any indebtedness under this Agreement which is due and owing to Administrative Agent;

(e) Fund proceeds of the Loan to Guarantor to complete the Project (if Guarantor is entitled to receive such proceeds under the Completion Guaranty or Administrative Agent otherwise elects to fund such proceeds to Guarantor), and in such event such proceeds shall be considered disbursements of the Loan, whether or not requested by Borrower (Borrower's authorization of such disbursements being deemed given hereby);

(f) Assess interest on all amounts evidenced by the Note at the Default Rate;

(g) Exercise or pursue any other remedy or cause of action permitted under this Agreement or any other Loan Documents, or conferred upon Administrative Agent by operation of Law.

Notwithstanding the foregoing, upon the occurrence of any Event of Default under Section 19(g) with respect to Borrower, all amounts evidenced by the Note shall automatically become due and payable, without any presentment, demand, protest or notice of any kind to Borrower.

<h3 style="text-align:center">Article 21<br>GENERAL PROVISIONS</h3>

**21.1   Administrative Agent Approvals.**

Whenever Administrative Agent approval is required under this Agreement, except where an alternate time is specified, Administrative Agent shall use commercially reasonable efforts to grant or withhold such approval within seven (7) full Business Days after Administrative Agent's receipt of a written request for such approval accompanied by documentation reasonably requested for Administrative Agent and/or its Construction Consultant, as applicable, to evaluate such request. Notwithstanding anything to the contrary contained herein, Borrower and Lenders acknowledge that all approvals requested of Administrative Agent hereunder may be contingent upon receipt of Administrative Agent's receipt of approval from the Construction Consultant with respect to such matter. Nothing herein shall be deemed to result in a deemed approval by Administrative Agent or in any right of Borrower for damages against Administrative Agent.

**21.2   Captions.**

The captions and headings of various Articles, Sections and subsections of this Agreement and Exhibits pertaining hereto are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

**21.3   Modification; Waiver.**

No modification, waiver, amendment or discharge of this Agreement or any other Loan Document shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment or discharge is sought.

-72-

   TIAA049712

**21.4   Governing Law.**

Irrespective of the place of execution and/or delivery, this Agreement shall be governed by, and shall be construed in accordance with, the laws of the State of New York.

**21.5   Acquiescence Not to Constitute Waiver of Administrative Agent's Requirements.**

Each and every covenant and condition for the benefit of Administrative Agent contained in this Agreement may be waived by Administrative Agent, provided, however, that to the extent that Administrative Agent may have acquiesced in any noncompliance with any construction or nonconstruction conditions precedent to the Opening of the Loan or to any subsequent disbursement of Loan proceeds, such acquiescence shall not be deemed to constitute a waiver by Administrative Agent of such requirements with respect to any future disbursements of Loan proceeds.

**21.6   Disclaimer by Administrative Agent.**

This Agreement is made for the sole benefit of Borrower, Lenders and Administrative Agent, and no other person or persons shall have any benefits, rights or remedies under or by reason of this Agreement, or by reason of any actions taken by Administrative Agent pursuant to this Agreement.   Administrative Agent shall not be liable to any contractors, subcontractors, supplier, architect, engineer, tenant or other party for labor or services performed or materials supplied in connection with the Construction.   Administrative Agent shall not be liable for any debts or claims accruing in favor of any such parties against Borrower or others or against the Project.   Administrative Agent, by making the Loan or taking any action pursuant to any of the Loan Documents, shall not be deemed a partner or a joint venturer with Borrower or fiduciary of Borrower.   No payment of funds directly to a contractor or subcontractor or provider of services shall be deemed to create any third-party beneficiary status or recognition of same by the Administrative Agent.   Without limiting the generality of the foregoing:

(a) Administrative Agent shall have no liability, obligation or responsibility whatsoever with respect to the Construction.   Any inspections of the Construction made by or through Administrative Agent are for purposes of administration of the Loan only and neither Borrower nor any third party is entitled to rely upon the same with respect to the quality, adequacy or suitability of materials or workmanship, conformity to the Plans and Specifications, state of completion or otherwise;

(b) Administrative Agent neither undertakes nor assumes any responsibility or duty to Borrower to select, review, inspect, supervise, pass judgment upon or inform Borrower of any matter in connection with the Project, including matters relating to the quality, adequacy or suitability of: (i) the Plans and Specifications, (ii) architects, contractors, subcontractors and material suppliers employed or utilized in connection with the Construction, or the workmanship of or the materials used by any of them, or (iii) the progress or course of Construction and its conformity or nonconformity with the Plans and Specifications; Borrower shall rely entirely upon its own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or supply of information to Borrower by

-73-

TIAA049713

Administrative Agent in connection with such matters is for the protection of Administrative Agent only, and neither Borrower nor any third party is entitled to rely thereon; and

(c) Administrative Agent owes no duty of care to protect Borrower, Guarantor, or any Tenant against negligent, faulty, inadequate or defective building or construction.

**21.7   Partial Invalidity; Severability.**

If any of the provisions of this Agreement, or the application thereof to any person, party or circumstances, shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such provision or provisions to persons, parties or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

**21.8   Definitions Include Amendments.**

Definitions contained in this Agreement which identify documents, including, but not limited to, the Loan Documents, shall be deemed to include all amendments and supplements to such documents from the date hereof, and all future amendments, modifications, and supplements thereto entered into from time to time to satisfy the requirements of this Agreement or otherwise with the consent of Administrative Agent.   Reference to this Agreement contained in any of the foregoing documents shall be deemed to include all amendments and supplements to this Agreement.

**21.9   Execution in Counterparts.**

This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

**21.10   Entire Agreement.**

This Agreement, taken together with all of the other Loan Documents and all certificates and other documents delivered by Borrower to Administrative Agent, embody the entire agreement and supersede all prior agreements, written or oral, relating to the subject matter hereof.

**21.11   Waiver of Damages.**

In no event shall Administrative Agent be liable to Borrower for consequential, punitive or exemplary damages, whatever the nature of a breach by Administrative Agent of its obligations under this Agreement or any of the Loan Documents, and Borrower, for itself and Guarantor, waives all claims for consequential, punitive or exemplary damages.

CONFIDENTIAL

TIAA049714

**21.12  Jurisdiction.**

TO THE GREATEST EXTENT PERMITTED BY LAW, BORROWER HEREBY WAIVES ANY AND ALL RIGHTS TO REQUIRE MARSHALLING OF ASSETS BY LENDER.  WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS AGREEMENT (EACH, A "PROCEEDING"), EACH OF BORROWER AND ADMINISTRATIVE AGENT IRREVOCABLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN THE COUNTY OF NEW YORK AND STATE OF NEW YORK, AND (B) WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY. NOTHING IN THIS AGREEMENT SHALL PRECLUDE LENDER FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION. BORROWER FURTHER AGREES AND CONSENTS THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY NEW YORK STATE OR UNITED STATES COURT HAVING JURISDICTION OVER THE COUNTY OF NEW YORK MAY BE MADE, TO THE EXTENT PERMITTED BY LAW, BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO BORROWER AT THE ADDRESS INDICATED BELOW, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; EXCEPT THAT IF BORROWER SHALL REFUSE TO ACCEPT DELIVERY (AS OPPOSED TO UNABLE TO RECEIVE DELIVERY), SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.

**21.13  Set-Offs.**

After the occurrence and during the continuance of an Event of Default, Borrower hereby irrevocably authorizes and directs Administrative Agent from time to time to charge Borrower's accounts and deposits with Administrative Agent (or its Affiliates), and to pay over to Administrative Agent an amount equal to any amounts from time to time due and payable to Administrative Agent hereunder, under the Note or under any other Loan Document.  Borrower hereby grants to Administrative Agent a security interest in and to all such accounts and deposits maintained by the Borrower with Administrative Agent (or its Affiliates).

**21.14  Binding Effect.**

The covenants, conditions, waivers, releases and agreements contained in this Agreement shall bind, and the benefits thereof shall inure to the parties hereto and their respective heirs, executors, administrators, successors and assigns.

-75-

TIAA049715

**21.15  Waiver of Accord and Satisfaction.**

Notwithstanding anything to the contrary contained in this agreement or any other loan document, except as expressly directed in a writing addressed to Borrower after the date hereof, any and all communications or notices by Borrower or any other loan party to Administrative Agent concerning disputed debts, obligations or liabilities, whether arising under this agreement or otherwise, including without limitation any instrument tendered as full satisfaction of a debt, shall be, in addition to the notices required under Article 22 hereof, delivered to Westdeutsche ImmobilienBank AG, Grosse Bleiche 46, 55116 Mainz, Germany, Attention: Mr. Armin Gemmerich.

**21.16  Usury Savings.**

All agreements herein are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to the Lenders or the holder hereof for the use, forbearance or detention of the money to be advanced hereunder exceed the highest lawful rate permissible under applicable Law. If, for any circumstances whatsoever, fulfillment of any provision hereof at the time performance of such provisions shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, *ipso facto*, the obligation to be fulfilled shall be reduced to the limit of such validity, and if for any circumstance the Lenders shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the Outstanding Principal due hereunder and not to the payment of interest.

