UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| K STREET DEVELOPERS, LLC, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | Civil Action No. 1:12-cv-00666- |
| | : | RLW |
| TEACHERS INSURANCE AND ANNUITY | : | |
| ASSOCIATION OF AMERICA, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Dale A. Cooter,  D.C. Bar No. 227454
Donna S. Mangold, D.C. Bar No. 358851
Stephen Nichols, D.C. Bar No. 429686
COOTER, MANGOLD, DECKELBAUM
& KARAS, LLP
5301 Wisconsin Avenue, NW
Suite 500
Washington, DC 20015

PHONE:      (202) 537–0700
FAX:          (202) 364-3664
EMAIL:       efiling@cootermangold.com

## **TABLE OF CONTENTS**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      THERE IS EVIDENCE OF A JOINT VENTURE SUPPORTING COUNT I . . . . . . . . . 3

        A.      District of Columbia Law on Joint Ventures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.      The Documents Are Not Inconsistent With a Joint Venture . . . . . . . . . . . . . . . . 5

        C.      There Was Sufficient Agreement to Constitute a Joint Venture . . . . . . . . . . . . . 15

        D.      Deposition Testimony Supports the Existence of the Joint Venture . . . . . . . . . . 18

        E.      The Joint Venture is Evidenced by the Physical Project Itself . . . . . . . . . . . . . . 20

        F.      The Overarching Joint Venture Was Not Terminated . . . . . . . . . . . . . . . . . . . . . 23

II.     SUMMARY JUDGMENT SHOULD BE DENIED WITH RESPECT TO THE
        REMOVAL OF UNION NORTH AS THE LLC'S OPERATING MEMBER . . . . . . . . 24

        A.      Plaintiffs Dispute Defendants' Material Facts Regarding Removal . . . . . . . . . . 25

                1. There are material disputed facts with respect to the tax refund . . . . . . . . . . 25

                2. There are material disputed facts with respect to the capital contribution . . . 28

        B.      The Wrongful Removal Provides Grounds for Counts II, IV and IX . . . . . . . . . 29

                1. TIAA-Union Place Breached the Operating Agreement . . . . . . . . . . . . . . . . . 30

                2. TIAA-Union Place breached the implied covenant
                   of good faith and fair dealing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

                3. TIAA-Union Place breached its fiduciary duty . . . . . . . . . . . . . . . . . . . . . . . . . 38

III.    TIAA-UNION PLACE BREACHED THE COVENANT OF GOOD
        FAITH IN DENYING THE LOAN EXTENSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40


CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

# TABLE OF AUTHORITIES

## *CASES*

*1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199 (D.C. 1984) . . . . . . . . . . . . 5

*Allen v. Yates*, 870 A.2d 39 (D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18, 19

*Amirsaleh v. Board of Trade of City of New York, Inc.*,
    2009 WL 3756700 (Del. Ch. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19

*Arndt v. City of Birmingham*, 547 So.2d 397 (Ala.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Auriga Capital Corp. v. Gatz Properties*, 40 A. 3d 839 (Del. Ch. 2012) . . . . . . . . 35, 36, 37, 39

*Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC*,
    C.A. No. 3658-VCS, 2009 WL 1124451 (Del. Ch. April 20, 2009) . . . . . . . . . . 31, 32, 36

*Bragdon v. Twenty-Five Twelve Assocs. Ltd. P'ship*, 856 A.2d 1165 (D.C. 2004) . . . . . . . . . . . . 5

*Cellular Radio Corp. v. OKI Am., Inc.*, 664 A.2d 357 (D.C. 1995) . . . . . . . . . . . . . . . . . . . . . 19

*Clean Harbors, Inc. v. Safety-Kleen, Inc.*, 2011 WL 6793718 (Del. Ch. 2011) . . . . . . . . . . 32, 33

*Colbert v. Georgetown Univ.*, 641 A.2d 469 (D.C. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*,
    624 A.2d 1199 (Delaware 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

*Duffy v. Duffy*, 881 A.2d 630 (D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Dunlap v. State Farm and Casualty Company*, 878 A.2d 434 (2005) . . . . . . . . . . . . . . . . . . . . . 31

*Environmental WasteControl, Inc. v. Browning–Ferris Indus., Inc.*,
    657 So.2d 885 (Ala.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Fibreform Wood Products, Inc. v. Louisiana-Pacific Corp.*,
    32 Fed. App. 331 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Fraser v. Gottfried*, 636 A.2d 430 (D.C. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Fry v. Diamond Constr., Inc.*, 659 A.2d 241 (D.C. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Gale v. Bershad*, No. Civ. A. 15714, 1998 WL 118022 (Del. Ch. Mar. 1998) . . . . . . . . . . . . . 39

*Geier v. Conway, Homer & Ghin-Caplan, P.C.*,
   Civ. A. No. 12-1171, 2013 WL 471663 (D.D. C. Feb. 8, 2013) . . . . . . . . . . . . . . . . . . . 5

*Grayson v. Imagination Station, Inc.*, 2010 WL 3221951 (Del. Ch. Aug. 16, 2010) . . . . . . . . . 39

*Heller v. Kiernan*, 2002 WL 385545 (Del. Ch. Feb. 27, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Hilco Capital, LP v.Federal Ins. Co.*, 978 A.2d 174 (Delaware 2009) . . . . . . . . . . . . . . . . . . . . 33

*In re Coffee Associates, Inc.*, Civ. A. No. 12950,
   1993 WL 51205 (Del. Ch. Oct. 13,1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*In re TMJ Implants Products Liability Litigation*, 880 F. Supp. 1311 (D. Minn. 1995) . . . . . 9, 10

*Libby v. L.J. Corp.*, 247 F.2d 78 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Marine Engineers Beneficial Ass'n v. Cunard Line Ltd.*,
   1993 WL 141069 (D.D.C. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Martin v. City of Washington*, 848 S.W.2d 487 (Mo. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Nader v. de Toledano*, 408 A.2d 31 (D.C. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Nemec v. Shrader*, 991 A.2d 1120 (Del. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 35

*Rastall v. CSX Transportation, Inc.*, 697 A.2d 46 (D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*ROI, Inc. v. E.I. DuPont De Nemors & Co., Inc.*, 1989 WL 135717 (Del. Sup. 1989) . . . . . . . 15

*Scheduled Airlines Traffic Offices, Inc. v. Objective , Inc.*, 180 F.3d 583 (4th Cir. 1999) . . . 15, 16

*Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437 (Del. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Steven R. Perles, P.C.  v. Kagy*, 473 F. 3d 1244 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*,
   505 F. Supp. 2d 20 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*U.S. v. Consolidated Rail Corp.*, 729 F. Supp. 1461 (D. Del. 1990) . . . . . . . . . . . . . . . . . . . . . . 4

*William Penn Partnership v. Slaiba*, 13 A.2d 749, 756 (Del. 2011) . . . . . . . . . . . . . . . . . . . . .  36

**_STATUTES_**

6 Del. Code §18-1101(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34,  36

6 Del. Code §18-1101(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 39, 40

6 Del. Code §18-1104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

8 Del. Code §273 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**_OTHER AUTHORITIES_**

46 Am. Jur.2d Joint Ventures § 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Black's Law Dictionary (9th ed. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

Plaintiffs Union North Place I, LLC ("Union North") and K Street Developers, LLC. ("K Street"), by and through their undersigned counsel, hereby oppose the Defendants' Motion for Summary Judgment and state as follows:

## INTRODUCTION

Plaintiffs filed this action to redress the Defendants' refusal to honor their commitment to jointly develop with Plaintiffs two very valuable parcels of real estate in Washington, D.C. as well as Defendants' arbitrary removal of Plaintiff Union North as a member of Union Place Phase I, LLC (the "LLC") and Defendants' decision to replace a low interest construction loan with significantly higher rate financing. Defendants now seek summary judgment in their favor as to all of Plaintiffs' claims, despite the fact that there are material facts in dispute and that applicable law does not provide the support necessary for Defendants' motion. The witnesses in this case have given conflicting testimony with respect to the parties' relationship; the circumstances regarding events which Defendants claim gave rise to their right to remove Plaintiff as the Operating Member of the LLC; and the Defendants' decision not to approve the Plaintiffs' request to seek an extension on the financing.   Crucial to the resolution of this case will be the presentation of live testimony and credibility determinations by a jury.  Accordingly, the Defendants' Motion for Summary Judgment should be denied in all respects.

## FACTS

Filed concurrently herewith is Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts.[1]  As evidenced by Plaintiffs' responses, many of Defendants' factual

---

[1]  Defendants' Statement of Undisputed Material Facts is cited herein as "SOF" and Plaintiffs' responses thereto are cited as "RSOF." The exhibits relied on by Defendants in support of their SOFs are cited herein as "Def. Ex." and the exhibits relied on by Plaintiffs in support of their RSOFs are cited as "Pl. Ex."  Additional facts which are material to consideration of the issues on summary judgment are cited herein as "ASOF" (and immediately

statements, or the inferences Defendants seek therefrom,  are disputed.  There are also additional

facts (beginning at ASOF ¶65), excluded from Defendants' facts, which must be considered.

## ARGUMENT

In considering the Defendants' Motion for Summary Judgment, "the record must be

viewed in the light most favorable to the party opposing the motion." *Colbert v. Georgetown

Univ.*, 641 A.2d 469, 472 (D.C. 1994).  Thus, Plaintiffs' arguments and presentation of facts are

"treated indulgently" while the Defendants' are "closely scrutinized." *Allen v. Yates*, 870 A.2d

39, 44 (D.C. 2005) (quoting *Fry v. Diamond Constr., Inc.*, 659 A.2d 241, 246 (D.C. 1995)).

Plaintiffs' evidence "is to be believed, and all justifiable inferences are to be drawn in [its]

favor." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986)).  Plaintiffs can defeat summary judgment by showing that "... there is

sufficient evidence supporting the claimed factual dispute to require a jury or judge to resolve the

parties' differing versions of the truth at trial." *Id.* (quoting *Nader v. de Toledano*, 408 A.2d 31,

42 (D.C. 1979)).  When all of the legal arguments and factual assertions made by the Defendants

and Plaintiffs are measured under these standards, only one outcome is possible and that is a

denial of Defendants' Motion.[2]  This case should be tried on all remaining Counts.[3]

_____

follow the RSOFs in the Plaintiffs' separately filed response to Defendants' Statement of
Material Facts).

[2] Although the Defendants have filed a Counterclaim against Plaintiffs and a Third-Party
Complaint against R.Cohen, A. Cohen and Cohen Management Company, the Defendants'
summary judgment motion seeks judgment only on Plaintiffs' First Amended Complaint; it does
not seek judgment on Defendants' Counterclaim.

