## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                    :

**K STREET DEVELOPERS, LLC, et al.,**     :
                                      :

        **Plaintiffs,**                  :

                                        :

        **vs.**                        :      **Civil Action No.  1:12-cv-00666-**
                                      :      **RLW**

**TEACHERS INSURANCE AND ANNUITY**  :
**ASSOCIATION OF AMERICA, et al.,**     :

                                        :

        **Defendants.**              :
_____ :

## PLAINTIFFS' RESPONSE TO DEFENDANTS'
## STATEMENT OF MATERIAL FACTS

Plaintiffs Union North Place I, LLC ("Union North") and K Street Developers, LLC. ("K Street" and, collectively with Union North, "Plaintiffs"), by and through their undersigned counsel, hereby respond to Defendants' Statement of Undisputed Material Facts ("Statement of Facts") filed by defendants Teachers Insurance and Annuity Association of America ("TIAA"), TIAA-CREF Global Investments, LLC ("TIAA-CREF") and TIAA Union Place Phase I, LLC ("TIAA Union Place" and, collectively with TIAA and TIAA-CREF, "Defendants") (Docket No. 79-2) and state as follows:

## I.   The LLC Agreement, the Formation of the LLC and the Completion of Phase I

1.   In or around the summer of 2006, TIAA and Plaintiff K Street Developers, LLC ("K Street")  agreed to acquire and develop land located at approximately 3rd St., N.E.  between K and L Street, N.E.  (the "Phase I Property")  in order to build the Loree Grand, a 10-story apartment complex in downtown Washington, D.C.  ("Phase I") .  *See* Compl.  ¶ 9, sentences 2-4; Ans.  ¶ 9; A.  Cohen Tr.  13:21-14:14.  The Amended Complaint cited herein refers to the First Amended Complaint, filed by Plaintiffs on May 25, 2012.  (Dkt.  No.  10.)  The Answer refers to the Second Amended Answer, Affirmative Defenses, Counterclaims and Third-Party Claims, filed by Defendants on August 22, 2013.  (Dkt.  No.  69.)  The Amended Complaint and the Second Amended Answer are annexed as Exhibits 5 and 6 to the Woods Decl., respectively.

**Response 1:**   This statement is not disputed, except to the extent TIAA seeks an

inference that the 2006 agreement was limited to Phase I.  It was not.  *See*, *infra.*, ¶¶ 7 and 66.

2.   The parties chose to go forward with Phase I, in part, because it would entitle them to a NOMA Real Estate Tax Abatement.  *See* A.  Cohen Tr.  15:5-16:2.  True and correct copies of the portions of the deposition transcript from the deposition of Alan Cohen, dated May 1, 2013, are annexed as Exhibit 7 to the Woods Decl.

**Response 2:**   This statement is not disputed, but is not complete.  The tax abatements

discussion was with respect to Phase I and Phase II.  A. Cohen 5/1/13 Tr., Appendix of Exhibits,

Ex. 4 at 15:10-16:2.

3.   TIAA and K Street agreed that Phase I would proceed in accordance with a written agreement.  *See* R.  Cohen Tr.  30:25-31:9.  True and correct copies of the portions of the deposition transcript from the deposition of Ronald Cohen, dated May 14, 2013, are annexed as Exhibit 8 to the Woods Decl.

**Response 3:**   This statement is not disputed.

4.   TIAA thus created TIAA Union Place, a special purpose entity created and wholly-controlled by TIAA, and K Street used plaintiff Union North, a special purpose entity created and wholly-controlled by Ronald Cohen, his son Alan Cohen and/or his family members and affiliates, including the Cohen Companies.  *See* Compl.  ¶ 9, sentences 2-4; Ans.  ¶ 9, R.  Cohen Tr.  33:3-2 1, Woods Decl.  Ex. 8; A.  Cohen Tr.  8:7-11, Woods Decl.  Ex. 7.

**Response 4:**   This statement is not disputed, except "the Cohen Companies" is

undefined in this paragraph and in any of the referenced exhibits and therefore the statement

about "the Cohen Companies" is disputed.

5.   TIAA Union Place and Union North then entered into the Limited Liability Company Agreement of Union Place Phase I, LLC, executed on January 31, 2007 (the "LLC Agreement") .  *See* the LLC Agreement, Woods Decl.  Ex.  9.  A copy of the LLC Agreement was marked as Ex.  D-1 and authenticated at the deposition of Alan Cohen, dated May 1, 2013.  *See* A.  Cohen Tr.  21:8-23:16, Woods Decl.  Ex. 7.  Union North was assisted by counsel.  *See* R.  Cohen Tr. 27:16-28:17, Woods Decl.  Ex.  8.

**Response 5:**   This statement is not disputed.

6.   The LLC Agreement governed all rights, duties, and responsibilities of the members of the Company.  *See* LLC Agreement §§ 1.1,2.5,2.7, 12.3, Woods Decl.  Ex.  9; A.  Cohen Tr. 13:4-18; 17:16-18:6; R.  Cohen Tr.  19:19-20:7.  TIAA Union Place and Union North were the two members of the LLC.  *See id*.  at § § 1.1 and 3.1.  Union North was the Operating Member and TIAA Union Place is the Investor Member.  *See id*.  at § 1.1 and 4.1(b) .  K Street was also a signatory of the LLC Agreement due to its ownership of the Phase II property.  *See id*.

**Response 6:**   Plaintiffs dispute the first sentence of paragraph 6.  None of the cited

sections of the LLC Agreement, and none of the cited deposition testimony of Alan and Ronald

Cohen, supports the claim that the LLC Agreement governed all rights, duties and

responsibilities of [TIAA Union Place and Union North].  The only "rights, duties and

responsibilities" the LLC Agreement governed were those "relative to the formation of the

Company."  LLC Agreement, Woods Decl. Ex. 9, at § 12.3, p. 44, Bates No. TIAA049463.  And,

to be clear, this limitation does not purport to apply to non-members of the Company such as

TIAA or K Street.  Moreover, Plaintiffs dispute the statements in the first sentence of paragraph

6 about the effect and scope of the LLC Agreement because they are not "facts" but rather, are

legal conclusions properly reserved to the Court.  The last sentence of this paragraph is also

disputed.  K Street was not a "signatory of the LLC Agreement."  *See*, LLC Agreement, Woods

Dec. Ex. 9, at pp. 46-47, Bates Nos. TIAA049465-049466.  K Street was a signatory to a joinder

page that came after the LLC Agreement, in which it "join[ed] in [the] Agreement for the sole

purpose" of making certain representations and warranties about the Property it was

contributing.  *See*, LLC Agreement, Woods Decl. Ex. 9, at Bates No. TIAA049467.  To the

extent other fact statements are made in paragraph 6, they are not disputed, except "the

Company" and "the LLC" are undefined terms.  Plaintiffs assume both of these terms refer to

Union Place Phase I, LLC.  If so, Plaintiffs do not dispute the fact statements made about the

Company or the LLC.  This assumption will also govern any responses Plaintiffs make below to

any statements about the "Company" or the "LLC."  To the extent this assumption is mistaken,

either here or below, then any statements about the "Company" or the "LLC" are disputed.

Plaintiffs will hereafter use the term "the Company" and when doing so they refer to Union

Place Phase I, LLC, the entity that owns the Phase I Property and which is governed by the LLC

Agreement.

## II.     Phase II Negotiations

7.  Ronald Cohen first testified that TIAA was committed to Phase II as soon as they
executed the LLC Agreement (R.  Cohen Tr.  21:10-23:1, Woods Decl.  Ex.  8) , but later
testified that as of November 2010, TIAA was entitled to walk away from Phase II.  *See id.*  at
50:20-25; 57:19-60:6.  Alan Cohen, however, testified that TIAA was obligated since the
inception of Phase I.  *See* A.  Cohen Tr.  41:1-5, Woods Decl.  Ex.  7.

**Response 7:**   The characterization of Ronald Cohen's "first" testimony is not disputed.

The characterization of Ronald Cohen's "later" testimony is disputed.  He testified that had

TIAA informed him in November, 2010 that it was not going to proceed with the development of

Phase II, he would have permitted TIAA to walk away from Phase II.   R. Cohen 5/14/13 Tr.,

Appendix of Exhibits, Ex. 3, at 50:11-15 and 53:11-53:20.  At that time, K Street had been

approached by another party who sought to develop Phase II without TIAA's participation. R.

Cohen Tr., Appendix of Exhibits, Ex. 3, at 43:24-44:9  But because of K Street's joint venture

with TIAA (and also because of TIAA Union North's rights under § 4.14 of the LLC

Agreement) K Street could not develop Phase II with an outside party without a mutual

termination of the joint venture and without TIAA Union North declining to exercise its § 4.14

rights.  R. Cohen 5/14/13 Tr., Appendix of Exhibits, Ex. 3, at 48:22-49:2.  Ronald Cohen

testified that in response to his November, 2010 inquiry, TIAA representatives, Gerry Casimir,

Evangeline Taylor and Marc DeBree each specifically assured him that TIAA was still going to

proceed with Phase II, as already contemplated by the parties' joint venture. R. Cohen 5/14/13

Tr., Appendix of Exhibits, Ex. 3, at 41:6-16; 42:6-16; and 53:10-55:1.  R. Cohen 5/14/13 Tr.,

Woods Decl. Ex. 8 at 58:12-18.  The statement about Alan Cohen's testimony is not disputed.

   8.  In connection with the development of Phase II, Ronald Cohen submitted an
affidavit, sworn to under penalty of perjury, on behalf of K Street, dated August
25, 2010, to the District of Columbia Zoning Commission.  *See* Woods Decl.  Ex.
10.

   **Response 8:** This statement is not disputed.

   9.  The affidavit included the following:

   a.  A request for a two-year extension of time to undertake the multi-phase residential and
   retail planned unit development (PUD)  associated with Phase II.

   b.  A statement that while Phase I was reaching completion, K Street had "engaged and
   met with a number of potential investors, both domestic and international, none of whom
   have yet committed to financially backing Phase II of the PUD.  From this pool of
   approximately 10-12 potential capital partners, [K Street] toured Phase I to provide a
   sense of the larger project, as well as shared relevant pro forma information on Phase II
   in terms of construction costs and leasing projections." A statement that potential
   investors remained hesitant to commit to Phase II given the recent volatility in financial
   markets and blamed those "changes in economic conditions" for K Street's "inability
   to-date to secure project financing for Phase II."

   c.  A statement that K Street was exploring with its project architects and potential
   investors the possibility of restructuring Phase II into two separate phases.

*See id.*

**Response 9:**    Plaintiffs do not dispute that Woods Decl. Ex. 10 is a true copy of K

Street's affidavit filed with the District of Columbia Zoning Commission, but otherwise dispute

the statements contained in paragraph 9.  Plaintiffs note that the statement of what is "included"

in the affidavit is only a paraphrase of the affidavit's terms, and that the paraphrase may be

inadvertently misleading.  For example, paragraph 9 (a) refers to a "... (PUD) associated with

Phase II."  But in reality the PUD was a consolidated approval that covered both Phase I and

Phase II and required construction of a single entity – a fact that is significantly consistent with

Plaintiffs' allegations in this lawsuit. PUD Order, Appendix of Exhibits, Ex. 12, at Bates pp.

TIAA 48852 through TIAA 48886.  This distinction is made clear in the actual language of the

affidavit, but is omitted from the paraphrase's characterization of that language.  For this reason,

while Plaintiffs do not dispute the accuracy of Woods Decl. Ex. 10, they dispute the purported

"statements" contained in paragraph 9.

   10.  Although K Street was courting other investors, according to Section 4.14 of the
LLC Agreement, TIAA possessed a right of first offer ("ROFO")  to cause Phase II be
contributed to the LLC:

> **Right of First Offer on Phase II.**  If at any time within five (5)  years after the date the
> Company breaks ground on Phase I, K Street Developers, LLC, an Affiliate of Operating
> Member elects to sell (directly or indirectly) or undertake the development of Phase II,
> Operating Member shall first give Investor Member notice of such sale or development,
> in which case Investor Member shall have the option to (i)  cause Operating Member to
> contribute Phase II to the Company. . . or, (ii) in the case that the Company has already
> dissolved, purchase Phase 11 for a price equal to 93.5% of the Market Value determined
> in accordance with the Arbitration Procedure and upon other reasonable terms and
> conditions.  If Investor Member fails to elect either (I)  or (ii)  within 30 days of the
> notice by Operating Member of its intention to sell or develop Phase II, Investor Member
> shall be deemed to have elected neither option.

*See* Woods Decl.  Ex.  9 (emphasis added) .

6

**Response 10:** This statement is disputed.  K Street specifically disputes the characterization that it was "courting" other investors.  In fact, as explained in Ronald Cohen's deposition testimony, K Street had been approached by a number of unsolicited third parties regarding the development of Phase II.  R. Cohen 5/14/13 Tr., Appendix of Exhibits, Ex. 3 at 39:21-25.  Ultimately, one of those potential investors ended up making a more firm expression of interest in Phase II, after the affidavit was filed with the District of Columbia Zoning Commission. R. Cohen 5/14/13 Tr., Appendix of Exhibits, Ex. 3 at 43:24-44:9.  K Street also disputes that ***TIAA*** had a ROFO to cause Phase II to be contributed to the Company under § 4.14 of the LLC Agreement.  Plaintiffs do not dispute that TIAA had a right to participate in the development of Phase II pursuant to the joint venture with K Street, but the ROFO under § 4.14 of the LLC Agreement belonged instead to the Company's Investor Member, TIAA Union Place. *See*, LLC Agreement, Woods Decl. Ex. 9, at § 4.14.

11.   Ronald Cohen conceded at his deposition that per the terms of the ROFO, the Phase II development was optional for both K Street and TIAA Union Place- *See* R.  Cohen Tr. 38:1-38:23; 53:8-20, Woods Decl.  Ex.  8.

