**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **K STREET DEVELOPERS, LLC <u>et al.</u>,**<br><br>Plaintiffs,<br><br>v.<br><br>**TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA <u>et al.</u>,**<br><br>Defendants. | Case No. 1:12-cv-00666 (CRC) |

**<u>MEMORANDUM OPINION</u>**

As the District of Columbia Court of Appeals recently noted, "[i]t is fundamental that in a business transaction between two sophisticated entities involving substantial sums . . . parties are bound by what they sign." <u>Washington Inv. Partners of Delaware, LLC v. Sec. House, K.S.C.C.</u>, 28 A.3d 566, 576 (D.C. 2011). This observation certainly applies to this case. Special purpose entities created by K Street Developers, LLC ("K Street") and Teachers Insurance and Annuity Association of America ("TIAA") entered into a written agreement to construct and manage the first phase of an apartment complex in Washington, D.C., with an option to undertake a second phase.[1] After TIAA opted not to participate in the second phase, and then removed K Street from the management of the first phase, K Street sued. It seeks at least $100 million in damages based on alleged violations of both the written agreement on phase one and a purported unwritten, overarching joint venture arrangement between the parties to develop the entire project. The Court previously dismissed all

---

[1] The plaintiffs in this matter are K Street Developers, LLC and Union North Phase I, LLC. The defendants are Teachers Insurance and Annuity Association of America; TIAA Union Place Phase I, LLC; and TIAA-CREF Global Investments, LLC. Several affiliates of the plaintiffs—Ronald Cohen Management Company, Inc.; PMAS, LLC; ADC Builders, Inc.; Alan Cohen; and Ronald Cohen—have also been involved in this litigation as third-party defendants and counterclaimants. Except where identifying the precise entity is relevant to the discussion, the Court will refer to the plaintiffs and their affiliates as "K Street" and the defendants and their affiliates as "TIAA."

counts of the complaint except for breach of contract, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing. Because K Street, after extensive discovery, has not provided any competent evidence to contradict the substantial documentary support marshalled by TIAA to show that no such breaches occurred, the Court will grant TIAA's motion for summary judgment.

## I. Background

Plaintiff K Street is a Washington, D.C.-area real estate development company controlled by Ronald Cohen. Defendant TIAA is a global investment company. In 2006, TIAA and K Street agreed to acquire land in downtown Washington, D.C., to develop the Loree Grand, a ten story apartment complex. Parties' Compiled Statement of Material Undisputed Facts, Responses and Replies ("CSOF") ¶ 2. The parties subsequently entered into a written agreement for the first phase of the development ("Phase I")—titled "Limited Liability Company Agreement of Union Place Phase I, LLC," ("the LLC Agreement")—which was governed by Delaware law. Defs.' Mot. for Summ. J. Ex. 9. TIAA entered into the LLC Agreement through a special purpose entity called TIAA Union Place as the "Investor Member." CSOF ¶ 4. K Street entered into the Agreement through a special purpose entity called Union North as the "Operating Member." Id.

Under Section 4.14 of the LLC Agreement, titled "Right of First Offer on Phase II," if K Street "elect[ed] to sell . . . or undertake the development of Phase II," TIAA Union Place would have 30 days to choose whether to participate in the development of Phase II as well. Defs.' Mot. for Summ. J. Ex. 9 § 4.14. On November 3, 2010, K Street notified TIAA Union Place that it had elected to undertake development of Phase II and asked whether TIAA was interested in exercising its right of first offer. CSOF ¶ 12. After some back and forth, TIAA responded in a January 27, 2011 letter that it had opted against doing so. Id. ¶ 16. Nonetheless, the parties subsequently engaged in further negotiations to determine if they could find another way to work together to

develop Phase II. Id., ¶ 17. These negotiations produced a non-binding letter of intent setting forth the terms under which TIAA "would be willing to consider" entering a joint venture with K Street to develop Phase II. Defs.' Mot. for Summ. J. Ex. 20 at 1. The potential development of Phase II would involve the construction of 525 apartment units, 20,000 square feet of retail space, and associated parking structures. Id. Ultimately, however, TIAA decided not to proceed with Phase II development and conveyed that final decision in a December 9, 2011 letter to Ronald Cohen. CSOF ¶ 24; Defs.' Mot. for Summ. J. Ex. 23. The letter stated in pertinent part:

> In accordance with our internal processes for the evaluation of such business opportunities, the acquisitions team considered (i) the uncertainty of the tax credits to be awarded to the project; (ii) your non-responsiveness to our numerous requests for comments to the Development Agreement and Joint Venture Agreement; and (iii) the general sense that we were not getting all of requisite information to make an informed decision notwithstanding a multitude of requests for same, and we determined that it would not be prudent to proceed with this second phase of the development.