## Article 22
## NOTICES

Any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed to have been properly given (a) if hand delivered, when delivered; (b) if mailed by United States Certified Mail (postage prepaid, return receipt requested) three Business Days after mailing; (c) if by Federal Express or other reliable overnight courier service, on the next Business Day after delivered to such courier service; or (d) if by telecopier on the day of receipted transmission (or if such transmission is completed after 5:00 pm Eastern Time, on the next Business Day after such transmission) so long as copy is sent on the same day by overnight courier as set forth below:

If to Borrower:

Union Place Phase I, LLC
c/o The Cohen Companies
2701 Tower Oaks Blvd.
Rockville, Maryland 20852

CONFIDENTIAL

TIAA049716

Attention: Ronald J. Cohen
Telephone: 301-692-1900
Facsimile: 301-692-1901

With copies to:

The Cohen Companies
2701 Tower Oaks Blvd.
Rockville, Maryland 20852
Attention: Michael P. Hollander, Esq., General Counsel.
Telephone: 301-692-1940
Facsimile: 301-692-1901

and

Teachers Insurance and Annuity Association
730 Third Avenue
New York, NY 10017
Attn: Gerald Casimir
Facsimile Number: (212) 916-4527

and

Teachers Insurance and Annuity Association
730 Third Avenue
New York, NY 10017
Attn: Harold D. Piazza, Esq.
Facsimile Number: (212) 916-6392

and

Teachers Insurance and Annuity Association
730 Third Avenue
New York, NY 10017
Attn: Harry St. Clair
Facsimile Number: (212) 916-4527

and

Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
Attn: John Gearen, Esq.
Facsimile Number: (312) 706-8707

-77-

CONFIDENTIAL

TIAA049717

Advances, and (B) appointing a receiver) as the Administrative Agent may determine in good faith to be necessary or appropriate to protect the Collateral.

If the Requisite Lenders do not Approve a pending Proposed Default Response within 15 Business Days after submittal, the Proposed Default Response shall be deemed rejected and the Requisite Lenders shall then be free to direct the Administrative Agent regarding the actions to be taken or not taken in response to the Event of Default, subject to the unanimous approval rights of the Lenders pursuant to Article 17.

Notwithstanding the foregoing and anything herein to the contrary, each Lender shall be obligated to fund its Ratable Share of any and all Protective Advances in the event such Protection Advances are deemed necessary by the Administrative Agent (in its sole and absolute discretion) to preserve the Lien of the Deed of Trust, the Collateral or any of Lenders' rights under any of the Loan Documents. If and to the extent any Lender shall fund amounts in excess of the Loan Amount for any purpose, such Lender's Ratable Share of the Loan shall be adjusted from time to time based on the total amounts advanced by all of Lenders from time to time in respect of the Loan

**24.9   Defaulting Lender.**  Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Advance that such Lender will not make available to the Administrative Agent such Lender's Ratable Share of such Advance, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Advance in accordance with Article 2, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.

If and to the extent that any Lender (a "Defaulting Lender") shall not have made such Ratable Share available to Administrative Agent (individually, a "Deficiency", and collectively, "Deficiencies"), and the Administrative Agent has advanced such amount to the Borrower, such Defaulting Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent at the Default Rate. If such Defaulting Lender shall repay to the Administrative Agent such corresponding amount, such amount (excluding interest) so repaid shall constitute such Defaulting Lender's Ratable Share of the Advance and the Borrower shall have no further obligation to repay such amount forthwith on demand, but such amount shall be treated as an Advance hereunder. Each Lender agrees that the Borrower or any of the other Lenders shall have the right to proceed directly against any Defaulting Lender in respect of any right or claim arising out of the default of such Defaulting Lender hereunder. If there shall be a Deficiency in respect of any Lender, one or more of the other Lenders shall have the right to, but without any obligation to, advance all or any part of the Ratable Share of an Advance that should have been made by the Defaulting Lender, and the Defaulting Lender agrees to repay upon demand to each of the Lenders (or the Borrower, if applicable), who has advanced a portion of the Deficiency the amount advanced on behalf of the Defaulting Lender, together with interest thereon at the Default Rate. If more than one Lender elects to advance a portion of the Deficiency, such Lenders' advances shall be made based on the relative Ratable Shares of the Loan of each advancing Lender or as otherwise

-83-

TIAA049718

agreed to by such Lenders.  In the event the Defaulting Lender fails to advance or repay the Deficiency (with interest at the Default Rate, if applicable) on or prior to the date of the next succeeding Advance, the entire interest of said Defaulting Lender in the Loan shall be subordinate to the interests of the other Lenders, the Defaulting Lender shall have no voting rights under the Loan Documents and all payments otherwise payable to the Defaulting Lender shall be used to advance or repay the Deficiency, as applicable, until such time such Defaulting Lender advances or repays all Deficiencies (including interest at the Default Rate, if applicable).

**[Signature Page To Follow]**

-84-

CONFIDENTIAL

TIAA049719

EXECUTED as of the date first set forth above.

**BORROWER:**                                    **UNION PLACE PHASE I, LLC**
a Delaware limited liability company
By: Union North Phase I, LLC, its Operating
Member

By:_____
Name: Ronald J. Cohen
Title: Manager

Loan Agreement Signature Page

CONFIDENTIAL

TIAA049720

**LENDER:**

**WESTDEUTSCHE IMMOBILIENBANK AG**

By:_____
Name:_____Armin Gemmerich_____
Title:_____Executive Director_____

By:_____
Name:_____Christian Girke_____
Title:_____Director_____

Loan Agreement Signature Page

## EXHIBIT A

### Legal Description of Land

ALL that certain lot or parcel of land situate, lying and being in the District of Columbia, and being more particularly described as follows:

BEING Part of Lot 67, Square 749 as recorded among the Records of the Office of the Surveyor of the District of Columbia in Book 202 at Page 62, said part being more particularly described as follows:

Beginning for the same at a point on the northerly line of K Street NE (147.67 feet wide), said point also being the southeast corner of Lot 67, thence running with the northerly line of K Street NE;

1. West, 149.50 feet to a point, thence running so as to cross and include part of Lot 67;

2. North, 323.833 feet to a point on the southerly line of L Street NE (90 feet wide), thence running with the southerly line of L Street NE;

3. East, 49.50 feet to a point, thence;

4. South, 55.736 feet to a point, thence;

5. East, 100.00 feet to a point on the westerly line of 3rd Street NE (90 feet wide), thence with the westerly line of 3rd Street NE;

6. South, 268.097 feet to the point of beginning, containing 42,839 square feet of land, more or less.

CONFIDENTIAL

TIAA049722

## EXHIBIT B

Intentionally Omitted

B-1

CONFIDENTIAL

TIAA049723

## EXHIBIT C

### Title Requirements

1. <u>Title Insurance Company Requirements</u>. The maximum single risk (i.e., the amount insured under any one policy) by a title insurer may not exceed 25% of that insurer's surplus and statutory reserves. Reinsurance must be obtained by closing for any policy exceeding such amount.

2. <u>Loan Policy Forms</u>. Standard 1992 American Land Title Association ("<u>ALTA</u>") form of loan title insurance policy, or the 1970 (amended October 17, 1970) ALTA loan form policies must be used.

3. <u>Insurance Amount</u>. The amount insured must equal at least the original principal amount of the Loan.

4. <u>Named Insured</u>. The named insured under the Title Policy must be substantially the same as the following: "Westdeutsche ImmobilienBank AG and its respective successors and assigns."

5. <u>Creditors' Rights</u>. Any "creditors' rights" exception or other exclusion from coverage for voidable transactions under bankruptcy, fraudulent conveyance, or other debtor protection laws or equitable principles must be removed by either an endorsement or a written waiver or issuance of a 1970 Form Policy with 1982 modifications.

6. <u>Arbitration</u>. In the event that the form policy which is utilized includes a compulsory arbitration provision, the insurer must agree, if permitted by law, that such compulsory arbitration provisions do not apply to any claims by or on behalf of the insured. Please note that the 1987 and 1992 ALTA form loan policies include such provisions.

7. <u>Date of Policy</u>. The effective date of the Title Policy must be as of the date and time of the closing.

8. <u>Legal Description</u>. The legal description of the property contained in the Title Policy must conform to (a) the legal description shown on the survey of the property, and (b) the legal description contained in the Deed of Trust. In any event, the Title Policy must be endorsed to provide that the insured legal description is the same as that shown on the survey.

9. <u>Easements</u>. Each Title Policy shall insure, as separate parcels: (a) all appurtenant easements and other estates benefiting the property, and (b) all other rights, title, and interests of the borrower in real property under reciprocal easement agreements, access agreements, operating agreements, and agreements containing covenants, conditions, and restrictions relating to the Project.