[3] Plaintiffs have demanded a jury trial.  In footnote 2 of their Memorandum of Points and
Authorities in Support of Defendants' Motion To (sic) For Summary Judgment ("Defs. Memo."),
the Defendants assert that there should be no jury trial because the LLC documents for Phase I

**I.**      <u>**THERE IS EVIDENCE OF A JOINT VENTURE SUPPORTING COUNT I**</u>

In Count I of the First Amended Complaint, Plaintiffs allege that they had a joint venture relationship with Defendant TIAA, that fiduciary duties flowed from that relationship, and that TIAA breached those duties. In moving for summary judgment on Count I, the Defendants assert that there can be no joint venture because there is no evidence of a mutual intent to form a joint venture with respect to Phase II and the written evidence "definitively and as a matter of law disprove [ ] any such mutual intent." Defs. Memo. at 4. Only by disregarding the testimony of Ron Cohen and Alan Cohen and that of the Defendants' own witnesses, and by ignoring the actual physical project itself, could the Court rule out a joint venture as a matter of law. This the Court cannot do. There is sufficient evidence in this case of an overarching joint venture and the Defendants' Motion for Summary Judgment as to Count I should be denied.

**A.**      <u>**District of Columbia Law on Joint Ventures**</u>

Under District of Columbia law, a joint venture relationship exists where two or more persons "'join in a particular business enterprise for profit, *as in the purchase, development and sale of real estate*, create a joint adventure or venture.'" *Fraser v. Gottfried*, 636 A.2d 430, 432 n.6 (D.C. 1994)(emphasis in original)(internal citation omitted); *Libby v. L.J. Corp.*, 247 F.2d 78 (1957). This is precisely the relationship between Plaintiffs and Defendant TIAA. They joined together in a particular business enterprise - the development and completion of a two-phase construction project on the Property - for profit.

---

waived a jury trial. Defendants "reserve these arguments for further briefing, as appropriate." Defs. Memo. at n.2. Plaintiffs are entitled to a jury trial on all their claims and will respond more fully on this issue in response to any further argument Defendants may make.

3

Defendants argue that courts "routinely grant summary judgment against plaintiffs where they cannot establish sufficient evidence to support a finding that a joint venture exists," but the cases they cite are factually distinguishable. Defs. Memo. at 5 (citing *U.S. v. Consolidated Rail Corp.*, 729 F. Supp. 1461, 1468-69 (D. Del. 1990); *In re Coffee Associates, Inc.*, Civ. A. No. 12950, 1993 WL 51205, at *4-6 (Del. Ch. Oct. 13,1993)). *Consolidated Rail* involved a unique fact pattern under CERCLA in which a third-party plaintiff tried to establish "active participation in the management of [a] facility" by a third-party defendant by showing a joint venture between that third-party defendant and another third-party defendant. *Consolidated*, 729 F. Supp. at 1468. The only evidence on the issue, an interrogatory answer, did not reveal the necessary business connection between the two purported joint venturers. *Consolidated*, 729 F. Supp. at 1468-69. In *Coffee Associates*, petitioner sought judicial dissolution (under Delaware law) of a "joint venture corporation" pursuant to a provision of Delaware statutory law (8 Del. Code §273). The court concluded, however, that the recitals in the shareholder's agreement provided insufficient evidence to demonstrate that the business relationship was that of a joint venture in corporate form for purposes of the statute. *Coffee Assoc.*, 1993 WL 51205, at *5-*6. There was nothing in the agreement that set the corporation apart from any other closely held corporation. *Id.*

Quoting *United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 505 F. Supp. 2d 20, 30 (D.D.C. 2007), the Defendants purport to set out the elements of a joint venture under District of Columbia law. Defs. Memo. at 5. In that case, however, this Court was quoting a case from Alabama, not the District of Columbia. 505 F. Supp. 2d at 30.[4] Thus, *Bill Harbert* provides no

---

[4] In their Memorandum, the Defendants' quotation of the *Bill Harbert* opinion fails to indicate that the *Bill Harbert* Court was in turn quoting *Environmental WasteControl, Inc. v. Browning–Ferris Indus., Inc.*, 657 So.2d 885, 887 (Ala.1995), which was quoting *Arndt v. City*

insight into District of Columbia joint venture law.[5]   Similarly, the Defendants quote at length a

portion of section 9 of 46 Am. Jur.2d Joint Ventures requiring the formation of a contract which,

among other things, "'set[s] down in an integrated written instrument'" the terms of the

agreement.  Defs. Memo. at 6.  Plaintiff's counsel located no case applying District of Columbia

law which adopts this provision of American Jurisprudence.   The Defendants are seeking to

define joint venture in a way that has not been adopted by the District of Columbia Court of

Appeals.

### B.      The Documents Are Not Inconsistent With a Joint Venture

Defendants previously sought to dismiss Count I for breach of fiduciary duty on the same

theory they advance now on summary judgment - that the written documents are inconsistent

with the notion of an overarching joint venture.  The Defendants' legal discussion consists of

general rules of interpretation of unambiguous written contracts.  *See*  Defs. Memo. at p.7 (citing

*1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 205-06 n.7 (D.C.984);

*Bragdon v. Twenty-Five Twelve Assocs. Ltd. P'ship*, 856 A.2d 1165, 1170 (D.C. 2004)).

Defendants then seek to apply those general principles to the operating agreement for TIAA

Union Place I, LLC, to the Phase II  Letter of Intent, and to the correspondence between the

parties and ask the Court to conclude that all those documents "conclusively establish that there

was no mutual intent to create a joint venture[.]" Defs. Memo. at 7.  Defendants' analysis fails to

account for the differences in the entities that are parties to the written documents and ignores the

---

*of Birmingham*, 547 So.2d 397 (Ala.1989).

[5] This same quotation was relied on in *Geier v. Conway, Homer & Ghin-Caplan, P.C.*,
Civ. A. No. 12-1171, 2013 WL 471663 (D.D. C. Feb. 8, 2013) another case cited by Defendants.
*See* Defs. Memo. at 6.

contrary deposition testimony.

From the Defendants' viewpoint, the analysis of whether there is an overarching joint venture begins and ends with the Phase I Operating Agreement because of its right of first offer ("ROFO") provision and its express disclaimer that the Operating Agreement forms a joint venture. Defs. Memo. at 8-9. At the motion to dismiss hearing, this Court rejected that theory, noting the significance in the fact that there are different parties involved:

> The Court finds that the two cited sections of the LLC agreement [Sections 2.7 and 4.14] that the defendant relies upon *do not definitively refute plaintiffs' claims as a matter of law*, as the defendant argues in docket 13-1 at page nine, their motion papers.

> The Court finds that . . . the LLC agreement is actually between a different entity than defendant TIAA. Of course it's a related entity, but it's a different entity. And so this *Section 2.7 of the LLC agreement does not conclusively undermine the plaintiffs' claim of a joint venture as to K Street Developers and TIAA*.

> And the Court must at this stage credit the plaintiffs' claims that the plaintiff and TIAA did not intend that the LLC agreement would replace the over-arching joint venture, but that those agreements were in furtherance of the joint venture as pled in the first amended complaint at paragraphs 11 and 34. *Whether or not there was a joint venture between plaintiff Union North and defendant TIAA Union Place, the only two members of the LLC, is not determinative as to whether there is an over-arching joint venture between plaintiffs and defendant TIAA.*

9/17/12 Hrg. Tr. (Pl. Exh. 11)[6] at 23:5-25 (emphasis added). These conclusions are as valid today as they were a year ago and Defendants have pointed to nothing in the record which would support the Court's reversing these conclusions.

---

[6] Pursuant to the Court's August 27, 2012 Order, concurrently filed herewith is a separate Appendix containing the Exhibits supporting this Opposition and authenticated by the Declaration of Stephen Nichols. Plaintiffs' supporting Exhibits are referred to herein as "Pl. Exh." Exhibits submitted by Defendants in support of their summary judgment motion are referred to herein as "Def. Exh."

The only factual argument Defendants make that they did not make in support of their

Motion to Dismiss is that K Street Developers "joined" the Phase I Operating Agreement by

executing the joinder page. *See* Def. Ex. 9 (at TIAA049467).  Presumably Defendants would

have this Court conclude that this joinder page invalidates the Court's distinction between K

Street Developers and TIAA on the one hand as joint venturers, and Union North and TIAA

Union Place on the other hand as the two LLC members.   It does not.  The Joinder is very

limited and reads in full as follows:

> The undersigned, the transferor of the Property to the Company pursuant to the
> Property Contribution, hereby joins in this Agreement for *the sole purpose* of
> *making the representations and warranties with respect to the Property set forth*
> *in Section 2.8* for the benefit of the Company and Investor Member *and to reflect*
> *the agreement of K Street Developers, LLC to the provisions of Section 4.14*.
> The undersigned understands that the Investor Member is relying upon this
> joinder as an inducement to enter int this Agreement. *The undersigned shall*
> *have no rights pursuant to this Agreement*.

RSOF at ¶ (citing Def. Ex. 9 (at TIAA049467)) (emphasis added).   By its express terms, the

limited purpose of the Joinder with respect to its reference to Section 2.8 was to reflect the

agreement of the landowners (K Street Developers, LLC, Casco, Inc., Three Cee Investors, LLC,

and Union North Corporation) that the Phase I Property was not encumbered by any lease or

occupancy agreement or other contract (§2.8(c)); that neither the Phase I Property nor the use of

the Property violated any governmental law or regulation (§2.8(d)); that there were no

environmental law violations related to the Phase I Property (§2.8(e)); the utilities entered the

Phase I Property through public or private easements (§2.8(f)); and the Phase I Property does not

rely on any other properties to fulfill municipal or other governmental requirements or to furnish

essential building systems or utilities to the Property (§2.8(g)).   With respect to its reference to

Section 4.14, the Joinder reflected K Street's agreement that Operating Member Union North Phase I would extend the ROFO on Phase II to Investment Member TIAA Union Place Phase I, LLC in accordance with Section 4.14.  These were the limited purposes of the Joinder page.  The Joinder did not make K Street Developers (or any of the other entities with ownership interests in the Property which signed the Joinder page) a member of the LLC nor did it make K Street a party to the terms of the Operating Agreement.