**Response 11:** This statement is disputed.  The first referenced portion of Ronald Cohen's transcript – pp. 38:1-38:23 – speaks of an "election" to proceed with the development of Phase II, rather than it being "optional."  The second referenced portion of Ronald Cohen's transcript also does not support this assertion.  Here, Ronald Cohen responds to a question about the November 3, 2010 letter Union North sent to TIAA Union Place, described below in Paragraph 12.   In response to that question, he states that had TIAA Union Place simply declined to proceed with the development of Phase II in response to his November 3, 2010 letter, he would have agreed to excuse TIAA from its obligation to develop Phase II.  R. Cohen 5/14/13

Tr., Appendix of Exhibits, Ex. 3 at 53:11-53:20.  This was because, as he also testified, K Street

had received an offer from a third party to develop Phase II that it could not pursue because of its

joint venture with TIAA and also because of TIAA Union Place's rights under § 4.14 of the LLC

Agreement, but that it could have pursued had the existing joint venturers both agreed not to

pursue the development of Phase II. R. Cohen 5/14/13 Tr., Appendix of Exhibits, Ex. 3 at 48:22-

49:12.  But instead, soon after the November 3, 2010 letter, TIAA assured Ronald Cohen that in

fact it was committed to proceeding with Phase II: ("... the deal [i.e., the commitment to develop

Phase II] is done, guys... Done, done, done.")  R. Cohen 5/14/13 Tr. , Woods Decl. Ex. 8 at

58:12-18.  Specifically, he was told by both Evangeline Taylor and Marc DeBree that TIAA was

going to go forward with Phase II and that he was not to negotiate with anyone else. R. Cohen

Tr., Appendix of Exhibits, Ex. 3 at 41:14 and 42:5.  This was also Gerry Casimir's

understanding.  R. Cohen 5/1/4/13 Tr., Appendix of Exhibits, Ex. 3 at 69:16.  *See generally*, R.

Cohen 5/14/13Tr., Appendix of Exhibits, Ex. 3, at 53:21 - 58:18.

    12.  On November 3,2010, Ronald Cohen, on behalf of Union North, issued a letter to
TIAA stating:

    a.      Pursuant to § 4.14 and 12.1 of the LLC Agreement, Union North was electing to
undertake the development of Phase II.

    b.      The letter noted that the delayed development of Phase II could lead to a loss of
the NOMA Real Estate Tax Abatement currently in effect.

    c.      The express purpose of the letter was "to determine [TIAA Union Place's]
interest in moving forward and exercising [TIAA Union Place's] Right of First
Offer to joint venture the Phase II Project, in order to be able to take advantage of
the residential market conditions and the NOMA Real Estate Tax Abatement
Program."

*See* November 3,2010 letter, Woods Decl.  Ex.  11, marked as Exhibit D-4 during the deposition
of Alan Cohen, dated May 1,2013 and authenticated by Ronald Cohen at his deposition, dated
May 14, 2013.  *See* R.  Cohen Tr.  43:8-44:16, Woods Decl.  Ex.  8.

    **Response 12**: This statement is disputed in part.  Union North's letter was not addressed

to K Street's joint venturer, TIAA, and does not purport to address any of TIAA's rights or

obligations under its joint venture with K Street.  Union North's letter was addressed to the

Company's Investor Member, TIAA Union Place.  Plaintiffs do not dispute that Ex. 11 to the

Woods Declaration is a true copy of the November 3, 2010 letter.  Moreover, while Plaintiffs do

not dispute that one purpose of the letter was "to determine [TIAA Union Place's] interest in

moving forward and exercising [TIAA Union Place's] Right of First Offer to joint venture the

Phase II Project, in order to be able to take advantage of the residential market conditions and the

NOMA Real Estate Tax Abatement Program", the context of the letter is further clarified by

Ronald Cohen's testimony recited above in Response 11 and by the testimony of Alan Cohen

who testified that the Cohen parties never thought Teachers would say "no" in response to the

Notice:

> Q. Did you have internal discussions about what if Teachers says no?

> A. No, because we knew they were going to do the deal; that was contemplated
> all along. We never once thought that Teachers was not doing Phase II.

A. Cohen 5/1/13Tr, Appendix of Exhibits, Ex. 4.at 52:11-15.

>   13.  On December 1, 2010, Alan Cohen, Ronald Cohen's son and affiliate of Union North
> sent an email to Evangeline Taylor, a director of asset management at TIAA-CREF to get an
> update on TIAA's interest in proceeding to Phase II, stating:

> > I have seized [sic – "ceased"] further discussions with 2 groups
> > that want to JV the remaining units at Union Place.  I have told the
> > 2 groups that I have given you all an extension until the first of the
> > year to decide if you wish to exercise your option, they were all a
> > bit disappointed.  My father and I are ready to sit down with you
> > and your group to discuss moving forward on 2A and 2B.  If you
> > feel that TIAA is not in the development mood please let me know.

*See* December 1,2010 email, Woods Decl.  Ex.  12, marked as Exhibit D-7 and authenticated by
Alan Cohen at his deposition, dated May 1,2013.  *See* A.  Cohen Tr.  60:18-62:1, Woods Decl.
Ex.  7.

**Response 13:**  Plaintiffs do not dispute that Alan Cohen is Ronald Cohen's son.

Plaintiffs also do not dispute that Ex. 12 to the Woods Decl. is a true copy of Alan Cohen's

December 1, 2010 email to Evangeline Taylor.  Plaintiffs note that Mr. Cohen's use of the word

"seized" is a misprint and the context clearly shows he meant "ceased."  Plaintiffs dispute

Defendants' characterization of Alan Cohen as an "affiliate" of Union North, as this is a legal

characterization rather than a statement of fact and such characterization is in no way evidenced

or supported by Ex. 12 of the Woods Declaration.   Plaintiffs also dispute the inference that

Defendants presumably seek – that TIAA could choose not to proceed with Phase II.  As far as

Alan and Ronald Cohen were concerned, TIAA was committed to Phase II pursuant to the

parties' joint venture.    For example, Alan testified:

> Q. Were you involved in discussions with anybody with Teachers about an
> alleged joint venture agreement that encompassed Phase II?
>
>  A. Every time we spoke about Phase I during the  negotiations with
> TIAA-CREF, it was always discussed.  And from my recollection, Gerry
> Casimir's main thrust  was that this was a great development because we have
> Phase I and then we go on to Phase II. That was the  whole -- that's how the whole
> thing started. We were,  yes, talking about Phase I -- that was the first phase
>  we were in -- and we were also, at the same time,  speaking about how great it is
> having the whole city block with almost 100 residential units with a  beautiful
> courtyard. That was always the top of the  discussion when we spoke about Phase
> I and Phase 2.
>
> * * * *
>
> Q. All right. And tell me, it's been alleged in this suit that Teachers agreed to
> develop Phase II; is that your understanding?
>
> A. Yes. It was my understanding all along the reason they were so intrigued with
> Phase I is because they had another phase to keep on going around the city block.
> That was where this whole thing was intriguing to Teachers.

A. Cohen 5/1/13 Tr. at 12:2-16; A. Cohen 5/1/13 Tr. at 14:15-22.

14. Ms. Taylor replied to Alan Cohen's email that same day:

> We are very interested in moving forward and currently are reviewing your offering package. William Harrison of TIAA's Acquisition Team will be reach out to you today to start discussions on Phase II and plan on making a trip to the area within the next two weeks. We are aware that the deadline for exercising our option will expire January 6, 2011 and will provide you with our answer on moving forward prior to this date.

*See id.*

**Response 14:** This statement is not disputed, with the qualifications noted in Responses 12 and 13.

15. On January 3, 2011, Ronald Cohen granted a requested extension, for TIAA to further analyze the Phase II development, until January 28, 2011, provided that TIAA would be ready to close on the transaction by February 14, 2011 should it decided to go forward. *See* December 28, 2010 email, Woods Decl. Ex. 13, marked as Exhibit 120 and authenticated by Ronald Cohen at his deposition, dated May 14, 2013. *See* R. Cohen Tr. 151:16-155:6, Woods Decl. Ex. 8. With regard to further extensions, Ronald Cohen stated "in fear of losing the other buyer I cannot in good conscience grant any further extensions." *See id*.

**Response 15:** This statement is disputed in part. There is nothing in any of the email correspondence between Evangeline Taylor, Alan Cohen and Ronald Cohen contained in Ex. 13 to the Woods Declaration suggesting that ***TIAA's*** rights or obligations were being discussed – in particular, any of its rights as a joint venturer with K Street. Rather, Evangeline Taylor's December 28, 2010 email speaks of "the Right of First Offer", which is clearly a reference to TIAA Union Place's rights under § 4.14 of the LLC Agreement, not TIAA's rights or obligations as a joint venturer. Plaintiffs do not dispute that Woods Decl. Ex. 13 is a true copy of email correspondence between Evangeline Taylor, Ronald Cohen and Alan Cohen in the period December 28, 2010 and January 3, 2011.

16. On January 27, 2011, Scott Anderson of TIAA-CREF formally responded on behalf of TIAA to Union North's November 3, 2010 letter as follows:

11

a.   TIAA was declining to go forward with Phase II and that Phase II be separated from the LLC and Phase I per § 4.14 of the LLC Agreement on behalf of TIAA to Union North's November 3, 2010 letter.

b.   As an institutional investor, it was not possible for TIAA to "exercise the ROFO given the uncertainties around Phase II, including the timing, cost and financing for the development of Phase II."

c.   It was not clear to TIAA how Phase II could proceed with the tax abatement or how returns on investments could be both determined and achieved

d.   TIAA had not yet seen let alone approved the second stage PUD review of Phase II "to understand the parameters of development and potential development costs to figure into a proforma."

e.   A number of issues needed to be addressed before proceeding with a future development

f.   TIAA indicated that it was "open to further discussions regarding a potential joint acquisition of Phase II at pricing and upon terms that make economic sense for both parties in the current market environment."

*See* January 27, 2011 letter, Woods Decl. Ex. 14, marked as Exhibit 121 and authenticated by Ronald Cohen at his deposition, dated May 14, 2013.  *See* R. Cohen Tr. 155:11-156:14, Woods Decl. Ex. 8.

**Response 16**:  Plaintiffs do no dispute that Woods Decl. Ex. 14 is a true copy of Scott Anderson's January 27, 2011 letter to Union North, but otherwise dispute the facts alleged in paragraph 16.  The actual letter speaks for itself; the paraphrasing is inaccurate.  For example, there is no indication that Mr. Anderson was "formally respond[ing] on behalf of ***TIAA***," (emphasis added) as paragraph 16 misleadingly puts it.  There is in fact no reference at all to ***TIAA*** in Mr. Anderson's letter.  Since Mr. Anderson was responding to Ronald Cohen's November 3, 2010 letter addressed to TIAA Union Place, the natural inference is that Mr. Anderson's use of the pronouns "we", "us" and the like refer to TIAA Union Place, not TIAA, although even this remains somewhat unclear since the letter is written on the letterhead of yet another entity – TIAA CREF – and Mr. Anderson nowhere actually states on whose behalf he writes.  Moreover, as described in Response 11 above, Ronald Cohen's deposition testimony indicates that **TIAA** had already responded to him that it was committed to going forward with

Phase II and instructed him not to discuss Phase II with third parties. R. Cohen 5/14/13 Tr., Appendix of Exhibits, Ex. 3 at 41:6-16 and 53:10-55:1.

17.  In February of 2011, negotiations for the development of Phase II recommenced when Ronald Cohen sent TIAA a detailed proposal titled "Concept Terms." *See* February 1, 2011 letter, Woods Decl. Ex. 15, marked as Exhibit 122 and authenticated by Ronald Cohen at his deposition, dated May 14, 2013. *See* R. Cohen Tr. 158:20-159:22, Woods Decl. Ex. 8.

**Response 17**: Plaintiffs do not dispute that Woods Decl. Ex. 15 is a true copy of Ronald Cohen's February 1, 2011 letter to Scott Anderson, but otherwise dispute the facts alleged in paragraph 17. For example, it is untrue to say that this letter "recommended" "negotiations for the development of Phase II." This characterization of the status of the parties' understanding as to Phase II is not supported by either Ex. 15 or the cited portion of Ronald Cohen's deposition testimony. As Ronald Cohen's testimony just before and after the isolated cited passage makes clear, his understanding was that TIAA was already committed to Phase II at this point, and that the purpose of the letter was instead to provide Gerald Casimir a basis upon which to gain approval for an agreed land-contribution value of approximately $43.5 million. R. Cohen Tr., Appendix of Exhibits, Ex. 3 at 157:12-160:19. *See*, Response 11 above.

18.  Peter Witham was Cohen's broker who was the "middle man" between the Cohens and TIAA for the Phase II negotiations with respect to "funneling numbers" and conducting due diligence. *See* A. Cohen Tr. 53:8-19, Woods Decl. Ex. 7; *See also* R. Cohen Tr. 14:1-12; 97:20-98:14, Woods Decl. Ex. 8. On March 22, 2011, Peter Witham sent TIAA revised terms for Phase II on behalf of Ronald Cohen entitled "Concept Joint Venture Terms." *See* March 22, 2011 email, Woods Decl. Ex. 16, marked as Exhibit 77 and authenticated by Peter Witham at his deposition, dated May 9,2013. *See* Witham Tr. 98:24-100:9. True and correct copies of the portions of the deposition transcript from the deposition of Peter Witham are annexed as Exhibit 17 to the Woods Decl. During the spring of 2011, TIAA was still reviewing the Cohen Companies' proposal. *See* A. Cohen Tr. 75:11-78:8; 85:9-86:17, Woods Decl. Ex. 7.

**Response 18:** Plaintiffs do not dispute that the transcripts of Alan Cohen's, Ronald Cohen's and Peter Witham's depositions included as Exs. 7, 8 and 17 of the Woods Decl. are

accurate transcriptions of portions of their respective deposition testimonies, or that Ex. 16 to the

Woods Decl. is a true copy of an email sent by Peter Witham.  Plaintiffs dispute the statements

contained in paragraph 18 to the extent that they imply TIAA was not already committed to

proceeding with Phase II.  No such implication is supported by any of the cited deposition

testimony.  In fact, in another portion of Alan Cohen's deposition not included in the paragraph

18 citations, he makes it clear that these communications were simply a matter of TIAA

"checking the box" and "what they do on every deal."  A. Cohen Tr., Appendix of Exhibits, Ex.

4 at 74:20-22.  Similarly, in the portions of Ronald Cohen's deposition testimony previously

cited, he testifies that Evangeline Taylor, Marc DeBree and Gerald Casimir had all specifically

assured him that TIAA was going to go forward with the deal and, additionally, told him that K

Street was not to talk to any third parties about the Phase II development. R. Cohen Tr.,

Appendix of Exhibits, Ex. 3 at 41:12-16; 42:5 and 69:16.