Defs.' Mot. for Summ. J. Ex. 23 at 1.

The parties dispute the underlying motivation for this decision and the scope of TIAA's discretion to make it. Id. TIAA argues that it was fully entitled to decline participation in Phase II under the right of first offer provision of the LLC Agreement. Defs.' Mot. for Summ. J. Ex. 9. TIAA also contends that K Street clearly recognized TIAA's discretion to decline to proceed with Phase II in an August 2010 affidavit submitted to the District of Columbia Zoning Commission by Ronald Cohen on behalf of K Street. Defs.' Mot. for Summ. J. Ex. 10. That sworn affidavit stated that K Street had failed to secure financial backing for Phase II of the development—a statement that would be false if TIAA was obligated to serve in this role. Id. at 12–13. By contrast, K Street asserts that an unwritten, overarching joint venture existed between the parties obligating TIAA to proceed with Phase II. Pls.' Opp'n. at 3–24. TIAA denies that any such joint venture existed. Defs.' Mot. for Summ. J. at 5–14. But even assuming a joint venture did exist at some point, TIAA

3

maintains that it was either superseded by the written instruments entered into by the parties or its terms were too vague to be binding. Id. at 14–17. K Street responds that one of these written instruments, the Letter of Intent, does not "disclaim that [TIAA has] any other relationship with [K Street], law, equity or otherwise," suggesting that TIAA still could have had an overarching relationship with K Street. Summ. J. Hr'g. Tr. 31: 5–10 (July 8, 2014). K Street thus alleges that TIAA's failure to proceed with Phase II constituted a breach of its fiduciary duty under the purported joint venture (Count I).

Approximately ten weeks after TIAA declined to participate in Phase II of the development, TIAA Union Place removed Union North as the Operating Member of Phase I—meaning that Union North would no longer serve as the day-to-day manager of the building. CSOF ¶ 43. Under Section 4.4 of the LLC Agreement, the Investor Member of the LLC could remove the Operating Member upon the occurrence of one or more specified "Removal Events." CSOF ¶ 26. TIAA identified two Removal Events to justify Union North's removal. First, a Removal Event has occurred under the Agreement "if Operating Member or any Affiliate of Operating Member . . . commingles funds derived from the Property with other funds, unless the misapplication or commingling was not intentional, the amount involved is not material, and Operating Member (or its Affiliate) promptly provides restitution thereof[.]" Defs.' Mot. for Summ. J. Ex. 9 § 4.4(a)(2). TIAA contends that K Street received and deposited into its own accounts a $190,744.70 tax rebate owed to Union Place, which K Street admits it has yet to pay back. Pls.' Opp'n at 27 ("the actual dollars for the tax rebate do still sit in a Cohen Management account"). Second, a Removal Event takes place under the Agreement if the Operating Member fails "to make any Additional Capital Contribution as set forth in Section 6.2[.]" Defs.' Mot. for Summ. J. Ex. 9 §4.4(a)(12).[2] TIAA

---

[2] Section 6.2 provides: "If and when decided by the Investor Member, Investor Member and Operating Member shall make Capital Contributions to the Company ('Additional Capital

4

maintains that Union North failed to make capital contributions towards the construction of a restaurant in the Loree Grand.  CSOF ¶ 43.  K Street contends that it was not required to return the tax rebate or make the capital contributions because it had made certain expenditures on its own for the benefit of the project which it claims were to be offset against monies owed to TIAA Union Place as part of a "true up" agreement between the parties.  CSOF ¶ 39.  Consequently, K Street alleges that Union North's removal as Operating Member constituted a breach of TIAA's fiduciary duty (Counts I and II), a breach of contract (Count IV), and a breach of the covenant of good faith and fair dealing (Count IX).

Finally, K Street alleges that TIAA Union Place's replacement of a construction loan from a third party with a higher interest loan from TIAA also constituted a breach of the covenant of good faith and fair dealing (Count IX).  TIAA responds that the LLC Agreement gave it broad discretion regarding major financial decisions, including the terms of company loans, and it replaced the loan due to legitimate concerns about its ability to truthfully reaffirm certain loan covenants in light of various instances of misfeasance by K Street.  This alleged misfeasance included using Phase I loan proceeds to pay Phase II property taxes in violation of the original loan agreement.  See Defs.' Mot. for Summ. J. at 32–35; CSOF ¶ 64.