CONFIDENTIAL

TIAA049724

10. <u>Exceptions to Coverage</u>. With respect to the exceptions, the following applies:

    a)    Each Title Policy shall afford the broadest coverage available in the state in which the subject property is located.

    b)    The "standard" exceptions (such as for parties in possession or other matters not shown on public records) must be deleted.

    c)    The "standard" exception regarding tenants in possession under residential leases, should also be deleted. For commercial properties, a rent roll should be attached in lieu of the general exception.

    d)    The standard survey exception to the Title Policy must be deleted. Instead, a survey reading reflecting the current survey should be incorporated.

    e)    Any exception for taxes, assessments, or other lienable items must expressly insure that such taxes, assessments, or other items are not yet due and payable.

    f)    Any lien, encumbrance, condition, restriction, or easement of record must be listed in the Title Policy, and, if permitted by law, the Title Policy must affirmatively insure that the improvements do not encroach upon the insured easements or insure against all loss or damage due to such encroachment.

    g)    The Title Policy may not contain any exception for any filed or unfiled mechanic's or materialmen's liens.

    h)    In the event that a comprehensive endorsement has been issued and any Schedule B exceptions continue to be excluded from the coverage provided through that endorsement, then a determination must be made whether such exceptions would be acceptable to Administrative Agent. In the event that it is determined that such exception is acceptable, a written explanation regarding the acceptability must be submitted as part of the delivery of the loan documents.

If Schedule B indicates the presence of any easements that are not located on the survey, the Title Policy, if permitted by law, must provide affirmative insurance against any loss resulting from the exercise by the holder of such easement of its right to use or maintain that easement. ALTA Form 103.1 or an equivalent endorsement is required for this purpose.

11. <u>Endorsements</u>. With respect to endorsements, the following applies:

    a)    Each Title Policy must include an acceptable environmental protection lien endorsement on ALTA Form 8.1. Please note that Form 8.1 may take exception for an entire statute which contains one or more specific sections under which environmental protection liens could take priority over the Deed of Trust; provided, however, that such specific sections under which the lien could arise must also be referenced.

C-2

CONFIDENTIAL

TIAA049725

b)   Each Title Policy must contain an endorsement which provides that the insured legal description is the same as shown on the survey.

c)   Each Title Policy must contain a comprehensive endorsement (ALTA Form 9) if a lien, encumbrance, condition, restriction, or easement is listed in Schedule B to the title insurance policy.

d)   Administrative Agent may require the following endorsements where applicable and available:

| | | |
|---|---|---|
| -access | -due execution | -single tax lot |
| -address | -first loss | -subdivision |
| -adjustable rate | -last dollar | -tie in |
| -assessments | -leasehold | -usury |
| -assignment of leases and rents | -mineral rights | -zoning (ALTA 3.1 |
| -assignment of loan documents | -mortgage tax | - with parking) |
| -condominium endorsement | -navigational servitude | |
| -contiguity | -reverter | |
| -doing business | -revolving credit | |

12.   <u>Other Coverages</u>. If permitted by applicable law, each Title Policy shall insure the following by endorsement or affirmative insurance to the extent such coverage is not afforded by the ALTA Form 9 or its equivalent in a particular jurisdiction:

a)   that no conditions, covenants, or restrictions of record affecting the property:

(i)    have been violated,
(ii)   create lien rights which prime the insured mortgage,
(iii)  contain a right of reverter or forfeiture, a right of reentry, or power of termination, or
(iv)   if violated in the future would result in the lien created by the insured mortgage or title to the property being lost, forfeited, or subordinated; and

b)   that except for temporary interference resulting solely from maintenance, repair, replacement, or alteration of lines, facilities, or equipment located in easements and rights of way taken as certain exceptions to each Title Policy, such exceptions do not and shall not prevent the use and operation of the Property or the improvements as used and operated on the effective date of the Title Policy.

13.   <u>Informational Matters</u>. The Policy must include, as an informational note, the following:

a)   The recorded plat number together with recording information; and

b)   The property parcel number or the tax identification number, as applicable.

C-3

TIAA049726

14.    <u>Delivery of Copies</u>.  Legible copies of all easements, encumbrances, or other restrictions shown as exceptions on the Title Policy must be delivered with the first draft of the title commitment.

C-4

CONFIDENTIAL

TIAA049727

## EXHIBIT D

Form of Survey Certification

## CERTIFICATION FOR SURVEYS (LONG FORM)

I hereby certify to WESTDEUTSCHE IMMOBILIENBANK AG, a German banking corporation, as administrative agent, including any of its successors and assigns in such capacity, for itself, and such other co-lenders as may exist from time to time, and _____ [insert Borrower and Title Insurance Company] that the survey prepared by me entitled " _____ " was actually made upon the ground and that it and the information, courses and distances shown thereon are correct; that the title lines and lines of actual possession are the same; that the size, location and type of buildings and improvements are as shown and all are within the boundary lines of the property; that there are no violations of zoning ordinances, restrictions or other rules and regulations with reference to the location of said building and improvements; that there are no easements, encroachments or use affecting this property appearing from a careful physical inspection of the same, other than those shown and depicted thereon; that all utility services required for the operations of the premises either enter the premises through adjoining public streets, or the survey shows the point of entry and location of any utilities which pass through or are located on adjoining private land; that the survey shows the location and direction of all storm drainage systems for the collection and disposal of all roof and surface drainage; that any discharge into streams, rivers or other conveyance system is shown on the survey; and that the parcels described heron do not lie within flood hazard areas in accordance with the document entitled "Department of Housing and Urban Development, Federal Insurance Administration Special Flood Hazard Area Maps". This survey is made in accordance with the "Minimum Standard Detail Requirements for Land Title Surveys" jointly established and adopted by ALTA and ACSM in 2005 and includes items 1-4 and 6-16 of Table A.  Pursuant to the Accuracy Standards as adopted by ALTA, NSPS, and ACSM and in effect on the date of this certification, the undersigned further certifies that:   [Surveyor to complete with appropriate choice from Minimum Standard Detail Requirement]

CONFIDENTIAL

TIAA049728

# EXHIBIT E

## INSURANCE REQUIREMENTS DURING AND POST CONSTRUCTION

**I. Insurance.** Borrower shall obtain, and maintain or cause to be maintained at all times during term of the Loan, such insurance as Westdeutche ImmoblienBank AG ("Administrative Agent") may reasonably require, including, but not limited to the insurance coverage set forth below. Unless otherwise expressly defined herein, capitalized terms set forth in this Exhibit are terms of art, as used in and understood in the insurance industry or are defined terms in the Loan and Security Agreement to which this is attached.

### A. During Construction

(a)   Builder's Risk. From the closing of the loan until replaced by permanent property insurance, "All Risk", Special Perils form of Builder's Risk Insurance, in such amount as Administrative Agent shall reasonably require, but in no event less than 100% of the insurable replacement cost value of the Project (including Upgrades and any leasehold improvements) (the **"Builder's Risk Insurance"**). Such policy shall be written on a Builder's Risk Completed Value Form (100% non-reporting) or its equivalent and shall not contain a permission to occupy limitation. Such policy shall not have exclusion for sidewalks, retaining walls or underground property. The policy shall include coverage for acts of terrorism. The policy shall include coverage for Flood and Earthquake with sub-limits per occurrence and in the annual aggregate acceptable to Administrative Agent. Such insurance policy shall also include coverage for:

   (i)   Loss suffered with respect to Borrower's materials, equipment, machinery, and supplies whether on-site, in transit, or stored off site, with a limit of no less than 100% replacement cost or a maximum limit of $500,000 per occurrence for both transit and off site storage;

   (ii)   At least 25% of the Soft Costs, excluding construction loan interest, contained in the Approved Budget, and including coverage for all types (including but not limited to fees; and plans, specifications, blueprints and models, in connection with any new construction or restoration following an insured loss), and also including 100% of construction loan interest;

(b)   From the date that building systems are energized, Comprehensive Broad Form Boiler and Machinery Insurance, covering all mechanical and electrical apparatus and pressure vessels. Such insurance shall provide coverage against loss or damage from an accident to and/or caused by boilers and machinery, including but not limited to: heating apparatus, pressure vessels, pressure pipes, electrical or air conditioning equipment on a blanket comprehensive coverage form, in such amount as Administrative Agent shall reasonably approve but no less than $10,000,000. All exclusions for testing shall be removed.

E-1

CONFIDENTIAL

TIAA049729

(c)     Professional Liability.  The Borrower will require the architect, engineers (including Structural and MEP contractors) and all other design professionals retained by the Borrower to purchase and maintain continuous professional liability coverage in the amount of $1,000,000 per claim / and $1,000,000 annual aggregate, or such other amount acceptable to Administrative Agent.  This policy may be on a "claims made" basis, and shall include coverage for bodily injury and property damage and retroactive coverage back to the first date that professional services were provided to the Project.  Evidence of this insurance shall be provided to Borrower in form of insurance certificate for a period of 3 years after substantial completion of the Project (unless the loan is paid off).