Defendants assert that it is indisputable that through Section 4.14 and through a November 3, 2010 letter from Ron Cohen to determine the interest of TIAA Union Place in moving forward with Phase II, that the development of Phase II was optional for all involved.  *See* Defs. Memo. at 8-11; SOF at ¶¶7, 11.  In their Statement of Facts, Defendants assert that this notion is supported by the deposition testimony of Ron Cohen.  Defendants' contention is disputed.  *See* RSOF at ¶¶7, 11.  Ron Cohen did not testify that proceeding with Phase II was optional.  RSOF at ¶11.  Rather, he testified that because K Street had received a firm offer from a third party to develop Phase II, K Street would have released TIAA from is obligation as to Phase II had it indicated it did not wish to go forward.  RSOF at ¶11.  TIAA, however, not only showed no interest in walking away from Phase II, TIAA assured Ronald Cohen that in fact it was committed to proceeding with Phase II: ("... the deal [i.e., the commitment to develop Phase II] is done, guys... Done, done, done.") (RSOF at ¶11).  Specifically, Ron Cohen was told by both Evangeline Taylor and Marc DeBree that TIAA was going to go forward with Phase II and that Ron Cohen was not to negotiate with anyone else.  RSOF at ¶11.  This was also Gerry Casimir's understanding. RSOF at ¶11.  Defendants also assert that because Section 4.14 of the LLC Agreement extended an ROFO on Phase II to TIAA Union Place (the LLC's Investor Member),

8

K Street could not have had a joint venture with TIAA for the development of Phase II.[7]  The

ROFO provisions are not inconsistent with the joint venture agreement between Plaintiffs and

Defendant *TIAA* regarding the two-phase project.  That the ROFO was extended to TIAA Union

Place was a mechanism for the joint venture (to which TIAA was a party) to implement the

Phase II portion of the joint venture.[8]  Whatever the LLC Agreement may have provided with

regard to Plaintiff K St. Developers' offering the Phase II Property to Defendant TIAA-Union as

one step in the implementation of Project Phase II does not preclude the existence of an

overarching joint venture between Plaintiffs and Defendant TIAA.  In fact, as the evidence

shows, TIAA was committed to Phase II (even if the exact structure - whether through TIAA-

Union Place by its ROFO, or through some other TIAA entity - had not been settled). *See e.g.*,

RSOF at ¶¶7,11, 12, 13, 16, 18; ASOF at ¶¶66, 94.

Because of the LLC's operating agreement, Defendants assert that the "existence of an

express contract governing the subject matter is inconsistent with a claimed relationship of a joint

venture," citing in support *In re TMJ Implants Products Liability Litigation*, 880 F. Supp. 1311,

1316 (D. Minn. 1995) and *Martin v. City of Washington*, 848 S.W.2d 487 (Mo. 1993).  *See* Defs.

Memo. at 10.  Both cases involved a third party attempting to hold one purported joint venturer

---

[7]  The Defendants also rely on Section 2.7 of the LLC Agreement which prohibits the
LLC and its members from being joint venturers. Defs. Memo. at 9 n.5. The provision does no
more than state that the LLC Operating Agreement did not itself *create* a joint venture between
Plaintiff Union North and Defendant TIAA Union Place. The Plaintiffs contend that the joint
venture with TIAA had already been created by the time the LLC Operating Agreement was
executed.

[8]  It is not as if TIAA and TIAA-Union Place were strangers to each other.  To the
contrary, as described by Defendants, TIAA "created TIAA Union Place, a special purpose entity
created and wholly-controlled by TIAA . . .." SOF at ¶4.

9

liable in tort for the actions of the other purported joint venturer and are inapposite. In *TMJ* the plaintiffs sued not only Dow Corning Corporation, the manufacturer of breast implants, but also its two shareholders, Dow Chemical Company and Corning Incorporated. The plaintiffs made a corporate control/piercing the corporate veil argument and also argued that the subsidiary was actually a joint venture of the parents and therefore the parent corporations should be liable for the actions of the subsidiary. 880 F. Supp. at 1316. The court rejected the theory, finding that there was no reason to disregard the corporate form (parent/subsidiary corporations) elected by the parent shareholders. 880 F. Supp. at 1316. The plaintiffs' attempt in *TMJ* to hold the parents liable in tort for the actions of subsidiary has no bearing on the issues in this case.

*Martin*, like *TMJ*, was a personal injury case in which the plaintiff sought to hold a defendant liable in tort even though the defendant did not cause the injury. The plaintiff fell through the bleachers while watching a football game at a local park maintained by the city and leased out to a local high school, by written contract, for sporting events. 848 S.W.2d at 489. The court rejected plaintiff's claim that her injuries were caused by the high school's failure to inspect the bleachers before the game. 848 S.W.2d at 494. The plaintiff's back-up theory was that the facilities lease agreement between the high school and city constituted a joint venture agreement such that the high school should be held jointly liable for the city's negligence in causing the plaintiff's injuries. This argument also failed. 848 S.W.2d at 495. Again, like *TMJ*, the joint venture claim was an attempt to hold a defendant liable for the negligence of the tortfeasor. Here, unlike either of those cases, the claim is made by one joint venturer against its co-joint venturer.

10

The existence of an overarching joint venture for a two phase real estate development is not vitiated by the August 2, 2011 Letter of Intent, by the affidavit submitted by Ron Cohen to the District of Columbia Zoning Commission, nor by Peter Witham's October 24, 2011 letter. *See* discussion in Defs. Memo. at 11-14.  The Defendants argue that the express language in the August 2, 2011 Letter of Intent stating it was non-binding on Cohen and TIAA could not create a binding contract, especially in the face of unfinished negotiations.  Defs. Memo. at 11-12.  They also contend that the Cohen Affidavit submitted to the Zoning Commission, in which Ron Cohen stated that potential investors were hesitant to commit to Phase II indicates that no investors, to include TIAA, had committed to developing Phase II.  There are disputed material facts raised by these issues and they cannot provide a basis for granting summary judgment.

With respect to the August 2011 Letter of Intent, although it recites it is non-binding, that characterization is contradicted by other provisions of the very same letter which are obviously not "non-binding." *See* RSOF at ¶21.  By way of example only, (i) the parties are required to keep the transaction confidential; (ii) Cohen (and, by implication, TIAA-CREF also) is required to "... act in good faith to negotiate a mutually acceptable Operating Agreement"; (iii) Cohen is prohibited from negotiating with third-parties; (iv) the envisioned Operating Agreement is required to "... follow the terms of the [Phase 1] Operating Agreement other than the terms set forth in Exhibit B" (among other things, this meant the parties would follow the Phase 1 Operating Agreement in giving K Street a cash payment equal to 90% of the land value at closing); (v) the due diligence period is fixed at 30 days and, (vi) the equity capitalization, land price and capital structure are fixed terms.  RSOF at ¶21.  Moreover, the parties agreed to a $30,000,000 land price at closing.  RSOF at ¶25. Thus, it is not simply enough to isolate one

11

term of the letter as Defendants do and ignore the other provisions which are binding.

In *Duffy v. Duffy*, 881 A.2d 630 (D.C. 2005), spouses signed a letter setting out the terms of their separation with the expectation that a formal agreement would be prepared by the wife's attorney. 881 A.2d at 632. The letter set out their agreement on thirteen separately listed items (for example, joint legal custody, vacation and visitation rights, division of proceeds from the sale of the house). 881 A.2d at 634-35. The letter recited, however, that once the agreement was prepared it would be sent to the husband's attorney for review. 881 A.2d at 634. When a final agreement was never signed, the wife sought to enforce the letter agreement. The husband argued that because the terms set out in the letter were subject to his attorney's review, that review was a condition precedent to enforcement. 881 A.2d at 637. The court rejected this argument, stating in part that "the Letter unambiguously states that the parties 'have agreed upon the basic terms of the divorce settlement,' expressing a meeting of the minds with respect tot eh terms of the agreement." 881 A.2d at 637. Here, the August 2011 Letter of Intent, like the letter in *Duffy*, reflects a meeting of the minds with respect to material terms. At a minimum, the Court would have to find that the Letter of Intent's self-description of "non-binding" creates an ambiguity in the face of agreement on so many material terms. In the face of such ambiguity a jury should interpret the letter. *Rastall v. CSX Transportation, Inc.*, 697 A.2d 46, 51 (D.C. 1997) (a contract ambiguity raises an issue of material fact which must be resolved by the fact finder).

With respect to Ron Cohen's affidavit filed with the Zoning Commission, the Defendants contend that the statements contained in the affidavit demonstrate that no investors, including TIAA had committed to developing Phase II. Defs. Memo. at 13. This is not so, however. After the Loree Grand was built, K Street began receiving inquiries from outside investors interested in

12

developing the Phase II Property.  ASOF at ¶79.  Because of its existing joint venture with TIAA,

K Street could not pursue these initial inquiries in any depth, but it was necessary to have

discussions with the outside investment community to determine the market price for any

proposed development of Phase II.  *Id.*  This was necessary to proceed with the next step of the

joint venture with TIAA because the parties had agreed that the Phase II Property would be

developed based on its market value at the time of development.  *Id.*  The affidavit Ron Cohen

filed with the District of Columbia Zoning Commission in August, 2010 and which is found at

Woods Decl. Ex. 10, reflected these discussions.  *Id.*  To the extent that affidavit states that the

extension was required because Cohen did not have a "firm financial commitment," this was

because in the absence of an established fair market value, price had not yet been definitively

determined which would allow a firm "financial" commitment.  *Id.*  By early November,

2010, Cohen had received serious enough expressions of interest in developing the Phase II

Property from sophisticated outside investors to give him confidence that the market value of

Phase II could be definitively determined to warrant proceeding with Phase II at that time.  *Id.*

On November 3, 2010, Cohen sent a letter to TIAA Union Place proposing to develop the Phase

II Property based on a land contribution by K Street at the fair market value of $50,730,000.  *Id.*

This was done pursuant to Section 4.14 of the LLC Agreement, which gave TIAA Union Place a

right to participate in any development of the Phase II Property based on a contribution by K

Street of the Phase II Property at fair market value.  *Id.*  Fair market value was to be determined

either by the parties' agreement or by an arbitration procedure.  *Id.*  Thus, Ron Cohen's Affidavit

filed with the Zoning Commission does not establish the absence of an overarching joint venture.