19.  Throughout July, TIAA and The Cohen Companies exchanged multiple drafts of a
certain non-binding Letter of Intent regarding the development of Phase II.  *See* A.  Cohen Tr.
86:21-90:5, Woods Decl.  Ex.  7; *See* also Woods Decl.  Exhibits 18 and 19, marked and
authenticated as Exhibits D-18 and-D 19 at the deposition of Alan Cohen, dated May 1,2013.
*See* A.  Cohen Tr.  88:22-90:3.  At that time, Plaintiffs and TIAA had not agreed upon the price
of K Street's land for use in Phase Il, the dollar amount TIAA would be expected to invest in the
Phase II development, the actual allocation of profit and loss, an operating agreement for Phase
II and specific terms of what Phase II would entail including the size, scope, and mix of
residential and commercial properties.  *See id*.

**Response 19:**  Plaintiffs do not dispute that the transcript of Alan Cohen's deposition

included as Ex. 7 to the Woods Decl. is an accurate transcription of portions of his deposition

testimony, or that Exhibits 18 and 19 to the Woods Decl. are true copies of email correspondence

between Alan Cohen and Marc DeBree.  Plaintiffs dispute the characterization "non-binding

Letter of Intent" as this is not a "fact" but rather, a legal conclusion properly reserved to the

Court.  *See also, infra*, at Responses 20 and 21 (disputing Letter of Intent was non-binding).

Plaintiffs also dispute the remaining allegations of this paragraph, i.e. that

> "[a]t that time, Plaintiffs and TIAA had not agreed upon the price
> of K Street's land for use in Phase Il, the dollar amount TIAA
> would be expected to invest in the Phase II development, the actual
> allocation of profit and loss, an operating agreement for Phase II
> and specific terms of what Phase II would entail including the size,
> scope, and mix of residential and commercial properties."

None of these assertions is borne out by either the cited deposition testimony or the

referenced exhibits.  In fact, the exact opposite is true.  A review of the "red-lined" portions of

Woods Decl. Ex. 19 shows that there was no change to any existing provision affecting the price

of land, the profit and loss allocation, the operating agreement or any term related to the "size,

scope, and mix of residential and commercial properties."  Moreover, a simple comparison of the

draft letter of intent attached to Ex. 19 and the actual, final signed letter of intent attached as Ex.

20 to the Woods Decl. shows that the two documents do not differ in any material way as to any

of the same matters either.  In other words, all of this had already been agreed to before the cited

time period.  *Compare*, Woods Decl. Ex. 19, at Bates Nos. KST 008739 (land price and profit

allocation), 8740 (delivery of project drawings and residential/commercial mix) and 8741

(Operating Agreement provisions) with Woods Decl. Ex. 20, at Bates Nos. TIAA033796 (land

price and profit allocation), 003397 (delivery of project drawings and residential/commercial

mix) and 33798 (Operating Agreement provisions) (a).  The only minor terms being discussed at

this time are those reflected in the red-lined portions of Ex. 19, all of which are clearly

immaterial in the overall context of the deal.

20.  On August 2, 2011, K Street and TIAA-CREF, on behalf of TIAA, formally entered
into a non-binding letter of intent involving Phase II (the "Letter of Intent") .  *See* Woods Decl.
Ex.  20, marked as Exhibit D-20 at the deposition of Alan Cohen, dated May 1, 2013 and

authenticated by Ronald Cohen at his own deposition, dated May 14, 2013.  *See* R.  Cohen Tr. 162:14-163:23, Woods Decl. Ex.  8.  The proposed terms of the Operating Agreement, also referred to as "the Summary of Proposed Joint Venture Terms," were attached as Exhibit B to the Letter of Intent.  *See Id.*

**Response 20:**  Plaintiffs do not dispute that Ex. 20 to the Woods Decl. is a true copy of the Letter of Intent.  Plaintiffs dispute the characterization "non-binding Letter of Intent" as this is not a "fact" but rather, a legal conclusion properly reserved to the Court.  Plaintiffs also dispute this characterization because, in Ronald Cohen's deposition testimony immediately following the cited passage, he explained that he did not consider the Letter of Intent non-binding.  R. Cohen Tr., Appendix of Exhibits, Ex. 3 at 163:22-164:20.   Also, Plaintiffs dispute the legal characterization that TIAA CREF acted "on behalf of TIAA" which, apart from being a legal characterization, is not supported by anything in the document.  Instead, the term "TIAA" is explicitly defined as "TIAA CREF or its designee."  Woods Decl. Ex. 20, at Bates No. TIAA033796.  In other words, these terms are used differently in the Letter of Intent than how they are defined in the Woods Declaration and the Statement of Facts.

21.  The Letter of Intent then provided that it was non-binding:

> **Non-Binding Nature of Letter of Intent:** It is expressly agreed by Cohen and TIAA that this letter of intent is **<u>non-binding on Cohen and TIAA</u>**, and Cohen and TIAA will have **<u>no obligation to purchase, sell or form a venture with respect to the Property</u>** prior to the execution and delivery by Cohen and TIAA of a written operating agreement (the "Operating Agreement") .  Cohen acknowledges and agrees that the terms and conditions of this letter of intent remain subject to review and approval by TIAA's required authorization procedures, and further inspection of the Property by representatives of TIAA.

*Id*.  (emphases added).

**Response 21:**  Plaintiffs do not dispute that Ex. 20 to the Woods Decl. is a true copy of

the Letter of Intent.  Plaintiffs again note, however, that "TIAA" as used in the Letter of Intent is

defined to mean **TIAA-CREF**.  Plaintiffs dispute the characterization of the Letter of Intent as

"non-binding," and further aver that this is not a "fact" but rather, a legal conclusion properly

reserved to the Court.   Moreover, Plaintiffs also point out that several parts of the Letter of

Intent contain provisions that by their own terms are obviously not "non-binding."  By way of

example only, (i) the parties are required to keep the transaction confidential (Bates No.

TIAA033798); (ii) Cohen (and, by implication, TIAA-CREF also) is required to "... act in good

faith to negotiate a mutually acceptable Operating Agreement" (Bates No. TIAA033797); (iii)

Cohen is prohibited from negotiating with third-parties (Bates No. TIAA033797); (iv) the

Operating Agreement is required to "... follow the terms of the [Phase 1] Operating Agreement

other than the terms set forth in Exhibit B" (Bates No. TIAA033798) (among other things, this

meant the parties would follow the Phase 1 Operating Agreement in giving K Street a cash

payment equal to 90% of the land value at closing); (v) the due diligence period is fixed at 30

days (Bates No. TIAA 033797) and, (vi) the equity capitalization, land price and capital structure

are fixed terms (Bates No. TIAA033796).   In addition, Ronald Cohen testified that he disagreed

with the characterization of the Letter of Intent as non-binding.  *See, supra*., at Responses 19 and

20.

22.  Although TIAA sent a draft of the Operating Agreement for Phase II to the
Cohens, it was not negotiated or executed.  *See* Woods Decl.  Ex.  21, marked as
Exhibit D-29 at the deposition of Alan Cohen, dated May 1, 2013.  *See* A.  Cohen
Tr.  112:4-21; 114-115, Woods Decl.  Ex.  7; *See also* R.  Cohen Tr.  197-200; 216,
Woods Decl.  Ex.  7.

**Response 22:**  Plaintiffs do not dispute a proposed Operating Agreement for Phase II was

transmitted on October 6, 2011, and that Woods Decl. Ex. 21 is a true copy of this document.

This was transmitted at the close of business on the next-to-last day of the due diligence period. Appendix of Exhibits, Ex. 13, at Bates No. TIAA 034714.  As Ronald Cohen explained, the discussions between the parties had continued.  R. Cohen 5/14/13 Tr. at 197:21-198:21. Moreover, Plaintiffs also note that, contrary to the Letter of Intent's requirement that the Phase II Operating Agreement track the terms of the LLC Agreement (other than those listed in Exhibit B to the Letter of Intent), this document, for the first time ever, dropped the eleventh-hour bombshell that TIAA CREF was only proposing to pay $20 million to K Street at closing, rather than the agreed-upon $27 million, and differed from the original LLC Agreement in several other respects .  *Compare*, Woods Decl. Ex. 21, at Article 8, p. 37 Bates p. KST009641 with Woods Decl. Ex. 9, at Article 8, p. 32 Bates p. TIAA049451; *See also*, red line additions at Woods Decl Ex. 21, at section 4.1 (c)(4), p. 22 Bates p. KST009626 and Woods Decl. Ex. 21, at  sections 4.4 (d) and (e), p. 27 Bates p. KST009631.  The form of the operating agreement was originally set up for both Phases and, when it came time to draft the agreement for Phase II, no changes were necessary other than to change the land contribution price.  A. Cohen 5/1/13 Tr., Appendix of Exhibits, Ex. 4 at 114:1-7.

23.   By email dated October 24, 2011, Peter Witham, on behalf of Ronald Cohen and with the permission of Alan Cohen, circulated a confidential memorandum to Michael Fisk, a Senior Director of TIAA.  *See* Woods Decl.  Ex.  22, marked as Exhibit 32 at the deposition of Alan Cohen, dated May 1, 2013 and authenticated by Peter Witham at his deposition, dated May 9, 2013.  *See* Witham Tr.  187:15-188:5, Woods Decl.  Ex.  17; *See also* A.  Cohen Tr.  117-118. In the memorandum, Witham revealed that the Phase II Property was cross-collateralized with another Cohen development project, completely unrelated to TIAA, named the Velocity Project.  *See Id.*  Witham invited TIAA to partner with Cohen on the Velocity Project (by investing $72 million into the project) and noted that the Cohen Companies "cannot move forward without solving the recapitalization of Velocity as well." *See id.*

**Response 23**:  Plaintiffs do not dispute that Ex. 22 to the Woods Decl. is a true copy of an email sent by Peter Witham to Michael Fisk and others.  Alan Cohen's testimony indicates

that he did not review the terms of Witham's letter before it was transmitted, although he was generally aware of its existence and authorized its transmission. A. Cohen 5/1/13 Tr., Appendix of Exhibits, Ex. 4 at 117:20; 119:3-5.  Plaintiffs dispute that there is anything in Ex. 22 establishing that Michael Fisk is a "senior director of *TIAA*" and note that Ex. 23 to the Woods Decl. is a letter from Mr. Fisk whose letterhead indicates he is instead a senior director of *TIAA-CREF*.  They therefore dispute this fact.  Plaintiffs also generally dispute this paragraph's references to "TIAA", when, in fact, Mr. Witham's email consistently refers only to "TIAA-CREF."  Plaintiffs also dispute that Mr. Witham "revealed" that the Phase II Property was cross-collateralized with the Velocity Project.  Alan Cohen testified that TIAA was already fully aware that Phase II was subject to an existing mortgage. A. Cohen 5/1/13 Tr., Appendix of Exhibits, Ex. 4 at 118:9-13; 120:2-8.  He also noted that the Phase I Property had been similarly encumbered when the Company was formed and that, as with Phase I, the existing mortgage would have been paid off with the sale proceeds and would have formed no impediment to the transaction. A. Cohen a5/1/13 Tr., Appendix of Exhibits, Ex. 4 at 118:9-13; 119:11-22 and 120:2-8.  Alan Cohen further testified that TIAA CREF had previously expressed an interest in the unrelated Velocity transaction and, after an equity investor's decision not to participate in a recapitalization of the Velocity Project, Mr. Witham's letter was simply an overture to TIAA CREF to see whether it wished to become involved in that additional project as well.  A. Cohen 5/1/13 Tr., Appendix of Exhibits, Ex. 4 at 123:20.  Any reference by Mr. Witham to the Cohen Companies not "moving forward" with Phase II is to be construed in the context of that overture.  In fact, Alan Cohen testified K Street was fully prepared and able to proceed with Phase II, with or without TIAA-CREF's involvement in the Velocity Project.  A. Cohen 5/1/13 Tr., Appendix

of Exhibits, Ex. 4 at 124:16-125:3.

24.  Thereafter, negotiations ceased and TIAA elected not to proceed with Phase II.  On December 9, 2011, Michael Fisk, on behalf of TIAA, issued a letter stating:

    a.      TIAA's decision not to proceed with Phase II was proper and made in good faith.

    b.       All discussions and documentation between TIAA and the Cohen Companies that were exchanged after TIAA's January 27, 2011 letter declining to proceed with Phase II were expressly non-binding in nature.

    c.      Among the reasons for TIAA's decision were: (i)  the uncertainty of the tax credits to be awarded the project; (ii)  Cohen's non-responsive to TIAA's comments regarding the draft Operating Agreement; (iii)  general discomfort that TIAA was not disclosing all the requisite information to TIAA; and (iv)  the October 24, 2011 confidential memorandum which described the cross-collateralization of the Phase II Property with another unrelated development project.

*See* December 9,2011 letter, Woods Decl.  Ex.  23, marked as Exhibit 127 and authenticated by Ronald Cohen at his deposition, dated May 14, 2013.  *See* R.  Cohen Tr.  218:6-14, Woods Decl. Ex.  8.

      **Response 24**: Plaintiffs do not dispute that Ex. 23 to the Woods Decl. is a true copy of

Mr. Fisk's December 9, 2011 letter to Ronald Cohen.  Plaintiffs dispute the implication that

"negotiations ceased" after the transmission of Mr. Witham's letter.  In fact, while Plaintiffs

remained willing to proceed on the parties' agreed terms, negotiations "ceased" after Marc

DeBree sent the non-conforming draft of the proposed Phase II operating agreement on October

6, 2011 – the next to last day of the due diligence period – in which TIAA CREF proposed for

the first time ever that K Street was to be paid $20 million for the Phase II Property, rather than

the $27 million specified in the Letter of Intent.  Alan Cohen testified that K Street rejected this

attempt to re-trade the agreed deal terms. A. Cohen 5/1/13 Tr., Appendix of Exhibits, Ex. 4 at

115:14-116:10.  *See also, supra*., at Response 22.  Thereafter, TIAA CREF apparently decided

not to proceed because K Street did not cave in to its attempt to re-trade the parties' agreed deal.

      25.  Plaintiffs base their damages claim of approximately $50 million on an appraisal

conducted in November 2011 even though the parties had discussed a price of $30 million.  *See* A.  Cohen Tr.  24:9-25:6, Woods Decl.  Ex.  7; *See* also R.  Cohen Ti.  62-63, Woods Decl.  Ex. 8 (explaining how the Cohens sought $42 million for Phase II property, but they agreed to move down to $30 million).