Judge Wilkins, who previously presided over the case, dismissed several counts of K Street's amended complaint. Specifically, the Court dismissed Count III (Aiding and Abetting Breach of Fiduciary Duty—Defendant TIAA); Count V (Promissory Estoppel—All Defendants); Count VI (Unjust Enrichment—Defendants TIAA and TIAA-Union); Count VII (Tortious Interference With Business Relations—Defendants TIAA-Union and TIAA-CREF); and Count VIII (Tortious Interference With Business Relations—Defendant TIAA).  Order on Def. Partial Mot. to Dismiss Sept. 18, 2012.  Judge Wilkins also observed that the remaining counts appeared "weak"

---

Contributions') in proportion to their respective Capital Sharing Ratios." Id. § 6.2.

and unlikely to survive summary judgment or trial. Mot. To Dismiss Hr'g Tr. 22: 5–10, 25: 19–21, 32:1–4, Sept. 17, 2012.

The case was reassigned to this Court on April 7, 2014, after the submission of the briefing. The Court held a hearing on the motion on July 8, 2014.

**II.     Standard of Review**

A party is entitled to summary judgment if the pleadings and other materials in the record "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, [or] interrogatory answers" show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[A] material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on a particular claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions" and thus not appropriate functions for "a judge at summary judgment." Barnett v. PA Consulting Grp., Inc., 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting Pardo–Kronemann v. Donovan, 601 F.3d 599, 604 (D.C. Cir. 2010)). Yet, "[s]elf-serving testimony does not create genuine issues of material fact, especially where that very testimony suggests that corroborating evidence should be readily available." Brooks v. Kerry, No. 10–0646, 2014 WL 1285948, at *8 (D.D.C. March 31, 2014) (quoting Fields v. Office of Johnson, 520 F. Supp. 2d 101, 105 (D.D.C. 2007)). "Particularly in a case . . . where the non-moving party relies almost entirely upon her own generally corroborated statements in depositions, declarations, and interrogatory responses to create a genuine issue of material fact, the Court must carefully assess . . . whether 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id.

(quoting Liberty Lobby, 477 U.S. at 248); see also Gen. Elec. Co. v. Jackson, 595 F. Supp. 2d 8, 36 (D.D.C. 2009) (observing that when a "declaration is self-serving and uncorroborated" it is "of little value at the summary judgment stage").

**III.  Analysis**

A. The Existence of an Overarching Joint Venture

The formal documents and transactions in this case overwhelmingly establish that TIAA and K Street, two sophisticated parties represented by counsel, were not parties to an overarching joint venture when TIAA notified K Street that it would not be participating in the development of Phase II. The Court reaches this conclusion for three reasons. First, considerable documentary evidence supports TIAA's position that no overarching joint venture to develop Phase II existed in the first place, whereas K Street only offers self-serving and sometimes contradictory testimony to show otherwise. Second, even if the parties intended to create an overarching joint venture, its terms were too vague to be enforceable. And third, even if an enforceable joint venture existed, the LLC Agreement and the Letter of Intent demonstrate that TIAA terminated it at will.

i. The Formation of an Overarching Joint Venture

As the Court noted in deciding TIAA's motion to dismiss, it will analyze the joint venture claims under the law of the District of Columbia—the location of the property—but will also take guidance from Delaware law, which "is highly authoritative on matters of partnership, joint ventures, business relations, [and] corporations in general." Mot. To Dismiss Hr'g Tr. 20: 21–22: 16, Sept. 17, 2012. Under District of Columbia law,

> [a] joint venture is an association of persons with intent, by way of express or implied contract, to engage in and carry out a single business venture for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, without creating a partnership or a corporation, pursuant to an agreement that there shall be a community of interest among them as to the purpose of the undertaking, and that each participant shall stand in the relation of principal as well as agent as to

> each of the other coadventurers, with an equal right of control of the means
> employed to carry out the common purpose of the venture.

Geier v. Conway, Homer & Chin-Caplan, P.C., 983 F. Supp. 2d 22, 34 (D.D.C. 2013) (quoting United States ex rel. Miller v. Bill Harbert Int'l Const., Inc., 505 F. Supp. 2d 20, 30 (D.D.C. 2007)). Despite this somewhat amorphous and wide-ranging definition, in determining whether a joint venture exists, "the fundamental issue is one of intent." Fraser v. Gottfried, 636 A.2d 430, 432 (D.C. 1994); see also Washington Inv. Partners of Delaware, LLC, 28 A.3d at 578 ("[t]he 'intent' element of joint venture is well-established"). More precisely, "a joint venture 'turn[s] less on the presence or absence of legal essentials than on the intent of the parties gathered from their agreement, conduct, and the circumstances surrounding their transactions.'" Washington Inv. Partners of Delaware, 28 A.3d at 579–80 n.13 (quoting Beckman v. Farmer, 579 A.2d 618, 628 (D.C. 1990)).