(d)     Borrower's  Commercial General Liability and Umbrella Liability coverage, including but not limited to, coverage for Personal Injury, Bodily Injury, Death, Property Damage, Fire Damage Legal Liability, with limits of not less than $5,000,000 per occurrence and in the annual aggregate per location.  The policies described in this paragraph shall cover, without limitation: elevators, escalators, independent contractors, contractual liability (covering, to the maximum extent permitted by the commercial general liability policy, the Borrower's obligation to indemnify the Administrative Agent as required under this Exhibit) and Products and Completed Operations Liability coverage.  Borrower shall add Administrative Agent, its directors, officers, employees and agents as additional insured.

(e)     Worker's Compensation.  If applicable, worker's compensation insurance covering Borrower and its employees at the site to the extent required, and in the amounts required by applicable Laws.

(f)     Employers Liability.   If applicable in the amount of $1,000,000 per accident, $1,000,000 per illness, per employee and $1,000,000 per illness, in the aggregate.

(g)     Contractor's Liability.   Borrower shall cause the General Contractor to maintain Commercial General Liability coverage, including, without limitation, products and completed operations and Automobile Liability insurance with no less than $25,000,000 in limits per occurrence and in the aggregate per project through primary and umbrella liability policies.   Borrower shall also ensure that all subcontractors maintain similar coverage with limits appropriate to the hazard associated with their respective work on the site as determined by the general contractor.  Subcontractors engaged in high hazard work shall maintain general liability and umbrella liability limits of at least $10,000,000.  All parties engaged in work on the Project shall maintain statutory Workers Compensation, Employer's Liability with limits of at least $1,000,000 and any legally mandated Disability insurance in force for all employees on the job.

(h)     Terrorism.    If the insurance policies in Subsections (a) through (g) above to not cover terrorism insurance, Borrower shall obtain insurance, from insurer or insurers with Standard and Poor's rating of A- or better and be authorized in the state where the Project is located, for damage to the Project caused by all certified and uncertified acts of terrorism in amounts not less than the 100% replacement cost value of

E-2

TIAA049730

the Property, or otherwise acceptable to Agent, in form and substance reasonably acceptable to Administrative Agent. Notwithstanding the foregoing, Borrower shall not be required to pay annual premiums for both terrorism insurance and any comprehensive all risk insurance policy in excess of 150% of the cost for such combined coverage.

(i)     Performance Bond.   A Performance Bond and Labor and Material Payment Bond (the "Bonds") in an amount equal to 100% of the general contract sum shall be required by the Borrower and each bond shall be in a form approved by Administrative Agent. In Administrative Agent's sole and absolute discretion, the Bonds may be obtained from all major subcontractors in lieu of Bonds from the General Contractor. Administrative Agent shall be named a dual obligee on all Bonds. The Bonds must be issued by bonding companies who are licensed in the state in which the Project is located and who are rated in the latest A.M. Best rating guide as A:IX or better. The Bonds must be written within the limitations of the most current U.S. Department of Treasury's listing of Approved Sureties (Department Circular #570).

(j)     Borrower may provide the Commercial General and Umbrella Liability and Workers Compensation and Employers Liability required to be carried pursuant to Sections I.A., Subsections (d), (e), (f) and (g) of this Exhibit through the purchase of a Wrap-up or Owner Controlled Insurance Program. This program shall provide coverage for all parties engaged in construction operations at the Project with limits approved by Administrative Agent.

**B. Post Construction**. -- After the earlier of: (i) substantial completion of the Project, or (ii) cancellation or expiration of the Builder's Risk Policy, the Borrower shall provide the following coverages:

(a)     "All Risk" insurance including Flood and Earthquake, and such other insurable hazards as, under good insurance practices are insured against for other property and buildings similar to the premises in nature, use, location, height, and type of construction. The amount of such insurance shall be not less than one hundred percent (100%) of the insurable replacement cost without depreciation of the Project. Such insurance policy shall contain an agreed amount endorsement. Flood and Earthquake sublimits shall be but not less than $5,000,000 each per occurrence and in the annual aggregate, unless the risk is location in a Mercalli Zone VII or greater or a Flood Zone "A", as defined by the National Insurance Flood Plan. If the Project is located in an Earthquake Mercalli Zone VII or greater Borrower shall maintain Earthquake limits providing for 75% of the replacement cost, with a deductible not greater than 5% of the replacement cost. If the Project is located in a Flood Zone "A", Borrower shall maintain Flood limits providing for 20% of the replacement cost, with a deductible not greater than 3% of replacement costs. Such insurance shall cover increased cost of law or ordinance insurance, costs of demolition and increased cost of construction with a sublimit of not less than $1,000,000. If coverage is provided under a blanket policy, Administrative Agent shall be named as sole Loss Payee and Deed of Trust for the Project.

E-3

CONFIDENTIAL

TIAA049731

(b)    Comprehensive Broad Form Boiler and Machinery. Insurance, in the minimum amount of $10,000,000 covering all mechanical and electrical equipment against physical damage and covering, without limitation, all tenant improvements and betterments that the Borrower is required to insure pursuant to any lease on a replacement cost basis. Such insurance shall provide coverage against loss or damage from an accident to and/or caused by boilers and machinery, including but not limited to: heating apparatus, pressure vessels, pressure pipes, and electrical or air conditioning equipment on a blanket comprehensive coverage form, in such amount Administrative Agent shall reasonably approve. All exclusions for testing shall be removed. Coverage shall be extended to include loss of rental income for 6 months as a result of damage from an insured peril.

(c)    Business Interruption (if applicable).   Upon Administrative Agent's reasonable request, business income and extra expense, against the perils insured by the "All Risk" Property, for a period of indemnity of twelve months.

(d)    Commercial General Liability. Commercial General Liability Insurance, including, but not limited to, Owned (if any), Hired and Non Owned Auto Liability, and Umbrella Liability coverage for Personal Injury, Bodily Injury, Death, Accident and Property Damage providing in combination no less than $10,000,000 per occurrence and in the annual aggregate, **per location**. The policies described in this paragraph shall cover, without limitation: elevators, escalators, independent contractors, contractual liability and Products and Completed Operations Liability coverage.

(e)    Reserved

(f)    Worker's Compensation. If applicable, worker's compensation insurance covering Borrower and its employees at the site to the extent required, and in the amounts required by applicable Laws.

(g)    Employers Liability. If applicable in the amount of $1,000,000 per accident; $1,000,000 per illness, per employee; and $1,000,000 per illness, in the aggregate.

(h)    Other. Such other insurances as may be reasonably requested by Administrative Agent.

## II.    Requirements of Insurance Policies

(a)    Unless otherwise specified herein, all insurance policies shall be issued by an insurer or insurers with an A.M. Best rating of A-10 or better and be authorized in the state where the Project is located. The Performance Bond must be issued by bonding companies and must be licensed in the state in which the Project is located and must be rated in the latest A.M.Best rating guide as A: X or better. The Performance Bond must be written within the limitations of the latest U.S. Department of Treasury's listing of Approved Sureties (Department

E-4

TIAA049732

Circular #570). All insurance acquired pursuant to this Exhibit shall be in form, amounts and with coverage and deductibles satisfactory to Administrative Agent, in Administrative Agent's sole discretion.

(b)     All insurance policies required to be carried pursuant to this Exhibit, shall name Borrower as the insured and shall also name Administrative Agent as Lender Loss Payee, Additional Insured and Mortgagee, under standard New York State non-contributing mortgagee clause. Without the Administrative Agent's prior written consent, Borrower shall not name any Person other than the Administrative Agent, as loss payee under any property insurance policies that Borrower is required to insure pursuant to any Lease.

(c)     The Commercial General Liability, Auto Liability and Employer's Liability and Contractors Liability set forth in Section I.A., Subsections (d), (f), and (g) and Section I.B., Subsections (d) (e) and (g), shall name Administrative Agent, its directors, officers, and employees as Additional Insured.

(d)     Administrative Agent shall be named as a dual-obligee on the Performance Bond required to be obtained by General Contractor pursuant to Section I.A., Subsection (h) of this Exhibit.

(e)     The amount of any deductible under any insurance policy must be reasonably acceptable to the Administrative Agent.

(f)     Borrower may provide required insurance under blanket policies. Borrower shall not maintain any property insurance on the Project that does not name Administrative Agent as Lender Loss Payee.