Finally, the Defendants also argue that the October 24, 2011 letter from Peter Witham, Ron Cohen's broker, "sent with the permission of Alan Cohen" belies the notion of a preexisting joint venture to develop Phase II because it references the cross-collateralization of the Phase II Property as an impediment to moving forward. Defs. Memo. at 13. Plaintiffs dispute the turning point significance which Defendants attribute to this letter. *See* RSOF at ¶23. First, Alan Cohen did not review the terms of Witham's letter before it was transmitted. RSOF at ¶23. The letter did not "reveal" (as Defendants state in SOF at ¶23) that the Phase II Property was cross-collateralized with the Velocity Project. To the contrary, TIAA was already fully aware that Phase II was subject to an existing mortgage. RSOF at ¶23. The Phase I Property had been similarly encumbered when the LLC was formed and, as with Phase I, the existing mortgage would have been paid off with the sale proceeds and would not have impeded the transaction. RSOF at ¶23. In fact, TIAA CREF had previously expressed an interest in the unrelated Velocity transaction and, after an equity investor's decision not to participate in a recapitalization of the Velocity Project, Mr. Witham's letter was simply an overture to TIAA CREF to see whether it wished to become involved in that additional project as well. RSOF at ¶23. Any reference by Mr. Witham to the Cohen Companies not "moving forward" with Phase II is to be construed in the context of that overture. In fact, K Street was fully prepared and able to proceed with Phase II, with or without TIAA-CREF's involvement in the Velocity Project. RSOF at ¶23. Thus, the Witham letter does not establish that there could not have been an overarching joint venture with respect to the development of Phase I and Phase II.

Accordingly, none of the documentary evidence establishes, as a matter of law, the absence of an overarching joint venture.

## C. <u>There Was Sufficient Agreement to Constitute a Joint Venture</u>

At pages 14-17 of their Memorandum the Defendants argue that the notion of an overarching joint venture for the development of both phases is defeated by the lack of agreement on material terms of the joint venture. The Plaintiffs disagree. It is not necessary to establish the overarching joint venture that there was agreement on every detail of the development.

As noted *supra*, District of Columbia law imposes very few requirements for finding a joint venture. The cases cited by Defendants, for the proposition that to be enforceable a contract must include all the terms which the parties intended to resolve, are distinguishable factually and/or procedurally. *See* Defs. Memo. at 14-15. *Steven R. Perles, P.C. v. Kagy*, 473 F. 3d 1244 (D.C. Cir. 2007) involved a claim by a law firm associate to a one-third share of the contingent fee taken in by the law firm for which she worked. First, the case was tried; it was not decided on summary judgment. Second, the evidence showed that after about a year of working for the firm, the associate tendered a compensation agreement which was rejected. Third, the associate's continued efforts to try to obtain a compensation agreement from the firm were rebuffed. Fourth, no joint venture was alleged. *ROI, Inc. v. E.I. DuPont De Nemors & Co., Inc.*, 1989 WL 135717 (Del. Sup. 1989) was also decided after trial. In *ROI*, the plaintiff only claimed breach of contract, not breach of fiduciary duty. The Court found that "as a matter of contractual" intent, there was no meeting of the minds. Although there was an interim agreement, it never ripened into an enforceable contract. In *Scheduled Airlines Traffic Offices, Inc. v. Objective , Inc.*, 180 F.3d 583 (4th Cir. 1999), the parties signed an agreement which expressly stated that they would "commence negotiations," but they never did. They expressly contemplated that the agreement would come first and the joint venture would follow thereafter. The company president

conceded in his testimony that the company never even attempted to begin negotiations. In addition, the pre-agreement discussions regarding a proposed joint venture were invalidated by the agreement's integration clause.  In *Fibreform Wood Products, Inc. v. Louisiana-Pacific Corp.*, 32 Fed. App. 331 (9th Cir. 2002), the written document in issue was entitled "*Proposed Joint Venture.*" 32 Fed. App. at 332-33 (emphasis added).  That document set out conditions prefatory to the formation of the joint venture and the conditions were never met.

Defendants assert that there was no agreement as to price of the Phase II land; no agreement as to the dollar amount expected for Defendants' investment; no agreement on profit/loss allocation; no Phase II operating agreement; and no specific terms as to what the Phase II development would entail, including size, scope, mix of residential and commercial). Defs. Memo. at 15.  Defendants are wrong.  The parties had agreed that the price for Parcel II would be based on fair market value at the time Parcel II was ready for development.  *See* RSOF at ¶60; ASOF at ¶79.  *See also* Def. Ex. 9 at §4.14.  Determining price in this way eliminated the risk that setting an actual dollar amount in 2006 would be unfair to either party when the Phase II was finally ready for development.   As to other terms, the Defendants are completely ignoring the fact that the PUD itself framed the project.  The Order[9] approving the PUD described both phases of the project in much detail, including the following details of Phase II:  (1) 612,433 square feet of gross floor area; (2) 598,635 square feet for residential use; (3) 13,7898 square feet for retail use, including a daycare center of approximately 3,449 square feet; (4) 500 residential units including at least 50 affordable units; (5) at least 525 underground parking spaces or

---

[9] The Zoning Commission Order approving the application for the PUD is dated April 20, 2006 and on October 18, 2006 K Street entered into the Covenant with the District of Columbia agreeing to develop the property in accordance with the PUD.  *See* Pl. Exh. 6.

16

enough to achieve a 1:1 unit to parking space ration for residents of both Phase I and Phase II. *See* Pl. Ex.6. Moreover, the form of the operating agreement was originally set up for both Phases and, when it came time to draft the agreement for Phase II, no changes were necessary other than to change the land contribution price.   RSOF at ¶22.   The scenario that the Defendants portray for the Court - that the details of Phase II were unknown - simply is not accurate.

    *Marine Engineers Beneficial Ass'n v. Cunard Line Ltd.*, 1993 WL 141069 (D.D.C. 1993) is instructive.  There, the plaintiffs alleged that defendant agreed to "join with them in a joint venture to secure a government contract for the chartering of cruise ships . . . ." 1993 WL 141069, at *1.  The defendant moved for summary judgment, arguing that plaintiffs failed to show each of the criteria courts require for finding that a joint venture exists and that there was not enough evidence to demonstrate an enforceable joint venture agreement between the parties. 1993 WL 141069, at *1.  This court rejected both of those assertions.  As to the first, the court agreed with the plaintiffs who noted that "courts in the District of Columbia appear not to have been so strict about the elements of a joint venture agreement (at least at the present procedural stage), and have permitted the inference of such an agreement from the conduct of the parties." 1993 WL 141069, at *1.  As to defendant's second assertion, the court concluded that the evidence was sufficient, at the summary judgment stage, to create a genuine issue for trial.  1993 WL 141069, at *1.  The evidence demonstrated a sharp dispute regarding the nature of the parties' discussions, with the defendant offering evidence that the discussions were nothing more than preliminary negotiations, while the plaintiffs offered evidence that the parties had reached a binding agreement. 1993 WL 141069, at *1.  Although, as the defendant argued, "several issues

regarding the ultimate terms of the desired contract with the United States had not been worked out," there was sufficient evidence, "viewed in a light most favorable to plaintiffs, for a jury to find that the parties had entered a joint venture agreement to secure the contract from the United States under the following terms: (1) [defendant would provide the vessels to Cruise America; (2) Cruise America would seek the award of a contract for the charter and would be the operator once the charter was awarded; and (3) MEBA would provide the officer staffing for the ships." 1993 WL 141069, at *1.

Similarly, there is sufficient evidence here to find a joint venture. The parties agreed that the two phases would be structured with mirror limited liability agreements. RSOF at ¶22. There is certainly sufficient evidence from which a jury could conclude that the parties agreed to implement the build a connected residential development in two phases as required by the PUD; that a single purpose limited liability corporation would be formed to implement each phase; that mirror operating agreements would be executed; that plaintiffs would contribute the real estate; and that defendants would contribute the majority of the financing. Here, as in *Marine Engineers*, the parties offer dueling interpretations of the evidence and the Plaintiffs must prevail in the current procedural posture.

### D.    Deposition Testimony Supports the Existence of the Joint Venture

With respect to the evidence, the Defendants contend that the over-arching joint venture theory cannot be saved by the "self -serving" deposition testimony of Ron and Alan Cohen. Defs. Memo. at 17-18. The Defendants would have this Court disregard the testimony of both Ron and Alan Cohen, obviously losing sight of the standard for considering a motion for summary judgment:   Plaintiffs' evidence "is to be believed, and all justifiable inferences are to

be drawn in [its] favor." *Allen v. Yates*, 870 A.2d 39, 44 (D.C. 2005)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).   If the Court were to do as Defendants ask, it would be making credibility determinations that have no place in summary judgment analysis:

> In granting summary judgment, the trial court disregarded Joseph's affidavit, terming it "misleading and self serving." We do not feel free to so treat the affidavit. In deciding a motion for summary judgment, we must construe the record in the light most favorable to the party opposing summary judgment. Joseph's affidavit does not make patently impossible assertions; therefore, both this court and the trial court are required to credit the statements it contained in ruling on the summary judgment motion.

*Cellular Radio Corp. v. OKI Am., Inc.*, 664 A.2d 357, 360 (D.C. 1995).   There was much testimony by Ron and Alan Cohen that from the beginning the parties had agreed to a two-phase project. *See e.g.*, RSOF at ¶¶7, 13. For example, Alan testified:

> Q. Were you involved in discussions with anybody with Teachers about an alleged joint venture agreement that encompassed Phase II?
>
> A. Every time we spoke about Phase I during the negotiations with TIAA-CREF, it was always discussed. And from my recollection, Gerry Casimir's main thrust was that this was a great development because we have Phase I and then we go on to Phase II. That was the whole -- that's how the whole thing started. We were, yes, talking about Phase I -- that was the first phase we were in -- and we were also, at the same time, speaking about how great it is having the whole city block with almost 100 residential units with a beautiful courtyard. That was always the top of the discussion when we spoke about Phase I and Phase 2.

> * * * *

> Q. All right. And tell me, it's been alleged in this suit that Teachers agreed to develop Phase II; is that your understanding?
>
> A. Yes. It was my understanding all along the reason they were so intrigued with Phase I is because they had another phase to keep on going around the city block.

19

That was where this whole thing was intriguing to Teachers.

RSOF at ¶13 (quoting A. Cohen 5/1/13 Tr. at 12:2-16; 14:15-22).  On November 3, 2010,

Michael Hollander (the Cohen's in-house counsel) sent an email to Evangeline Taylor  (*see* SOF

at ¶12 citing Def. Dep. Ex. No. 4) regarding the Cohen Companies' intention to begin the

development of Union Place Phase II.  The Cohen parties never thought Teachers would say "no"

in response to the Notice:

> Q. Did you have internal discussions about what if Teachers says no?
>
> A. No, because we knew they were going to do the deal; that was contemplated all
> along. We never once thought that Teachers was not doing Phase II.