**Response 25**: Plaintiffs object to this statement on the ground that it is not relevant or material to the motion for summary judgment: Contrary to Defendants' implication, K Street's damages are not properly measured by the difference between the Letter of Intent's $30 million land contribution price and the price at which K Street was ultimately forced to sell the Phase II Property.  Had TIAA CREF and TIAA proceeded with the parties' agreed deal, K Street (or its designee) would not have simply sold the Phase II Property, but would have also received an equity position in the to-be-formed Phase II Company that would have entitled it to 50% of all revenues after TIAA CREF and/or TIAA had realized their internal rate of return on the investment.  *See*, LLC Agreement, Ex. 9 to Woods Decl. at p. 32, §8.2 (b).  *See also*, Draft Phase II Operating Agreement, Ex. 21 to Woods Decl. at §8.2 (b), p. 37 Bates p. KST009641. Naturally, the price a party will accept for a straight sale of its property is greater than the price it will accept to contribute the property to a venture in which it will retain an interest.

Plaintiffs also dispute that these characterizations of Alan Cohen's cited deposition testimony and of their Amended Complaint are "facts" but rather, legal conclusions properly reserved to the Court.  Moreover, the characterizations themselves are misleading.  The parties had not merely "discussed a price of $30 million" for the Phase II Property, they had agreed upon it in the Letter of Intent and had proceeded on this basis until TIAA-CREF attempted to retrade the deal on the last day of the due-diligence period.  *See*, A. Cohen 5/1/13 Tr, Appendix of Exhibits, Ex. 4 at 114:5-7; 115:13-19.

## III.  **The Removal of Union North**

26.  Section 4.4 of the LLC Agreement, entitled "Removal of Operating Member," provides that the "Operating Member may be removed by the Investor Member as provided herein under any of the following circumstances (a 'Removal Event')" and sets forth 15 specifically delineated circumstances that constitute a Removal Event.

*See* LLC Agreement at §§ 4.4, 6.2, Woods Decl.  Ex.  9.

**Response 26:**  Plaintiffs do not dispute that this is an accurate citation of a portion of

Section 4.4 of the LLC Agreement.

27.  Alex Diaz is the Chief Financial Officer of the "Cohen Companies," which includes all Cohen affiliates except for ADC Builders, and is paid by the Ronald Cohen Management Company ("RCMC") .  *See* Diaz Tr.  4:9-16; 5:17-19.  True and correct copies of the portions of the deposition transcript from the deposition of Alex Diaz are annexed as Exhibit 24 to the Woods Decl.  Diaz has been CFO for the Cohen Companies since 1997 and reports directed to Ronald Cohen and Alan Cohen.  *See id.*  at 4:20-5:1.  RCMC is the management arm of the Cohen Companies.  *See id*.  at 19:2-4.

**Response 27**: This statement is not disputed.

28.  Cohen Companies' personnel handled the payment of bills, including tax bills, on behalf of the LLC and placed construction draw requests with the lender for Union Place.  *See*, e.g., *Id.*  7:1-4; 18:5-21:5.

**Response 28:** This statement is not disputed.

29.  Aarons Grant and Habif, LLC ("AGH")  are independent auditors who were retained by Union North to conduct annual financial audits of Union Place.  *See* Ed.  at 44:8-13; R. Cohen Tr.  229:24-230:17.

**Response 29:** This statement is not disputed, although Plaintiffs note AGH were

recommended to be the Company's auditors by the TIAA CREF accounting department.  J.

Chang 5/16/13 Tr., Appendix of Exhibits, Ex. 9, at 55:16-20.

30.  For the 2009 audit of the financial statements of Union Place, AGH discovered that no real estate taxes had been recorded as being paid.  This was because Union Place had a real estate tax credit related to a retroactive restatement of the property value dating back to the inception of the Company.  *See* letter to Alex Diaz from AGH dated June 15, 2010, Woods Decl. Ex.  25, marked as Exhibit D42 and authenticated by Alex Diaz at his deposition, dated May 3,2010.  *See* also Diaz Tr.  33-35; 45:6-22, Woods Decl.  Ex.  24; CIP/Fixed Assets Roll-Forward and Additions Test, dated December 31, 2009, Woods Decl.  Ex.  26.

**Response 30:** This statement is not disputed.

31. The credit of $431,939.02 offset all of the 2009 property taxes of $241,194.32, leaving a refund of $190,744.70.  *See* Schedule of 2009 tax refund and Government of District of Columbia Tax Taxpayer Record, Woods Decl.  Ex.  27; Diaz Tr.  33:20-34:9, Woods Decl.  Ex.  24.

**Response 31:** This statement is not disputed.

32. In May 2010, when AGH inquired about the tax refund; The Cohen Companies' CFO, Alex Diaz, stated that, "You can accrue the receivable for real estate in 2009 that will actually be collected in 2010.  The amount is $190,744."  *See* May 12, 2010 email, Woods Decl.  Ex.  28, marked as Exhibit D-38 and authenticated by Alex Diaz at his deposition, dated May 3,2013.  *See* Diaz Tr.  35:22-37:11, Woods Decl.  Ex.  24.

**Response 32:** This statement is not disputed.

33. The $190,744 tax refund is listed as a receivable in the 2009 financial statements of Union Place.  *See* Woods Decl.  Ex.  29, marked as Exhibit D-53 and authenticated by Christopher VonGuggenberg at his deposition, dated May 3, 2013.  *See* VonGuggenberg Tr. 32:5-15.  True and correct copies of the portions of the deposition transcript from the deposition of Christopher VonGuggenberg, dated May 3,2013, are annexed as Exhibit 30 to the Woods Decl.

**Response 33:**  This statement is not disputed.

34. During the 2010 audit, AGH noted that the $190,744 receivable was still outstanding.  In a March 15, 2011 email, Cohen Companies informed AGH that the tax refund check had been received and was mistakenly deposited into K Street's account.  *See* March 15, 2011 email, Woods Decl.  Ex.  31, marked as Exhibit D-40 and authenticated by Alex Diaz at his deposition, dated May 3, 2013.  *See* Diaz Tr.  33:20-34:9; 38:21-40:2, Woods Decl.  Ex.  24. The Cohen Companies asked that AGH "reclassify [the refund] as a receivable from Cohen." Woods Decl.  Ex.  31.

**Response 34**:  This statement is not disputed.

35. The Cohen Companies' CFO testified that they accidentally deposited the check into The Cohen Companies account because "D.C.  Treasury issued the check made payable to the Cohen Companies" and "we just assumed incorrectly that it was for the Cohen Companies and we deposited it into a-Cohen account and gave- credit — gave that to a Cohen entity." *See* Diaz Tr.  34:11-35:4, Woods Decl.  Ex.24.

**Response 35:** This statement is not disputed.  However, the context of this testimony makes clear that the Cohen Companies' bookkeeping personnel who processed this check payable to The Cohen Companies had no idea the money belonged to the Company and that the deposit into the account of the payee named on the check was simply a mistake.

36.  The Cohen Companies' CFO agreed under oath that this tax credit "should have been deposited or credited back to Union Place." Diaz Tr.  35:17-19, Woods Decl.  Ex.  24.

**Response 36:** This statement is not disputed, with the qualification noted in Response 35.

37.  The $190,744 is listed as a receivable due from affiliate in the 2010 financial statements of Union Place.  *See* Union Place Phase I, LLC 2010 Financial Statements, Woods Decl.  Ex.  32, marked as Exhibit D-44 and authenticated by Alex Diaz at his deposition, dated May 3, 2013.  *See* Diaz Tr.  48:17-49:1, Woods Decl.  Ex.  24.

**Response 37**: This statement is not disputed.

38.  On March 30, 2011, Ronald Cohen, on behalf of the LLC, sent a letter to AGH certifying, among other things, that the LLC's financial records were maintained in accordance with generally accepted accounting principles and that all of the LLC's financial data had been provided to AGH.  *See* Wood Decl.  Ex.  33, marked as Exhibit 133 and authenticated by Ronald Cohen at his deposition, dated May 14, 2013.  *See* R.  Cohen Ti.  231:21-232:8, Woods Decl.  Ex.  8.

**Response 38:** This statement is not disputed.  Plaintiffs further state that the tax rebate was disclosed to TIAA Union Place at this time. *See*, December 31, 2010 Union Place Phase I, LLC Financial Statements, Woods Decl. Ex. 32, at p. 7, Bates No. TIAA 000064.

39.  When asked in his deposition about the tax rebate, Ronald Cohen conceded that the tax rebate was owed to Union Place.  *See* R.  Cohen Tr.  106; 107:24-109:9.

**Response 39**: This statement is not disputed.  However, TIAA Union Place had known about the tax rebate at least as early as March, 2011, when it was informed of it by AGH. *See*, Ex. 32 to the Woods Decl., at p. 4 Bates No. TIAA000058;  December 31, 2010 Union Place Phase I, LLC Financial Statements, Woods Decl. Ex. 32, at p. 7, Bates No. TIAA 000064 .

TIAA CREF's witness admitted that it had no dissatisfaction at all with Union North's management of Phase I until the third or fourth quarter of 2011 – long after it knew about the tax rebate issue and, not-so-coincidentally, when the Phase II deal cratered.  S. Anderson 5/7/13 Tr., Appendix of Exhibits, Ex. 6 at 40:9-12.  Moreover, this supposed dissatisfaction was admittedly never communicated to Union North until the notification of its removal as Operating Member was transmitted in February, 2012.  S. Anderson 5/7/13 Tr., Appendix of Exhibits, Ex. 6 at 41:12.  As noted in Ronald Cohen's deposition transcript, this was the first time Ronald Cohen even knew about the tax refund, but that TIAA Union Place had known about this for almost a year and had never asked for its return.  R. Cohen 5/1/13 Tr., Appendix of Exhibits, Ex. 3 at 108:20-109:6.  The same testimony makes clear that, had this matter been brought up, The Cohen Companies would have simply returned the money if necessary.  R. Cohen 5/1/13 Tr., Appendix of Exhibits, Ex. 3 at 108:13-14.  Moreover, the parties had previously agreed that the Company would use the adjacent Phase II Property for a parking lot, dirt storage facility, dog park and an entertainment venue and that the savings from these uses would ultimately be repaid in a true-up that set off these savings against the Phase II property taxes paid by the Company, this tax rebate and other associated benefits to K Street, the owner of the Phase II Property.  Alan Cohen testified that the economic value of these uses was over $1.8 million, well in excess of the tax rebate.  A. Cohen 6/26/13 Tr., Appendix of Exhibits, Ex. 5, at 22:25; 23:7; 7:7 and 12:6-12:9.

40.  Alan Cohen had no idea about the tax rebate being mistakenly deposited, nor did he have, as corporate designee, any opinion regarding whether it is owed to Union Place.  *See* A. Cohen Tr.  165-166, Woods Decl.  Ex.  7.

**Response 40:** This statement is not disputed.

41.  The net income budgeted for the Loree Grand for June 2010 through May 2011 was below $190,744.70.  *See* 2010 and 2011 Budgets of the Loree Grand, Woods Decl.  Ex.  34.

**Response 41:**   This statement is disputed.   The referenced budgets show that the net income budgeted for June 2010 through May 2011 is $865,874.47, greatly exceeding $190,744.70.   Moreover, the premise that this is relevant suffers from a fatal flaw – it is based on the unsupported assumption that materiality is to be measured by the monthly budgeted net income.   However, neither section 4.4 (a)(2) of the LLC Agreement nor Article 1 (the definitions article) defines "material."   LLC Agreement, Woods Decl. Ex. 9, at pp. 1-9, Bates Nos. TIAA049420-TIAA049428 and p. 20, Bates No. TIAA049439.   The LLC Agreement does not require materiality be evaluated by comparing the full amount of the refund to the budgeted monthly net income.   A more meaningful approach to determining materiality is to spread the amount of the tax refund out to determine what monthly budget impact the refund would have over the same twelve month period.   Affidavit of Alan Cohen, Appendix of Exhibits, Ex. 2, at ¶ 20.   One-twelfth of $190,744.70 is $15,895.39.   This figure should then be compared against monthly total operating expenses to gauge whether the tax refund would have had material impact on operating expenses.   In the stated time period, June 2010 through May 2011, the monthly operating expenses ranged from a low of $113,611.67 (in July 2010) to a high of $152,128.00 (in January 2011).   Woods Decl. Ex. 34.   An additional $15,895.39 in any given month would not have had a material impact on those monthly operating expenses.   Affidavit of Alan Cohen, Appendix of Exhibits, Ex. 2, at ¶ 20.   Alternatively, the amount of the tax refund can be compared to the $865,874.47 in total net income through the end of May 2011.   Woods Decl. Ex. 34.   Under either approach, the tax refund was not material.   By all accounts, Phase I was a complete success and the tax refund simply was not material to the performance of this Phase of the development.   Affidavit of Alan Cohen, Appendix of Exhibits, Ex. 2, at ¶ 20.

Plaintiffs also object to this statement because it is not relevant or material to the motion for

summary judgment.

42.  The tax rebate still has never been paid to Union Place.  *See* R.  Cohen Tr.  107:24-108:3, Woods Decl.  Ex.  8.

**Response 42:** This statement is not disputed, with the qualifications noted in the response

to paragraph 39.

43.  On February 22, 2012, TIAA Union Place notified Union North of the decision to remove Union North as the Operating Member of the Company, effective February 27, 2011 (the "February 22 Letter"), identifying the following reasons as the bases for the removal:

a.    The wrongful deposit by the Cohen Companies of a tax rebate owed to Union Place.
b.    The failure to repay that rebate and false statements regarding the status of Union North's payment of certain capital contributions and failure to make such contributions.

*See* Feb.  22, 2012 letter, Woods Decl.  Ex.  35, marked as Exhibit 111 and authenticated by Ronald Cohen at his deposition, dated May 14, 2013.  *See* R.  Cohen Tr.  109:12-24, Woods Decl.  Ex.  8.

**Response 43:** Plaintiffs do not dispute that Ex. 35 to the Woods Decl. is a true copy of

TIAA Union Place's February 22, 2012 letter to Union North and that the paraphrase accurately

cites portions of this document.  Plaintiffs dispute that facts existed to support the purported

removal.  *See, supra*. Responses 35-37; 39 and 41.  *See, infra*., Responses 43-45 and 48-54.