Throughout its briefings and at the summary judgment hearing, K Street has made general allusions to an unwritten understanding or oral agreement between the parties—entered at an indeterminate time—that created an overarching joint venture obligating TIAA to participate in the development of Phase II. But the record of the parties' actual "agreement, conduct, and the circumstances surrounding their transactions"—reflected especially by the LLC Agreement, the Letter of Intent, and the Zoning Commission affidavit—reveal that K Street and TIAA did not manifest the requisite intent to form such an agreement.

The LLC Agreement provides that K Street could "elect[]" to proceed with "the development of Phase II," which would in turn trigger "the option" for TIAA Union Place to participate in the project as well. Defs.' Mot. for Summ. J. Ex. 9 § 4.14. Importantly, the plain language of this "right of first offer" provision gives K Street itself the option not to proceed, which, as TIAA argues, "is fundamentally incompatible with the contemporaneous existence of a

joint venture that allegedly obligated TIAA to proceed." Defs.' Mot. for Summ. J. at 9. K Street's President, Ronald Cohen, recognized as much in his deposition, agreeing that as of November 2010, K Street itself had "the option to develop or not develop." CSOF ¶ 7. The parties' conduct reflected the fact that neither side believed the LLC Agreement—or any other agreement—bound them to move forward with Phase II. Union North sent a letter to TIAA on November 3, 2010 "to determine [TIAA Union Place's] interest in moving forward and exercising [its] Right of First Offer," which would have been unnecessary had TIAA been bound to participate. Id. ¶ 12. As Cohen acknowledged in his deposition, TIAA could have rejected the offer to develop Phase II "[a]t that point," undercutting K Street's argument that the parties created an overarching joint venture years before, or that it continued to exist afterwards. Id. ¶ 7.

The Letter of Intent negotiated by the parties after TIAA rejected K Street's right of first offer proposal further illustrates that the parties never intended to form an overarching joint venture and were not in one at the time. The letter describes negotiations and *potential* terms of agreement concerning the formation of a joint venture to develop Phase II. Defs.' Mot. for Summ. J. Ex. 20. The letter specifically affirms, however, that "[i]t is expressly agreed by Cohen and TIAA that this letter of intent is non-binding on Cohen and TIAA, and *Cohen and TIAA will have no obligation to purchase, sell or form a venture with respect to the Property* prior to the execution and delivery by Cohen and TIAA of a written operating agreement[.]" Id. (emphasis added). This language could not be more clear. K Street has provided no persuasive explanation for why it signed a document explicitly disclaiming the formation of a joint venture regarding Phase II if an overarching joint venture already existed.

K Street argues that the *absence* of even more definitive language ruling out the overarching joint venture proves it could have existed. Summ. J. Hr'g. Tr. 31: 5–10, July 8, 2014. But when contract "language is clear and unambiguous, its plain language is relied upon in determining the

9

parties' intention." GLM P'ship v. Hartford Cas. Ins. Co., 753 A.2d 995, 998 (D.C. 2000) (quotation marks and citations omitted). Consistent with this principle, the District of Columbia Court of Appeals recently rejected an argument very similar to the one K Street advances. In Washington Investment Partners of Delaware, "counsel for [plaintiffs] conceded that . . . express language disclaim[ed] joint venture" but continued to contend that a joint venture had been formed. 28 A.3d at 579. The court concluded that "if [plaintiffs'] believed the parties' to be partners all along, it cannot explain why it signed an agreement clearly stating the opposite[.]" Id. The same reasoning applies here. A reasonable jury could not find a separate, unwritten joint venture agreement existed given the unambiguous language of the actual written document negotiated and signed by both parties.