(g)     Borrower shall pay the premiums for the insurance policies as the same become due and payable. Borrower shall deliver to the Administrative Agent certified copies of the insurance policies required to be maintained pursuant to this Exhibit within sixty (60) days after the Closing Date or ten (10) days after the issuance of the policies by the insurer, whichever is later, but in all events, no later than ninety (90) days after the Closing Date, and failure to do so will be an immediate Event of Default. Notwithstanding the foregoing, Administrative Agent shall not be deemed by reason of the custody of such insurance policies to have knowledge of the contents thereof. Borrower also shall deliver to the Administrative Agent, within ten (10) days of the Administrative Agent's request, a certificate of the Borrower or the Borrower's insurance agent setting forth the particulars as to all such insurance policies, that all premiums due thereon have been paid currently and that the same are in full force and effect. BORROWER SHALL DELIVER A CERTIFICATE OR OTHER EVIDENCE OF INSURANCE ACCEPTABLE TO LENDER EVIDENCING THE INSURANCE REQUIRED HEREUNDER ON THE CLOSING DATE, TOGETHER WITH RECEIPTS FOR THE PAYMENT OF PREMIUMS THEREON. ALL CERTIFICATES FOR PROPERTY INSURANCE MUST BE ON ACORD FORM 27(3/93) or Acord 28(2003/10); ACORD 25 certificates are acceptable for liability insurance. Prior to the expiration date of each of the insurance policies the Borrower shall deliver to the Administrative Agent a certificate of insurance evidencing renewal of coverage as required herein. Within ten (10) days after such renewal, Borrower shall deliver to the Administrative

E-5

TIAA049733

Agent evidence of payment of premium satisfactory to the Administrative Agent. Not later than ninety (90) days after the renewal of each of the insurance policies, Borrower shall deliver to Administrative Agent an original or certified copy (as required pursuant to this Section) of a renewal policy or policies.

(h)     Each insurance policy shall contain a provision whereby the insurer agrees that so long as the Loan is outstanding, such policy shall not be canceled or fail to be renewed, lapsed or materially changed without in each case, at least thirty (30) days prior written notice to the Administrative Agent, except ten (10) days for non-payment of premium

(i)     In the event any insurance policy (except for general and other liability and Workers Compensation insurance) shall contain breach of warranty provisions, such policy shall provide that with respect to the interest of the Administrative Agent, such insurance policy shall not be invalidated by and shall insure the Administrative Agent regardless of; (A) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured; (B) the occupancy or use of the property for purposes more hazardous than permitted by the terms thereof; or (C) any foreclosure or other action or proceeding taken by the Administrative Agent pursuant to any provision of this Agreement.

(j)     Any insurance maintained pursuant to this Agreement may be evidenced by blanket insurance policies covering the premises and other properties or assets of the Borrower or its affiliates; provided that any such policy shall in all other respects comply with the requirements of this section. Administrative Agent, in its reasonable discretion, shall determine whether such blanket policies contain sufficient limits of insurance.

(k)     Any insurance carried by Administrative Agent shall be for its sole benefit and shall not inure to the benefit of the Borrower and Insurance required from Borrower shall be primary to any available, if any, to Administrative Agent.

(l)     All required policies, other than professional liability, shall provide that insurers have waived rights of subrogation against Administrative Agent. The required insurance shall be primary without right of contribution from any insurance, which may be carried by Administrative Agent.

(m)     The required limits are minimum limits established by Administrative Agent and nothing contained herein shall be construed to mean the required limits are adequate or appropriate to protect the Borrower from greater loss.

E-6

CONFIDENTIAL

TIAA049734

**EXHIBIT F**

Intentionally Omitted

F-1

CONFIDENTIAL

TIAA049735

**EXHIBIT G**

Initial Budget

(See attached.)

G-1

CONFIDENTIAL

TIAA049736

**Exhibit G  (page 1)**
**Budget**

|  | in US $ |
|---|---|
| LAND | 17,000,000 |
|  |  |
| **HARD COSTS** |  |
| Construction above grade - 238,786 GSF | 38,000,000 |
| Construction below parking - 173 spaces | 5,500,000 |
|  |  |
| Hard Costs - Subtotal | 60,500,000 |
| Hard Costs - Contingency @ 5% | 2,175,000 |
|  |  |
| Total Hard Costs | 62,675,000 |
|  |  |
| **SOFT COSTS** |  |
| Architectural / Engineering / Enviromental | 1,800,000 |
| Real Estate Taxes Dureing Construction | 1,140,000 |
| Legal Expenses | 200,000 |
| Bonds, Permits, Inspections | 150,000 |
| Insurance | 100,000 |
| Loan / Closing Recordation | 835,000 |
| Marketing During Lease-up | 400,000 |
| F.F. & E (Common Area, Office, Other) | 300,000 |
| Fees (Loan & Brokerage) | 1,200,000 |
| Miscellaneous | 200,000 |
| Signs & marketing Material | 200,000 |
| Contingency | 125,000 |
|  |  |
| Soft Costs - Subtotal | 6,650,000 |
| Construction Loan Interest - During Construction | 5,000,000 |
| Developer Fee | 1,600,000 |
| Interest Reserve during Rent Stabilization | 3,000,000 |
|  |  |
| Total Soft Costs | 16,250,000 |
|  |  |
| **Total Project Costs** | **78,925,000** |

CONFIDENTIAL

TIAA049737

Exhibit G (page 2)

*Phase I  237,000 ⌀*
*Parking  177*
*2 BelowGrade*

# PROJECT SUMMARY
## ADC BUILDERS, INC.

Budget

JOB *Union Place*                    ESTIMATOR *ADC/DLW*

LOCATION *200 K Ne*                  DATE *9/07*

| DIV | DESCRIPTION | SUBS | LABOR | MATERIAL | TOTAL |
|---|---|---|---|---|---|
| 1 | GENERAL CONDITIONS | | | | 3,100,000 |
| 2 | SITEWORK | | | | 3,587,000 |
| 3 | CONCRETE | | | | 10,995,000 |
| 4 | MASONRY | | | | 1,115,000 |
| 5 | METALS | | | | 1,200,000 |
| 6 | WOOD & PLASTICS | | | | 1,935,000 |
| 7 | THERM/MOIST PROT. | | | | 1,305,500 |
| 8 | DOORS & WINDOWS | | | | 1,980,000 |
| 9 | FINISHES | | | | 4,737,000 |
| 10 | SPECIALTIES | | | | 490,000 |
| 11 | EQUIPMENT | | | | 1,083,000 |
| 12 | FURNISHINGS | | | | 200,000 |
| 13 | SPECIAL CONST. | | | | 28,000 |
| 14 | CONVEYING SYSTEMS | | | | 610,000 |
| 15 | MECHANICAL | | | | 5,205,000 |
| 16 | ELECTRICAL | | | | 3,865,000 |
| | NET CONSTRUCTION | | | | |
| | GENERAL CONTRACTOR FEE % | | | | 2,064,500 |
| | ▓▓▓▓▓▓▓▓▓▓▓ | | | | |
| | TOTAL CONSTRUCTION COSTS | | | | 43,500,000 |
| | *Contingency* | | | | 2,175,000 |
| | COSTS PER SQUARE FOOT | | | | |
| | COSTS PER ROOM | | | | |
| | COSTS PER SPACE | | | | |

CONFIDENTIAL

TIAA049738

# EXHIBIT H

Draw Request Forms

UNION PLACE PHASE I, LLC
[_____]
[_____]


[_____, 200_]


Westdeutsche ImmobilienBank AG,
as Administrative Agent
Grosse Bleiche 46
55116 Mainz, Germany


     Re:   Union Place, Washington, D.C.

Ladies and Gentlemen:

     In accordance with that certain Loan and Security Agreement (as the same may hereinafter be amended, restated, modified, extended and/or assigned from time to time, the "***Loan Agreement***") dated as of _____ ___, 2008, between Westdeutsche ImmobilienBank AG, a German banking corporation, as agent (including any of its successors and assigns in such capacity, "***Administrative Agent***") for itself, and such other co-lenders as may exist from time to time (collectively, "***Lenders***" and each individually, a "***Lender***"), having an office at Grosse Bleiche 46, 55116 Mainz, Germany, and Union Place Phase I, LLC, a Delaware limited liability company, ("***Borrower***") having an address at having an address at [_____], this letter will serve as the Borrower's Requisition requesting the sum of [$_____] under the Loan Agreement. All capitalized terms used herein, and not otherwise defined herein, have the same meaning as in the Loan Agreement.

     The draw amount for this month is as follows:

| | |
|---|---|
| Current Total Draw Amount: | [$_____] |
| Less interest/fees already capitalized this period: | [$_____] |
| Amount of new loan proceeds: | [$_____] |
| Less Lenders holdbacks for reimbursements: | [$_____] |
| Net Amount of Wire: | [$_____] |

     Please wire the funds on [_____, 2008] as follows:

          Amount:   [$_____.___]
          Bank:     [_____]

H-1

CONFIDENTIAL

TIAA049739

ABA #:              [_____]
Escrow No.:        [_____]
Account:           [_____]
Account Number:   [_____]

Please fund this advance under the loan under the Base Rate option.  We will follow with further instructions regarding the conversion to LIBOR option.

The support for the above advance is provided in the attached hereto.  I would appreciate you advising me as soon as the advance has been credited.

Borrower hereby acknowledges that it has no outstanding defenses, claims, counterclaims or offsets against Lenders under the Loan Documents.