RSOF at ¶12 (citing A. Cohen Tr. at 52:11-15).  *See also* ASOF at ¶¶66-69.  Even the

Defendants' own witnesses referred to the Cohens as their "partners."  *See e.g.*, ASOF ¶94 (citing

testimony of Trevor Michael and Jae Chang).   In addition, in an internal November 22, 2011

TIAA email, William Harrison, the Director of Global Real Estate for TIAA-CREF wrote to

Michael Fisk, the South Regional Senior Director for U.S. Acquisitions, describing the project as

a "one phase project - not two." ASOF at ¶67.  The deposition testimony cannot be ignored.

Any testimonial inconsistencies will have to be resolved by the jury.

### E.      The Joint Venture is Evidenced by the Physical Project Itself

The overarching joint venture is evidenced not just by documents and deposition

testimony; it is also evidenced both by the Planned Unit Development ("PUD") approved by the

District of Columbia government and the actual events taking place on the ground.  The PUD

required the buildings which were to be built on the two contiguous parcels to be physically

connected to each other.  ASOF at ¶69.   In fact, the PUD specified that the height approved for

the Phase II building depended on a physical connection between the two buildings. ASOF at ¶69. While there was no impediment to legally-distinct ownership of the Phase I Property and Phase II Property, any construction on one part of the Property had to be linked to construction on the other parcel so as to form the single building required. ASOF at ¶69. The PUD's requirement of a physical connection between the two buildings solidifies Plaintiffs' contention that they never would have embarked on the project with a business partner who was not committed to both buildings. Not only did the PUD require what in essence was one building built in two phases, the project was actually designed and constructed so that the first phase of the building would physically abut and connect to the second phase of the building. ASOF at ¶69. It is not credible that Defendants could have looked at the PUD and looked at the design and not understood that Plaintiffs were looking for a partner committed to the entire project.

The overarching joint venture is also evident from what actually took place at the site. Pursuant to the PUD, the connection that was required actually happened - the Loree Grand was actually built to make a connection to the structure to be constructed in the second phase. ASOF at ¶69. In addition, portions of Parcel II were physically taken to create amenities benefitting Parcel I. For example, to obtain the necessary approvals from the District of Columbia government for Project Phase I, the parties were required to, and in fact did, take land from the Phase II Property, paved over it, and constructed twenty-five parking spaces on it - to benefit the Project Phase I residents. ASOF at ¶72. The Loree Grand was designed to contain 212 of the approximately 712 residential units authorized by the PUD Order for the entire Property. *Id.* The PUD Order required a 1 to 1 ratio of on-site parking spaces to residential units. *Id.* This meant that a total of 212 parking spaces needed to be constructed and be available for the use of

21

the Loree Grand's tenants.  *Id.*  Because of the physical configuration of the Phase I Property, a subterranean parking garage constructed underneath the Loree Grand could contain approximately 85-90 parking spaces on each of its floors.  *Id.*  To accommodate all of the required 212 units, the parking garage would need to have three levels.  *Id.*  Building a three-level parking garage would require the expenditure of at least $1.5 million more than would building only a two-level parking garage.  *Id.*  To save the LLC this money, the joint venturers agreed that a two-level garage would be built underneath the Loree Grand, while K Street would allow the LLC to build and use a 39 unit parking lot on the adjacent Phase II Property.  *Id.*  The LLC charged the tenants of the Loree Grand a monthly parking fee for their parking spaces, including those located in the Phase II Property parking lot.  *Id.*  This parking lot was never used by anyone other than Loree Grand tenants.  *Id.*  By this arrangement, the LLC saved the expense of building the third level of a parking garage on the Phase I Property – at least $1.5 million.  *Id.*

To construct a building the size of the Loree Grand configured with a below-grade parking garage requires the excavation and removal of a substantial amount of sub-surface soil. Typically, the soil is transported off-site and disposed of at substantial cost to the site owner. The joint venturers agreed to save the Company this cost by simply storing all of the soil displaced by the Loree Grand's construction onto the adjacent Phase II Property.  ASOF at ¶73. This saved the Company approximately $300,000.00.  *Id.*  As with the parking spaces, this use by the Company of the Phase II Property was not memorialized in any written lease or easement nor did the Company pay any monthly rent or charge for the soil storage.  *Id.*

When the Loree Grand was ultimately built, its management company informed the LLC

that a substantial pool of its young, professional potential tenants were pet owners.   ASOF at

¶74.   The LLC would benefit from being able to offer tenants a park specially dedicated to pets

so that dog owners could walk their dogs.   *Id.* Because there was no available space for the dog

park on the Phase I Property, K Street again allowed use of the Phase II Property to benefit Phase

I - this time by the construction of the dog park on the Phase II Property for the benefit of the

Phase I tenants.   *Id.* The LLC charged the Phase I tenants for using the dog park.   *Id.* The dog

park was never used by anyone other than Loree Grand tenants.   *Id.* Based on the figures he

was provided by the management company, Alan Cohen testified that the LLC realized an

additional $24,000 per year in revenue from rentals to tenants who would not have otherwise

rented at the Loree Grand.   *Id.*

The actions in commingling, so to speak, the two parcels and in specifically constructing

the Loree Grand so that it could be physically connected to the second building only makes sense

if Defendant TIAA had agreed to join with Plaintiffs in developing the whole site.   The Phase I

Property and the Phase II property were treated as one contiguous development parcel.   Had there

been no intention to have an overarching joint venture to develop the entire site, there would

have been no reason to allow the Phase II Property to be used to benefit Phase I.

**F.      The Overarching Joint Venture Was Not Terminated**

In their final argument regarding the joint venture, the Defendants argue that even if the

Court were to find sufficient evidence of the creation of an overarching joint venture, any such

joint venture was terminated and therefore Plaintiffs cannot succeed on Count I.   The Defendants

contend that there were four events terminating any joint venture: the grant of the ROFO to

TIAA Union Place; TIAA Union Place's decision to decline the ROFO; the execution of the

23

Letter of Intent with respect to Phase II; and Peter Witham's statement that K Street would not move forward with Phase II because of the cross-collateralization problem. Defs. Memo. at 16-17. These are all the same arguments that Defendant makes to support the contention that there was no joint venture for Phase II and which are addressed above. The grant of the ROFO to TIAA Union Place did not effect the obligation of TIAA to go forward with Phase II even if a particular single purpose entity, TIAA-Union Place, would not be participating. The execution of the Phase II Letter of Intent was the execution of the overarching joint venture as it related to Phase II; TIAA Union Place's decisions as Investor Member in Phase I did not terminate the joint venture to which TIAA was a party; and Peter Witham's statements do not alter the fact that Defendants already knew about the cross - collateralization.

For all the foregoing reasons, the Defendants' Motion for Summary Judgment on Count I should be dismissed.[10]

## II.   SUMMARY JUDGMENT SHOULD BE DENIED WITH RESPECT TO THE REMOVAL OF UNION NORTH AS THE LLC'S OPERATING MEMBER

Plaintiffs have alleged in the First Amended Complaint ("FAC") that Plaintiff Union North was wrongfully removed as the operating member of the Phase I LLC. There are three Counts based on the wrongful removal of Union North - breach of fiduciary duty (Count II), breach of contract (Count IV) and breach of the covenant of good faith and fair dealing (Count IX).[11] In moving for summary judgment, the Defendants assert that there are no disputed facts

---

[10] The Defendants do not argue that if a joint venture existed, there was no breach of fiduciary duty. Their argument on Count I is confined to the claim that no joint venture exists.

[11] Count I alleging breach of fiduciary duty against TIAA is also based in part on the wrongful removal of Union North. However, as stated *supra* in n.10, the Defendants do not

with respect to two of the grounds for the removal and that the removal based on those grounds
was undertaken within the terms of the Operating Agreement and did not violate any fiduciary
duty or the covenant of good faith and fair dealing owed by Defendant TIAA Union Place.
Plaintiffs submit that summary judgment should be denied.  Material factual disputes exist as to
whether, factually, Defendant has even established the grounds for removal.  Furthermore,
despite Defendants' contrary contention, the removal provisions of the LLC Operating
Agreement are discretionary.  Summary judgment should be denied as to Counts II, IV and IX of
the First Amended Complaint with respect to the removal issue.

### A.    Plaintiffs Dispute Defendants' Material Facts Regarding Removal

As noted by Defendants, although Defendant TIAA Union Place identified several actions
in its February 22, 2012 letter on which it based its removal of Union North (*see* Defs. Memo. at
19-20 & n.6; Def. Ex. 35), Defendants have isolated two such actions to support its summary
judgment motion - the purported failure of Plaintiff Union North to make a capital contribution
and misapplication of a D.C. property tax refund.  Defs. Memo. at 19-20.  Defendants contend
that both of these grounds of removal have been established without dispute.  Plaintiffs disagree.
Neither fact can be conclusively established at this stage and therefore summary judgment should
be denied on Counts II, IV and IX on this basis alone.

### 1. There are material disputed facts with respect to the tax refund.

Pursuant to Section 4.4(a)(2) of the Operating Agreement, Union North could be removed
if Union North or an Affiliate "misapplie[d] any funds derived from the Property . . . or

------

argue, as to Count I, that no breach of fiduciary duty occurred, only that there was no duty owed.

commingle[d] funds derived from the Property with other funds, unless the misapplication of commingling was not intentional, the amount involved is not material and Operating Member (or its Affiliate ) promptly provides restitution thereof." Defendants contend that the deposit of a District of Columbia tax refund check into an account for the Cohen Companies constituted an event of removal under the foregoing section. As the language of Section 4.4(a)(2) makes clear, however, even if there is a misapplication or commingling of funds, such is not grounds for removal where the misapplication or commingling is unintentional, the amount is not material and the Operating Member makes restitution. *See* §4.4(a)(2).

The basic facts of the tax refund itself are not disputed. RSOF at ¶¶30-31. In 2010, the District of Columbia refunded $190,744.70 in real property taxes paid on the Phase I Property as a result of a retroactive tax rate adjustment. RSOF at ¶¶30-31. D.C. Treasury issued the refund check to the Cohen Companies which, on receipt of the refund, assumed it was properly issued to the Cohen Companies. RSOF at ¶¶34-35. The Defendants do not dispute that the deposit of the refund into the Cohen Companies account was unintentional. *See* SOF at ¶35 (stating that the Alex Diaz, the CEO for the Cohen Companies, testified that the deposit into a Cohen Companies' account was accidental). The Defendants do not take the position that the deposit was anything other than a mistake. Thus, the only factual issues left to analyze are whether the amount was material and whether restitution was made.