44.  On February 29, 2012, Ronald Cohen and his counsel met with certain TIAA representatives and TIAA counsel to discuss the issues between the parties.  *See* R.  Cohen Tr.  110:9-20, Woods Decl.  Ex.  8.  By that date, Ronald Cohen knew that the payment of the tax rebate was a basis for Union North's removal.  *Id.*

**Response 44:** The facts alleged in the first sentence of this paragraph are not disputed.

Plaintiffs also do not dispute that "by that date Ronald Cohen knew that the payment of the tax

rebate was a basis for Union North's removal."  Ronald Cohen's testimony is that he never even

knew of the tax rebate before the February 22, 2012 letter mentioned in the previous paragraph

and was never given an opportunity to simply correct the oversight, if necessary.  R. Cohen

5/1/13 Tr., Appendix of Exhibits, Ex. 3 at 108:13-109:6.  TIAA Union Place was not interested

in having the rebate repaid, but had instead carefully chosen the ostensible grounds upon which

it based Union North's removal precisely because those grounds could ***not*** be cured.  *See*, Scott

Anderson 2/9/2012 Email, Appendix of Exhibits, Ex. 14, at Bates No. TIAA 039776 ("... these 3

[grounds] do not have a cure period and allow us the easiest way to remove Cohen.").

45.  On March 9, 2012, TIAA Union Place's counsel informed Union North that it had
forbore on removing Union North after the February 29, 2012 meeting "in order to provide the
Cohen Member the opportunity to address the Removal Events and, thereafter, an opportunity to
cure those Removal Events ..." *See* March 9,2012 letter, Woods Decl.  Ex. 36.  Having heard
nothing from Union North or its representatives, however, TIAA Union Place elected to remove
Union North as Operating Member effective March 9,2012.  *See also* Cohen March 12, 2012
letter, Wood Decl.  Ex.  37.

**Response 45:** Plaintiffs object to this statement because it is irrelevant and immaterial to

the motion for summary judgment.  Plaintiffs do not dispute that Ex. 36 to the Woods Decl. is a

true and accurate copy of the March 9, 2012 letter sent by TIAA Union Place's counsel to Union

North.  Plaintiffs dispute the remaining allegations of paragraph 45.  Specifically, the quotation

in the first sentence of paragraph 45 misleadingly deletes the end of the quoted sentence.  The

sentence with the deletion restored reads "... in order to provide the Cohen Member the

opportunity to address the Removal Events and, thereafter, an opportunity to cure those Removal

Events ***to which a notice and cure applied pursuant to the Operating Agreement***, TIAA

refrained from immediately effectuating the removal." (emphasis supplied).  Woods Decl. Ex.

36.  But none of the "Removal Events" listed in numbered paragraphs 1 through 3 of Woods

Dec. Ex. 36 (including the tax rebate issue) were subject to a notice and cure period under the

LLC Agreement.  In fact, the undisputed evidence is that TIAA Union Place had deliberately selected these "Removal Events" precisely because they could ***not*** be cured. *See*, Scott Anderson 2/9/2012 Email, Appendix of Exhibits, Ex. 14, at Bates No. TIAA 039776 ("... these 3 [grounds] do not have a cure period and allow us the easiest way to remove Cohen.").

Thus, there was no "opportunity to cure" the tax rebate or other items listed at numbered paragraphs 1 through 3 of Ex. 36 to the Woods Decl.

### Alleged Deal Regarding True-up Claims

46.  At his deposition, Ronald Cohen testified that an agreement was made to "true- up" amounts owed regarding dirt storage was made with Gerry Casimir, who had the authority to make such a deal.  *See* R.  Cohen Tr.  79, Woods Decl.  Ex.  8.  He also testified that the purported agreement to compensate for dirt storage with payment of Phase II property real estate taxes was made with Jae Chang, and it was done "long before the construction loan." *Id*.  at 72.  He also testified that a deal was struck sometime in 2007.  *Id*.  at 83.

**Response 46:** This statement is not disputed.

47.  Ronald Cohen also testified that a deal was reached to pay Phase II property taxes for "[a]s long as it took for us to break ground on Phase 2" (*See Id*.  at 84)  and later, "until the construction line category [for real estate taxes ran out of money" (*See Id*.  at 84-5) , but ultimately, the amount of time the real estate taxes would be paid was "speculative" (*See Id*.  at 85) .

**Response 47**: This statement is not disputed.

### Kitchen on K

48.  Ronald and Alan Cohen designed the Loree Grand to have a restaurant on the premises.  Accordingly, the parties contracted with Kitchen on K and agreed to fund a build-out.  In order to fund the costs of Kitchen on K build-out, Alan Cohen submitted bills and invoices to TIAA.  *See* Taylor Decl., Ex.  2.

**Response 48:** Plaintiffs dispute that Ronald and Alan Cohen "designed the Loree Grand."  Plaintiffs do not dispute that Alan Cohen on behalf of ADC Builders, Inc. submitted bills and invoices to fund the costs of the Kitchen on K buildout.  Plaintiffs dispute that these

bills and invoices were submitted to TIAA.  The bills and invoices were submitted to Evangeline

Taylor, a director of TIAA CREF.  April 28, 2011 Email and First Page of Email Attachment of

TIAA CREF Director Evangeline Taylor, Appendix of Exhibits, Ex. 15 at Bates Nos. TIAA

39668 and 39669.

49.  On four separate occasions in 2011, TIAA made capital contributions to fund the
Kitchen on K build out totaling $776,611.78.  *See* Ottenbreit Tr.  33:15-34:5.  True and-correct
copies of the portions of the-deposition transcript from the deposition of David Ottenbreit, dated
Aug.  1,2013, are annexed as Exhibit 38 to the Woods Decl.  *See* also email dated February
7,2012, Woods Decl.  Ex.  39; 2011 Cash Account Schedule, Woods Ex.  40.  These capital
contributions are detailed below.

On May 2,2011, TIAA contributed $250,689.86.  This payment represented 100%
of the total amount due for the first Kitchen on K payment.  *See* email dated April
28, 2011, Taylor Decl.  Ex.  3.  In his email request to TIAA for payment, Alan
Cohen indicated that "[w]e [Cohen] have already paid out of pocket NOT
reflected in the attached 58K%."  *See* April 27, 2011 email, Woods Decl.  Ex.  41.

On June 7,2011, TIAA contributed $323,502.61.  This payment represented 100%
of the total amount due for the second Kitchen on K payment.  When TIAA asked
Alan Cohen if it should pay 90% of the $323,502.61 invoice or 100%, Alan
Cohen responded that Cohen Companies had already funded "over our 10%" and
that TIAA should pay 100%.  *See* June 6, 2011 email, Woods Decl.  Ex.  42.  *See*
Cost Listing & Invoices of Kitchen on K, dated June 3,2011, Taylor Decl.  Ex.  4.

On July 18, 2011, TIAA contributed $123,640.30.  This payment represented
100% of the total amount due for the third Kitchen on K payment.  *See* 2011 Cash
and Equity Accounts Ledger, Woods Decl.  Ex.  43.

On August 23, 2011, TIAA contributed $78,779.01.  This payment represented
100% of the total amount due for the fourth Kitchen on K payment.  *See id.*

**Response 49:** Plaintiffs dispute that "TIAA" made any contributions.  Any referenced

contributions were made by TIAA-CREF, on behalf of TIAA Union Place, the Investor Member

in the Company. *See, e.g.*, 8/23/11 Wire Transfer Warrant, Appendix of Exhibits, Ex. 16 at Bates

Nos. TIAA 52791 and 521792.  Plaintiffs do not dispute that contributions were made by TIAA

Union Place in the referenced amounts.  Plaintiffs do not dispute that Woods Decl. Ex. 42 is a

true copy of email correspondence between Evangeline Taylor, an employee of TIAA CREF and

Alan Cohen.

50.  Since the $776,611.78 contributed by TIAA represents 100% of the total costs to build out the Kitchen on K, thus the 10% which Cohen Companies owes to TIAA for not contributing to the capital calls is $77,661.18 ($776,611.78 x 10%) .

**Response 50**:  Plaintiffs dispute the statement that TIAA (rather than TIAA Union Place)

contributed any money.  Plaintiffs dispute that the "Cohen Companies" owe any money to

"TIAA."  Neither "Cohen Companies" or "TIAA" is a member of the Company. *See*, LLC

Agreement, Ex. 9 to the Woods Decl. at p. 1.  Because of offsets due to Plaintiffs, they dispute

that the 10% capital contribution is owed.  *See infra* at RSOF at ¶54.  Plaintiffs also dispute

paragraph 50 because its statements are not "facts" but rather, are legal conclusions properly

reserved to the Court.

51.  On December 22, 2011, AGH communicated to Cohen Companies that in reviewing capital activity through September 30, 2011, capital contributions were only made by TIAA and that it expected to see a 10% capital contribution made by Cohen Companies.  *See* December 22, 2011 email, Woods Decl.  Ex.  44, marked as Exhibit D-47 and authenticated by Christopher VonGuggenberg at his deposition, dated May 3, 2013.  *See* VonGuggenberg Tr.  13:20-15:4, Woods Decl.  Ex.  30.

**Response 51:**  Plaintiffs do not dispute that Ex. 44 to the Woods Decl. is a true and

accurate copy of email correspondence dated December 22, 2011 between Angel Morales and

Chris VonGuggenberg.  Plaintiffs dispute that Mr. Morales makes any mention of the "Cohen

Companies" in his email and dispute the characterization of  the contents of Mr. Morales' email

in that the email message itself states only that it is a "year-end request for the audit of Union

Place Phase I, LLC" and notes that "a few additional items from [the auditor's] review of the

preliminary information provided" have been included.   The communication described in

paragraph 51 of the Statement of Facts, regarding the capital activity, appears only as a line item

on the fourth page of attachments to the email.   Defendant TIAA Union Place, in its capacity as

Investor Member, never sent a notice, in the manner required by Section 12.1 of the Agreement,

requiring an Additional Capital Contribution as set forth in Sections 6.2 and 6.3 of the

Agreement.   At best the evidence shows ongoing discussions between the Cohens, Alex Diaz,

and Angel Morales regarding the costs and the off-sets to the costs.

52.   In January of 2012, the auditors inquired of Alex Diaz, "In reviewing capital activity
through September 30, 2011, we noted contributions made only by Teachers.  Were these capital
calls the sole responsibility of Teachers we would expect to see a 10 percent contribution from
Cohen." *See* Jan. 10, 2012 email, Woods Decl.  Ex.  45, marked as Exhibit D-45 and
authenticated by Alex Diaz at his deposition, dated May 3, 2013.  *See* Diaz Tr.  52:4-53:4,
Woods Decl.  Ex.  24.  Mr. Diaz responded, "Record the 10 percent portion of the capital
contribution to AR from Cohen." *See* Woods Decl.  Ex.  45; *See* also Diaz Tr.  at 52:4-53:4,
Woods Decl.  Ex.  24.

**Response 52:** This statement is not disputed, however, as noted in RSOF at ¶51, TIAA

Union Place never notified Union North in the manner required by Sections 6.2, 6.3 and 12.1 of

the Operating Agreement, that it was requiring Additional Capital.


53.   On January 23, 2012, the Cohen Companies reiterated to AGH that the 10% should
be reflected as a receivable.  *See* January 23, 2012 email, Woods Decl.  Ex.  46, marked as
Exhibit D-5 I and authenticated by Christopher VonGuggenberg at his deposition, dated May 3,
2013.  *See* VonGuggenberg Tr.  24:17-25:12, Woods Decl.  Ex.  30.  ("The Cohen contribution
should be reflected as a receivable.")

**Response 53**: This statement is not disputed, however, as noted in RSOF at ¶51, TIAA

Union Place never notified Union North in the manner required by Sections 6.2, 6.3 and 12.1 of

the Operating Agreement, that it was requiring Additional Capital.


54.   Ron Cohen conceded that the Kitchen on K capital contributions were not made by
Union North, but claimed they are subject to some sort of "offset" for the Phase I dirt, the
parking on Phase II property for Phase 1, and for a dog park.  *See* R.  Cohen Tr.  244-246,

Woods Decl.  Ex.  8.

**Response 54:** Plaintiffs do not dispute that pages 244 through 246 of Ronald Cohen's deposition transcript contain an accurate transcription of a portion of his testimony regarding the Kitchen on K capital contribution issue.  In that testimony, Ronald Cohen explains that the Kitchen on K capital contribution was not made in cash but were represented by "monies owed to us."  Woods Decl. Ex. 8, at p. 244:16-17.  The remaining characterizations of Ronald Cohen's testimony is clearly argumentative, rather than simply a quotation of Mr. Cohen's testimony and for that reason is disputed.  Furthermore, as noted in RSOF at ¶51, TIAA Union Place never notified Union North in the manner required by Sections 6.2, 6.3 and 12.1 of the Operating Agreement, that it was requiring Additional Capital.

## IV.  Loan Default

55.  On May 23, 2008, the LLC and Westdeutsche ImmobilienBank AG ("WestImmo") entered into a Loan and Security Agreement whereby Westimmo agreed to lend the LLC $55,250,000 (the "Loan") .  *See* Woods Decl.  Ex.  47, marked as Exhibit 110 and authenticated by Ronald Cohen at his deposition, dated May 14, 2013.  *See* R.  Cohen Tr.  103:10-104:14, Woods Decl.  Ex.  8.

**Response 55:** This statement is not disputed.  Plaintiffs also do not dispute that Ex. 47 to the Woods Decl. is a true and accurate copy of the Loan and Security Agreement by and between WestImmo and the Company (the "Loan Agreement").

56.  The Loan was for a two-year term.  Any extension would require a reaffirmation of its original warranties and representations.  *See id.*  at § 4.3(b) (v)  and (vii); *See* also § 19.1(1) (listing as an event of default an untrue or incorrect warranty or representation) .

**Response 56:** This statement is not disputed.  But WestImmo's representative pointed out in his deposition testimony that he had previously informed Defendants that TIAA Union Place could request a loan extension, while qualifying any required reaffirmation of original

warranties and representations to the extent TIAA Union Place felt this was necessary. A.

Breindel 5/16/13 Tr., Appendix of Exhibits, Ex. 10 60:21-22.

57. The warranties and representations are numerous, and require that there be no default under the Westimmo Loan, WestImmo Loan at § 3.1(1) , and that the amounts specified in the construction budget (for which the Westimmo loan would be used to pay)

> Present a full and complete itemization by category of all costs, expenses and fees which [Union Place] reasonably expects to pay. . . . [Union Place] is unaware of any other such costs, expenses or fees which are material and are not covered by the Budget. The Budget does not include any amount paid or to be paid to [Union Place] or Guarantor [Ronald Cohen] or any Affiliate of [Union Place] or Guarantor [Ronald Cohen] except as otherwise expressly set forth in this Agreement.

*Id*. at § 3.1(h) .