Finally, the sworn affidavit submitted by Ronald Cohen to the District of Columbia Zoning Commission seeking a two year extension of a deadline to file a building permit for Phase II demonstrates that even Cohen believed TIAA was not bound to invest in the next stage of the project. Defs.' Mot. for Summ. J. Ex. 10. In one portion, Cohen reports that "[K Street has] engaged and met with a number of potential investors . . . none of whom have yet committed to financially backing Phase II[.]" Defs.' Mot. for Summ. J. Ex. 10 ¶ 3. In another, Cohen explained that "changes in economic conditions . . . have resulted in our inability to-date to secure project financing for Phase II," and reaffirmed in the same sentence that "we have been unable to secure financing for the approved project." Id., ¶ 5. While K Street asserts that the affidavit merely reflected that "in the absence of an established fair market value, price had not yet been definitively determined which would allow a firm 'financial' commitment," Pls.' Opp'n. at 13, the document's plain and repeated language proves otherwise. Cohen's statements in the affidavit itself go far beyond merely describing a delay in determining the fair market value of Phase II. No reasonable jury could square these statements, made under oath, with the contention that K Street had an

active, overarching joint venture with *any* financial partner for the development of Phase II, let alone one specifically with TIAA.

### ii. The Letter of Intent As Evidence of an Overarching Joint Venture

Even if the Court were to assume that the parties initially intended to form a joint venture, the language of the Letter of Intent—agreed to by both parties—demonstrates that their arrangement was not binding. "Determining whether documents or oral representations constitute an enforceable contract is a question of law[.]" Dyer v. Bilaal, 983 A.2d 349, 355 (D.C. 2009) (citing EastBanc v. Georgetown Park Assocs., 940 A.2d 996, 1002 (D.C. 2008)). In the District of Columbia, enforceable oral contracts "require both an agreement as to all the material terms and an objective manifestation of the parties' intent to be bound by the oral agreement." Strauss v. NewMarket Global Consulting Grp., LLC, 5 A.3d 1027, 1032 (D.C. 2010) (citation omitted). The "material terms (such as subject matter, price, payment terms, and duration) must be 'sufficiently definite' so that each party can be 'reasonably certain' about what it is promising to do or how it is to perform," and the "parties need to express their intentions so that a court can understand them, determine whether a breach has occurred, and identify the obligations it should enforce." Id. at 356 (citing Rosenthal v. National Produce Co., 573 A.2d 365, 370 (D.C.1990) (citation omitted)).

K Street argues that the negotiations surrounding the Letter of Intent reflected a binding agreement on all material terms. CSOF at ¶¶ 19–21. Yet the final version of the letter clearly identified its contents as non-binding and stated that "Cohen acknowledges and agrees that the terms and conditions of this letter of intent remain subject to review and approval by TIAA's required authorization procedures, and further inspection of the Property by representatives of TIAA." Defs.' Mot. for Summ. J. Ex. 20 at 2. In other words, Cohen's own understanding—as reflected by the letter he signed—was that TIAA was not bound to move forward with the

11

development of Phase II. This is hardly the type of objective manifestation of intent described by Strauss.

Nevertheless, K Street argues that a genuine issue of fact exists as to whether the letter reflected a binding agreement. Relying on Marine Engineers Beneficial Ass'n, Dist. Two v. Cunard Line Ltd., No. 91-0654, 1993 WL 141069, *1 (D.D.C. Apr. 19, 1993), it contends that sufficient evidence of a joint venture may be present despite "a sharp dispute regarding the nature of the parties' discussions." Pls.' Opp'n at 17–18. Marine Engineers is easily distinguishable. In that case, the Court emphasized the "clear testimony . . . that the parties had reached a binding agreement," particularly when "considered in light of the parties' 15–year prior course of dealings with each other." Id. This case, by contrast, lacks any clear testimony on the intent to form a joint venture, features a document signed by both parties disclaiming any binding agreement, and concerns the first and only instance of these two sets of parties working together. Summ. J. Hr'g. Tr. 44: 14–16, July 8, 2014.

### iii. The Termination of a Purported Overarching Joint Venture

As explained above, K Street lacks any competent evidence establishing the existence of an overarching joint venture with definite, binding terms. Even if K Street presented proof of such an arrangement, however, TIAA still would prevail because it disavowed any overarching agreement at several points in the parties' relationship.

In the District of Columbia, "there is very little law applicable to [a partnership] that does not apply to [a joint venture]." Jonathan Woodner Co. v. Laufer, 531 A.2d 280, 285 (D.C. 1987). The Supreme Court has observed that "[i]t is universally conceded that a contract of partnership, containing no stipulation as to the time during which it shall continue in force . . . may be dissolved by either partner at his own will[.]" Karrick v. Hannaman, 168 U.S. 328, 333-34 (1897). Several Delaware courts have held specifically that joint ventures are terminable at will. See, e.g.,