Borrower represents and warrants to Lenders as of the date hereof that:  (a) any completed construction is substantially in accordance with the Plans and Specifications; (b) all costs for the payment of which Lenders have previously advanced funds have in fact been paid; (c) each of the representations and warranties of any Loan Party contained in the Loan Documents, including those set forth in **Article 3** of the Loan Agreement, were true, correct and complete as of the date of the Loan Agreement and as of the date of any previous Advance and continue to be true and correct in all material respects as of the date hereof; (d) no Default or Event of Default shall have occurred and be continuing under the Loan Agreement; and (e) Borrower continues to be in compliance in all material respects with all of the other terms, covenants and conditions contained in the Loan Agreement.

Very truly yours,

UNION PLACE PHASE I, LLC

By:    [_____]

     By:    [_____]

          By:    _____
               Name:
               Title:

H-2

CONFIDENTIAL

TIAA049740

**[Form of Schedule of Supporting Documentation for Construction Cost Disbursements]**

1.    Application and Certificate for Payment (AIA Document No. G702); [specify any additional schedules or supplementary information being provided]

2.    Report of the Construction Consultant, certifying to Administrative Agent as to the value of completed construction, percentage of completion, compliance with Plans and Specifications, and whether there are sufficient funds in the Budget to pay the remaining Project Costs and complete the Construction of the Project and sufficient unfunded proceeds from the Loan Amount to pay the remaining Project Costs in full;

3.    Lien waivers from the General Contractor and all Major Subcontractors;

4.    Written request of Borrower for any necessary changes in the Plans and Specifications, the Budget or the Construction Schedule;

5.    Copies of all executed Change Orders, contracts and subcontracts (all of which are subject to Administrative Agent's approval), and, to the extent requested by Administrative Agent or the Construction Consultant, of all inspection or test reports and other documents relating to the construction of the Improvements not previously delivered to Administrative Agent;

6.    A schedule of values and anticipated cost report; and

7.    [Specify such other information, documentation and certifications required under the Loan Agreements or as Administrative Agent shall reasonably request.]

CONFIDENTIAL

TIAA049741

# EXHIBIT I

Ratable Share

| Name of Lender | Amounts | Percentage |
|---|---|---|
| Westdeutsche ImmobilienBank AG | $55,250,000.00 | 100% |
| Total | $55,250,000.00 | 100% |

I-1

CONFIDENTIAL

TIAA049742

## EXHIBIT J

Approved Plans and Specifications

(see attached)

J-1

CONFIDENTIAL

TIAA049743

SY0316_dwgindex-CD

| | Union Place Phase I Drawing Index -Issue for Permit 100 %Construction Documents, 04-01-06 | |
|---|---|---|
| SHEET NO. | SHEET NAME | |
| **VOLUME I** | | |
| GENERAL | | |
| G-000A | COVER SHEET (1 OF 2) | |
| G-001A | DRAWING LIST, ABBR., SYMBOLS, NOTES | |
| G-002A | LOCATION MAP, CODE SUMMARY, ZONING DATA, | |
| | AND GENERAL NOTES | |
| ARCHITECTURE | | |
| A-001 | P2 LEVEL COLUMN LOCATION PLAN | |
| A-002 | P1 LEVEL COLUMN LOCATION PLAN | |
| A-003 | LEVEL 1 COLUMN LOCATION PLAN PART A | |
| A-004 | LEVEL 1 COLUMN LOCATION PLAN PART B | |
| A-005 | LEVEL 2 COLUMN LOCATION PLAN PART A | |
| A-006 | LEVEL 2 COLUMN LOCATION PLAN PART B | |
| A-007 | LEVEL 3 COLUMN LOCATION PLAN | |
| A-008 | LEVEL 4 COLUMN LOCATION PLAN | |
| A-009 | LEVEL 5 COLUMN LOCATION PLAN | |
| A-010 | LEVEL 6 COLUMN LOCATION PLAN | |
| A-011 | LEVEL 7 COLUMN LOCATION PLAN | |
| A-012 | LEVEL 8 COLUMN LOCATION PLAN | |
| A-013 | LEVEL 9 COLUMN LOCATION PLAN | |
| A-014 | LEVEL 10 COLUMN LOCATION PLAN | |
| A-015 | ROOF & PENTHOUSE COLUMN LOCATION PLAN | |
| | | |
| A-101 | P2 PARKING LEVEL FLOOR PLAN | |
| A-102 | P1 PARKING LEVEL FLOOR PLAN | |
| A-103 | LEVEL 1 FLOOR PLAN - PART A | |
| A-104 | LEVEL 1 FLOOR PLAN - PART B | |
| A-105 | LEVEL 2 FLOOR PLAN - PART A | |
| A-106 | LEVEL 2 FLOOR PLAN - PART B | |
| A-107 | LEVEL 3 FLOOR PLAN | |
| A-108 | LEVEL 4 FLOOR PLAN | |
| A-109 | LEVEL 5-6 FLOOR PLAN | |
| A-110 | LEVEL 7 FLOOR PLAN | |
| A-111 | LEVEL 8 FLOOR PLAN | |
| A-112 | LEVEL 9 FLOOR PLAN | |
| A-113 | LEVEL 10 FLOOR PLAN | |
| A-114 | ROOF PLAN | |
| | | |
| A-121 | P1 LEVEL REFLECTED CEILING PLAN | |
| A-122 | LEVEL 1 REFLECTED CEILING PLAN | |
| A-123 | LEVEL 2 REFLECTED CEILING PLAN | |
| | | |
| A-201 | K STREET ELEVATION | |
| A-202 | 3RD STREET ELEVATION | |
| A-203 | PARTIAL NORTH & WEST ELEVS. AND LOADING AREA ELEVS. | |
| A-204 | PARTIAL NORTH & WEST ELEVATIONS AND | |
| | NORTH PENTHOUSE ELEVATIONS | |
| A-205 | PENTHOUSE ELEVATIONS | |
| | | |
| A-211 | ENLARGED ELEVATIONS - K STREET | |
| A-212 | ENLARGED ELEVATIONS - 3RD STREET | |
| A-213 | ENLARGED ELEVATIONS - 3RD STREET | |
| | | |
| A-301 | BUILDING SECTION | |
| A-302 | BUILDING SECTION | |
| | | |
| A-311 | PARKING GARAGE SECTION | |
| | | |
| A-321 | EXTERIOR WALL SECTIONS | |
| A-322 | EXTERIOR WALL SECTIONS | |
| A-323 | EXTERIOR WALL SECTIONS | |
| A-324 | EXTERIOR WALL SECTIONS | |
| A-325 | EXTERIOR WALL SECTIONS | |
| A-326 | EXTERIOR WALL SECTIONS | |
| | | |
| A-401 | ENLARGED PLAN - LOBBY/WAITING AREA/MEETING ROOM | |
| A-401a | ENLARGED FINISH PLAN - LOBBY/WAITING AREA/MEETING RM. | |
| A-402 | ENLARGED PLAN - ELEVATOR/BUILDING MAINTENANCE | |
| A-402a | ENLARGED FINISH PLAN - ELEVATOR/BUILDING MAINTENANCE | |