The Defendants make only one statement regarding the materiality of the amount: "In light of the fact that the tax rebate exceeds the amount of the net income budgeted for the Loree Grand in each of the months from June 2010 through May 2011, it cannot possibly be characterized as immaterial." Defs. Memo. at 32. In SOF ¶41, the Defendants cite to

Defendants' Exhibit 34 which contains the 2010 and 2011 budgets for the Loree Grand. The Defendants argument suffers from a fatal flaw - it is based on the unsupported assumption that materiality is to be measured by the monthly budgeted net income. However, neither Section 4.4(a)(2) nor Article 1 (the definitions article) defines "material." The Agreement does not require materiality be evaluated by comparing the full amount of the refund to the budgeted monthly net income. A more meaningful approach to determining materiality is to spread the amount of the tax refund out to determine what monthly budget impact the refund would have over the same twelve month period. *See* RSOF at ¶41. One-twelfth of $190,744.70 is $15,895.39. *Id*. This figure should then be compared against monthly total operating expenses to gauge whether the tax refund would have had material impact on operating expenses. *Id*. In the stated time period, June 2010 through May 2011, the monthly operating expenses ranged from a low of $113,611.67 (in July 2010) to a high of $152,128.00 (in January 2011). Def. Ex. 34. An additional $15,895.39 in any given month would not have had a material impact on those monthly operating expenses. RSOF at ¶41. Alternatively, the amount of the tax refund can be compared to the $865,874.47 in total net income through the end of May 2011. *Id*. Under either approach, the tax refund was not material. *Id*. By all accounts Phase I was a success and the tax refund simply was not material to performance of the project. *Id*.; *see also* ASOF at ¶78.

The lone remaining factor for consideration on the tax refund issue is restitution. While the actual dollars for the tax rebate do still sit in a Cohen Management account (RSOF at ¶42), that does not mean that there had not been "restitution." "Restitution" is not defined in the LLC Agreement. The Agreement contains nine *pages* of defined terms, but "restitution" is not among them. As a measure of recovery "restitution" is the return of a benefit gained. Under the

circumstances here, because of the ultimate true-up contemplated by the parties (*see* RSOF at ¶39; ASOF at ¶75), there was no additional benefit gained from the tax rebate which accrued to Union North to the detriment of Defendants. RSOF at ¶39. Moreover, the Defendants should be estopped from this argument because the evidence shows that although TIAA Union Place knew about the tax rebate mix-up as early as March 2011, it was not made an issue until almost a year later when TIAA Union Place asserted it as a basis for removal in February 2012. *See* RSOF at ¶¶38-39. In fact, even after becoming aware of the tax rebate mistake, Defendants did not ask for a return of the money and had no dissatisfaction with Union North's management of Phase I. *See* RSOF at ¶39. Rather, Defendants requested that it be listed as an account receivable on the financial statements and it was. RSOF at ¶¶36,38. Moreover, as the evidence shows, TIAA Union Place was not interested in having the rebate repaid, but had instead carefully chose the ostensible grounds upon which it based Union North's removal precisely because those grounds could *not* be cured. Scott Anderson, the Senior Director of Asset Management for TIAA-CREFF, sent an in-house email to Gerald Casimir explaining that the three bases for removal, including the "commingling of funds," did not "have a cure period and allow us the easiest way to remove Cohen." *See* RSOF at ¶44 (quoting 2/9/2012 Anderson email to Casimir). Thus, the restitution issue could not, under these circumstances, provide a basis for removal.

## 2. **There are material disputed facts with respect to the capital contribution.**

The second basis for removal that Defendants discuss in their summary judgment motion was Union North's purported failure to make a ten percent capital contribution toward the build-out of Kitchen on K, the restaurant on the first floor of the Loree Grand. Defs. Memo. at 22-23. In their Statement of Material Facts, the Defendants discuss the build-out, the costs of the build-

28

out, and the requests for payments for their share received from Alan Cohen on behalf of ADC Builders. *See* SMF at ¶¶48-54. The Defendants contend that they paid 100% of the costs but should have only paid 90% of the costs. However, the Defendants point to no record evidence that would establish that Defendant TIAA Union Place, in its capacity as Investor Member, sent a notice, in the manner required by Section 12.1 of the Agreement, requiring an Additional Capital Contribution as set forth in Sections 6.2 and 6.3 of the Agreement. *See* RSOF at ¶¶51-53. At best the evidence shows ongoing discussions between Alan Cohen, Alex Diaz, and Angel Morales regarding the costs and the off-sets to the costs. Alex Diaz testified that the cost could be included as an account receivable chargeable to Cohen. *See* RSOF at ¶52. The issues regarding the costs to build Kitchen on K could not constitute a Removal Event because TIAA Union Place never properly notified Plaintiff Union North it was requiring an Additional Capital Contribution.

**B.     The Wrongful Removal Provides Grounds for Counts II, IV and IX**

As the foregoing discussion demonstrates, the Defendants have failed to establish that TIAA-Union Place had the factual grounds on which to remove Plaintiff Union North as the Operating Member of Union Place LLC. Because there was no ground, factually, to remove Union North the removal itself was wrongful and constituted a breach of the fiduciary duty owed by TIAA-Union Place as a member of a limited liability company (Count II), a breach of the Operating Agreement (Count IV), and a breach of the implied covenant of good faith and fair dealing (Count IX). None of the arguments advanced by Defendants defeats these claims as a matter of law.

### 1. TIAA-Union Place Breached the Operating Agreement.

In the Operating Agreement Defendant TIAA-Union agreed that Plaintiff Union North would be removed as the operating member only if certain events took place. As just discussed, neither the tax rebate issue nor the Kitchen on K capital contribution issue provided grounds on which to remove Union North as the Operating Member of the LLC.   Because Union North can only be removed for certain conduct, a removal in the absence of that conduct constitutes a breach of contract. By removing Union North in the absence of a qualifying Removal Event, TIAA-Union Place breached the Operating Agreement.

The foregoing facts provide sufficient basis on which Plaintiff Union North can demonstrate a breach of contract.  The conduct - the tax rebate and capital contribution - simply did not warrant the removal of Plaintiff Union North as the operating member.  Even putting aside the allegations of pretext, which Defendants assert (Defs. Memo. at 25-26) are not pertinent to the breach of contract count,[12] the contract was breached by the removal of Plaintiff Union North in the absence of facts giving rise to a removal event.  Accordingly, Defendants' motion should be denied insofar as it seeks summary judgment on Count IV of the First Amended Complaint.  Defs. Memo. at 25-26.

### 2. TIAA-Union Place breached the implied covenant of good faith and fair dealing.

In Count IX of the First Amended Complaint Plaintiff Union North alleges that TIAA

---

[12] At page 25 the Defendants argue that Plaintiffs' assertion that the removal was based on pretext cannot be alleged as part of the breach of contract claim and state it can only be asserted as part of the claim for breach of the covenant of good faith and fair dealing.  Then, at pages 26 to 29 Defendants argue that the argument that the removal was a bad faith exercise of discretion has no place in a claim for breach of the covenant of good faith and fair dealing where removal is permitted by the contract.   Defendants cannot have it both ways.

Union Place breached the implied covenant of good faith and fair dealing by, among other things, removing Plaintiff Union North as the Operating Member of the limited liability company.[13]  In moving for summary judgment on Count IX, the Defendants argue that because express contractual provisions permitted the removal of the Operating Member upon the occurrence of certain events, those removal provisions of the contract cannot be rewritten through imposition of the covenant of good faith and fair dealing. Defs. Memo. at 26-27.  While it is true that the implied covenant cannot be based on conduct permitted by an agreement and cannot be applied to alter express terms of a contract, as noted by the cases cited by Defendant (*e.g.*, *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010)), the Plaintiffs have not asked the Court to rewrite the Operating Agreement or to insert terms contrary to those already contained in the agreement. It is also true, as Defendant also acknowledges (*see* Defs. Memo. at 28-29), that where an agreement affords one party discretion, the covenant applies to protect against an unreasonable exercise of discretion.  *See Amirsaleh v. Board of Trade of City of New York, Inc.*, 2009 WL 3756700, at *4 (Del. Ch. 2009).  As noted by the *Nemec* dissent, citing *Dunlap v. State Farm and Casualty Company*, 878 A.2d 434 (2005), "under Delaware law, a contracting party, even where expressly empowered to act, can breach the implied covenant if it exercises that contractual power arbitrarily or unreasonably." *Nemec*, 991 A.2d at 1131 (Jacobs, J., dissenting (citing *Dunlap*, 878 A.2d at 442); *see Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC*, C.A. No. 3658-VCS, 2009 WL 1124451, at *7  (Del. Ch. April 20, 2009).   The *Amirasaleh* Court explained:

Under Delaware law, the implied covenant of good faith and fair dealing inheres

---

[13]  Count IX also alleges a breach of the implied covenant as a result of Defendant's refusal to approve Plaintiff's request for approval of the loan extension.  This aspect of Count IX is discussed *infra*.

> in every contract. [citation footnote omitted]. It is triggered when the defendant's conduct does not violate the express terms of the agreement *but nevertheless deprives the plaintiff of the fruits of the bargain.* [citation footnote omitted]. Thus, the implied covenant is "best understood" as judicial tool used to imply terms in a contract that protect the reasonable expectations of the parties to (or beneficiaries of) the contract.

*Amirsaleh*, 2009 WL 3756700, at *4 (emphasis added). Moreover, under Delaware alternative entity law, an implied covenant of good faith is imposed on members of a limited liability company and cannot be eliminated by an operating agreement. 6 Del. Code §18-1101(c). A plaintiff states a claim for breach of the implied covenant where it is alleged that the defendant's "conduct was motivated by a culpable mental state [citation footnote omitted]. In other words, the defendant's conduct must be driven by an improper purpose." *Amirsaleh*, 2009 WL 3756700, at *5. Furthermore, where a contract grants discretion to just one party, that party "must exercise its discretion in good faith. If it does not, it will run afoul of the implied covenant." 2009 WL 3756700, at *5. In *Clean Harbors, Inc. v. Safety-Kleen, Inc.*, 2011 WL 6793718 (Del. Ch. 2011), the Chancery Court denied defendant's motion to dismiss the plaintiff's claim asserting breach of the covenant[14] of good faith and fair dealing in which plaintiff challenged the price at which the board of directors called certain outstanding shares. The defendant argued that the plaintiff's allegations were insufficient. In denying the motion, the Chancellor held that "to allege a breach of a contractual duty to act in good faith, a complaint need only allege 'facts related to the alleged at taken in bad faith, and a plausible motivation for it.' [citation footnote omitted]. This is minimal standard, the purpose of which is to give the defendant notice of the claim being made against it. [citation footnote omitted]." *Clean Harbors,*

---

[14] The Court's discussion of adequacy of the plaintiff's allegations regarding bad faith are instructive even though the covenant involved in *Clean Harbors* was contractual not implied.