**Response 57:** As noted above, Plaintiffs do not dispute that Woods Decl. Ex. 47 is a true

and accurate copy of the Loan Agreement.

58. Other relevant portions of the Westimmo Loan provide that:

> • The proceeds of the Loan shall be used only to pay. . . a portion of(a) actual, out of pocket Project Costs . . . and (ii) transaction costs related to the making of the Loan. *Id*. at § 2.1(d) ;

> • No amounts in the Budget shall be disbursed to Borrower, Guarantor or any Affiliate of Borrower or Guarantor, *Id*. at § 12.8

> • Except for the Loan, Borrower shall not incur any indebtedness -. . other than, after the completion of Construction, customary trade payables. *Id*. at § 15.1(s) ;

> • Union Place "has not incurred and shall not incur any indebtedness, secured or unsecured, direct or contingent. . . other than indebtedness expressly permitted hereunder, *Id*. at § 15.2(1)

> • Union Place "has not made or shall not make any loans or advances to any third party," *Id*. at § 15.2(g)

> • Union Place "shall not commingle its funds and assets with those

of any other Person" *Id*.  at § 15.2(q)

• Union Place "has and shall maintain its assets in such manner
that it is not costly or difficult to segregate, ascertain or identify, its
individual assets from those of any other Person" *Id*.  at § 15.2(r)

**Response 58:** As noted above, Plaintiffs do not dispute that Ex. 47 to the Woods Decl. is

a true and accurate copy of the Loan Agreement.  The characterization of the cited portions of

the Loan Agreement as "relevant" is a legal conclusion properly reserved to the Court, rather

than a statement of fact, and as such it is disputed by Plaintiffs.

59.  Each construction draw made upon the Westimmo Loan had to represent and warrant
that each of the above-listed representations and warranties was and remained true and correct.
*Id*.  at § 12.4(a) .  The consequence of an Event of Default in the spring of 2012 included
foreclosure.  *Id*.  at § 20.1(a)  through (g) .

**Response 59:** Plaintiffs do not dispute that Ex. 47 to the Woods Decl. is a true and

accurate copy of the Loan Agreement and do not dispute that the cited sections of the Loan

Agreement generally relate to the paraphrase of those sections contained in paragraph 59.  The

speculative second sentence of paragraph 59 is not an assertion of "fact" but rather, a legal

conclusion properly reserved to the Court and is therefore disputed.

60.  On February 15, 2012, TIAA Union Place provided notice to the lender for the
construction loan, Westimmo that TIAA Union Place was removing Union North as Investor
Member.  *See* Breindel Tr.  62:16-64:7, Woods Decl.  Ex.  48.

**Response 60:** This statement is not disputed.  A copy of the referenced notice is included

in the Appendix of Exhibits as Ex. 17 at Bates No. TIAA 047336.  Contrary to the representation

TIAA Union Place made to WestImmo in its February 15, 2012 notice, however, TIAA Union

Place never in fact initiated "... its rights to right to acquire the Operating Member's interest in

Borrower."  Appendix of Exhibits as Ex. 17 at Bates No. TIAA 047336.  Such a process would

have required TIAA Union Place to pay Union North the "Arbitrated Value" of its interest.  LLC

Agreement, Woods Decl. Ex. 9, at p. 21 § 4.4 (b)(i) and p. 2. The "Arbitrated Value" was based

on the hypothetical net proceeds of the sale of the Phase I Property at its fair market value.  At

the time, TIAA Union Place's internal valuation of Phase I was $87,800,000.  E. Taylor 4/16/13

Tr., Appendix of Exhibits, Ex. 7, at 128:10-13.

61.  In light of the misconduct identified by TIAA Union Place in its removal of Union
North, TIAA Union Place issued, on March 27, 2012, a capital call, noting that the "Company is
unable to satisfy the conditions precedent to extending the term of the [Westimmo Loan] and
therefore, will not seek to extend the loan term." *See* March 27, 2012 letter, Woods Decl.  Ex.
49.

**Response 61:** Plaintiffs do not dispute that Woods Decl. Ex 49 is a true and accurate

copy of correspondence sent by TIAA Union Place's counsel to Union North on March 27, 2012.

This correspondence was not a capital call, nor does it even facially purport to be a capital call,

so Plaintiffs dispute this characterization.  Plaintiffs do not dispute the accuracy of the quotation

from the correspondence, but dispute the false statement that the Company was unable to extend

the WestImmo Loan.  On the contrary, by March 27, 2012 TIAA Union Place had already met

with WestImmo's loan officer to present its supposed "concern" that it would not be able to

"make the required representations and warranties pursuant to Section 4.3 ..." and was

specifically told by the loan officer that notwithstanding these matters, if TIAA Union Place was

concerned about making representations and warranties, it should simply qualify the

representations and warranties when it requested the loan extension. A. Breindel 5/16/13 Tr.,

Appendix of Exhibits, Ex. 10, at 60:21-22.  Having received this suggestion, TIAA Union Place

did not even attempt to extend the 2.10% loan or pursue market-rate financing for the Loan. E.

Taylor 4/16/13 Tr., Appendix of Exhibits, Ex. 7, at 131:5-23.  This was despite the fact TIAA

Union Place's internal valuation of Phase I was $87,800,000.  E. Taylor 4/16/13 Tr., Appendix

of Exhibits, Ex. 7, at 128:10-13.  Internal documents produced by WestImmo show that it was

disappointed at TIAA Union Place's choice not to extend the loan.  *See*, March 23, 2012 Email

from Sascha Matheis to Alan Brindel, Appendix of Exhibits, Ex. 18, ("What a pity, Alan.").  As

noted above, the interest rate on the loan was 2.10%.  *See*, 03/26/12 Email Correspondence

between Nicole Scherb-Yilmaz and Alan Breindel, Appendix of Exhibits, Ex. 19.

62.  On May 10, 2012, TIAA Union Place issued a call for capital contributions to pay
the WestImmo Loan balance of $52,632,323.92.  *See* May 10, 2012 letter, Woods Decl.  Ex.  50.

**Response 62:** Plaintiffs do not dispute that Ex. 50 is a true and accurate copy of the

purported capital call issued by TIAA Union Place on May 10, 2012.  Plaintiffs dispute any

implication that the Company would have needed to pay the WestImmo Loan balance had TIAA

Union Place, consistent with its fiduciary duties, extended the WestImmo Loan or sought

replacement financing at market terms.  Plaintiffs dispute the relevance of Woods Decl. Ex. 50 in

light of the fact Defendants are not seeking summary judgment based on the non-payment of this

capital call.  Plaintiffs also refer the Court to the additional facts surrounding this capital call set

forth in the Statement of Additional Facts, at ¶ 92 below.

63. Union North declined to make its share of the capital call, $5,263,232.39, and so
TIAA made a Company loan to Union Place of the entire loan amount, $52,632,323.92.  TIAA
treats this loan as a company loan.  *See* accounting records, Taylor Decl.  Ex.  1.

**Response 63:** This statement is not disputed, except that Plaintiffs dispute that any

"Company loan" was made by TIAA.  These funds were advanced by TIAA CREF.  TIAA

CREF Journal Entry Register and Related Emails, Appendix of Exhibits, Ex. 20, at Bates Nos.

TIAA 42903-TIAA 42904.  Moreover, Plaintiffs object to the relevance and admissibility into

evidence of the manner in which any party chooses to characterize this "loan."  Finally, as with

the previous statement of fact, Plaintiffs dispute the relevance of this statement in light of the

fact Defendants are not seeking summary judgment based on the non-payment of this capital

call.

64.  Alan Breindel, the Executive Director of WestImmo, was not aware that the Phase II property taxes were paid from the WestImmo Loan proceeds.  *See* Breindel Tr.  45,47, and 49, Woods Decl.  Ex.  48.

**Response 64:** Plaintiffs do not dispute that this was Mr. Breindel's testimony at one point in his deposition, but the substance of the testimony is disputed.  Moreover, Alan Cohen testified that Mr. Breindel was aware of these payments and in fact approved draw requests disclosing that the loan proceeds were being used to pay the property taxes. A. Cohen 5/1/13 Tr., Appendix of Exhibits, Ex. 4, at 151:1-154:8.  This testimony is further supported by extrinsic evidence and Mr. Breindel's testimony elsewhere.   Appendix of Exhibits, Ex. 21 (Alan Breindel Deposition Exhibit 135), for example, is a draw request.  It requests authorization for three tax bills, one for Phase I issued to Union Place in the amount of $126,492 (Appendix of Exhibits, Ex. 21 at p. **WI 00170**) and the other two for Phase II, issued to K Street in the amount of $150,530.92 and 8,637.61 (Appendix of Exhibits, Ex. 21 at Bates Nos. WI 00171 and WI 00172).  Mr. Breindel admitted that WestImmo reviewed the tax bills issued to K Street. Breindel 5/16/13 Tr., Appendix of Exhibits, Ex. 10, at 85:7-8; 86:16.  He also acknowledged WestImmo knew that K Street was not the owner of Phase I.  Breindel 5/16/13 Tr., Appendix of Exhibits, Ex. 10, at 86:6-12. Mr. Breindel also admitted that all three tax bills were within the WestImmo-approved budget.  Breindel 5/16/13 Tr., Appendix of Exhibits, Ex. 10, at 81:16-18. He also admitted payment of all three tax bills was approved in writing by WestImmo, as reflected in Appendix of Exhibits, Ex. 21 (Alan Breindel Deposition Exhibit 135), at p. 1. Breindel 5/16/13 Tr., Appendix of Exhibits, Ex. 10, at 92:9-14.

## ADDITIONAL DISPUTED MATERIAL FACTS

65.   As of 2006 Ronald Cohen and/or his family members, controlled entities that owned most of an entire city block bounded by 3rd and 2nd Streets on the east and west and L and K Streets to the north and south (the "Property") in a section of downtown Washington, DC known as "North of Massachusetts Avenue" or "NOMA."  Due to the thriving economy, Mr. Cohen and his family determined that it would be a good time to develop this Property.  The Property consisted primarily of two separate legally-distinct parcels, each of which was owned by K Street Developers, LLC.  These have been referred to throughout this case as the Phase I Property and Phase II Property.  Affidavit of Ronald Cohen, Appendix of Exhibits, Ex. 1, at ¶ 2.

66.   Through a broker, Peter Witham, who had previously brokered deals in which Teachers Insurance and Annuity Association of America ("TIAA") had been involved, Ronald Cohen was placed in contact with TIAA.  After negotiations, K Street and TIAA eventually agreed to develop the Property by improving it with multi-family housing, and formed a joint venture for this purpose.  The purpose of the joint venture from its inception was to develop the entire Property, not just a portion of it.  From the start, both venturers were committed to develop both Phases of the Property.  R. Cohen 5/1/13 Tr., Woods Decl. Ex. 8, at pp. 21:10-23:1. Affidavit of Ronald Cohen, Appendix of Exhibits, Ex. 1, at ¶ 3. Affidavit of Alan Cohen, Appendix of Exhibits, Ex. 2, at ¶ 3.

67.   While the Property consisted of legally-distinct parcels, the parties agreed from the beginning that their joint venture would cover the development of the entire Property.  Affidavit of Ronald Cohen, Appendix of Exhibits, Ex. 1, at ¶ 4. Affidavit of Alan Cohen, Appendix of Exhibits, Ex. 2, at ¶ 4.   Consistent with this, TIAA viewed the development of the entire Property as a single investment.  November 22, 2011 Email of TIAA CREF Director William C.

Harrison to TIAA CREF Senior Director Michael D. Fisk, Appendix of Exhibits, Ex. 22 ("A big part of the delay ... was getting to understand/them [sic] to admit it was really a one phase project – not two.") Also consistent with this, the development of the entire Property was subject to an order requiring its development as a single planned unit development (the "PUD"), the terms of which were governed by an order effective as of October 13, 2006 (as amended, the "PUD Order") by the District of Columbia Zoning Commission (the "Commission"). PUD Order, Appendix of Exhibits, Ex. 12, at Bates Nos. TIAA 48852 through TIAA 48886.

68. The PUD Order permitted a total of approximately 712 residential units to be constructed on the Property. PUD Order, Appendix of Exhibits, Ex. 12, at ¶¶ 12, 15 (a) and 21, Bates Nos. TIAA 48881-TIAA 48882. It was decided that  it made economic sense to bring these units to the market in phases. This was done to avoid the economic risk of bringing the entire 712 units into the market at one time. Each discrete phase would require only a portion of the financial outlay that would be required by the overall construction. And by constructing the 712 units in separate phases, the timing of bringing the units to market could be controlled to coincide with demand. Affidavit of Ronald Cohen, Appendix of Exhibits, Ex. 2, at ¶ 5.

69. The PUD Order required the separate parcels of the Property to be improved with a single building whose footprint would overlap the two Phases. While there was no impediment to legally-distinct ownership of the Phase I Property and Phase II Property, any construction on one part of the Property had to be linked to construction on the other parcel so as to form the single building required. PUD Order, Appendix of Exhibits, Ex. 12, at ¶¶25, 53 and 54, Bates No. TIAA 48868, 48876.  Affidavit of Ronald Cohen, Appendix of Exhibits, Ex. 1, at ¶ 6. Not only did the PUD Order require what was in essence one building built in two phases, the project

was actually designed and was in fact built so that the first phase of the single building – the Loree Grand – would physically abut and connect to the second phase of the building.  Affidavit of Ronald Cohen, Appendix of Exhibits, Ex. 1, at ¶ 6.