Sheppard v. Carey, 254 A.2d 260, 264 (Del. Ch. 1969) ("The relationship between joint venturers is terminated if one of them abandons the enterprise."); Pan Am. Trade & Inv. Corp. v. Commercial Metals Co., 154 A.2d 151, 154 (Del. Ch. 1959) ("a joint venture may be abandoned or rescinded in much the same manner as a partnership"). In this case, TIAA disavowed any unwritten, overarching joint venture obligating it to proceed with Phase II at three points, at the very least: (1) when it accepted the right of first offer provision of the LLC Agreement, which explicitly granted TIAA the option—but did not obligate it—to proceed; (2) when it subsequently rejected the right of first offer after K Street elected to move forward with developing Phase II; and (3) when it signed the Letter of Intent, which plainly disclaims any obligation on the part of TIAA to proceed with Phase II. No reasonable jury could find that sophisticated parties with the benefit of counsel intended to maintain an unwritten overarching arrangement that directly contradicts two formal documents on the same topic.

### B. TIAA's Removal of Union North as Operating Member

As noted previously, TIAA removed Union North as the Operating Member of Phase I based on two "Removal Events" enumerated in the LLC Agreement: (1) "commingl[ing] funds derived from the Property with other funds" and (2) failing "to make any Additional Capital Contribution" when called for by the Investor Member. Defs.' Mot. for Summ. J. Ex. 9 §4.4(a)(2), (12). K Street claims that TIAA Union Place's removal of Union North constituted a breach of fiduciary duty, breach of contract, and breach of the covenant of good faith and fair dealing.

#### i. Breach of Contract and of the Covenant of Good Faith and Fair Dealing

The LLC Agreement is governed by Delaware law. To succeed on a claim for breach of contract under Delaware law, "a party must prove the following three things: (1) the existence of a contract, whether express or implied; (2) the breach of an obligation imposed by that contract; and (3) the resultant damage to the plaintiff." VLIW Technology, LLC v. Hewlett-Packard Co., 840

A.2d 606, 612 (Del. 2003). The covenant of good faith and fair dealing is "a limited and extraordinary legal remedy . . . that requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." Nemec v. Shrader, 991 A.2d 1120, 1128 (Del. 2010) (internal citation omitted). Conduct can only form the basis of a breach of the covenant, however, if it is unauthorized by the contract, meaning "[t]he implied covenant only applies to developments that could not be anticipated, not developments that the parties simply failed to consider." Id. at 1126. For example, suppose a restaurateur enters into a contract to create restaurant A with an investor, but subsequently created restaurant B next door, cutting sharply into restaurant A's business. If the contract contained a general provision affirming the restaurateur's right to develop other restaurants in the same city, the investor could not sue for breach of the covenant of good faith, as the investor would have simply "failed to consider" the possibility of the restaurateur's actions, despite the fact that he could have anticipated them under the terms of the contract.

K Street simply has not provided any competent evidence that TIAA Union Place's removal of Union North as Operating Member pursuant to the clear terms of the Agreement constitutes a breach of contract or of the covenant of good faith and fair dealing. K Street's contentions that the conduct cited by TIAA to justify Union North's removal under the Agreement should be excused because of alternative arrangements that were never memorialized, or because of K Street's general allegations of underlying bad faith by TIAA, do not address the fundamental shortcoming of its claim: the absence of proof of any breach of the terms of the LLC Agreement itself.

Specifically, TIAA Union Place based the removal on two developments that clearly were contemplated by the parties, as they are covered Removal Events enumerated in the LLC Agreement. Defs.' Mot. for Summ. J. Ex. 9 § 4.4(a). First, K Street has acknowledged that it deposited certain tax rebates owed to the LLC into K Street accounts and still has not returned the

14

money. Pls.' Opp'n at 27 ("the actual dollars for the tax rebate do still sit in a Cohen Management account"); Summ. J. Hr'g. Tr. 37: 19 –39:12, July 8, 2014. Section 4.4(a)(2) describes "commingl[ing] funds derived from the Property" as a Removal Event, unless "the Operating Member (or its Affiliate) promptly provides restitution," which K Street has not done.[3] This alone justifies TIAA Union Place's decision to remove Union North under the plain terms of the LLC Agreement. Second, the parties agreed to build a restaurant in the Loree Grand. CSOF ¶ 48. Although the LLC Agreement required Union North to make 10 percent of all capital contributions, Defs.' Mot. for Summ. J. Ex. 9 § 6.2, Union North never provided the required funds for the construction of the restaurant, CSOF ¶ 54. This falls clearly within the Removal Event outlined in Section 4.4(a)(12): "the failure of Operating Member to make any Additional Capital Contribution as set forth in Section 6.2[.]"[4]