CONFIDENTIAL

TIAA049744

030313_derplsdev/CD

| SHEET NO. | SHEET NAME |
|---|---|
| | Union Place Phase I Drawing Index-Issue for Permit 100 %/Construction Documents_04-01-08 |
| A-403 | ENLARGED PLANS - TYPICAL CORRIDORS |
| A-411 | ENLARGED STAIR PLANS |
| A-412 | STAIR SECTIONS |
| A-413 | STAIR SECTIONS |
| A-414 | ENLARGED ELEVATOR PLANS AND SECTIONS |
| A-420 | ENLARGED REFLECTED CEILING PLAN - LOBBY/WAITING AREA/MEETING ROOM |
| A-421 | ENLARGED REFLECTED CEILING PLAN - ELEVATOR/BUILDING MAINTENANCE |
| A-422 | ENLARGED REFLECTED CEILING PLAN - TYPICAL CORRIDORS |
| A-423 | ENLARGED REFLECTED CEILING PLAN - 2ND & 3RD FLOOR CORRIDORS |
| A-424 | ENLARGED REFLECTED CEILING PLAN - 9TH, 10TH & PARTIAL 8TH FLOOR CORRIDORS |
| A-430 | MAIN LOBBY & WAITING AREA ELEVATIONS |
| A-432 | AMENITY AREA ELEVATIONS |
| A-433 | TYPICAL RES. CORRIDOR ELEVATIONS (LEVELS 3-10) |
| A-434 | ENLARGED PUBLIC RESTROOM AND GALLEY PLANS & ELEVATIONS |
| A-501 | PLAN DETAILS |
| A-502 | PLAN DETAILS |
| A-503 | PLAN DETAILS |
| A-506 | EXTERIOR SECTION DETAILS |
| A-507 | EXTERIOR SECTION DETAILS |
| A-508 | EXTERIOR SECTION DETAILS |
| A-509 | EXTERIOR SECTION DETAILS |
| A-510 | EXTERIOR SECTION DETAILS |
| A-511 | TYPICAL STAIR ELEMENTS |
| A-512 | TRASH CHUTE SECTIONS & ELEVATOR DETAILS |
| A-513 | CORNER CANOPY DETAILS |
| A-514 | MAIN ENTRY CANOPY DETAILS |
| A-520 | CEILING DETAILS AND SECTIONS AT TYP. MILLWORK |
| A-521 | ENLARGED PLANS AND SECTIONS TYP. MILLWORK |
| A-522 | CONCIERGE DESK PLAN AND MILLWORK DETAILS |
| A-601 | PARTITION TYPES |
| A-611 | DOOR SCHEDULE |
| A-612 | DOOR FRAMES, TYPES AND DETAILS |
| A-613 | WINDOW TYPES |
| A-614 | WINDOW TYPES, SCHEDULE & LOUVER SCHEDULE |
| A-615 | SIGNAGE SCHEDULE |
| A-631 | FINISH LEGEND & SCHEDULES |
| A-700 | DWELLING UNIT TYP. DETAILS & NOTES |
| A-701 | TYPICAL UNIT PLANS - FLOOR 1 PART A |
| A-702 | TYPICAL UNIT PLANS - FLOOR 1 PART B |
| A-703 | TYPICAL UNIT PLANS - FLOOR 2 PART A |
| A-704 | TYPICAL UNIT PLANS - FLOOR 2 PART B |
| A-705 | TYPICAL UNIT PLANS - FLOOR 2 PART C |
| A-706 | TYPICAL UNIT PLANS - FLOOR 2 PART D |
| A-707 | TYPICAL UNIT PLANS - FLOOR 3 PART A |
| A-708 | TYPICAL UNIT PLANS - FLOOR 3 PART B |
| A-709 | TYPICAL UNIT PLANS - FLOOR 3 PART C |
| A-710 | TYPICAL UNIT PLANS - FLOOR 3 PART D |
| A-711 | TYPICAL UNIT PLANS - FLOORS 4-8 PART A |
| A-712 | TYPICAL UNIT PLANS - FLOORS 4-8 PART B |
| A-713 | TYPICAL UNIT PLANS - FLOORS 4-8 PART C |
| A-714 | TYPICAL UNIT PLANS - FLOORS 4-8 PART D |
| A-715 | TYPICAL UNIT PLANS - FLOOR 7 PART D |
| A-716 | TYPICAL UNIT PLANS - FLOORS 9-10 PART A |
| A-717 | TYPICAL UNIT PLANS - FLOORS 9-10 PART B |
| A-718 | TYPICAL UNIT PLANS - FLOORS 9-10 PART C |
| A-721 | 1ST FLOOR REFLECTED CEILING PLAN - PART A |
| A-722 | 1ST FLOOR REFLECTED CEILING PLAN - PART B |

Page 2 of 3 5/14/2008 2:12 PM

CONFIDENTIAL

TIAA049745

B0G315_dwgindex-CO

| SHEET NO. | SHEET NAME |
|---|---|
| | Union Place Phase I Drawing Index Issue for Permit 100 %Construction Documents_04-01-08 |
| A-733 | 2ND FLOOR REFLECTED CEILING PLAN - PART A |
| A-734 | 2ND FLOOR REFLECTED CEILING PLAN - PART B |
| A-735 | 2ND FLOOR REFLECTED CEILING PLAN - PART C |
| A-736 | 2ND FLOOR REFLECTED CEILING PLAN - PART D |
| A-737 | 3RD FLOOR REFLECTED CEILING PLAN - PART A |
| A-738 | 3RD FLOOR REFLECTED CEILING PLAN - PART B |
| A-739 | 3RD FLOOR REFLECTED CEILING PLAN - PART C |
| A-740 | 3RD FLOOR REFLECTED CEILING PLAN - PART D |
| A-741 | 4TH-7TH FLOOR REFLECTED CEILING PLAN - PART A |
| A-742 | 4TH-7TH FLOOR REFLECTED CEILING PLAN - PART B |
| A-743 | 4TH-7TH FLOOR REFLECTED CEILING PLAN - PART C |
| A-744 | 4TH-5TH FLOOR REFLECTED CEILING PLAN - PART D |
| A-745 | 6TH FLOOR REFLECTED CEILING PLAN - PART D |
| A-746 | 7TH FLOOR REFLECTED CEILING PLAN - PART D |
| A-747 | 8TH FLOOR REFLECTED CEILING PLAN - PART A |
| A-748 | 8TH FLOOR REFLECTED CEILING PLAN - PART B |
| A-749 | 8TH FLOOR REFLECTED CEILING PLAN - PART C |
| A-750 | 9TH-10TH FLOOR REFLECTED CEILING PLAN - PART A |
| A-751 | 9TH-10TH FLOOR REFLECTED CEILING PLAN - PART B |
| A-752 | 9TH-10TH FLOOR REFLECTED CEILING PLAN - PART C |
| | |
| A-800 | KITCHENS 'A', 'B', & 'C' - PLANS & ELEVATIONS |
| A-801 | KITCHENS 'D', 'E', & 'F' - PLANS & ELEVATIONS |
| A-802 | TYPICAL BATHROOMS & POWDER ROOMS - PLANS |
| A-803 | TYPICAL BATHROOMS & POWDER ROOMS - ELEVATIONS |
| | |
| VOLUME 2 | |
| G-000B | COVER SHEET (2 OF 3) |
| G-001B | DRAWING LIST, ABBR., SYMBOLS, NOTES |
| G-002B | LOCATION MAP, CODE SUMMARY, ZONING DATA, |
| | AND GENERAL NOTES |

Page 3 of 3 5/14/2008 2:12 PM

CONFIDENTIAL

TIAA049746

**EXHIBIT K**

Bailment Letter (Warehousemen)

[TO BE OBTAINED FROM ALL PUBLIC WAREHOUSEMEN]

[BORROWER LETTERHEAD]

CERTIFIED MAIL (RECEIPT REQUESTED)

[NAME AND ADDRESS OF WAREHOUSE COMPANY]

RE: _____

Gentlemen:

The undersigned, _____ ("Borrower") has delivered and will, from time to time hereafter, deliver certain materials ("Materials") to you for storage in your public warehouse located at your address set forth above. WESTDEUTSCHE IMMOBILIENBANK AG, a German bank having its principal office at [_____], ("Administrative Agent") has extended a construction loan to Borrower, which loan is secured by, among other things, a security interest in all of the tangible and intangible personal property of Borrower, including, without limitation, the Materials.

By signing and returning this letter you acknowledge and agree that Administrative Agent's security interest in the Materials is senior to all liens, claims and interests, other than your warehouseman's lien for any accrued and unpaid warehousing fees charged by you for the actual storage of the Materials. To protect Administrative Agent's security interest in the Materials, from and after _____, 200_, all warehouse receipts and other documents of title which evidence any Materials now or hereafter delivered by Borrower to you shall be non-negotiable and issued to or for the account of Administrative Agent. You shall provide Administrative Agent with a copy of such receipts or other documents upon Administrative Agent's request for those items. Notwithstanding the issuance of such receipts or other documents to or for the account of Administrative Agent, Administrative Agent's acknowledgment hereof shall constitute authorization to you, subject to the conditions described below, to release any of the Materials to any authorized agent of Borrower upon Borrower's request. Your authority to release the Materials to Borrower or Borrower's customers is subject to the following conditions: (i) within one (1) day after your release of any Materials, you shall mail to Administrative Agent, at the address set forth above, attention: Joel Solomon, General Counsel, a copy of a receipt describing the agent to whom such Materials were released and the quantity and description of the released Materials, and (ii) upon the oral or written direction of Administrative Agent, you shall refuse to release Materials to Borrower or Borrower's agent and you shall only release such Materials to Administrative Agent or the party designated by Administrative Agent in such oral or written direction.

Borrower agrees that you shall have no liability to Borrower if you comply with Administrative Agent's oral or written direction as described above. Borrower further agrees that

K-1

CONFIDENTIAL

it will continue to pay all warehousing fees and other expenses related to the storage of the Materials and will reimburse you for all reasonable costs or expenses incurred as a direct result of your compliance with the terms and provisions of this letter.

Please confirm receipt of this letter and your agreement to the delivery instructions and other terms contained in this letter by signing the enclosed acknowledgement and returning it to Administrative Agent at the address set forth above, attention Joel Solomon, General Counsel.