2011 WL 6793718, at *7. *See also Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199 (Delaware 1993) (plaintiff's allegation that defendant acted in retaliation because of lawsuit was sufficient allegation of bad faith).

As explained in *Hilco Capital, LP v.Federal Ins. Co.*, 978 A.2d 174 (Delaware 2009):

> The trial court correctly stated the general principle that, "there can be no breach of the . . . covenant of good faith and fair dealing where the contract expressly permits the actions being challenged . . .." But, the corollary is that, when a contract gives one party discretion, "it must not be exercised to deprive the other party of the benefit of the contractual relationship or evade the spirit of the bargain." [footnote omitted]. Thus, despite the fact that the Participation Clause in the Federal policy gave Federal "sole discretion" whether to participate in the settlement of any claim, Federal still had to exercise that discretion consistent with its covenant of good faith and fair dealing.

978 A.2d at 178.[15] In *Desert Equities, Inc. v. Morgan Stanley Leveraged equity Fund, II, L.P.*, 624 A.2d 1199 (Delaware 1993), the Delaware Supreme Court reversed the chancery court's dismissal of plaintiff's complaint on the pleadings. 624 A.2d at 1201. The plaintiff was a limited partner in a limited partnership with the defendants. 624 A.2d at 1201. At issue was the scope of the authority conferred on the defendant general partner to exclude the plaintiff limited partner from further participation in the partnership's investment opportunities. 624 A.2d at 1202. The general partner notified the plaintiff that "in the exercise of the General Partner's authority conferred by section 5.04 of the Partnership Agreement, [plaintiff] was 'excused' from further participation in at least three new Fund II investments," stating as its reason that the plaintiff's participation "'might have a material adverse effect, directly or indirectly, on the

---

[15] The court applied Missouri law but noted that Missouri and Delaware law are the same on this issue. 978 A.2d at 178. Although the court ruled in defendant's favor, finding no violation of the covenant, it did so in the context of summary judgment and after full review of the record. *Id.*

investment, the [Fund II] partnership or Morgan Stanley.'" 624 A.2d at 1202. Plaintiff filed suit, asserting claims for breach of contract, breach of fiduciary duty, and breach of the implied covenant of good faith and fair dealing. 624 A.2d at 1202. "The crux of plaintiff's complaint is that the General Partner acted with bad faith in exercising its excusal authority to exclude [plaintiff] from further participation in Fund II. Plaintiff asserts that the General Partner did so in retaliation for [plaintiff's] filing of the Fund I suit." 624 A.2d at 1202. The chancery court dismissed the complaint finding the allegations that the "General Partner did not in good faith *believe* that [plaintiff's] participation in the Fund I litigation 'would have a material adverse effect on the entities [footnote omitted]' participating in the Fund II investments" to be legally insufficient. 624 A.2d at 1203 (emphasis in original). The *Desert* court reversed, finding that plaintiff's allegations of bad faith (based on retaliation) in exercising contractual discretion to be sufficient. 624 A.2d at 1206. Moreover, "the reasonableness of the General Partner's beliefs, as well as the reasonableness of its exercise of its contractual rights, is not a question of law" but a mixed question of law and fact which cannot be resolved on a motion to dismiss. *Id.*

Here, the evidence shows that the Defendant's exercise of the removal provisions was pretextual and constituted a bad faith exercise of discretion because the facts do not actually demonstrate the existence of a removal event. *See* RSOF at Section III (¶¶26-54). The Defendant, as the LLC member with authority to make all major decisions, is bound to exercise its contractual rights in good faith. 6 Del. Code §18-1101(c), (d). Moreover, just as the plaintiff in *Desert Equities* alleged bad faith in defendant's exercise of discretionary rights (regarding excusal) under the contract, here the evidence shows bad faith in Defendant's exercise of discretionary rights (regarding removal) under the contracts. *See* RSOF at Section III (¶¶26-54).

In *Auriga Capital Corp. v. Gatz Properties*, 40 A. 3d 839 (Del. Ch. 2012), the Chancery Court granted judgment in favor of plaintiff, a member of a Delaware LLC, in its action against the managing member asserting both breaches of the limited liability agreement and of fiduciary duties, specifically finding that "the LLC agreement here does not displace the traditional duties of loyalty and care that are owed by managers of Delaware LLCs to their investors in the absence of a contractual provision waiving or modifying those duties." 40 A.3d at 843. "'[I]nequitable action does not become legally permissible simply because it is legally possible.'" 40 A.3d at 849 (quoting *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971).

As *Auriga* noted, the Delaware LLC Act explicitly provides that "'[i]n any case not provided for in this chapter, *the rules of law and equity . . . shall govern.*'" 40 A.3d at 849 (alterations and emphasis by *Auriga*) (citing 6 Del. Code §18-1104). Thus, "unlike in the corporate context,[16] the rules of equity apply in the LLC context *by statutory mandate*, creating an even stronger justification for application of fiduciary duties grounded in equity to managers of LLC to the extent that such duties have not been altered or eliminated under the relevant LLC agreement [footnote omitted]. . .. [B]ecause the LLC Act provides for principles of equity to apply, because LLC managers are clearly fiduciaries, and because fiduciaries owe the fiduciary duties of loyalty and care, the LLC Act starts with the default that managers of LLCs owe enforceable fiduciary duties." 40 A.3d at 850, 851 (emphasis in original) (footnote added). The *Auriga* Court also recognized that the LLC Act permits members of an LLC to fully or partially

---

[16] *Nemec*, the case Defendants rely on, arose in the corporate context.

supplant those default duties. 40 A.3d at 852 (citing 6 Del. Code §18-1101(c)).[17] Where the duties have not been eliminated or modified, however, the core default fiduciary duties apply. 40 A.3d at 852. *See also Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC*, C.A. No. 3658-VCS, 2009 WL 1124451, at *9 (Del. Ch. April 20, 2009) (traditional fiduciary duties apply in limited liability company unless eliminated or limited by contrary provisions of operating agreement). The *Auriga* Court cautioned that "a judicial eradication of the explicit equity overlay in the LLC Act could tend to erode [Delaware's] credibility with investors in Delaware entities." *Id*. at 854. A member of a Delaware limited liability company is entitled to expect that it will have the protections of those equitable fiduciary duties in the absence of an express provision in the LLC agreement eliminating those duties. *Id*. As noted by *Auriga*, "[t]hat expectation has been reinforced by [Delaware's] Supreme Court in decisions like *William Penn Partnership v. Slaiba*" [13 A.2d 749, 756 (Del. 2011)]. . . ." 40 A.3d at 854. Furthermore, the LLC Act "promises investors that equity will provide the important default protections it always has, absent a contractual choice to tailor or eliminate that protection." 40 A.3d at 856.

Here, as in *Auriga*, the LLC agreement does *not* supplant the equitable fiduciary duties owed by an LLC manager to the members. 40 A.3d at 852. The Operating Agreement here is comparable to the agreement in *Auriga*. Neither has a "general provision stating that the only duties owed by the manager to the LLC and its investors are set forth in the Agreement itself." 40 A.3d at 856. Thus, the agreement here, like that in *Auriga*, "does not displace the traditional fiduciary duties of loyalty and care owed to the Company and its members . . . ." *Id*. The

---

[17] The implied duty of good faith and fair dealing cannot be eliminated, however. 6 Del. Code §18-1101(c).

agreement in *Auriga*, like the agreement here, contains a partial exculpatory provision.  The provision from the agreement in *Auriga* provides that no member is liable to another member for any loss or damages "incurred by reason of any act or omission performed or omitted by such [member] in good faith . . . and reasonably believed to be within the scope of the authority conferred on such [member] by this Agreement, except that [such member] shall be liable for such loss, damages or claim incurred by reason of such [member's] gross negligence, willful misconduct or willful misrepresentation."  40 A.3d at 858.  Thus, the member in *Auriga* could "escape monetary liability for a breach of his default fiduciary duties if he can prove that this fiduciary breach was not: (1) in bad faith, or the result of (2) gross negligence, (3) willful misconduct or (4) willful misrepresentation."  *Id.*  He also had to prove he was acting in a manner "reasonably believed to be within the scope of authority conferred on [him]."  *Id.*  Here, the Agreement similarly provides a member shall be indemnified by the Company only if the member "was acting within the scope of its duties or under the authority of the Members," but members shall not be indemnified for actions "constituting negligence, gross negligence, willful misconduct *or bad faith*, or involving a breach of [the] Agreement . . .."  Def. Exh. 9 (at ¶4.9(a)) (emphasis added).  Moreover, because Section 4.4 provides that the Operating Member "may" be removed under certain circumstances,  Defendant had a fiduciary duty to exercise that discretion in good faith.

The removal authority of Defendant TIAA-Union Place is expressly discretionary. Section 4.4(a) states that Union North "may be removed" by TIAA-Union Place under certain circumstances.  Def. Ex. 9 at §4.4(a).  Yet the Defendants all but ask the court to ignore the use of the discretionary word "may" in that section.  This the Court cannot do.  Although Section

4.4(a) actually uses the discretionary word "may," the Defendants argue that to interpret that provision as discretionary would "amount to a re-writing of the contract," and then ask the court to interpret "may" as "shall" which, apparently in Defendants' view, would not constitute a rewriting of the contract. *See* Defs. Memo. at 28-29.    The Defendants' argument is non-sensical.  Because the Agreement itemized fifteen bases for removal, the Defendants ask the Court to assume that upon the occurrence of any one of them, removal was mandatory.  That is not what the agreement says, however.  Moreover, the discretionary nature of the removal authority is buttressed by the fact that the Defendants were aware of the conduct on which they based the removal long before they took any action to remove Union North. *See* RSOF at Section III (¶¶26-54); ASOF at ¶¶83-84.