70.  The parties to the joint venture agreed that each Phase would be developed as a separate limited liability company, which would be formed when construction on each Phase was ready to proceed.  By early 2007, K Street and TIAA were ready to proceed with the development of the Phase I Property, and so they formed the Company for this purpose.  The Company is governed by the terms of the LLC Agreement.  LLC Agreement, Woods Decl. Ex. 9. A TIAA-related entity, TIAA Union Place was defined as the Investor Member.  LLC Agreement, Woods Decl. Ex. 9, at Bates No. TIAA049420.  Its interest had a capital sharing ratio of 90%.  LLC Agreement, Woods Decl. Ex. 9, at p. 3, Bates No. TIAA049422. A Cohen-related entity, Union North was defined as the Operating Member.  LLC Agreement, Woods Decl. Ex. 9, at Bates No. TIAA049420.  Its interest had a capital sharing ratio of 10%.  LLC Agreement, Woods Decl. Ex. 9, at p. 3, Bates No. TIAA049422.   Union North contributed the Phase I Property to the Company.  LLC Agreement, Woods Decl. Ex. 9, at § 4.13, p. 25, Bates No. TIAA049444. The value of the Phase I Property for purposes of this contribution was agreed to be $17,000,000.00.  Under the LLC Agreement, Union North received an up-front special distribution of 90% of this amount, or $15,300,000.00.   LLC Agreement, Woods Decl. Ex. 9, at § 8.3, p. 32, Bates No. TIAA049451.   This was funded by a corresponding initial contribution to the Company of $16,088,848.22 by TIAA Union Place.  LLC Agreement, Woods Decl. Ex. 9, at § 6.1, p. 28, Bates No. TIAA049447.  TIAA Union Place was to receive 90% of any distributions to the Company's members until the time that these distributions had allowed it to receive an

internal rate of return ("IRR") of 14.5% on its initial contribution.  Union North would receive

the remaining 10% of any distributions.  LLC Agreement, Woods Decl. Ex. 9, at § 8.3 (a), p. 32,

Bates No. TIAA049451.   After TIAA Union Place achieved its 14.5% IRR, the two members

would split all subsequent distributions equally.   LLC Agreement, Woods Decl. Ex. 9, at § 8.3

(b), p. 32, Bates No. TIAA049451.

71.   The joint venturers agreed that each Phase would be developed by Ronald Cohen

Management Company ("RCMC"), an entity controlled by Ronald Cohen.   They also agreed

that the general contractor for construction of each Phase would be ADC Builders, Inc. ("ADC

Builders"), an entity controlled by Alan Cohen, Ronald Cohen's son.  Accordingly, the Company

entered into a development agreement for the development of the Phase I Property with RCMC.

The Company also entered into a construction contract for the construction of an apartment

building on Phase I with ADC Builders.  The building was to be known as the "Loree Grand."

Affidavit of Alan Cohen, Appendix of Exhibits, Ex. 2, at ¶ 8.

72.   The Loree Grand was designed to contain 212 of the approximately 712 residential

units authorized by the PUD Order for the entire Property.  PUD Order, Appendix of Exhibits,

Ex. 12, at ¶¶ 12, 15 (a) and 21, Bates Nos. TIAA 48881-TIAA 48882.  The PUD Order required

a 1 to 1 ratio of on-site parking spaces to residential units.   PUD Order, Appendix of Exhibits,

Ex. 12, at ¶ 36 (g), Bates No. TIAA 48871.  This meant that a total of 212 parking spaces needed

to be constructed and be available for the use of the Loree Grand's tenants.  Affidavit of Ronald

Cohen, Appendix of Exhibits, Ex. 1, at ¶ 9.  Because of the physical configuration of the Phase I

Property, a subterranean parking garage constructed underneath the Loree Grand could contain

approximately 85-90 parking spaces on each of its floors.  To accommodate all of the required

212 units, the parking garage would need to have three levels.  A. Cohen 6/26/13 Tr., Appendix of Exhibits, Ex. 5, at 19:17-20:7.  Building a three-level parking garage would require the expenditure of at least $1.5 million more than would building only a two-level parking garage. A. Cohen 6/26/13 Tr., Appendix of Exhibits, Ex. 5, at 27:10-14. To save the Company this money, the joint venturers agreed that a two-level garage would be built underneath the Loree Grand, while K Street would allow the Company to build and use a 39 unit parking lot on the adjacent Phase II Property.   A. Cohen 6/26/13 Tr., Appendix of Exhibits, Ex. 5, at 19:17-22:6. Affidavit of Alan Cohen, Appendix of Exhibits, Ex. 2, at ¶ 9.   The Company's use of the parking lot on the Phase II Property was not memorialized in any written lease.  Nor did the Company pay any monthly rent for the parking lot.  The Company did, however, charge its tenants a monthly parking fee for their parking spaces, including those located in the Phase II Property parking lot.  This parking lot was never used by anyone other than Loree Grand tenants. Affidavit of Alan Cohen, Appendix of Exhibits, Ex. 2, at ¶ 9.  By this arrangement, the Company saved the expense of building the third level of a parking garage on the Phase I Property – at least $1.5 million.  A. Cohen 6/26/13 Tr., Appendix of Exhibits, Ex. 5, at 22:25-23:7.  A. Cohen 6/26/13 Tr., Appendix of Exhibits, Ex. 5, at 27:10-30:2.  Affidavit of Ronald Cohen, Appendix of Exhibits, Ex. 1, at ¶ 9.

73.  To construct a building the size of the Loree Grand configured with a below-grade parking garage requires the excavation and removal of a substantial amount of sub-surface soil. Typically, the soil is transported off-site and disposed of at substantial cost to the site owner. The joint venturers agreed to save the Company this cost by simply storing all of the soil displaced by the Loree Grand's construction onto the adjacent Phase II Property.  This saved the

Company approximately $300,000.00. A. Cohen 6/26/13 Tr., Appendix of Exhibits, Ex. 5, at 6:15-7:7; 11:12-13:7. As with the parking spaces, this use by the Company of the Phase II Property was not memorialized in any written lease or easement. Nor did the Company pay any monthly rent or charge for the soil storage. Affidavit of Alan Cohen, Appendix of Exhibits, Ex. 2, at ¶ 10.

74. When the Loree Grand was ultimately built, its management company informed the Company that a substantial pool of its young, professional potential tenants were pet owners. The Company would benefit from being able to offer tenants a park specially dedicated to pets so that dog owners could walk their dogs. Since there was no place to put this park on the Phase I Property, K Street again allowed the proposed dog park to be constructed on the Phase II Property. As with the parking lot, this use by the Company of the Phase II Property was not memorialized in any written lease or easement. Nor did the Company pay any monthly rent or charge for use of the dog park. The Company did, however, charge its own tenants for using the dog park. The dog park was never used by anyone other than Loree Grand tenants. Based on the figures he was provided by the management company, Alan Cohen testified that the Company realized an additional $24,000 per year in revenue from rentals to tenants who would not have otherwise rented at the Loree Grand. A. Cohen 6/26/13 Tr., Appendix of Exhibits, Ex. 5, at 51:1-53:19. Affidavit of Alan Cohen, Appendix of Exhibits, Ex. 2, at ¶ 11.

75. Before construction began on the Phase I Property, the parties discussed these contemplated uses by the Company of the Phase II Property. As partial compensation to K Street for use of the Phase II Property, they agreed that the real estate taxes for Phase II would be paid by the Company from available funds. R. Cohen 5/1/13 Tr., Appendix of Exhibits, Ex. 3,

at 81:20-83:18.  Accordingly, real estate taxes for both the Phase I Property and the Phase II

Property were included in the Company's budgets for 2010 and 2011.  These budgets were

reviewed and approved by Defendants.  In fact, defendant TIAA Union Place, was vested with

the exclusive right of approval of those budgets, pursuant to section 4.1 (b)(2)(A) of the LLC

Agreement.  LLC Agreement, Woods Decl. Ex. 9, § 4.1 (b)(2)(A), p. 16, Bates No.

TIAA049435.  A total of $306,561 in real estate taxes on the Phase II Property were paid

pursuant to the approved budgets.  The parties also agreed that any further expenses paid for the

benefit of Plaintiffs could be set off against the substantial cost savings the Company was

realizing from its use of the Phase II Property.  Even though it was likely that the contemplated

benefits to the Company from these uses – over $1.8 million – would far exceed the amount of

the real estate taxes and other expenses paid by the Company for the benefit of K Street, K Street

did not expect the Company or its joint venturer, TIAA, to make up the difference.  Once

construction on the Phase II Property was to begin, the parties would perform a "true up" of their

mutual benefits and costs, and in the unlikely event the benefits to the Plaintiffs exceeded the

benefits to the Company, the difference would be reimbursed out of the proceeds of the

development of Phase II.  Affidavit of Alan Cohen, Appendix of Exhibits, Ex. 2, at ¶ 12.

76.  Apart from the joint venture and the "true up" described by Ronald and Alan Cohen,

there is no other evidence in the record of why these commercially-sophisticated parties allowed

the Company to construct and use a parking lot on the neighboring Phase II Property, to

construct and use a dog park on the Phase II Property, to store its excavated soil on the Phase II

Property or why the Phase II Property's real estate taxes would be included in the Company's

budgets, which were approved by TIAA Union Place.  Trevor Michael, TIAA's Managing

45

Director at the time the Company was formed, admitted that he had at least one conversation with Ronald Cohen discussing the development of Phase II by the parties.  He claimed not to recollect the substance of the conversation.  T. Michael 4/25/13 Tr., Appendix of Exhibits, Ex. 8, at 21:2-13.

77.  As noted in Defendants' Statement of Facts, construction of the Loree Grand was funded by an approximately $55.2 million loan to the Company by WestImmo, a construction lender.  This loan was memorialized in the Loan Agreement, a copy of which is attached as Exhibit 47 to the Woods Decl.

78.  The Loree Grand was constructed by ADC Builders under budget.  It opened to the public and began renting in the summer of 2010.  According to the TIAA CREF Director with responsibility over its management, the Loree Grand was "a good product" and "under budget." S. Anderson 5/7/13 Tr., Appendix of Exhibits Ex. 6, at 35:18-20.  The record is devoid of evidence of any complaint or dissatisfaction expressed at the time by any of the Defendants with any aspect of ADC Builders or RCMC's performance under their agreements with the Company, or with Union North's performance as the Company's Investor Member.  *See also*, Affidavit of Alan Cohen, Appendix of Exhibits Ex. 2, at ¶ 14.

79.  After the Loree Grand was built, K Street began receiving inquiries from outside investors interested in developing the Phase II Property.  Because of its existing joint venture with TIAA, K Street could not pursue these initial inquiries in any depth, but it was necessary to have discussions with the outside investment community to determine the market price for any proposed development of Phase II.  This was necessary to proceed with the next step of the joint venture with TIAA because K Street had agreed that the Phase II Property would be developed

based on its market value at the time of development.  (The affidavit Ronald Cohen filed in August, 2010 with the D.C. Zoning Commission and which is found at Woods Dec. Ex. 10 reflected those discussions, and the reference in the affidavit to "a firm financial commitment" meant that, in the absence of an established fair market value, the price had not been definitively determined to permit a firm "financial" commitment.  By early November, 2010, however, Ronald Cohen had received serious enough expressions of interest in developing the Phase II Property from sophisticated potential investors to give him confidence that the market value of Phase II could be definitively determined to warrant proceeding with Phase II.  On November 3, 2010, he sent a letter to TIAA Union Place proposing to develop the Phase II Property based on a land contribution by K Street at the fair market value of $50,730,000.  This was done pursuant to Sections 4.14 and 12.1 of the LLC Agreement, which gave TIAA Union Place a right to participate in any development of the Phase II Property based on a contribution by K Street of the Phase II Property at fair market value.  Fair market value was to be determined either by the parties' agreement or by an arbitration procedure.  Affidavit of Ronald Cohen, Appendix of Exhibits, Ex. 1, at ¶ 15.

80.  Defendants believed the Phase II Property's fair market value was approximately $41.7 million.  January 27, 2011 TIAA CREF Interoffice Memo, Appendix of Exhibits, Ex. 23, at Bates No. TIAA 33831.  They concluded, however, that development of this remaining portion of the Property at fair market value would not yield them their desired IRR, based on current market conditions.  They still wanted to develop the Phase II Property, just not at the price required by the procedure described at section 4.14 of the LLC Agreement.  January 27, 2011 TIAA CREF Interoffice Memo, Appendix of Exhibits, Ex. 23, at Bates Nos. TIAA 33831-

33839.  Moreover, they also concluded that, if they could not convince Plaintiffs to develop the

Phase II Property at a price lower than its fair market value, Defendants would not just refrain

from proceeding with Phase II, they were also going force the sale of the Phase I Property and

exit their entire venture with Plaintiffs.  January 27, 2011 TIAA CREF Interoffice Memo,

Appendix of Exhibits, Ex. 23, at Bates Nos. TIAA 33831 ("In the event we are unable to

negotiate agreeable terms for Phase II, Asset Management recommends a partnership or asset

sale of Phase I at stabilization 3Q or 4Q 2011."); *See also*, January 26, 2011 Letter from TIAA

CREF Senior Director Michael D. Fisk to Mark Wood, Appendix of Exhibits, Ex. 24 ("Fyi - my

vote is to get out if we can."); January 31, 2011 Letter from TIAA CREF Director William C.

Harrison to Michael Fisk and Mark Wood, Appendix of Exhibits, Ex. 25 ("We need to extract

ourselves from this").  These conclusions had all been reached by the end of January, 2011.

Plaintiffs were not informed of Defendants' decision.  Affidavit of Ronald Cohen, Appendix of

Exhibits, Ex. 1, at ¶ 17.  Had Plaintiffs known that senior management of TIAA CREF had

already determined it did not wish to develop Phase II, they would have terminated the parties'

joint venture and pursued a sale of Phase II or development of Phase II with third parties.

Affidavit of Ronald Cohen, Appendix of Exhibits, Ex. 1, at ¶ 17**.**

81.  On January 27, 2011, TIAA Union Place formally notified K Street it did not wish to

develop the Phase II Property in the manner described in section 4.14 of the LLC Agreement.

Woods Decl. Ex. 14.  The parties continued to discuss proceeding with the development of the

Phase II Property, however, based on a land contribution at less than fair market value.  *See*,

February 1, 2011 Email of Scott Anderson to Peter Witham, Ronald Cohen and Alan Cohen,

Appendix of Exhibits, Ex. 26.   Around this same time, TIAA CREF directors Scott Anderson

and Evangeline Taylor, as well as TIAA CREF managing director Gerald Casimir, each assured

Ronald Cohen TIAA was still committed to the joint venture, but only at a price that would

support the desired IRR.  R. Cohen Tr., Appendix of Exhibits, Ex. 3 at 41:14 and 42:5.  This was

also Gerry Casimir's understanding.  R. Cohen 5/1/4/13 Tr., Appendix of Exhibits, Ex. 3 at

69:16.  They also instructed K Street not to enter into any negotiations with any other party

concerning the Phase II Property.  R. Cohen 5/1/13 Tr., Appendix of Exhibits, Ex. 3, at p. 40:22-

25.  Satisfied with his previous experience with his joint venturer, TIAA, Ronald Cohen agreed

to finalize the development of the Phase II Property on the requested basis.  Had he known,

however, that senior executives of TIAA CREF had already expressed their wish not to proceed

with Phase II and their intent to sell Phase I, he would not have gone forward.  Affidavit of

Ronald Cohen, Appendix of Exhibits, Ex. 1, at ¶ 17.  By April, 2011, the parties had agreed to a

land contribution price of $30 million.  11/22/11 Email of William Harrison, Appendix of

Exhibits, Ex. 22.