K Street makes two main arguments in response. First, K Street alleges that TIAA is using this rationale as a pretext to mask its true, bad faith motivations. Pls.' Opp'n at 34–35. Motive is irrelevant, however, in the absence of the essential elements of a breach of contract or of the covenant of good faith and fair dealing. The two grounds for removal offered by TIAA are clearly contemplated by the terms of the agreement that both parties signed. This means that the removal cannot be a "development[] that could not be anticipated," Nemec, 991 A.2d at 1126, and cannot

---

[3] Even if K Street had returned the money, if the amount were material—which a tax rebate of over $190,000 is in the context of this case—commingling the funds would still constitute a Removal Event. See Defs.' Mot. for Summ. J. Ex. 9 § 4.4(a).

[4] In their pleadings, K Street alleges that TIAA Union Place did not send proper notice regarding the capital contribution and thus Union North cannot be removed for failing to provide the required funds. Pls.' Opp'n. at 29. Yet, Alan Cohen asserted in an email to TIAA that plaintiffs "ha[d] already funded over our 10%," the proportion of the capital contribution required, Defs.' Mot. for Summ. J. Ex. 42, and Ronald Cohen admitted that plaintiffs technically owed the funds to TIAA, but preferred to negotiate an offset rather than pay in cash, R. Cohen Dep. 244:1–246: 18. After admitting it owed the funds and asserting, at the time, that it provided the funds, K Street cannot now plausibly maintain that it did not have notice.

wrongfully deprive Union North of "the fruits of the bargain," id. at 1128, since it involves executing the bargain to which Union North agreed. Second, K Street contends that it was not required to return the tax rebate or make the capital contribution because it made certain expenditures for the benefit of the project which were to be offset against monies owed to TIAA Union Place as part of a "true up" agreement between the parties. CSOF ¶¶ 46, 50, 54. After extensive discovery, however, K Street has not identified any competent evidence outside of its own deposition testimony to establish the existence of such a "true up" agreement, much less explain why it should supersede the clear terms of the detailed removal event provisions. See Summ. J. Hr'g. Tr. 38: 4 –39:12, July 8, 2014. Of course, K Street could have pursued a separate claim against TIAA Union North to recover its purported unilateral expenses, but the mere existence or possibility of these equitable claims does not release Union North from its explicit obligations under the LLC Agreement.

ii. Breach of Fiduciary Duty

Delaware courts largely do not permit fiduciary duty claims arising from the same operative facts as a parallel contract claim because to do so "'would undermine the primacy of contract law over fiduciary law in matters involving . . . contractual rights and obligations.'" Grayson v. Imagination Station, Inc., No. 5051-CC, 2010 WL 3221951, at *7 (Del. Ch. Aug. 16, 2010) (quoting Gale v. Bershad, No. 15714, 1998 WL 118022, at *5 (Del.Ch. Mar. 4, 1998)). One narrow exception exists: "[w]here there is an 'independent basis for the fiduciary duty claims apart from the contractual claims.'" Id. (quoting PT China LLC v. PT Korea LLC, C.A. No. 4456, 2010 WL 761145, at *7 (Del.Ch. Feb. 26, 2010)). Here, K Street's breach of fiduciary duty claim depends on the same conduct—Union North's removal as Operating Member—as its claims for breach of contract and breach of the covenant of good faith and fair dealing. Compare Compl. ¶¶ 38–42 with ¶¶ 49–53 and ¶¶ 80–83. All three claims request identical damages. See id. Since no overarching

16

joint venture existed between TIAA and K Street, there would be no other basis from which an independent claim could arise. Thus, the breach of fiduciary duty claim cannot survive independently of Union North's contractual claims related to the LLC Agreement.

K Street alleges the breach of fiduciary duty claim does not arise from the parties' contractual relationship; instead, according to K Street, "TIAA breached its [fiduciary] duty as a joint venturer by causing the removal of Union North[.]" Pls.' Opp'n at 39 n. 19. Yet, under District of Columbia law—which governs analysis of the alleged joint venture—"[t]o recover on a claim for breach of fiduciary duty, the plaintiff must prove by a preponderance of the evidence that a fiduciary duty existed between the parties, that the defendant violated that fiduciary obligation, and that the plaintiff suffered damages as a proximate result of the violation." Gov't of Rwanda v. Rwanda Working Grp., 227 F. Supp. 2d 45, 64 (D.D.C. 2002) (citing Landise v. Mauro, 725 A.2d 445, 450 (D.C. 1998)). Thus, even if TIAA did owe K Street a fiduciary duty, K Street must provide evidence sufficient for a reasonable jury to find that TIAA breached that duty. As detailed above, all of the competent evidence in this case points to the conclusion that TIAA Union Place reasonably exercised its rights in removing Union North as Operating Member. Without more than the conclusory allegations that K Street has provided, it cannot succeed on this claim.