Very truly yours,

By:_____

Name:_____

Its:_____

K-2

TIAA049748

ACKNOWLEDGEMENT OF PUBLIC WAREHOUSEMEN

The terms and conditions of this letter are acknowledged and agreed to as of this

_____ day of _____, 200_.

[PUBLIC WAREHOUSEMEN COMPANY]

By:_____

Name:_____

Its:_____

K-3

TIAA049749

ACKNOWLEDGEMENT OF WESTDEUTSCHE IMMOBILIENBANK AG

The terms and conditions of this letter are acknowledged and agreed to as of this

_____ day of _____, 200_.

WESTDEUTSCHE IMMOBILIENBANK AG

By:_____

Name:_____

Its:_____

K-4

CONFIDENTIAL

TIAA049750

## EXHIBIT L

Bailment Letter (Other Than Warehousemen)

[TO BE OBTAINED FROM CONTRACTOR OR OTHER BAILEES OTHER THAN PUBLIC

WAREHOUSEMEN]

[BORROWER LETTERHEAD]

CERTIFIED MAIL (RETURN RECEIPT REQUESTED)

[NAME AND ADDRESS OF BAILEE]

     Re: _____

Ladies and Gentlemen:

    This letter is to confirm that we, from time to time, deliver materials to you for processing or storage (such merchandise heretofore or hereafter delivered to you being referred to as "Bailed Inventory") and that title to and ownership of the Bailed Inventory remains with us at all times. This letter is also to advise you that, pursuant to a certain Loan and Security Agreement, (the "Loan Agreement") between us and WESTDEUTSCHE IMMOBILIENBANK AG ("Administrative Agent") we have granted to Administrative Agent a security interest in, among other things, all of our inventory, including, without limitation, the Bailed Inventory.  In order to protect our ownership interest and Administrative Agent's security interest in the Bailed Inventory, we ask that you sign and return to Administrative Agent, Westdeutsche ImmobilienBank AG, [_____], Attention: [_____], an acknowledgment of the terms and conditions of this letter.  By so doing you:

    (i)    Acknowledge and confirm that you are holding the Bailed Inventory on bailment for processing or warehousing, that such Bailed Inventory is our property and is subject to Administrative Agent's security interest, that such security interest in the Bailed Inventory shall be senior to all liens, claims and interests, including any fees charged by you for the actual processing or storage of the Bailed Inventory and that you will notify all successors and assigns of yours of the existence of the agreements contained herein; and

    (ii)    Evidence your agreement that if, at any time hereafter, Administrative Agent shall notify you in writing that we have defaulted on our obligations to Administrative Agent, you will comply with Administrative Agent's written instructions as to the disposition of the Bailed Inventory and that until the aforesaid financing arrangements under the Loan Agreement have been terminated and Administrative Agent has been paid in full, you shall not deduct from or offset against any amounts due and owing by us to you at any time hereafter by applying any of the Bailed Inventory in payment for processing or storage services provided by you to us.

CONFIDENTIAL

We agree that you shall have no liability to us if you comply with Administrative Agent's written directions and we agree to reimburse you for all reasonable costs and expenses incurred by you as a direct result of such compliance.

Very truly yours,

By:_____

Name:_____

Its:_____

TIAA049752

## ACKNOWLEDGEMENT OF BAILEE

The terms and conditions of this letter are acknowledged and agreed to as of this

_____ day of _____, 200_.


[BAILEE]

By:_____

Name:_____

Its:_____

CONFIDENTIAL

TIAA049753

### Exhibit M

Outstanding Government Approvals

CONFIDENTIAL

TIAA049754



**The Loree Grand at Union Place**



STATUS SUMMARY OF PERMITS - Square 749, Lot 67

WARD: 6     ZONE: C-3-C     ANC: 6D
OWNER:     K STREET DEVELOPERS, LLC

| PHASE/ APPLICATIONS | TYPE | DCRA FILE # | SUBMISSION DATE | APPROVAL DATE/STATUS | PERMIT NO. | PERMIT EXPIRES |
|---|---|---|---|---|---|---|
| 1 RAZE PERMIT | Demolition | 24536 A 7 | | R501131, 10/23/06; R501130, 10/23/06; R-00006, 1/17/06; R-00007, 1/17/06; R-00001, 1/17/06; R-00002, 1/17/06; R-00003, 1/17/06; R-00004, 1/17/06; R-00005, 1/17/06; R-500678, 1/18/06; R-500680, 1/18/06; R-500681, 1/18/06; R-500679, 1/18/06 | | |
| 2 PUBLIC SPACE PERMIT | Utility Release Letters | 24536 A 7 | | RELEASE LETTERS | Pepco (6/6/07); Washington Gas (6/28/07); Verizon ( 7/11/07); DCWASA 8/14/07 | SEE ITEM #9 BELOW |
| 3 TREE PERMIT | DDOT, DOE | 24536 A 7 | 12/20/2007 | Under Review by DOE, DDOT | | |
| 4 TCP/FENCE PERMIT | DDOT | 24536 A 7 | 8/9/2007 | 10/30/2007 | PA 28701 | 4/30/2008 |
| 5 TRAILER PERMIT | DCRA | 24536 A 7 | | 10/24/2007 | B 112619 | 10/29/2008 |
| 6 NEW ADDRESS | 250 K STREET, N.E. | 24536 A 7 | 5/7/2007 | 8/30/2007 | -- | — |
| 7 DEWATERING | TDA | 24536 A 7 | 6/18/2007 | 7/27/2007 | #0707-735 | 7/26/2008 |
| 8 SHEETING & SHORING, EXCAVATION | - DOH / ENVIRONMENT REVIEW | 24536 A 7 | 5/9/2007 | 7/9/2007 | #1727 | |
| | - DCRA / PRIVATE SPACE | | 5/9/2007 | 8/9/2007 | 107854 | 8/8/2008 |
| 9 PUBLIC SPACE PERMIT | DDOT | 24536 A 7 | 7/16/2007 | 10/29/2007 | PA 28701 | 10/30/2008 |
| 10 FOUNDATION TO GRADE | DCRA | 24536 A 7 | 11/27/2007 | Expected by 5/31/08 | | |
| 11 BUILDING PERMIT | DCRA | 24536 A 7 | 24-Sep-07 | Expected by 07/15/08 | | |
| 12 DCWASA | Engineering Review | 24536 A 7 | 28-Feb-08 | Under Review | | |
| 13 VAULT AGREEMENT | DCRA | 24536 A 7 | 7/16/2007 | 8/30/2007; RECORDED 2-29-08 | DOC# 2007113714 | |

CONFIDENTIAL

**Exhibit N**

Certificate as to compliance with Minimum Net Worth Requirement and the Minimum
Liquidity Requirement

CONFIDENTIAL

TIAA049756

## COMPLIANCE CERTIFICATE

Reference is made to the Completion Guaranty, the Deferred Equity Guaranty, the Limited Payment Guaranty, and the Recourse Carve-out Guaranty ("the Principal Guarantees") dated _____, 2008 by Ronald J. Cohen and Ronald Cohen Management Company (the "Guarantor") in favor of Westdeutsche ImmobilienBank AG. Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Loan and Security Agreement. The Guarantor hereby certifies to the Administrative Agent as follows:

1. The representations and warranties of the Guarantor contained in the Principal Guarantees are true and correct in all material respects as of the date hereof as though made on the date hereof other than representations and warranties that expressly relate solely to an earlier date, in which case they are true and correct in all material respects as of such earlier date.
2. As of the date of this Certificate, no Event of Default has occurred and is continuing.
3. The Net Worth of the Guarantor, for the period ended _____ was $_____ as set forth in the attached current financial statements (for both Ronald J. Cohen and Ronald Cohen Management Company including a balance sheet, income statement and changes in cash position) Such financial statements shall be certified as being true and correct by Guarantor. The Net Worth of the Guarantor that was required to be maintained by the Guarantor during such period was $_____.
4. The Liquidity of the Guarantor as of the period ended _____ was $_____ as evidenced by the attached bank or brokerage statements. The Minimum Liquidity that the Guarantor was required to maintain as of the end of such period was $_____.


_____
Ronald J Cohen


Ronald Cohen Management Company


By:_____
    Ronald J. Cohen

Dated: _____

TIAA049757

## <u>Schedule 2.1</u>

Rate Cap Coverage Schedule

CONFIDENTIAL

TIAA049758

## Schedule 2.1
## Disbursement Schedule

| | Date | Current Advance | Total |
|---|---|---|---|
| Closing Advance | | 12,000,000 | 12,000,000 |
| Closing Advance 1 | | 2,402,778 | 14,402,778 |
| Closing Advance 2 | | 2,402,778 | 16,805,556 |
| Closing Advance 3 | | 2,402,778 | 19,208,334 |
| Closing Advance 4 | | 2,402,778 | 21,611,112 |
| Closing Advance 5 | | 2,402,778 | 24,013,890 |
| Closing Advance 6 | | 2,402,778 | 26,416,668 |
| Closing Advance 7 | | 2,402,778 | 28,819,446 |
| Closing Advance 8 | | 2,402,778 | 31,222,224 |
| Closing Advance 9 | | 2,402,778 | 33,625,002 |
| Closing Advance 10 | | 2,402,778 | 36,027,780 |
| Closing Advance 11 | | 2,402,778 | 38,430,558 |
| Closing Advance 12 | | 2,402,778 | 40,833,336 |
| Closing Advance 13 | | 2,402,778 | 43,236,114 |
| Closing Advance 14 | | 2,402,778 | 45,638,892 |
| Closing Advance 15 | | 2,402,778 | 48,041,670 |
| Closing Advance 16 | | 2,402,778 | 50,444,448 |
| Closing Advance 17 | | 2,402,778 | 52,847,226 |
| Closing Advance 18 | | 2,402,774 | 55,250,000 |

CONFIDENTIAL

TIAA049759