TIAA-Union exercised its discretionary authority in a manner that was arbitrary and in bad faith considering the facts that Project Phase I had already been successfully completed; portions of the Phase II property had been used for the benefit of Phase I; Phase II was already underway; Plaintiff Union-North had not engaged in conduct on which Defendant TIAA-Union could have, in good faith, exercised its discretionary removal authority.[18]

### 3. TIAA-Union Place breached its fiduciary duty.

As alleged in the First Amended Complaint, the wrongful removal of Union North constitutes a breach of the fiduciary duty owed by TIAA-Union Place as a member of a Delaware

---

[18] Defendants make a passing contention that the implied covenant of good faith argument must be dismissed because Plaintiffs suffered no damages as a result of the removal of Union North. Defs. Memo. at 28. As Defendants note, however, in footnote 8, Plaintiffs have proffered expert testimony that as a result of the removal of Union North as the managing member, Ron Cohen was absent from the decision-making role which had a particularly deleterious effect on setting rental rates.

limited liability company.[19]   Relying on *Grayson v. Imagination Station, Inc.*, 2010 WL

3221951, at *7 (Del. Ch. Aug. 16, 2010) and *Gale v. Bershad*, No. Civ. A. 15714, 1998 WL

118022, at *5 (Del. Ch. Mar. 1998), the Defendants argue that the breach of fiduciary duty in

Count II must be dismissed because it arises out of the same operative facts as Count IV alleging

breach of the Union Place Phase, I, LLC Operating Agreement and Count IX alleging breach of

the covenant of good faith and fair dealing.   Defendants' reliance on these cases is misplaced.

*Grayson* and *Gale* expressly note that if the fiduciary duty arises outside the contract, then the

breach of fiduciary duty claim can co-exist with both the breach of contract claim (*Grayson*,

2010 WL 3221951, at *7) and breach of the implied covenant of good faith and fair dealing

(*Gale*, 1998 WL 118022, at *5).   Here, the fiduciary duty owed by Defendant TIAA-Union Place

to Plaintiff Union North arises out of Delaware law, not out of the operating agreement.   *See*

*Auriga Capital Corp. v. Gatz Properties*, 40 A. 3d 839, 851 (Del. Ch. 2012) ("because the LLC

Act provides for principles of equity to apply, because LLC managers are clearly fiduciaries, and

because fiduciaries owe the fiduciary duties of loyalty and care, the LLC Act starts with the

default that managers of LLCs owe enforceable fiduciary duties").   Accordingly, Count II is not

defeated by the presence of Counts IV and IX.[20]

---

[19]   As noted *supra* at n.11, Plaintiffs also have alleged that the wrongful removal of Union
North constituted a breach of fiduciary duty by Defendant TIAA.   In footnote 9 of their
Memorandum, Defendants state that Plaintiffs have not alleged a contractual relationship
between TIAA and Union North.   This is correct.   However, Plaintiffs' claim in this regard is not
dependent on a contractual relationship.   As Plaintiffs alleged in Paragraph 36 of the First
Amended Complaint, Defendant TIAA breached its duty as a joint venturer by causing the
removal of Union North as the Operating Member.   Defendants themselves has asserted in
Paragraph 2 of their Statement of Facts that TIAA controls TIAA Union Place.

[20]   The Defendants also cite to, but do not discuss,  6 Delaware Code Section 18-1101(d),
providing that one member of a limited liability company is not liable to another member for a

The Defendants argue that TIAA Union Place owed no fiduciary duty to Union North, citing in support *Heller v. Kiernan*, 2002 WL 385545, at *4 (Del. Ch. Feb. 27, 2002).[21]  *Heller* did not involve claims between members of a limited liability company.  In *Heller*, there was no agency relationship between the plaintiff and defendant and therefore no special relationship existed from which a fiduciary duty arose.  2002 WL 38545.  *Heller* is inapposite.  As noted above members of limited liability companies owe traditional fiduciary duties toward each other. Defendant TIAA Union Place shirks from its fiduciary duty by asserting that it was Union North, the day-to-day manager, who owed fiduciary duties to TIAA Union Place, not the other way around.  Defs. Memo. at 31.  Union North may have had day to day decision making authority over the construction and management of the building, but it was TIAA Union Place which was responsible for the management of the LLC itself and which reserved to itself the major decision making authority for the LLC and had a 90% ownership interest.  A claim by TIAA Union Place that it had no fiduciary duties in the exercise of its decision to remove Union North as the Operating Member or in the exercise of its major decisions for the LLC is absurd.

## III.   TIAA-UNION PLACE BREACHED THE COVENANT OF GOOD FAITH IN DENYING THE LOAN EXTENSION

In addition to the claim based on the wrongful removal of Union North as the Operating Member, Count IX also asserts a violation of the covenant of good faith and fair dealing based on TIAA Union-Place's refusal to agree to Union North's loan extension request.  Plaintiff has

---

breach of fiduciary duty if the first member acted in good faith reliance on the provisions of the agreement.  Defs. Br. at 30.  Section 18-1101(d) has no application where, as here, the member does not act "in good faith reliance" on the provisions of the operating agreement.

[21]   Defendants also cite to the definition of "fiduciary" in Black's Law Dictionary. Plaintiffs have no quarrel with this definition.

alleged that Defendant TIAA-Union owed it the duty of good faith and fair dealing (FAC at ¶74) and that it acted in bad faith in refusing to agree to the financing extension request, motivated by either (1) retaliation for the incident described in Paragraph 14 of the First Amended Complaint regarding Trevor Michael; (2) a desire to force Plaintiff Union North into a default situation; (3) or a desire to take Project Phase I over for its own benefit. FAC at ¶¶78-79.  In seeking summary judgment on this aspect of Count IX, the Defendants contend that the decision with respect to the financing extension was on behalf of the company as a whole and was not targeted toward Union North and also that the decision fell within TIAA-Union Place's major decision making authority.  Defendants' Motion for Summary Judgment on Count IX should be denied.

Defendants first raise what they describe as a practical weakness with Plaintiffs' claim - that the consequence of the loan extension decision was felt nine times as much by Defendants as by Plaintiffs because of the 90%-10% division of interests between TIAA-Union Place and Union North in Union Place LLC.  If Defendants had replaced the WestImmo financing with another market lender, the Defendants' argument might have a ring of truth to it.  That is not what happened, of course.  WestImmo was replaced by TIAA as the lender so TIAA was repaying itself.

The Defendants also argue that their refusal to approve the loan extension request cannot be second guessed by the Plaintiffs or this Court because Section 4.1 (b) gave Defendant TIAA - Union Place the right to make all major decisions, to include all financing decisions.  Defs. Memo. at 31-32.  However, the "Major Decisions" section must be read in conjunction with both the indemnity and management sections of the Operating Agreement. The indemnity section, Section 4.9(a) , as noted in the previous discussion, states that a member is not to be indemnified

for acting in bad faith.  In the management section, Section 4.1(a), Defendant TIAA-Union Place agreed to "use all commercially reasonable efforts to minimize Operating Expenses and maximize the Operating Revenues of the Property in the best interests of Company, and to exercise such efforts as a party not having a conflict of interest."  "Operating Expenses" is defined to include interest expenses.  *See* Def. Ex.9 at TIAA049425.  By refusing to approve the loan extension request and substituting the low interest (2.10%) WestImmo loan (RSOF at ¶61; ASOF at ¶91) with a significantly higher (15%) interest loan  (ASOF at ¶93),[22]  Defendant TIAA-Union Place exercised its "Major Decisions" authority in a way that increased Operating Expenses, contrary to its obligations in Section 4.1(a).

The Defendants argue that the reason they did not approve the loan extension request was their concern that they would not be able to make the required representations and warranties to the lender, WestImmo.  Defs. Memo. at 32-33.  However, by March 27, 2012 TIAA Union Place had already met with WestImmo's loan officer to present its "concern" that it would not be able to "make the required representations and warranties pursuant to Section 4.3 . . .." and was specifically told by the loan officer that notwithstanding these matters, if TIAA Union Place was concerned about making representations and warranties, it should simply qualify the representations and warranties when it requested a loan extension.  RSOF at ¶61.  Having received this suggestion, TIAA Union Place did not even attempt to extend the 2% loan or pursue market-rate financing for the Loan.  RSOF at ¶61.  This was despite the fact TIAA Union Place's internal valuation of Phase I was $87,800,000.  RSOF at ¶61.  Moreover, Alan Breindel, the Executive Director of WestImmo, the lender, was aware the Phase II property taxes were paid

---

[22] *See* RSOF at ¶61 regarding interest rates for original and replacement financing.

from the WestImmo Loan proceeds and in fact approved draw requests disclosing that the loan proceeds were being used to pay the property taxes. RSOF at ¶64. This testimony is further supported by extrinsic evidence and Mr. Breindel's testimony elsewhere. RSOF at ¶64. This draw request seeks authorization for three tax bills, one for Phase I issued to Union Place in the amount of $126,492 ( RSOF at ¶64 (citing Breindel Dep. Ex. 135 at p. WI 00170)) and the other two for Phase II, issued to K Street in the amount of $150,530.92 and 8,637.61 (RSOF at ¶64 (citing Breindel Dep. Ex. 135 at pp. WI 00171 and WI 00172)). Mr. Breindel admitted that WestImmo reviewed the tax bills issued to K Street. RSOF at ¶64. He also acknowledged WestImmo knew that K Street was not the owner of Phase I. RSOF at ¶64. Mr. Breindel admitted that all three tax bills were within the approved budget. RSOF at ¶64. Payment of all three tax bills was approved in writing by WestImmo. RSOF at ¶64.

Having declined approval to pursue a further extension of the WestImmo Loan, TIAA Union Place, on May 10, 2012, issued a call for capital contributions to pay the WestImmo Loan balance of $52,632,323.92. *See* SOF at ¶62. Union Place LLC would not have needed to pay the WestImmo Loan balance had TIAA Union Place (the Investor Member), consistent with its fiduciary duties and duty of good faith and fair dealing, extended the WestImmo Loan or sought replacement financing at market terms. RSOF at ¶62.

## CONCLUSION

For all the foregoing reasons, the Plaintiffs respectfully request the Court to deny the Defendants' Motion for Summary Judgment. The Defendants have failed to demonstrate that they should prevail as a matter of law on Counts I, II, IV and IX. This case must be tried to resolve the multitude of material factual issues.

Respectfully submitted,

COOTER, MANGOLD, DECKELBAUM
& KARAS, LLP


By:    /s/ Dale A. Cooter
        Dale A. Cooter,  D.C. Bar No. 227454
        Donna S. Mangold, D.C. Bar No. 358851
        Stephen Nichols, D.C. Bar No. 429686
        Fernando Amarillas, D.C. Bar No. 974858
        5301 Wisconsin Avenue, NW
        Suite 500
        Washington, DC 20015

        PHONE:     (202) 537–0700
        FAX:        (202) 364-3664
        EMAIL:      efiling@cootermangold.com

44

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of October, 2013 a copy of the foregoing

Plaintiffs' Opposition to Defendants' Motion for Summary Judgment and proposed Order was

served through the Court's e-filing system on:

> Rebecca Woods, Esq.
> SEYFARTH SHAW, LLP
> 975 F Street, NW
> Washington, DC 20004

> /s/ Stephen Nichols
> Stephen Nichols