82. At the time the parties began discussing the manner in which they would proceed with

their development of Phase II, existing District of Columbia law provided for a $1.50/FAR

square foot per year tax abatement for up to 3,000 residential units in NOMA.  Defendants were

aware of this financial incentive to develop residential housing in NOMA at least since January,

2009.  Draft TIAA CREF Interoffice Memo, Appendix of Exhibits, Ex. 27, at Bates No. TIAA

049616.  The allotment of tax abatements had not been exhausted as of January, 2011.  Affidavit

of Ronald Cohen, Appendix of Exhibits, Ex. 1, at ¶ 18.

83.  Also in March, 2011, the Company's auditors, AGH released to each of the

Company's members the Company's 2010 audited financial statements.  Woods Decl. Ex. 32.

These financial statements reflected the Company's payment of the Phase II Property's real estate taxes, as well as the payment by the District of Columbia to RCMC of a tax rebate of $190,744.70, which was a rebate pursuant to the Tax Abatement Program of real estate taxes paid by the Company.  Woods Decl. Ex. 32, at p. 7, Bates No. TIAA 000064.

84.  There is no evidence that any of Defendants objected to, or expressed any concern about, the payment of the tax rebate to The Cohen Companies.  There is no evidence that any of the Defendants questioned the Company's payment of the real estate taxes for the Phase II Property.  To the contrary, Scott Anderson, a director of TIAA CREF, testified that there was no dissatisfaction with any of the Plaintiffs on any basis until several months after this time, and that the dissatisfaction had to do with "reporting of the performance of the building", rather than payment of Phase II Property real estate taxes or the tax rebate.  S. Anderson 5/7/13 Tr., Appendix of Exhibits, Ex. 6, at 40:7-12.  Affidavit of Ronald Cohen, Appendix of Exhibits, Ex. 1, at ¶ 20.

85.  In the spring and summer of 2011, the parties finalized and ultimately executed their letter of intent ("Letter of Intent") to develop the Phase II Property.  A description of this process, as well as a description of how the parties ultimately failed to proceed with the development of the Phase II Property, is contained in paragraphs 18 through 24 of Defendants' Statement of Facts, as supplemented and corrected by Plaintiffs' Responses to the same paragraphs.

86.  After Defendants ultimately decided not to proceed with the development of the Phase II Property, they began to implement their preexisting, undisclosed plan to exit from Phase I.  First, even though TIAA Union Place was not the Company's Managing Member, it held a January 23, 2012 conference call with the Company's auditors, after which the auditors compiled

a requested list of "concerns" regarding Union North's actions as the Company's Managing

Member.  Appendix of Exhibits, Ex. 28.  AGH were recommended to Plaintiffs to be the

Company's auditors by the TIAA CREF accounting department.  J. Chang 5/16/13 Tr., Appendix

of Exhibits, Ex. 9, at 55:16-20.  Neither TIAA Union Place nor AGH informed the Company or

Union North of their undisclosed meetings or Defendants' furtive exit strategy.  Nor did

Defendants give Union North the opportunity to address any of the "concerns" discussed by AGH

and TIAA Union Place.    Affidavit of Alan Cohen, Appendix of Exhibits, Ex. 2., at ¶ 24.

Affidavit of Ronald Cohen, Appendix of Exhibits, Ex. 1, at ¶ 24.

87.  Next, TIAA Union Place compiled a list of three purported removal events to justify

its removal of Union North as the Company's Operating Member.  Each "removal event" was by

design selected because each purported event had no associated cure period.  Scott Anderson

2/9/2012 Email to Gerald Casimir, Appendix of Exhibits, Ex. 14.

88.  On February 22, 2012 TIAA Union Place's counsel sent a letter to Union North

informing it of the purported Removal Events listed in Mr. Anderson's 2/9/2012 email.  A copy

of this letter is attached as Ex. 35 to the Woods Decl.  The three alleged Removal Events that had

been listed in Mr. Anderson's 2/9/2012 email to Mr. Casimir were repeated in numbered

paragraphs 1 through 3 of Ex. 35.  The letter then went on to list several other purported Removal

Events.  By the letter, TIAA Union Place purported to remove Union North as the Operating

Member, effective February 27, 2012.  *See*, Ex. 35 to Woods Decl. at p. 2, KST 011189.  No

opportunity was given to cure any of the alleged Removal Events.

89.  TIAA Union Place's counsel then apparently discovered that several of the additional

Removal Events listed after the numbered paragraphs of the 2/22/12 letter in fact had 15-day

notice and cure periods associated with them under the terms of the LLC Agreement.  *See*, LLC

Agreement, Ex. 9 to Woods Decl. at § 4.4 (13), p. 21 Bates No. TIAA049440.  Because Union

North had been removed on February 27, 2012 as the Operating Member without having been

afforded the required notice and cure opportunity for those alleged Removal Events, counsel then

transmitted yet another letter on March 9, 2012 – the 16th day after the first February 22, 2012

letter.  This letter is attached as Ex. 36 to the Woods Decl.  The new letter claimed that "... TIAA

refrained from immediately effectuating the removal" accomplished by the earlier February 22,

2012 letter.  In fact, there is no evidence TIAA ever rescinded its first removal of Union North as

the Operating Member.  Rather, the only evidence is that TIAA Union North removed Union

North as Operating Member as of February 27, 2012 and then let 15 days elapse after the

removal, after which time it claimed that Union North had failed to exercise any cure rights.

90.  A total of $306,960.82 in Phase II Property real estate taxes was paid out of the

TIAA-approved Phase I budgets.  Second Amended Answer, Woods Decl. 8, at p. 24, ¶¶ 43 and

44.  The Phase I tax rebate totaled $190,744.  Second Amended Answer, Woods Decl. 8, at p. 25,

¶ 55. The Union North portion of the capital contribution associated with the Kitchen on K build-

out was 86,290.20.   Second Amended Answer, Woods Decl. Ex. 8, at p. 30, ¶ 97.

91.  As described in paragraphs 55 through 61 of Defendants' Statement of Facts, and in

Plaintiffs' Responses, after TIAA Union Place removed Union North as the Company's Operating

Member, it decided not to renew the existing Loan with WestImmo, which bore interest at the

approximate rate of 2.1%, or to seek new financing at market rates.   As described in paragraph

61 of the Statement of Facts, TIAA Union Place was purportedly concerned that the alleged

Removal Events would prevent the Company from making the representations and warranties

required to extend the Loan.  In fact, as set forth in Response 61, when TIAA Union Place voiced this concern to Alan Breindel, WestImmo's loan officer, he suggested that TIAA Union Place simply request the renewal and qualify any associated representations and warranties.  A. Breindel 5/16/13 Tr., Appendix of Exhibits, Ex. 10, at 60:21-22.  TIAA Union Place elected not to do this.  Instead, it decided to pay off the $52,632,323.92 balance of the 2.1% interest Loan, and issue a capital call to the members for their respective shares of this amount.

92.  TIAA Union Place first issued a purported capital call to the Company's members on April 11, 2012 requiring them to pay their respective shares of the $52,632,323.92 Loan balance by April 20, 2012.  April 11, 2012 Capital Call, Appendix of Exhibits, Ex. 29.  Although the loan did not actually need to be paid off until May 23, 2012, an email fromTIAA-CREF Director Evangeline Taylor explained that TIAA Union Place was "... strategically making the capital call now in order to stall litigation discussions and negotiations with Cohen Company prior to their putting up capital."  Appendix of Exhibits, Ex. 20, at Bates No. TIAA 042907.  Since even a "strategic" capital call requires that both of the members to whom it is issued put up their share of the money, "TIAA will also have to fund our 90% at this time."  Appendix of Exhibits, Ex. 20, at Bates No. TIAA 42907.  If Union North failed to pay its 10% share of the capital call, Ms. Taylor noted that "... TIAA will need to fund [Union North's] 10% into the account in 5 business days thereafter (April 27th) which will result into a default loan to Cohen at an interest rate of 15%."  Appendix of Exhibits, Ex. 20, at Bates No. TIAA 42907.  In fact, April 20, 2012 came and went, and there is no evidence either TIAA Union Place or Union North paid the capital call.  Thereafter, having satisfied itself by means of this dry run that Union North would not be making its share of the capital call, TIAA Union Place simply "rescinded" the prior phony capital call.

4/24/12 Email of Evangeline Taylor, Appendix of Exhibits, Ex. 30.   Later, on May 10, 2012, TIAA Union Place issued yet another capital call.  On May 21, 2012, before the time for Union North to pay its 10% share of the capital call had expired, TIAA CREF not TIAA Union Place, wired the entire Loan balance.  Appendix of Exhibits, Ex. 20, at Bates No. TIAA 42904.

93.  TIAA Union Place elected to treat the entire $52,632,323.92 payment made by its affiliate TIAA CREF as a "Company Default Loan" under section 6.3 (a) of the LLC Agreement. LLC Agreement, Woods Decl. Ex. 9, § 6.3 (a), pp. 28-29.  This enabled TIAA Union Place (which had not in fact made the payment) to treat the Loan repayment as a loan to the Company, and charge it 15% interest.  LLC Agreement, Woods Decl. Ex. 9, § 6.3 (a)(1), pp. 28-29 and p. 4. The Company's $52,632,323.92 Loan, bearing interest at 2.1%, had been replaced by a 15% loan in the same amount with funds sourced from an affiliate of the new Managing Member, TIAA Union Place, without any attempt having been made either to extend the Loan or replace it with market-based financing.   Under the LLC Agreement, the new Company Default Loan must be repaid in full before any distributions can be made to the members.  LLC Agreement, Woods Decl. Ex. 9, § 6.3 (a)(3), p. 29.

94.  Witnesses for the Defendants have referred to the Cohens as their partners and to the project as a joint venture.  For example:

> A.   Trevor Michael testified that his expectation that Ron and Alan Cohen should have found time in their schedules to meet with him even on short notice was not unreasonable because in his experience, "especially with partners, on multi-million dollar deals, where they would take whatever time is needed o meet with their partner, their money partner, especially if there are issues associated with th project."  Transcript of Deposition of Trevor Michael ("Michael Tr.") (pertinent portions of which are included in the T. Michael Tr., Appendix of Exhibits, Ex.8 at 34:3-7.

B.  In further testimony regarding his attempt to meet with Ron and Alan Cohen, Trevor Michael testified: "I believe when you are partners, that you – it's like a marriage.  You do anything you can to please your partner, to do what – commercially and reasonable things. . . So in that instance I felt that the way that I, and I am sure many of my colleague[s] at TIAA feel, is that you do whatever you can in a partnership.**"**  T. Michael Tr., Appendix of Exhibits, Ex. 8 at 35:18-21; 36:2-4.

C. With further reference to the meeting he unsuccessfully tried to schedule, Trevor Michael testified about an email he sent on 8/17/10 to Alan Cohen in which the stated that the payment of development fees entitled him to certain "access" which he testified meant "[a]ccess to the partner, that, you know, we pay a fee not only for their skillful development of the project, but also we pay a fee to have access to people."  T. Michael Tr., Appendix of Exhibits, Ex. 8 at 37:12-15.  Michael also testified, with respect to his expansive view of development fees being paid, that it "ties in our relationship, that I can call you and say, 'Hey, I need to meet with you.'  It is part of the partnership."  T. Michael Tr., Appendix of Exhibits, Ex. 8 at 43:20-22.

D. Trevor Michael, responding to a question regarding the $750,000 payment which Alan Cohen asked Marc DeBree to get approved, testified that in his view Marc DeBree should not have funded it because he "believed that to be the partner's expense."  T. Michael Tr., Appendix of Exhibits, Ex. 8 at 58:20-21.   He also testified that they "want our partners – when you do a development deal, or anything, when you have a partner, you want to make sure that the partner has the financial wherewithal to be able to complete their financial obligations on a project."  T. Michael Tr., Appendix of Exhibits, Ex. 8 at 59:20-24.

E. With respect to the decision not to consent to the loan extension, Trevor Michael testified that the economic consequence of the decision was "that the parent TIAA would loan the partnership the money to pay off the loan."  T. Michael Tr., Appendix of Exhibits, Ex. 8 at 66:18-20.

F. Jae Ho Chang, the TIAA CREF "point person" during construction, testified that he first got involved with Union Place "right after the closing of the joint venture."  Transcript of Deposition of Jae Ho Chang ("Chang Tr.") (pertinent portions of which are included in the Plaintiffs' Exhibit Appendix at Ex.9) at

8:10-11.

G.  Jae Chang testified that when the first management company did not work out, "we selected another one" and then explained that he meant not him individually but "we as a joint venture."  J.Chang 5/16/13 Tr., Appendix of Exhibits, Ex. 9 at 28:14-20.

H.  Jae Chang did not believe it was necessary to go over draw requests submitted during construction because "[t]hat's what we have partners for."  J. Chang 5/16/13 Tr., Appendix of Exhibits, Ex. 9 at  5:4-11.  The partners were the Cohens.  J. Chang 5/16/13 Tr., Appendix of Exhibits, Ex. 9 at 45:17-19.

I. Jae Chang testified that the auditor, Aarons Grant & Habif, was selected by the "joint venture."  J. Chang 5/16/13 Tr., Appendix of Exhibits, Ex. 9 at 55:12-15.

Respectfully submitted,

COOTER, MANGOLD, DECKELBAUM
& KARAS, LLP


By:      /s/ Dale A.  Cooter
         Dale A.  Cooter,  D.C.  Bar No.  227454
         Donna S.  Mangold, D.C.  Bar No.  358851
         Stephen Nichols, D.C.  Bar No.  429686
         Fernando Amarillas, D.C.  Bar No.  974858
         5301 Wisconsin Avenue, NW
         Suite 500
         Washington, DC 20015

         PHONE:      (202)  537–0700
         FAX:        (202) 69 364-3664
         EMAIL:      efiling@cootermangold.com

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 16th   day of October, 2013 a copy of the foregoing

Plaintiffs' Response to Defendants' Statement of Material Facts was served through the Court's

e-filing system on:


     Rebecca Woods, Esq.
     SEYFARTH SHAW, LLP
     975 F Street, NW
     Washington, DC 20004


     <u>/s/ Stephen Nichols</u>
     Stephen Nichols