      C.   The Construction Loan

Finally, K Street alleges that TIAA Union Place also breached the covenant of good faith and fair dealing by opting not to extend a construction loan for the Loree Grand from Westdeutsche ImmobilienBank AG ("WestImmo"). Compl. ¶¶ 77–79. As noted above, the covenant of good faith and fair dealing "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain," Nemec, 991 A.2d at 1128, but it "only applies to developments that could not be anticipated," id. at 1126. Section 4.1(b) of the LLC Agreement provides that

"[e]xcept for management of the routine, day-to-day affairs of the Company by Operating Member . . . all other decisions regarding the Company and its business, operations and assets ('Major Decisions') shall be made by the Investor Member alone." Defs.' Mot. for Summ. J. Ex. 9 § 4.1(b). It specifies further that these major decisions include "financing, refinancing," and "Company financial affairs," including the "determination of the terms and conditions of all Company borrowings and the identity of the Lender thereof, [and] any determination to amend any approved Loan Documents[.]" Id. The LLC Agreement also gives the Investor Member the discretion to require capital contributions, id. § 6.2, and outlines a very specific procedure to be followed "[i]n the event of a failure by any Member to contribute any . . . Additional Capital Contributions" required by Section 6.2, id. § 6.3.

The WestImmo loan required Union Place to recertify all of its original warranties and representations, including that "[a]ll financial statements and other information previously furnished . . . in connection with the Loan are true, complete and correct in all material respects[.]" Defs.' Mot. for Summ. J. Ex. 47 § 3.1(l). The loan lists default and foreclosure proceedings as potential penalties for a false warranty or representation. Id. §§ 19.1, 20.1. Among numerous other conditions, the loan states that the company "shall not commingle its funds and assets with those of any other Person," id., §15.2(q), which is precisely what K Street did with the tax rebates cited by TIAA Union Place when it removed Union North as Operating Member, Pls.' Opp'n at 27. As a result of this potential violation of the loan terms, the use of loan proceeds to pay Phase II property taxes when the original loan agreement only permitted paying property taxes for Phase I, see Defs.' Mot. for Summ. J. at 32–35; CSOF ¶ 64, and a number of other concerns with Union North's management of Phase I, TIAA Union Place determined that the "Company [wa]s unable to satisfy the conditions precedent to extending the term of the [loan]," and issued a capital call for replacement financing consistent with Section 6.3 of the LLC Agreement, CSOF ¶¶ 61–63.

TIAA contends it had full discretion to make this decision under the major decisions provision of the LLC Agreement. Defs.' Mot. for Summ. J. at 32. It further notes that the very existence of the detailed provisions for replacement financing illustrates that its actions could not constitute unanticipated developments. Id. at 34. K Street counters that, notwithstanding these provisions of the LLC Agreement, TIAA's refusal to extend the loan violated the separate indemnity and management sections of the LLC Agreement. Pls. Opp'n at 41–42. The indemnity and management provisions provide, respectively, that decisions made in bad faith are not indemnified, and that the parties are obligated "to use all commercially reasonable efforts to minimize Operating Expenses and maximize the Operating Revenues of the Property, in the best interest of the Company[.]" Id.

The Court finds that invoking a procedure explicitly contemplated by the parties' agreement in order to avoid the risk of default or foreclosure does not constitute bad faith or a commercially unreasonable decision sufficient to justify the extraordinary finding of a breach of the covenant of good faith and fair dealing. Deciding whether to extend one loan or to secure another clearly falls within TIAA Union Place's rights under the Agreement to make company decisions regarding the "determination of the terms and conditions of all Company borrowings and the identity of the Lender thereof, [and] any determination to amend any approved Loan Documents[.]" Defs.' Mot. for Summ. J. Ex. 9 § 4.1(b). K Street may not like TIAA's financial decisions, and it may have a legitimate quarrel with whether TIAA's chosen course was absolutely necessary. But it has not presented evidence that could convince a reasonable jury that TIAA acted in bad faith so as to warrant the "extraordinary" finding of a breach of the covenant of good faith and fair dealing.

## IV. Conclusion

For the foregoing reasons, the Court will grant TIAA's motion for summary judgment. The Court will issue an Order consistent with this memorandum opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: September 23, 2014